UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRIAN SMITH, individually and on behalf of all others similarly situated, | : : : | Case No. |
| Plaintiff, | : : | |
| vs. | : : | **CLASS ACTION COMPLAINT AND JURY DEMAND** |
| LIFEVANTAGE CORPORATION, DARREN JENSEN, JUSTIN ROSE, and RYAN GOODWIN, | : : : : | |
| Defendants. | : : | |

## I.  <u>INTRODUCTION</u>

1.      Plaintiff paid LifeVantage Corporation ("LifeVantage") over $1,000 to participate in the company's supposed business opportunity. However, the business opportunity was merely a pyramid scheme, designed to only make money for LifeVantage and a few top promotors at the expense of Plaintiff and people like him. Plaintiff brings this action to recover the money he lost as a LifeVantage "Distributor," an individual who paid LifeVantage for the right to work and participate in LifeVantage's "business model."  Darren Jensen, Justin Rose, and Ryan Goodwin (collectively, the "Individual Defendants," and with LifeVantage, the "Defendants") are LifeVantage's principals, and they are jointly and severally liable with LifeVantage for perpetuating a pyramid scheme.

2.      Pyramid schemes are engines of fraud in which participants pay money into the scheme and are rewarded based on bringing more paying participants into the scheme. The scheme company distributes the money to the participants, with the top recruiting promoters bringing in new participants receiving larger shares of the distribution. Because the money is distributed unevenly, because the scheme promoters keep a share for themselves, and because no

legitimate earnings from product sales rather than recruiting come in to the scheme, the majority of participants lose money.

3.    LifeVantage is nothing more than a pyramid scheme dressed up as a multi-level marketer (an "MLM") of dietary supplements. LifeVantage induces people to become Distributors with sales pitches promising wealth and business independence, and its marketing and compensation system encourages its Distributors to recruit others into the system with the same promises of wealth and business independence. Distributors pay money to participate in the business opportunity, which funds LifeVantage's payments and "bonuses" to other Distributors. Despite LifeVantage's claims of retail sales, little money comes in to the system from actual retail users of LifeVantage products disconnected from the business opportunity. The majority of its retail sales are monthly sales to its Distributors purchasing product in order to participate in the compensation system and remain eligible to receive bonuses. Distributors really can only make money by bringing in new Distributors - a classic pyramid scheme.

4.    LifeVantage and its corporate predecessors previously sold its products through traditional retail channels but found little commercial success. In late 2008, LifeVantage changed its business model from retail sales through traditional channels to the MLM model of sales through its Distributors. Unlike the money-losing retail-store model, the MLM model has been a great success for the company. Selling products alone was not profitable for LifeVantage, but selling false dreams of wealth and financial independence turned things around for the company. Under the MLM model, LifeVantage induced hundreds of thousands of people to pay money to participate in the business opportunity.  They in turn recruited others to do the same. The most successful recruiters, several of whom were entirely familiar with the tricks of the industry, were

handsomely paid for the recruiting under what LifeVantage calls "one of the more financially rewarding" compensation plans in the MLM industry.

5.      New recruits pay LifeVantage for the right to compete with its other Distributors. Each new recruit purchases an expensive product package, costing upwards of $1,000 and containing samples and other materials for their businesses. The new Distributors are told or strongly encouraged to agree to an automatic shipment program of $100 or more per month in product, secured by their credit cards, and to pay for "training" and other accoutrements of being a Distributor. Each new Distributor is placed in his or her recruiter's "downline," with a portion of their initial purchase being kicked "upline" to the recruiter and others up the chain. LifeVantage's MLM system further encourages Distributors to expend thousands of dollars in additional product purchases, event fees and expenses, and other miscellaneous fees.

6.      LifeVantage must operate as a pyramid scheme to turn a profit because its products—some of which are falsely advertised as remedies for various diseases—are snake oil and have no real medicinal or nutritional value. On its website, LifeVantage promotes itself as a "wellness and personal care company" founded on science-based health and skin care products. Its leading and most heavily promoted product is called "Protandim."  While LifeVantage touts Protandim's uniqueness, it is nothing more than a scientific-sounding brand name. It is not FDA approved and thus falls into the unregulated marketplace of homeopathic or "natural" remedies. In other words, Protandim is just another product similar to all the other trendy vitamins and supplements available on retail shelves (which are offered at a much lower price). Thus, LifeVantage must offer something more than just its products to make money. That something more is the false hope of financial prosperity through LifeVantage's MLM opportunity, *i.e.*, participation in an illegal pyramid scheme disguised as a legitimate business opportunity.

7.     The Fifth Circuit, sitting *en banc*, recently held that these types of multi-level marketing schemes are ideally suited for class certification. *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629 (5th Cir. 2016), *cert. denied*, 138 S. Ct. 76 (2017). Plaintiff seeks, on his own behalf and on behalf of a class of similarly situated persons, to recover from Defendants under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), federal securities laws, and various state laws.

## II.     THE PARTIES

### A.     PLAINTIFF

8.     Plaintiff, Brian Smith ("Smith"), is an individual residing in Avon, Connecticut. Smith created and runs the non-profit organization, Cancer Survivors Who Can Charities, Inc. Smith also owns a small film production company, Atlantian Films, which he formed to integrate cancer survivors into the workplace and provide them with a creative outlet.

9.     Smith was introduced to LifeVantage in 2016. He was approached by a LifeVantage Distributor who suggested that LifeVantage products would be helpful to the members of his cancer organization. Smith attended two LifeVantage meetings hosted by LifeVantage Distributors before enrolling as a Distributor. The meetings initially promoted the products with videos and phone-ins from "doctors," but then quickly moved to the "business opportunity" offered by LifeVantage and included phone-ins from LifeVantage's top-earning Distributors. Smith was shown the Compensation Plan Highlights and materials depicting the "income opportunities" and "financial freedom" that could be achieved by becoming a Distributor.

10.     Smith was only presented with the option to purchase three of the four "distributor enrollment packs" or "Product Packs"—the $1,200 Platinum Pack, the $600 Gold Master Edition Pack, or the $600 Gold Performance Edition Pack (in addition to the required

$50.00 "Start Kit"). He was not presented with the option to purchase the $300 Silver Pack, nor was he told that he could become a Distributor by merely purchasing the Start Kit. Rather, he was told that he was required to also purchase one of the Product Packs.

11.    Smith enrolled as a Distributor in March, 2016. He purchased the required Start Kit for $50, the $1,200 Platinum Pack, and signed up for an auto-ship of the LifeVantage product Protandim Nrf2. He decided to enroll as a LifeVantage Distributor because he was unable to work outside of his home at the time and he thought he could earn an income selling LifeVantage products, while also providing a benefit to the members of his organization.

12.    Smith did not fill out a Distributor application or sign-up though the LifeVantage website, but rather provided his credit card information to the LifeVantage Distributor who enrolled him without Smith ever signing—electronically or physically—an application. Smith was never shown the Terms and Conditions that LifeVantage purports bind their Distributors once they sign up and give LifeVantage their credit card information. Upon information and belief, it is common practice among LifeVantage Distributors to not show new recruits, like Smith, actual applications, but to obtain credit card information and fill in the paperwork on behalf of the new recruit.

13.    Smith was placed in the downline of Distributor Theresa Cannavo. He attempted to sell the product by promoting his LifeVantage website on social media, but quickly discovered that there were several other LifeVantage Distributors in his area attempting to do the same. No one contacted him about purchasing the products, and he did not sell any LifeVantage products to customers or enroll any Distributors.

14.    Smith cancelled his auto-ship after just eight (8) months. In addition to a growing realization that the "business opportunity" was a scheme to recruit others to become Distributors,

and not a means of obtaining commission on sales of a wellness product, Smith began to have concerns about the side effects of the products that he and other members of his organization were noticing. He was contacted by a cancer patient in Colorado who claimed that Protandim negatively affected their vision. He had given free bottles of Protandim to several people within his cancer organization who could not afford LifeVantage' s monthly rate, and was contacted by one of these persons who claimed to be experiencing the same negative vision effects. Smith became uncomfortable and started questioning the product testing touted by LifeVantage because, among other reasons, the test results advertised to Smith and other Distributors were devoid of independent studies or testing.

15.     In addition, he discovered that the ingredients in several LifeVantage products were mostly easily found herbs, such as turmeric, a well-known nfr2 activator. LifeVantage claimed to provide its own special blend and charged upwards of $50 a month for the products, claiming it was the special blend that caused nrf2 to occur.

16.     Even though he tried canceling the auto-ship, Smith received and was charged by LifeVantage for several product shipments he did not order. He struggled to return the unordered products and never received a full refund. To stop the unauthorized shipments and charges, Smith was forced to cancel his credit card. To this day, he still receives emails from LifeVantage about updating his credit card information and renewing his orders and distributorship. LifeVantage also told Smith that if he did not purchase their products, his membership would be terminated.

17.     During his time as a Distributor, Smith learned that: (1) he would have to recruit others to become LifeVantage Distributors in order to recoup the money he paid to become a Distributor, (2) he was required to make monthly purchases of Protandim products to get any

commissions and remain a Distributor, (3) it was nearly impossible for him to break even based on retail product sales alone, and (4) he would have to pay additional costs to attend meetings to learn the "selling secrets" of the top-earning Distributors. Had Smith been informed that the LifeVantage business opportunity was actually a pyramid scheme, he would not have purchased the Start Kit or Platinum Kit, or made any of the payments necessary to maintain his Distributor rights. Not surprisingly, Smith lost money as a result of being a LifeVantage Distributor.

      **B.**    **<u>DEFENDANTS</u>**

18.    Defendant LifeVantage is a Utah corporation headquartered in Sandy, Utah. LifeVantage originally incorporated in 1988 as a Colorado corporation under the name Andraplex. It changed its name to Yaak River Resources, Inc. in 1992, and again in 2004 to Lifeline Therapeutics, Inc. In October 2004 and March 2005, LifeVantage acquired all of the outstanding common stock of Lifeline Nutraceuticals Corporation, the wholly owned subsidiary that owns the patent rights to Protandim, and changed its name to LifeVantage Corporation in November 2006. LifeVantage markets and sells its products and distributorship opportunity in the United States, Asia, and Europe. The bulk of its sales and activities occur in the United States, where its revenue totaled over $158 million in 2016.

19.    Defendant Darren Jensen ("Jensen") is an individual believed to reside in Utah. Jensen is the Chief Executive Officer at LifeVantage. Jensen has more than 26 years of experience in the multi-level marketing industry holding positions with several other MLM companies including Jeunesse Global, Ampegy, Agel Enterprises, Amway and Nu Skin Enterprises before joining LifeVantage in May, 2015. Some of these companies have been sued for, or have settled claims of, operating an illegal pyramid scheme. Jensen is actively involved in promoting the LifeVantage scheme to potential recruits at LifeVantage events, through social media, and through his direction of LifeVantage's top promoters.

20.     Defendant Justin Rose ("Rose") is an individual believed to reside in Utah. Rose is the Chief Sales Officer at LifeVantage. Rose also has several years of experience in the multi-level marketing industry holding positions with companies including Shaklee Corporation, Nu Skin Enterprises, and Melaleuca before joining LifeVantage in July, 2015. Rose is actively involved in promoting the LifeVantage scheme to potential recruits at LifeVantage events, through social media, and by his direction of LifeVantage's top promoters.

21.     Defendant Ryan Goodwin ("Goodwin") is an individual believed to reside in Utah. Goodwin is the Chief Marketing Officer at LifeVantage. Goodwin directs all marketing communications and media initiatives at LifeVantage. Goodwin is actively involved in promoting the LifeVantage scheme to Distributors and potential recruits by providing training and tips to Distributors and potential recruits on how to market the LifeVantage business opportunity to others. Goodwin joined LifeVantage in August, 2015.

## III.    JURISDICTION AND VENUE

22.     LifeVantage is subject to the jurisdiction of this Court. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332(d). This Court has personal jurisdiction over each defendant. Defendants continuously and systematically engaged and engage in business in Connecticut. The Defendants do business as individuals, limited partnerships or limited liability companies in Connecticut. In accordance with 18 U.S.C. § 1965(a) and (b), all of the Defendants are subject to this Court's jurisdiction in that they "transact affairs" in the District of Connecticut. Advertising and/or promotional materials generated by LifeVantage have been disseminated for a period of years in, among other states, the State of Connecticut. Several LifeVantage Distributors have residences in Connecticut and perform ongoing promotional work on behalf of LifeVantage in Connecticut.

23.     LifeVantage operates its business in Connecticut, and a substantial part of the events or omissions giving rise to these claims occurred in this judicial district. Venue is proper in this Court pursuant to 28 U.S.C. §1391.

### IV.     FACTUAL BACKGROUND

### A.     LIFEVANTAGE AND ITS PRODUCTS

24.     The company currently known as LifeVantage has been around since 2003. "Protandim," LifeVantage's leading (and most promoted product for years) is a capsulated form of milk thistle, bacopa extract, ashwagandha, green tea extract, and turmeric extract, which LifeVantage promotes as "clinically proven to reduce oxidative stress in humans by 40% in 30 days. See, http://www.lifevantage.com/products/protandim-nrf2/.

25.     Protandim sales account for about 60% of the company's product sales. To improve sales, LifeVantage has consistently touted the uniqueness and science-based nature of itself and Protandim in multiple ways.

26.     First, LifeVantage claims in public filings with the Securities and Exchange Commission that it, "is a company focused on nutrigenomics, the study of how nutrition and naturally occurring compounds affect our genes. … We provide quality, scientifically validated products and a financially rewarding direct sales business opportunity to preferred customers, retail customers and independent distributors who seek a healthy lifestyle and financial freedom." (LifeVantage Form 10-K filing, 2016).

27.     Second, through various marketing materials including online videos, printed materials made available to Distributors and potential Distributors, and its website, LifeVantage implies that the United States Patent and Trademark Office ("USPTO") has granted LifeVantage approval on the efficacy of its "scientific" product. LifeVantage knows that the USPTO has no

power to approve the efficacy of any health claims made in a patent filing. Notwithstanding that, the LifeVantage patent disclosures state that a number of "natural" ingredients identified in studies as far back as the 1960's increase the "anti-oxidant potential" in "mammalian" cells, and list a Britannica-length list of diseases and ailments that its anti-oxidants will allegedly cure:

The compositions of the present invention are useful to promote healthful benefits as follows: relaxation; bone marrow and women's health (e.g., stabilizes fetus and regenerates hormones); mental function (e.g., memory and concentration); sexual function; diuretic; anti-inflammatory; anti-mutagenic agent; anti-cancer agent; cholagogueue; depurative; fumitory; hemostatic agent; hepatoprotective agent; lactagogue; stomachic; tonic; vulnerary; tissue healing (e.g.; wounds; skin; other connective tissues; lymph tissue; blood vessels; and mucous membranes); remove free radicals in the peripheral and/or cerebral vascular systems; and inhibit lipid peroxidation; improve cerebral blood circulation and to protect the nerves against damaging free radicals; protective against cell damage caused by chemotherapy and radiation therapy; to enhance immune function; and to protect against toxins (e.g., acetametaphen and other drugs; mercury; lead).

The compositions of the present invention are useful to prevent or treat the following disorders and diseases: memory loss; Parkinson's disease; aging; toxin-induced hepatotoxicity; inflammation; liver cirrhosis; chronic hepatitis; and diabetes due to cirrhosis; indigestion; fatigue; stress; cough; infertility; tissue inflammation; cancer; anxiety disorders; panic attacks; rheumatism; pain; manic depression; alcoholic paranoia; schizophrenia; fever; insomnia; infertility; aging; skin inflammations and disorders; alcoholism; anemia; carbuncles; convalescence; emaciation; IIIV; AIDS; immune system problems; lumbago; multiple sclerosis; muscle energy loss; paralysis; swollen glands; ulcers; breathing difficulties; inflammation; psoriasis; cancer (e.g., prostate cancer, lung cancer and breast cancer); pain; cardiovascular disease (e.g., arteriosclerosis and atherosclerosis); ischemia/reperfusion injury; anxiety; attention deficit disorder; leprosy; arthritis (e.g., psoriatic arthritis; ankylosing spondvlitis; and rheumatoid arthritis); hemorrhoids; tuberculosis; high blood pressure; congestive heart failure; venous insufficiency (pooling of blood in the veins; usually in the legs); sore throat; hepatitis; syphilis; stomach ulcers; epilepsy; diarrhea; asthma; burns; piles; sunburn; wrinkles; headache; insect bites; cuts; ulcers; sores; herpes; jaundice; bursitis; canker sores; sore gums; poison ivy; gastritis; high cholesterol; heart disease; bacterial infection; viral infection; acne; aging; immune disorders; dental caries; periodontitis; halitosis; dandruff; cardiovascular disease (e.g., hypertension; thrombosis; arteriosclerosis); migraine headaches, diabetes; elevated blood glucose; diseases of the alimentary canal and respiratory system; age-related physical and mental deterioration (e.g., Alzheimer's Disease and age-related dementia); cardiovascular disease; cerebral vascular insufficiency and impaired cerebral performance; congestive symptoms of premenstrual syndrome; allergies; age-related vision loss; depression; Raynaud's disease; peripheral vascular disease; intermittent claudication; vertigo; equilibrium disorder; prevention of altitude sickness; tinnitus (ringing in the ear); liver fibrosis; macular degeneration; asthma; graft rejection; and immune disorders that induce toxic shock; bronchoulmonary disease as cystic fibrosis; chronic bronchitis; gastritis; heart attack; angina pectoris; chronic obstructive pulmonary disease; kidney damage during coronary angiography; Unverricht-Lundborg disease; pseudoporphyria; pneumonia; and paracetamol hepatotoxicity

28.    <u>Third</u>, LifeVantage relies on Dr. Joe M. McCord's endorsement. In June 2011, LifeVantage announced Dr. Joe M. McCord's appointment as the company's first Chief Scientific Officer. McCord is considered the scientist behind Protandim and personally appeared at Distributor events to act as the chief scientific spokesperson. McCord's association with LifeVantage dates back to 2004 as a member of the initial management team and board member. McCord retired from LifeVantage in June 2013, but is still endorsed by LifeVantage as the leader behind the scientific efforts of LifeVantage products and used in the educational and marketing activities of LifeVantage.

29.    <u>Fourth</u>, LifeVantage pushes the "science" behind its products with its Science Advisory Board, or SAB, which consists of a network of doctors and veterinarians. LifeVantage claims that science is the foundation of its products and that SAB and its network of experts provide Distributors with "a broad, solid, foundation of peer reviewed research and patented products upon which [they] can build [a] LifeVantage business." LifeVantage Lab, Episode 7: Discussing our Science Advisory Board, found at https://www.youtube.com/watch?v=RnKmy6oqUG8.

30.    <u>Fifth</u>, LifeVantage established the LifeVantage Lab, which is a video series created by LifeVantage and available to the public online at its own website and various other sites, such as YouTube and <u>iTunes</u>. LifeVantage Lab is also used to promote the "science and research" behind its products and is yet another marketing tool used to legitimize its products to new Distributors and potential recruits with claims about its research studies and patents. In LifeVantage Lab, Episode 1, titled "Welcome to LifeVantage," Shawn Talbott, Chief Science Officer, claims:

> "Protandim is a patented formula that has been researched, tested, and evaluated by renowned universities and research institutions around the world. The

difference between Protandim and other antioxidant products, such as juices and vitamin supplements, could not be further apart. It's really the difference between taking antioxidants and making our own antioxidants. Making our own antioxidants is not only safer and more effective at protecting your body it is literally the future of science and medicine."

31.    Despite Defendants' marketing efforts, "Protandim" is nothing more than an everyday nutritional supplement with a scientific-sounding brand name. The actual claims granted by the USPTO in the patents that it touts are limited to a formulation of green tea and a few other ingredients together with common binders, and no patent claims were approved (nor could have been approved) that the formulations will cure any of the laundry-list of diseases that "Protandim" allegedly cures. The "clinical studies" touted by LifeVantage were either not performed on humans, or do not show any clinical usefulness in treating a disease of any kind. The products bearing the Protandim name are not FDA approved and thus fall into the unregulated marketplace of homeopathic or "natural" remedies where consumers are on their own with respect to efficacy and/or product safety.

### B.    OPERATIONAL HISTORY

32.    Originally, LifeVantage and its corporate predecessors tried to sell its products through traditional retail channels, but found little commercial success. Apparently, LifeVantage's marketing efforts and specious claims regarding Protandim's scientific and unique nature failed to spark consumer demand.

33.    After a series of financial losses over several years, LifeVantage turned to multi-level marketing in 2008. Unlike its laborious and money-losing store-shelf retail model, LifeVantage's MLM sales model convinced hundreds of thousands of people to become LifeVantage customers. But these customers were not paying for LifeVantage products; they were paying for the right to participate in LifeVantage's new business model.

### C.  **LIFEVANTAGE'S MLM MODEL IS REALLY A PYRAMID SCHEME**

34.    Pyramid schemes are a mechanism used to transfer funds from one individual to another.  They are illegal because they are structured in a way that incentivizes participants to grow their business by finding new participants with no incentive for retail sales. When the rewards are primarily based on selling the right to participate in the venture, rather than selling the merchandise, the revenue from the minimal sales of goods to consumers is insufficient to cover the marketing expenses and rewards promised for recruiting new participants, causing a collapse due to market saturation.   There is no natural market demand for the product sold by the scheme's promoters, resulting in little to no demand for the product beyond sales made internally to new recruits.  As the market for new distributors saturates, new distributors are left with unsellable, higher-than-market-price inventory and little to no chance to recoup their money from legitimate customers who actually want the product for itself.  The only market for the inventory, and the only opportunity to recoup the cost of maintaining the distributorship rights lies in recruiting another person. Pyramid schemes naturally funnel money to a small percentage of people at the top, money funded by the large base of distributors at the bottom.

35.    Pyramid schemes are held to be illegal in the United States. For example, the FTC uses the following test (from *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1181 (1975)) to characterize a pyramid scheme:

> [Pyramid] schemes are characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users.  In general such recruitment is facilitated by promising all participants the same 'lucrative' rights to recruit.

36.     The State of Connecticut also prohibits pyramid schemes. "The advertisement for sale…or the actual sale… of any …rights or privileges at a price … which is contingent upon the [recruitment] of prospective customers procured by the purchaser, or the [recruitment] of … rights or privileges, to other persons procured by the purchaser, is declared to be an unlawful practice rendering any obligation incurred by the buyer in connection therewith, completely void and a nullity." Conn. Gen. Stat. § 42-145.

37.     Well-recognized elements of a pyramid scheme, particularly in companies attempting to masquerade as a "legitimate" MLM company, are: (1) whether the entire scheme is more associated with recruiting other participants rather than selling the alleged product to outside customers; (2) whether sales are primarily made internally to new distributors rather than to outside customers; (3) whether there is a high dropout or "churn" rate among newly-signed distributors (indicating the reason why product was purchased was for the business opportunity to recruit others); (4) whether the scheme's promoters spread implied or express promises of great wealth or financial independence if one is to participate in the "business opportunity"; (5) whether the scheme's promoters cause distributors to load up on the product (inventory loading) in order to receive commissions; and (6) whether there is actual or incipient market saturation.

38.     The essential characteristic of a pyramid scheme is the compensation of participants primarily derived from participants' payments into the scheme and based on participants' recruitment of new participants into the scheme. Little outside money comes into the scheme. The participants, knowingly or not, feed off each other's money and are highly

incentivized to bring new participants into the scheme.[1]  LifeVantage's business model fits this description perfectly.

39.    To become profitable, LifeVantage created its own customer base by recruiting Distributors and requiring them to purchase LifeVantage's products in exchange for the right to participate in LifeVantage's supposed income-producing scheme, encouraging them to recruit other Distributors and to purchase ever more products, and redistributing the Distributors' money back to them. LifeVantage's focus is now on selling the LifeVantage program to recruits, not on selling LifeVantage's products to retail customers, and it successfully carries out this strategy by coupling its products with a dream of financial rewards through participation in the scheme.

### 1.    LifeVantage Requires Distributors to Pay Money to Participate.

40.    LifeVantage requires Distributors to constantly spend money to participate in the supposed business opportunity in multiple ways.

41.    First, an individual must "enroll" as a Distributor and purchase a Start Kit for $50, plus shipping and handling charges. Plaintiff Smith was presented with the LifeVantage business opportunity and paid money to LifeVantage for the right to sell LifeVantage products and to participate in the LifeVantage Compensation Plan.

42.    Second, in order to receive any bonuses, a Distributor must maintain a certain amount of "PV" every month. PV refers to the amount of product purchases for which the Distributor is directly responsible—the Distributor's personal purchases, purchases made by "Preferred Customers" signed up by the Distributor, and orders by retail customers. To be

---

[1] The dependence on the need to always find new recruits, means that a pyramid scheme's market will eventually collapse and thus new markets must be found where the "business opportunity" is not yet tapped out. Virtually all network sales companies that survive the initial two— or three—year (transient) sales rise, move sales internationally. LifeVantage has expanded and continues to expand internationally offering the business opportunity in Canada, Australia, Japan, Hong Kong, Mexico, Netherlands, Germany, Thailand, and the United Kingdom.

eligible for half bonuses, a Distributor must maintain 100-199PV every month. To be eligible for full bonuses, a Distributor must maintain at least 200PV every month. To be eligible for any bonuses and maintain "Distributor" status, 40PV must come from a Distributor's personal purchases.

43.    Third, in order to remain in "good standing," Distributors must pay an annual renewal fee.  The renewal fee amount is not disclosed to Distributors in the U.S. Independent Distributor Application and Agreement or the LifeVantage USA Policies and Procedures. (See **Exhibits A & B**).

### 2.    LifeVantage encourages the purchase of expensive Product Packs.

44.    Of course, the required purchases represent only a small portion of the money LifeVantage bilks from its Distributors. LifeVantage encourages Distributors to purchase expensive Product Packs when they first sign up, and its MLM system and Compensation Plan encourage Distributors to purchase ever more unneeded and otherwise unwanted product to move up in, or sustain their positions in, the LifeVantage business plan.

45.    When Distributors sign up, LifeVantage encourages them to purchase Product Packs in addition to a "Start Kit."  The Product Packs contain a variety of LifeVantage product samples, LifeVantage event tickets, mobile technology to assist Distributors with building and managing their business, and/or Pro Audio Series CDs and enrollment in the program, which includes presentations from LifeVantage leaders. The LifeVantage Distributor Application offers several Product Pack options: the Platinum Pack at $1,200.00, the Gold Master Edition Pack at $600.00, the Gold Performance Edition Pack at $600.00, and the Silver Pack at $300.00.

46.    LifeVantage Distributors encourage new recruits—just like Plaintiff—to purchase the Platinum or Gold Packs to become a Distributor under the Compensation Plan so that they

can have more "success" and receive better "training" with the more expensive Product Packs rather than enrolling as a Distributor by only purchasing the required $50 Start Kit.

47.    In written form, the Independent Distributor Application Enrollment Pack options may look like this:



48.    In addition to the various Product Packs, LifeVantage encourages Distributors to sign up for automatic shipment of products. LifeVantage promotes auto-ship as a way for Distributors to meet their monthly PV requirements:



49.    Plaintiff Smith enrolled in the monthly auto-ship programs and the Pro Audio Series weekly auto-ship. He did so in reliance on the representations and/or omissions made in the Compensation Plan and presentations by LifeVantage and found on its website that such purchases would be advantageous to his business.

**3.    The LifeVantage Compensation Plan Disproportionately Rewards Distributors for Recruiting Other Participants into the Program.**

50.    Two key aspects of LifeVantage's Compensation Plan encourage Distributors to recruit new Distributors and to purchase product: rankings and bonuses. The higher a Distributor ascends in the LifeVantage ranks, the more types of bonuses he or she is theoretically eligible for. Ascension in the ranks depends upon the recruiting and the amount of product purchased by the Distributor and his or her "downline."   In addition, the size of bonuses depends upon the amount of product purchased by a Distributor's downline.

51.    On the other hand, LifeVantage provides little incentive for Distributors to generate retail sales to ultimate users. Distributors may sell the products for more than they pay LifeVantage for the products, but this compensation is negligible compared to the potential compensation tied to recruiting.

### a.    The ranking system encourages recruiting and product purchases.

52.    The amount of a Distributor's bonus is determined in part by the Distributor's rank. The higher the Distributor's rank, the more types of bonuses the Distributor is eligible to receive, and the greater the potential bonus. The LifeVantage Compensation Plan provides twelve ranks: Pro 1-Pro 10, Executive, and Presidential. (See **Exhibits C** and **D,** Compensation Plan Highlights and Compensation Plan).

53.    Ascending the ranks depends upon a Distributor's monthly PV, monthly OV (the product purchased by junior Distributors), the number of "legs" in the Distributor's organization (the number of directly junior Distributors), and the distribution of OV across the legs. The first five rows of the chart below summarize the ranking requirements:

| Royalty Commission (dynamically compressed) | | | PREMIER | | | ELITE | | | MASTER | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **PAID AS RANK** | Pro 1 | Pro 2 | Pro 3 | Pro 4 | Pro 5 | Pro 6 | Pro 7 | Pro 8 | Pro 9 | Pro 10 | Executive | Presidential |
| Minimum Monthly PV [4] | 100 | 100 | 100 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Minimum Monthly OV | 1,000 | 2,500 | 5,000 | 10,000 | 20,000 | 50,000 | 100,000 | 200,000 | 500,000 | 1,000,000 | 2,000,000 | 5,000,000 |
| Minimum Leg Req. | 1 | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 3 | 4 | 5 |
| Maximum % per Leg | 100 | 80/20 | 80/20 | 80/20 | 60/30/10* | 60/30/10* | 60/30/10* | 60/30/10* | 60/30/10* | 40/40/20 | 40/40/10/10 | 40/35/10/10/5 |
| UNILEVEL 1st | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% |
| 2nd | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| 3rd | | 9% | 9% | 9% | 9% | 9% | 9% | 9% | 9% | 9% | 9% | 9% |
| 4th | | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| 5th | | | | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| 6th | | | | | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| 7th | | | | | | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| 8th | | | | | | | 5% | 5% | 5% | 5% | 5% | 5% |
| 9th | | | | | | | | | 2% | 2% | 2% | 2% |

| | Enroller | Gen 1 | Gen 2 | Gen 3 | Gen 4 | Gen 5 |
|---|---|---|---|---|---|---|
| **30% Generational Matching Bonus** [6] | YOU → | you earn 10% → | you earn 5% → | you earn 5% → | you earn 5% → | you earn 5% |

Earn a 10% match of all personally enrolled Distributor's Royalty Commissions generated from their downline sales. Earn 5% on generations 2, 3, 4, and 5 of personally enrolled Distributors Royalty Commission generated from their downline sales. To qualify for the generational matching bonus, you must have 200 PV in new purchase volume from Preferred Customers, Distributors or Retail Customers during a calendar month and 200 PV. [6]

**4% Elite Pool** 4% of total commissionable sales paid to qualified Pro 7 through Master Distributors.

Pro 7, 8, 9 & 10 share 1%    Pro 8, 9 & 10 share 1%
Pro 9 & 10 share 1%    Pro 10 Executive Presidential share 1%

(1) At least 40 PV must come from personal product purchases. The remaining PV can come from purchases made by Personally enrolled Preferred Customers and Retail Customers
(2) Receive a 30% or 40% Smart Start Bonus on all product purchased by new personally enrolled Distributors and Preferred Customers within their first calendar month, up to 1,000 CV. Product packs are available for purchase by both Preferred Customers and Distributors. Start Kits are sold separately and are required to begin your distributorship.
(3) "Paid Rank" is defined by the most recently completed and closed monthly commission period. You must have 200 PV to earn this bonus which may come from selling product to Preferred Customers, Retail Customers AND at least 40 PV in personal product purchases.
(4) Minimum monthly PV requirements may come from Preferred Customers, Retail Customers AND at least 40 PV in personal product purchases.
(5) 10% of the OV requirement must come from the equivalent of a third leg.
(6) Earn the full Generational Matching Bonus by being 'paid as' Pro 3 or higher and by maintaining a minimum of 200 PV, at least 40 of which must come from personal product purchases. The remaining PV can come from purchases made by personally enrolled Preferred Customers and Retail Customers. If your PV is between 100-199, you will earn half of the Generational Matching Bonus.
* The LifeVantage Compensation Plan is unique. Any charts, illustrations and stated examples of income under the plan are potential in nature and not based on the actual performance of any individual.

©2016 LifeVantage Corporation - 9785 S. Monroe St., Ste. 300, Sandy, UT 84070 - USA - 866.460.7241 - lifevantage.com
This form may not be altered without the express written consent of LifeVantage.

16111020106
Revised 11/07/2016

54.    The requirements for rank ascension encourage recruiting and product purchases. Maintaining monthly PV explicitly requires personal product purchases. Attaining OV levels encourages recruiting (because the more Distributors recruited, the more persons who will be buying product and contributing to OV) and personal product purchases (because personal purchases count toward OV). Maintaining sufficient legs obviously encourages recruiting, as does the percentage OV requirements across the legs, because not only do the ranks require multiple legs (after Pro 1), but also enough legs must be sufficiently active.

**b.    The bonuses encourage recruiting and product purchases.**

55.    The LifeVantage Compensation Plan includes bonuses and rewards that pay based on recruiting and product purchases by Distributors:  the Smart Start Bonus, the Launch Bonus,

Royalty Commissions, the Generational Matching Bonus, the Elite Bonus Pool, the Rank Achievement Bonus, and the My LifeVenture Program.

### i.      **Smart Start Bonus.**

56.     The Smart Start Bonus is paid weekly to Distributors who personally enroll new Distributors or Preferred Customers into their organization. A Distributor who has 200PV will earn a 40% bonus of the product volume for each Silver, Gold, or Platinum Pack purchased by a newly enrolled Distributor (a Distributor with a PV of 100-199 will earn 30% rather than 40% on all newly enrolled Distributor and Preferred Customer initial purchases). Thus, a Distributor with 200PV who personally enrolls a new Distributor that purchases a Platinum Pack will earn $400, $200 on all new Distributors that purchase a Gold Pack, and $100 on all new Distributors that purchase a Silver Pack. In this way, the Smart Start Bonus encourages recruiting (because there is no bonus without a new enrollee), pressuring new enrollees to buy the most expensive product Packs (because the bonus is based on the cost of the Pack), and product purchases by the Distributor receiving the bonus (because the amount of the bonus depends on the Distributor's PV).

57.     The Smart Start Bonus will also pay 40% to a Distributor for all personally enrolled "Preferred Customer" initial purchases. A Preferred Customer is a customer who enrolls in LifeVantage's monthly autoship program and receives a selection of LifeVantage products automatically each month at the discount wholesale pricing or Distributor cost.   Although Distributors receive some compensation for signing up Preferred Customers, at every turn the Compensation Plan incentivizes a Distributor to push a prospective enrollee to become a Distributor because enrolling a Distributor increases the ability of a Distributor to grow his or her business and receive even more bonuses, while enrolling a Preferred Customer cannot lead to vertical growth (since Preferred Customers cannot enroll new Distributors).

ii.      **Launch Bonus.**

58.    The LifeVantage Launch Bonus pays the first qualified Pro 3 or 4 Distributor above the enrolling Distributor $50 for each Platinum Pack purchased (or $25 for each Gold Pack Purchased and $12.50 for each Silver Pack Purchased). The same Pack purchased will pay up the line for another $50 to the next qualified Pro 5 or 6, then another $50 to the next qualified Pro 7, 8, or 9 upline, then $25 to the first qualified Pro 10, $15 to the first qualified Executive, and $10 to the first qualified Presidential Ranked Distributor upline. For example:



59.    The LifeVantage Launch Bonus thus incentivizes Distributors to recruit new Distributors because with more junior Distributors, the likelihood of earning a Launch Bonus increases. The Launch Bonus also encourages senior Distributors to encourage their junior Distributors to engage in recruiting, so the senior Distributor can earn a Launch Bonus.

### iii.    Royalty Commissions.

60.    Royalty Commissions are paid monthly and are based on the Distributor's rank and products purchased by junior Distributors (other than initial Product Pack purchases, which are bonused via the Smart Start Bonus). As the Distributor ascends in the ranks, the Distributor may receive Royalty Commissions based on more junior Distributors' purchases. A Distributor can only achieve multiple levels in their business organization by recruiting additional Distributors to the scheme. The more directly junior Distributors recruited by a Distributor, the more opportunity there is for that Distributor to develop a long leg that will allow him to receive Royalty Commissions from more junior Distributors. The chart produced after paragraph 53, above, sets forth the details of how Royalty Commissions are paid.

### iv.    Generational Matching Bonus.

61.    The Generational Matching Bonus is paid monthly to Distributors based upon the Royalty Commissions of a Distributor's organization. A Distributor must be qualified as a Pro 3 Rank or higher in order to receive the Generational Matching Bonus. A Distributor will earn 10% of the commissions earned by all of that Distributor's personally enrolled Distributors' Royalty Commissions, 5% of the Royalty Commissions of the Distributor's personally enrolled distributors' Distributors (2nd Generation), and 5% of the Royalty Commissions of each the 3rd Generation, 4th Generation, and 5th Generation Distributors' Royalty Commissions.

62.    The Generational Matching Bonus motivates Distributors to recruit new Distributors because the receipt of the bonus depends upon the existence of junior Distributors. In addition, to receive a Generational Matching Bonus, Distributors in Pro Rank 3-6 must incur 100 in new volume by a new Distributor, Preferred Customer, or Retail Customer in the month the Generational Bonus is to be awarded, which also encourages recruiting. (At Pro Rank 7 and higher, this new volume requirement is waived.)

63.     The Generational Matching Bonus encourages Distributors to recruit new Distributors rather than Preferred Customers or Retail Customers because the bonus payout is based upon vertical levels that can only be achieved with the enrollment of additional Distributors. Preferred Customers and Retail Customers do not count for vertical advancement. The following excerpt from the Compensation Plan describes the Generational Bonus:



### v.     <u>Elite Bonus Pool.</u>

64.     The Elite Bonus Pool is paid monthly to the Distributors that maintain a qualified Elite Level Rank of Pro 7 or higher. 4% of all total commissionable sales is placed in the "Elite Bonus Pool" and divided into four shares. Pro 7s earn one share of the 1% Pro 7 Pool, Pro 8s earn one share of the Pro 7 Pool and one share of the Pro 8 Pool, Pro 9s earn one share of the Pro 7 Pool, Pro 8 Pool, and Pro 9 Pool, and Pro 10s earn one share each of the Pro 7, Pro 8, Pro 9, and Pro 10 Pool. See for example:



65.    The Elite Bonus Pool motivates Distributors to recruit other Distributors into the scheme because an individual cannot achieve the Elite Ranks without enrolling Distributors who then enroll the next round of Distributors, and so on. Moreover, the more Distributors a Distributor recruits, the greater the amount of total commissionable sales.

**vi.    <u>Achievement Bonuses</u>.**

66.    The LifeVantage Achievement Bonuses are paid to Distributors that reach the highest "Master" Ranks. A Master Pro 10 is eligible to receive a $100,000 Achievement Bonus, An Executive Master Pro 10 is eligible to receive a $250,000 Achievement Bonus, and a Presidential Master Pro 10 is eligible to receive a $500,000 Achievement Bonus. To receive the Achievement Bonuses, the Distributor must remain qualified at the Master Rank and remain "actively engaged" and in good standing and be recognized on stage at a major event, *i.e.* motivate other Distributors to continue recruiting participants by providing misleading money-making representations. In fine print, LifeVantage discloses that the Master Pro 10 Achievement

Bonus is paid out over 12 months and the Presidential and Achievement Bonus is paid out over a period of 24 months and only in the months that the Distributor achieves the qualified Rank.

67.    The Achievement Bonuses encourage Distributors to remain in the LifeVantage program, to recruit, and to maintain their PV requirements.

### vii.    <u>The My LifeVenture Program</u>.

68.    LifeVantage also offers Distributors awards through its "My LifeVenture" program where LifeVantage's top-performing Distributors are rewarded for recruiting other product-purchasing Distributors with select LifeVantage branded Jeeps, Harley Davidson motorcycles, ATV's, or other luxury toys, vacations, or shopping experiences. (See **Exhibit E,** My LifeVenture).



*        *        *

69.    Thus, the entire focus of the Compensation Plan, which ultimately controls the payouts to Distributors, is recruitment and product purchases by Distributors. Just like a classic pyramid scheme, Distributors are required and encouraged to pay their own money into the scheme and recruit others who will do the same.

### 4.    Little of Distributors' Compensation Comes From Retail Sales.

70.    As stated above, Distributors are required to continually purchase product to maintain their Distributor status and receive the highest level of commissions. While it is theoretically possible for Distributors to sell the products they purchased from LifeVantage for a profit, they do not in reality for a variety of reasons. First, the retail sale of LifeVantage products has already been deemed a failure. They are everyday nutritional products that LifeVantage itself could not profitably market as retail products, which is exactly why LifeVantage became an MLM in the first place.

71.    Second, LifeVantage knows that recruiting—not retail sales—is what makes money for LifeVantage and consequently it incentivizes distributors to recruit. In a 2009 publicly filed report with the Securities and Exchange commission LifeVantage acknowledged that recruiting Distributors is the key to success and product sales, not retail customers:

> [L]ike most network marketing companies, we are likely to experience high turnover among independent distributors from year to year. Independent distributors who join to purchase our products for personal consumption or for short-term income goals may only stay with us for a short time. Independent distributors have highly variable levels of training, skills and capabilities. ***As a result, in order to maintain sales and increase sales in the future, we need to continue to retain independent distributors and recruit additional independent distributors. To increase our revenue, we must increase the number of and/or the productivity of our independent distributors.*** (Emphasis added).

72.    Third, since recruiting is the lifeblood of its business model, LifeVantage has little interest in retail sales and no reason to incentivize them. If LifeVantage cared about retail sales, it would have some way to track them, such as by requiring all retail sales to be made through

the LifeVantage website. LifeVantage's bonuses and compensation structure could then by tied to the distributor's verifiable retail sales. But instead, LifeVantage sells its products to the Distributors and has no meaningful ability to verify that Distributors are actually making retail sales.

73.     <u>Fourth</u>, LifeVantage restricts Distributors from selling the products in the only fora where Distributors could reasonably expect to sell enough products to make a meaningful profit:  e-commerce sites. Similarly, LifeVantage prohibits Distributors from selling products in brick-and-mortar stores:

> LifeVantage strongly encourages the retailing and selling of its products through person-to-person contact. In an effort to reinforce this method of marketing and to help provide a standard of fairness for its Independent Distributor base, Independent Distributors may not display or sell LifeVantage products or literature in any retail establishment.

*See* **Exhibit B,** Policies and Procedures ("P&P"), Section 10/1—Commercial Outlets. LifeVantage Distributors are strictly prohibited from selling products through online retailing outside of the Distributor's own LifeVantage website and brink-and-mortar stores so Distributors can make their pitch in person and encourage what LifeVantage is really interested in—hooking potential customers on LifeVantage's "business opportunity."

74.     <u>Fifth</u>, Plaintiff's own experience, and the experience of other LifeVantage Distributors with whom he has spoken, indicates that selling LifeVantage products at retail for a profit is extremely difficult and not a significant source of income.

75.     <u>Sixth</u>, LifeVantage's sales are directly correlated to the number of new recruits, who are the real customers of LifeVantage. From the time LifeVantage transitioned to a MLM model and launched its network marketing sales channel, LifeVantage's sales per year grew proportionately with the number of Distributors and stay consistently around a 2:1 ratio of Preferred Customers to Distributors. LifeVantage's own numbers show that the revenue from

product sales to Preferred Customers is insufficient to cover the promised rewards to Distributors for recruiting new participants (numbers taken from LifeVantage's Company filings available at https://www.sec.gov/).

| | Sales Per Year | Preferred Customers Per Year | Independent Distributors Per Year |
|---|---|---|---|
| 2007 | $5,050,988 | | |
| 2008 | $3,200,174 | | |
| 2009 | $4,141,304 | | More than 2,000 |
| 2010 | $11,478,460 | | |
| 2011 | $38,919,000 | 35,000 | 16,000 |
| 2012 | $126,183,000 | 119,000 | 46,000 |
| 2013 | $208,178,000 | 138,000 | 67,000 |
| 2014 | $213,968,000 | 128,000 | 68,000 |
| 2015 | $190,336,000 | 115,000 | 65,000 |
| 2016 | $206,540,000 | 117,000 | 69,000 |

76.     But even the above numbers for Preferred Customers are inflated. LifeVantage unilaterally demotes Distributors to Preferred Customers if they have not bought a product for three months. So, most of LifeVantage's Preferred Customers are just really reclassified Distributors who quit purchasing product and were demoted from LifeVantage's so called business opportunity.

77.     The overwhelming majority of funds used to compensate Distributors comes not from retail sales, but from sales to other Distributors and Distributors' payments to LifeVantage

for things such as required product purchases, Start Kits, Product Packs, Renewal Fees and the like. Thus, Distributors are primarily feeding off each other, just as in a classic pyramid scheme.

### 5. The Vast Majority of Distributors Lose Money.

78. Despite his best efforts to succeed, Plaintiff lost money from his participation in LifeVantage. And data provided by LifeVantage shows that, like Plaintiff, most Distributors lose money. LifeVantage's own Compensation Summary provides the following chart:

## July 1, 2016 through June 30, 2017

| Paid Rank | Total Annual Earnings | Monthly Average | Monthly Minimum | Monthly Maximum | Average % of Paid Distributors as a % of Total Distributors |
|---|---|---|---|---|---|
| DISTRIBUTOR | $1,731,282 | $13 | $0 | $9,440 | 40% |
| PRO 1 | $3,427,754 | $79 | $0 | $3,331 | 18% |
| PRO 2 | $6,484,651 | $261 | $0 | $13,610 | 9% |
| PRO 3 | $6,679,706 | $580 | $0 | $9,060 | 5% |
| PREMIER PRO 4 | $8,300,754 | $1,193 | $0 | $14,724 | 2% |
| PREMIER PRO 5 | $7,924,772 | $2,551 | $0 | $18,718 | 1% |
| PREMIER PRO 6 | $8,263,390 | $5,858 | $2 | $23,950 | <1% |
| ELITE PRO 7 | $5,678,802 | $11,292 | $224 | $32,214 | <1% |
| ELITE PRO 8 | $6,256,421 | $22,889 | $6,375 | $77,525 | <1% |
| ELITE PRO 9 | $4,336,764 | $42,641 | $16,498 | $66,955 | <1% |
| MASTER PRO 10 | $4,592,237 | $99,828 | $57,058 | $124,920 | <1% |
| EXECUTIVE MASTER PRO 10 | $1,993,294 | $110,739 | $85,258 | $154,854 | <1% |

The earnings of the Distributors in this chart are not necessarily representative of the income, if any, that a Distributor can or will earn through the LifeVantage Compensation Plan. Distributors' success will depend on individual diligence, work effort and market conditions. LifeVantage does not guarantee any income or rank success.

79. This chart is based on gross earnings to Distributors. The numbers do not account for the Start Kit, Product Packs, or Renewal Fees each Distributor paid. Nor does this chart account for the money Distributors paid LifeVantage to purchase product.

80. The Compensation Summary makes clear that most of the money paid out by LifeVantage is given to a very small number of people. Of the $65,669,827 of funds paid to

Distributors, $47,346,434 (or 72%) is paid to less than about 4% of all Distributors—the ones at the very top of the LifeVantage pyramid.

81.     The Compensation Summary also makes clear that almost all of the remaining 94% of Distributors lose money. They are left to split the remaining approximately $18,323,393 in funds, which averages out to about $298 per Distributor. Obviously, $298 per year does not go far in LifeVantage, especially after Starter Kits and Product Packs ($50 to $1,200), renewal fees, and monthly-required-product purchases (at least $40 per month) are made.[2]

82.     All of the Defendants know that new Distributors are doomed to lose money. The Individual Defendants have the Compensation Summary as well as the records for each Distributor showing that only a small percentage make a profit.

### C.     THE INDIVIDUAL DEFENDANTS ORCHESTRATE LIFEVANTAGE'S PYRAMID SCHEME

83.     LifeVantage's principals are intricately involved in promoting and maintaining LifeVantage's pyramid scheme. They promote and decide how LifeVantage is run and marketed. In short, they orchestrate the fraud.

84.     The Individual Defendants also reassure new Distributors and potential recruits of the legitimacy of the scheme. Defendant Jensen, CEO at LifeVantage, speaks often at LifeVantage events, has a noticeable social media presence, and works collaboratively with several of the top earning promoters. Defendant Rose, Chief Sales Officer at LifeVantage, also speaks at events and offers advice to new distributors and potential recruits on "how to be

---

[2] LifeVantage had 14,500 out of 60,000 (or 24% of) Distributors who never received any compensation from LifeVantage. These Distributors necessarily received less from LifeVantage than they paid LifeVantage because every Distributor at least purchased a Starter Kit or paid a Renewal Fee. Moreover, because of the income incentives discussed above, most purchased products to maintain Distributor status and make bonuses. Consequently, another 40% of Distributor likely lost money since they only made an average of $13 per month. Assuming these Distributors purchased enough LifeVantage product to stay eligible as a Distributor (about $40), they also lost money.

successful just like anyone else in this industry that is successful." [3] Defendant Goodwin, the Chief Marketing Officer at LifeVantage, can be found in numerous videos available to the public online giving advice on how to use LifeVantage's technology and build a business.

85.    The Individual Defendants also manage the LifeVantage Field Advisory board, or FAB. The FAB assists LifeVantage by explaining and promoting the LifeVantage opportunity to other Distributors, discusses business plans, and is actively involved in carrying out and orchestrating the scheme. The FAB is an exclusive group and functions with the LifeVantage top promotors to conduct and orchestrate the scheme.

### D.    LIFEVANTAGE, WITH THE SUPERVISION OF THE INDIVIDUAL DEFENDANTS, PROMOTES THE PYRAMID SCHEME THROUGH MISREPRESENTATIONS

86.    Pyramid schemes lure in recruits with the notion that Distributors can get rich quick. Although the get-rich-quick promises are often accompanied by small print disclaimers in the company's "official" written materials, LifeVantage and its "Top Achieving" promoters message is loud and clear:  vast riches await people "just like you" who "work" the system, *i.e.,* try to sell product and recruit others to join the pyramid beneath them in their "downlines."  Even though LifeVantage and the Individual Defendants know almost all new recruits are doomed to lose money (as discussed above), the illusion of easily "obtainable" wealth is spread through LifeVantage materials and numerous individual accounts on Facebook, YouTube, and Twitter, associated with the LifeVantage "opportunity."

87.    LifeVantage and the Individual Defendants claim that paying LifeVantage fees and buying its products will allow Distributors access to a lawful program of "unlimited earning potential:"

---

[3] *See* https://www.youtube.com/watch?v=kCowftf3PE0.



88.    To sell the financial-success promise, Defendants tout the wealth of the few insiders at the top of the pyramid as examples of the riches that await new Distributors. This false image of lawfully achievable financial success is the bedrock of LifeVantage's business and the reason why people become Distributors. The top promotors consistently tout the financial advantages of LifeVantage's scheme.

89.    Defendants' spread the myth that LifeVantage presents a duplicable image of success in numerous ways. First, LifeVantage's Top Achievers are listed by rank on its website and www.lvnmedia.com. The websites provide links to "inspirational" videos, stories, and other tools by the top ranked Distributors on how new Distributors can achieve success too.

90. <u>Second</u>, Distributors and potential recruits can hear other "inspirational" stories from the top earners on how they became successful at the LifeVantage Academy. The Academy supposedly gives Distributors and recruits the "tools" for them to duplicate the success of the top-earning Distributors.

91. <u>Third</u>, LifeVantage acknowledges new top-ranked Distributors at its events so that the newly enrolled Distributors or potential recruits can witness the "achievable" success.

92. <u>Fourth</u>, newly enrolled Distributors are asked to participate in daily, weekly, and monthly calls and events or "trainings" where they are able to listen to LifeVantage's Elite and Master Ranked Distributors provide advice, tools, and strategies to build their business.

93. <u>Fifth</u>, the concept of duplication is reinforced by LifeVantage's self-styled "Proven Plan," which provides recruits with scripts and business tools "proven" to "assist a [Distributor] on the path to success and eventually become a Master Distributor."  For example:

## BUSINESS TRAINING: OUR PROVEN PLAN

At LifeVantage, we are here to support you every step of the way as you work to create and live the life you've always dreamed of.

We are here with you as you build your LifeVantage business and as you embark on your journey of personal development of helping yourself and others find financial freedom.

We have created a proven system that will assist you on the path to success and to eventually become a Master distributor.

The idea is simple. When you grow, we grow.

Providing you with the advanced tools, ongoing support, and daily motivation you need to get started is just the beginning. With proven science, amazing products, and a sure-fire plan, there's no telling how far we can go together.

Your Start Kit has all the tools you need to not just start your business, but to launch your business in your first thirty days.



94. But any claim or suggestion that LifeVantage offers Distributors a route to financial success—much less at the level attained by LifeVantage's top performers—is false. These blatant misrepresentations were all made as part of a coordinated strategy so that all Distributors were presented with the same or similar misleading statements regarding the financial prosperity attainable through LifeVantage. Obviously, as made clear in LifeVantage's own Compensation Summary, Defendants know that almost all Distributors will lose money and that the vast majority of money distributed by LifeVantage only goes to a small percentage of Distributors.

95. To make matters even worse, many of LifeVantage's "Top Achievers" are known professional recruiters in the industry and used as marketing tools to promote the earning

potentials to new recruits. Beginning in 2009, when it embarked on the pyramid-scheme marketing model, LifeVantage brought in a number of professional recruiters to act as LifeVantage's "Top Earning" Distributors. These individuals were inserted into the top ranks of the pyramid and hired to act as the faces and spokespersons behind the scheme. These individuals actively participate in the scheme and assist in the function of the enterprise by: (1) participating in and speaking at LifeVantage events; (2) participating in daily/weekly/monthly calls; (3) actively promoting the scheme via social media and in numerous videos publicly available online; (4) creating and disseminating training guides and "how to" advice for recruiting and building a business; and (5) creating the general impression of unlimited earning potential. Unbeknownst to the average Distributor or potential recruit, their recruiters are not average Distributors; they have been given special bonuses, payments, rank status, and other preferential treatments that enabled them to "achieve" their "success."

96.    In addition to making false claims regarding the financial prosperity Distributors may attain, Defendants make false claims regarding the lawful nature of LifeVantage's scheme. For example, Defendant Rose has gone to great lengths to assure Distributors that LifeVantage is different than other MLMs found to be pyramid schemes, like Vemma.[4]  Additionally, the company in its Form 10-K recognizes that recruiting-based compensation plans in MLM companies are illegal:

> Direct selling activities are regulated by the FTC, as well as various federal, state and local governmental agencies in the United States and foreign countries. These laws and regulations are generally intended to prevent fraudulent or deceptive schemes, often referred to as "pyramid" schemes, which compensate participants primarily for recruiting additional participants without significant emphasis on product sales. The laws and regulations often:

---

[4] https://www.youtube.com/watch?v=nhgymaxWy8g.

• require us or our distributors to register with governmental agencies;

• impose caps on the amount of commission we can pay;

• impose reporting requirements; and

• require that we ensure, among other things, that our distributors maintain levels of product sales to qualify to receive commissions and that our distributors are being compensated primarily for sales of products and not primarily for recruiting additional participants.

97.     What LifeVantage does not tell potential Distributors and new Distributors like Plaintiff is that LifeVantage's compensation system is precisely structured in the fraudulent and deceptive ways its own SEC filing describes. Its Distributors are rewarded primarily in return for recruiting others into its scheme rather than providing incentive for retail sales of its products – a structural certainty to collapse since the revenues from actual sales to actual consumers not associated with LifeVantage cannot cover the promised rewards for recruiting new participants.

## E.     LIFEVANTAGE OPERATES A PYRAMID SCHEME DESPITE ITS SMOKESCREEN POLICIES

98.     As discussed above, just like in a classic pyramid scheme, LifeVantage requires and incentivizes its Distributors to pay it money for the opportunity to receive compensation from LifeVantage and incentivizes its Distributors to recruit new people into the scheme. And, as in a classic pyramid scheme, the majority of Distributors' compensation comes from contributions to the scheme made by other Distributors and not from legitimate operations (*i.e.*, retail sales).

99.     Recognizing that its business bears all the traits of a pyramid scheme, LifeVantage has adopted two policies in an effort to avoid the pyramid scheme label without changing its business practices:  (1) the 70% certification; and (2) two refund policies. Each of

these are mere smoke-screens designed to obscure the fact that LifeVantage is a pyramid scheme.

### 1.    The 70% certification requirement is a sham.

100.    LifeVantage requires Distributors to be able to certify that at least 70% of products previously purchased were sold or consumed by the Distributor (the "70% Requirement"):

> By placing a new product order, an Independent Distributor is deemed to have certified that he or she has sold or consumed at least 70% of all products purchased in prior orders.[5]

101.    The Federal Trade Commission ("FTC"), in a well-known decision referred to as the *Amway* decision, determined that an MLM might avoid the pyramid scheme label if its distributors actually sold to retail customers or consumed 70% of the products they purchased.[6] LifeVantage plainly had the *Amway* decision in mind when it adopted the 70% requirement.

102.    Because LifeVantage does not track retail sales, LifeVantage has no way to determine if a Distributor has complied with the 70% Requirement. Regardless of the 70% Requirement, Distributors routinely purchase more product than they need for personal consumption or to meet retail sales demand.

### 2.    The refund policies do not prevent the conclusion that LifeVantage operates a pyramid scheme.

103.    LifeVantage offers two refund policies, but neither of these prevent the conclusion that LifeVantage operates a pyramid scheme. First, LifeVantage allows Distributors to return product within 30 days of purchase (the "**30-Day Refunds**").[7] The products must be

---

[5] Exhibit B, Section 11.3 P&P.
[6] *In the Matter of Amway Corp., Inc.*, 93 F.T.C. 618 (1979).
[7] Exhibit B, Section 13.1 P&P.

unopened, undamaged, and submitted for a refund within 30 days of purchase.[8] Second, LifeVantage allows Distributors to return all unopened product purchased within one year of purchase, but Distributors must resign from LifeVantage at the time they make the returns (the "**Resignation Refunds**").[9]

104.    LifeVantage's refund policies are inadequate to prevent the conclusion that LifeVantage is a pyramid scheme. As discussed above, the essential reasons why LifeVantage is a pyramid scheme are that it (a) requires and incentivizes Distributors to pay money to participate in the Compensation Plan, (b) emphasizes and rewards recruiting over product sales, and (c) primarily compensates Distributors with other Distributors' money. Only a complete and entire refund policy would impact the first reason why LifeVantage operates a pyramid scheme, and no refund policy can impact the second and third reasons why LifeVantage operates a pyramid scheme.

105.    LifeVantage's refund policies do not affect the conclusion that LifeVantage requires and incentivizes Distributors to pay money to participate in the Compensation Plan.

106.    First, both refund policies are limited in time, so Distributors who purchased product outside the 30-day and one-year windows cannot receive refunds.

107.    Second, they are limited to a return of unopened product.

108.    Third, they provide no protection for Distributors who sold the product for less than the wholesale price, who gave away product in an effort to recruit new Distributors, or who consumed product they never would have purchased absent the incentives in the Compensation Plan.

---

[8] *Id.*
[9] *Id.* at 13.3.

109.    <u>Fourth</u>, the 30-Day Refunds do not apply to either Starter Kits, Product Packs, or Annual Fees, and the Resignation Refunds do not apply to Annual Fees.

110.    <u>Fifth</u>, Distributors must resign before they are eligible for Resignation Refunds. Far from protecting Distributors, the requirement that Distributors resign punishes Distributors who have purchased more product than they need. Eligibility for Resignation Refunds requires Distributors to give up their places in the LifeVantage compensation structure, which LifeVantage has encouraged the Distributors to achieve through hard work, recruiting, and product purchases.

111.    <u>Sixth</u>, both refund policies, and certainly the Resignation Refund policy, put the Distributor at risk that LifeVantage will invoke the 70% Requirement to reduce any unpaid bonuses. The return of product necessarily means that the Distributor did not consume or sell at least that much product. LifeVantage threatens its Distributors that if it learns that a Distributor did not actually sell or consume 70% of the products the Distributor purchased:

> Failure to comply with this [70% R]equirement or falsely representing the amount of product sold or consumed in order to advance in the Compensation Plan constitutes a breach of the Agreement and is grounds for termination. Furthermore, a breach of this requirement entitles the Company to recover any commissions paid to the Independent Distributor for any period of time during which such documentation is not maintained or for which the provision has been breached.[10]

Moreover, a Distributor might fear that a Resignation Refund could result in threatened or actual litigation by LifeVantage to recover previously paid bonuses.

**F.    CLASS ACTION ALLEGATIONS**

112.    Plaintiff brings this suit as a class action pursuant to the FED. R. CIV. P. 23(b)(2) and (3) individually and for a class tentatively defined as:

---

[10] *Id.* at 11.3.

> All purchasers of the LifeVantage "business opportunity" (the "Class"). Excluded from the Class are all persons named as a Defendant (or a spouse of a Defendant or a related entity of Defendant) and any purchaser who has not experienced a financial loss as a result of their LifeVantage Distributor enrollment.

113.    Smith's claims are typical of the claims of the class in that he paid money to become a Distributor and lost money as Distributor. Smith will fairly and adequately represent the interests of the class because his claims are typical of those of the class and his interests are fully aligned with those of the class. Smith has retained attorneys who are experienced and skilled in complex class action litigation, including in class action pyramid scheme litigation.

114.    Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.

115.    The Defendants have acted on grounds that apply generally to the class, *i.e.*, running a pyramid scheme, so that class-wide damages, final injunctive relief, or corresponding declaratory relief is appropriate respecting the class as a whole.

116.    This case presents questions of law or fact common to class members that predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. (FED. R. CIV. P. 23(b)(3)).

117.    The questions of law and/or fact common to the class, include but are not limited to the following:

> a.    Whether the Defendants were operating an unlawful pyramid scheme;

b.    Whether the Defendants encouraged or required class members to pay money to LifeVantage for the illusory "right" to sell LifeVantage products;

c.    Whether the Defendants engaged in acts of mail and/or wire fraud when operating the unlawful pyramid scheme;

d.    Whether Defendants violated federal securities laws; and

e.    Whether the Defendants caused injury to the business or property of class members and, if so, the amount thereof.

118.    These and other questions of law and/or fact that are common to the class predominate over any questions affecting only individual class members. No element of establishing liability requires individualized proof.

119.    A class action under Fed. R. Civ. P. 23(b)(3) is superior because:

a.    No class member has an interest in individually controlling the prosecution of his/her/its separate action. No class member can be expected to incur the cost of attorneys' fees and cost to recover their $1,200, $600, or $300 Enrollment Pack plus other payments to become a Distributor and maintain Distributor status.

b.    There is no other pending litigation over these issues.

c.    It is manifestly desirable to concentrate the litigation of the class's claims in Connecticut and this district.

d.    The Court will encounter no difficulties in managing this case as a class action.

### V.    CLAIMS FOR RELIEF

### COUNT ONE

### VIOLATION OF 18 U.S.C. §§ 1961(5), 1962(c)
### AGAINST ALL DEFENDANTS

120.    Plaintiff and the class repeat and re-allege every allegation above as if set forth herein in full.

121.    Section 1962(c) of the RICO statute makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate . . .

commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).

122.    RICO requires that a "person" violate its provisions. 18 U.S.C. § 1962(c-d). A RICO "'person' includes any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). A RICO person can be either an individual or a corporate entity. Each Defendant is a RICO person because each is an individual or entity capable of holding a legal or beneficial interest in property.

123.    A RICO "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact, although not a legal entity." 18 U.S.C. § 1961(4). All of the Defendants in this action (and non-party top-earning Distributors) collectively form an enterprise.

A.    **THE RICO ENTERPRISE**

124.    LifeVantage and its top-earning Distributors have acted as an "association-in-fact" enterprise for the common purpose of engaging in a particular fraudulent course of conduct -- the establishment and perpetuation of an unlawful pyramid scheme in which hundreds of thousands of people have lost money.

125.    The association-in-fact enterprise has a longevity sufficient to permit those associates to pursue the enterprise's purpose of establishing and perpetuating the unlawful pyramid scheme. The "association-in-fact" began in 2009 when LifeVantage transitioned to a network marketing sales channel and began selling its products through a network of independent Distributors.  The association-in-fact continues to today.

126.    LifeVantage and its top-earning Distributors have maintained relationships between and among each other (and nonparties) in order to effectuate the unlawful scheme. The operation and management of the association-in-fact enterprise was generally led, at various

times, by LifeVantage's principals (named as Defendants) and some of the top-earning Distributors.

127.    In 2009, LifeVantage "purchased" a number of the top promoters in the industry and entered into various side agreements or addendums to their Distributor agreements. LifeVantage paid these individuals to associate with LifeVantage as LifeVantage's "top earners." These top earning promoters were given preferential rank status in the LifeVantage compensation plan and paid accordingly.

128.    LifeVantage attempts to legitimize its business by making an earning claims statement available on its website and by adding "earnings not typical" disclaimers to some of its marketing materials. The earnings statement claims it "is intended to provide truthful comprehensive information regarding the income earned by LifeVantage Distributors," but this claim is false. While the numbers might actually reflect the correct percentages (grim in themselves since less than 3% of all LifeVantage Distributors make it to the Premier ranks or higher), the amounts listed for the top Elite and Pro ranks are not truthful because they do not disclose the fact that these Distributors are able to achieve the earnings listed because they have been given preferential placement, volumes, bonuses and other rewards that are not offered or available to the average Distributor.    These top earning Distributors are the faces behind LifeVantage's "you can do it, too" motto, but no one else could do what these top earning Distributors did, because only they were inserted into the top of the compensation structure.

129.    LifeVantage's principals are also intricately involved in and used to reassure new Distributors and potential recruits of the legitimacy of the scheme by personally appearing and speaking at LifeVantage events and through online videos disseminated to Distributors.

130.    Several of LifeVantage's top earning Distributors work together and have created teams to provide training and materials to new Distributors and potential recruits. For example: http://www.teamheart.net/, Team Heart's main web page, which is password protected to only those that join the team, offers earning guides, training academies, and weekly calls to its members. Team Heart's "elites" are Pro 7 Distributors Kelly McCoy, Lisa Panton, Tanis MacDonald, Charlotte Venter, Pro 9 Distributors Rachel Jackson and Tara Wilson, and Executive Master Pro 10 Distributor Carrie Dickie.

131.    In addition to the numerous events and trainings that LifeVantage offers to its new Distributors and potential recruits, LifeVantage offers incentive trips and retreats to Distributors as a reward for achieving certain ranks. LifeVantage and its top professional promoters plan, participate in, and/or attend these incentive trips. The incentive trips are another way that LifeVantage and the top professional promoters motivate Distributors to recruit others into the scheme. For example, on its website, LifeVantage promotes a Summit event to Distributors that achieve a Pro 5 rank:

> Premier Pro 5 Summits are held for emerging LifeVantage leaders in the United States, Mexico, Canada, Australia, Netherlands and United Kingdom. This once-in-a-lifetime experience includes two days of training and networking and is available to every distributor who meets the qualifications. The Premier Pro 5 Summit will teach distributors the fundamentals of business building at a key LifeVantage rank. Distributors will learn what they need to know to take their business to the next level while preparing them to be among the next generation of LifeVantage leadership.

132.    LifeVantage also promotes pictures from past trips and events to incentivize new Distributors and potential recruits. For example:



133.    Defendants also use social media to attract potential recruits and motivate new Distributors to enroll additional Distributors. LifeVantage creates and directs the materials that are shared on social media.

134.    LifeVantage has also created mobile applications for Distributors, which offer training materials, assist with sharing the business opportunity on social media, and provide other tools for a Distributor to manage their business. For example:



**LV MOVE**

LV Move is our exciting new platform to train your field. Automatically guide your new distributors through prospecting, receiving their first order, and signing up their own distributor with scripts and hands-on learning. Additionally, LV Move helps you develop your own ability to mentor and champion your team.



**LV SHARE**

LifeVantage Share makes managing your social media a breeze. Expand your reach on Facebook, Twitter, Pinterest and Instagram by sharing curated photos, videos and articles with your prospects. You can even schedule posts ahead of time, or let LV Share determine the best time for you to share content.



**LV PRO**

Our new Pro App gives you real-time access to your business on the go. Now you can easily share videos, send texts or email prospectors from anywhere. Sign-up your enrollers, order new product or marketing materials, and view up-to-date business qualifications, all from the palm of your hand.



**TAXBOT**

It's like having your own mini accountant that lives in your pocket. Except that would be weird, so it's an app. Replace that shoebox of crumpled receipts – just snap a picture and let the app do the work. You can import chosen transactions from your bank, print off beautiful accounting and tax deduction reports, even track your business mileage with the GPS in your smartphone. Also includes access to videos and articles guaranteed to increase your tax refund!

135.    LifeVantage and its top professional promoters also provide coaching and influence new Distributors and potential recruits through the Pro Audio Series, a collection of recordings by the top earners offering inspiration and advice on how to successfully build a LifeVantage business and the perks of becoming a Distributor.

### B.    ALL DEFENDANTS ARE "EMPLOYED BY OR ASSOCIATED WITH" THE RICO ENTERPRISE

136.    Under Section 1962(c), a defendant must be "employed by or associated with" the RICO enterprise. Section 1962(c) operates equally to both "insiders" and "outsiders" who participate directly or indirectly in the conduct of the enterprise's affairs through a pattern of racketeering activity. All Defendants are employed by or associated with the enterprise.

137.     All Defendants conduct and participate in the operation and/or management of the pyramid scheme through a pattern of racketeering activity by conducting the affairs and supporting the acts of the pyramid scheme. The Defendants control and direct the websites, web presentations, events, sponsored conventions and speeches, the dissemination of videos marketing the LifeVantage business opportunity, and other individual promoters. Defendants, therefore, have an ascertainable structure separate and apart from the pattern of racketeering activity.

138.     The top earning professional promoters (not named as defendants) are also "employed by or associated with" each other and the remaining Defendants for purposes of RICO. They conduct and participate in the operation or management of the pyramid scheme through a pattern of racketeering activity, by conducting the affairs and supporting the acts of the pyramid scheme. They receive payments and benefits for operating at or near the top of the "downline" pyramid, engage in wholesale recruiting, communicate regularly with LifeVantage regarding personal appearances at recruiting conventions, operate websites that induce innocent people to engage in the illegal pyramid, and cooperate with LifeVantage to lend their names to promotional materials, and make false statements. While appearing as ostensible "independent" Distributors for purposes of convincing innocent recruits to join the "business opportunity," each of them takes direction from and is in contact with each other and LifeVantage

### C.     ALL RICO "PERSONS" ARE DISTINCT FROM THE RICO "ENTERPRISE"

139.     RICO requires the involvement of a RICO "enterprise." 18 U.S.C. § 1964 (a-d). An "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18

U.S.C. § 1961(5). The enterprise itself is not the liable entity, rather it is the RICO person who conducts the affairs of the enterprise through a pattern of racketeering activity.

140.    LifeVantage, its principals, and the non-named top earning professional promoters described in this complaint are distinct from each other and distinct from the enterprise. LifeVantage is distinct from the RICO enterprise because it is functionally separate, performs different roles within the enterprise and uses its separate legal incorporation to facilitate the racketeering scheme. For example, LifeVantage operates legally in part by selling its products to consumers without operating as a pyramid scheme. The LifeVantage principals— Defendants Jensen, Rose, and Goodwin—are distinct from the enterprise because each operates in a managerial capacity for the corporation and each is simultaneously aware that a significant portion of the corporation's activity is illegal in order to facilitate the racketeering activity, i.e., the pyramid scheme. Similarly, each of the non-named top earning professional promoters are distinct from one another and distinct from the enterprise. Each operates as a separate legal entity, indeed, each is formally not an employee but an independent contractor by the express terms of the LifeVantage agreement each signs. Each are aware of the scheme and willingly participate in it (by way of, for example, appearing in ads, and obtaining payments outside the Compensation Plan in order to masquerade as an "average" promoter), and maintains a separate legal presence, often using an incorporated company to receive payments. The actual separation between the company and these people/entities serves the function of convincing people like Plaintiff and the class that they too can become successful in legally selling the product.

**D.    THE DEFENDANTS ENGAGED IN ACTIVITIES THAT AFFECT INTERSTATE AND FOREIGN COMMERCE**

141.    The pyramid scheme has operated in the United States and in Canada, Australia, Japan, Hong Kong, Mexico, Netherlands, Germany, Thailand, and the United Kingdom. All of the Defendants have engaged in activities that affect interstate and foreign commerce.

**E.    THE DEFENDANTS PARTICIPATED IN THE CONDUCT OF THE ENTERPRISE'S AFFAIRS**

142.    Each of the Defendants conducted, or participated directly or indirectly, in the conduct of such enterprise's affairs. LifeVantage participated in the operation of the enterprise because it provided the host entity for the pyramid scheme. LifeVantage directed the enterprise's affairs through its website, videos, events, compensation plan, and by directing the Defendant Distributors and other top-earning Distributors. Defendants Jensen, Rose, and Goodwin participated in the conduct of the enterprise because each of the individuals directed the operations of LifeVantage, specifically the events, the marketing and communications, and directed the top-earning professional promoters, who participated in the conduct of the enterprise because they directed recruiting calls, directed Distributors in their downline with scripts and "tools" on how to be successful recruiters, and directed Distributors in their downline through videos, social media, and at LifeVantage events on how to market the LifeVantage "business opportunity."

**F.    THE DEFENDANTS ENGAGED IN A "PATTERN OF RACKETEERING ACTIVITY" OVER AN EXTENDED PERIOD OF TIME WITH A THREAT OF REPETITION INTO THE FUTURE**

143.    RICO requires a "pattern of racketeering activity." A "pattern of racketeering activity" is one that is performed by at least two acts of racketeering activity, or violations of a "predicate" offense (an act "indictable under any of" certain provisions of" 18. U.S.C. § 1961 (1) (D)). *See* 18 U.S.C. § 1961(5). A "pattern of racketeering activity" can be a past conduct that by

its nature projects into the future with a threat of repetition. It can also be conduct over a closed period through a series of related predicates extending over a substantial period. Both of these apply here.

144.    The pattern of racketeering activity is well established and has continued from 2009 to the present and intends to continue into the future. LifeVantage has taken every imaginable step to sell the pyramid program to actual innocent people who were targeted as Distributors. With each new person recruited, the Defendants increase the value of their control of the pyramid scheme. The Defendants have stated their intentions to continue to grow the pyramid throughout the United States, and have expanded internationally. It is certain that their conduct is a continuing threat due to their racketeering activities.

G.    **DEFENDANTS HAVE USED AND CAUSED TO BE USED FRAUDULENT MAIL AND WIRE COMMUNICATIONS IN INTERSTATE COMMERCE, 18 U.S.C. §§ 1341 AND 1343**

145.    Mail and wire fraud are enumerated predicate acts that can constitute RICO "racketeering activity" under Section 1961(1)(D).

146.    Mail fraud occurs when an individual devises a plot to defraud and subsequently uses the mail in furtherance of it. 18 U.S.C. § 1341. The Defendants have transmitted, caused to be transmitted or invited others to transmit material, by mail or private or commercial carriers, such as UPS, for the purpose of executing their scheme or artifice to defraud in violation of RICO. Likewise, Defendants distributed by UPS (mail) to many individuals literally hundreds of thousands or millions of pieces of promotional literature, statements, checks, and other mailings all between 2009 and the present. Without limitation, each statement sent monthly to a Distributor is a mailing and an act of mail fraud, and each promotional literature sent by U.S. Mail is a mailing and an act of mail fraud.

147.    Wire fraud occurs when an individual devises a plot to defraud and subsequently uses wire means in furtherance of it. 18 U.S.C. § 1343. The Defendants have used the Internet since 2009 to disseminate, publish and spread the pyramid scheme throughout the United States and other foreign markets for the purpose of executing their scheme or artifice to defraud in violation of RICO. Thus, it transmitted, caused to be transmitted and invited others to transmit, by means of wire in interstate commerce, writings, signs, signals, pictures, or sounds for the purpose of executing their scheme or artifice to defraud in violation of 18 U.S.C. §1343. Without limitation, for example, each transmission of a video to be posted on YouTube, Vimeo, Facebook, or through Twitter, or establishment of a website to disseminate information about the pyramid scheme or transmission of signals, pictures or information to such website is a separate act of wire fraud.

148.    Each Defendant committed at least two predicate acts of mail and/or wire fraud relevant to this Count. The following charts provide a sample of these predicate acts for each Defendant. Numerous similar mailings and/or wire fraud occurred during the time period alleged in this Complaint.

**LifeVantage:**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | General Content |
|---|---|---|---|---|
| W | Pyramid Scheme Victims | https://www.lifevantage.com/opportunity/ | 2017 | Opportunity of a lifetime; The LifeVantage Compensation Plan and unlimited earning potential |

| W | Pyramid Scheme Victims | http://www.lvnmedia.com/home | 2017 | "training" videos by Top Earning Distributors; Placed "interview" emphasizing making money from being a distributor |
| W | Pyramid Scheme Victims | https://www.businessforhome.org/2013/08/lifevantage-awards-55-jeeps-to-top-distributors/ | 2013 | Placed "interview" emphasizing the rewards and money from being a Distributor |
| M/W | Pyramid Scheme Victims | https://www.lifevantage.com/ | 2009- current | Compensation Plan and Plan Highlights emphasizing financial rewards |

**Jensen:**

| Mail/Wire | Directed To | Where Published | Date or Date Range of Document | General Content |
|---|---|---|---|---|
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=ikIe2TraGUA | 2015 | Jensen speaking at Elite Academy event, 8 Steps to unlock your true potential with LifeVantage |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=9Vlonax9eqE | 2016 | Jensen participating in weekly LV broadcast with Master Pro 10 Distributor – spread the word on LV |

**Rose:**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | General Content |
|---|---|---|---|---|
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=nhgymaxWy8g | 2015 | Reassuring the legitimacy of the business opportunity |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=kCowftf3PE0 | 2017 | Placed "interview" emphasizing making money from being a Distributor |

**Goodwin:**

| Mail/ Wire | Directed To | Where Published | Date or Date Range of Document | General Content |
|---|---|---|---|---|
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=9F3pgn4QumA | 2016 | How to share the opportunity with others; recruiting |
| W | Pyramid Scheme Victims | https://www.youtube.com/watch?v=KIOgr8Lm6VU | 2016 | How to use social media to share the opportunity; recruiting |

149.    Each of the Defendants named in this Count acted with requisite intent to establish, perpetuate, and/or carry out the pyramid scheme to defraud. Each Defendant named in this Count acted with either specific intent to defraud or with such recklessness with respect to the false or misleading information mailed or wired in furtherance of the pyramid scheme as to constitute requisite *scienter* to commit mail and wire fraud. That *scienter* can be inferred from, among other things, at least the following:

a.    LifeVantage acknowledged that the network marketing industry is subject to regulation, including regulation by the FTC and that there was a risk that the FTC or other governmental agency could determine that LifeVantage was not complying with the existing laws and regulations. Its management, including the Defendants, took steps to masquerade the actual effect of the Compensation Plan in SEC filings and from their Distributors while knowing, because each Distributor's spending, commissions, and purchases is tracked in real time and reports of these are made available to management, that the vast majority of payments to Distributors is for recruiting, and that the vast majority of Distributors lose money.

b.    Defendants Jensen, Rose, and Goodwin understood that the operation of the business is an illegal pyramid scheme if the Compensation Plan paid substantially for recruiting others rather than for product sales to legitimate, third-parties. Rose even went as far as to reassure Distributors and new recruits of the legitimacy of the business after the lawsuit was filed against MLM company, Vemma. See https://www.youtube.com/watch?v=nhgymaxWy8g. Jensen, Rose and Goodwin had at their disposal all facts necessary to know that in all substantial respects LifeVantage was conducting its business as did Vemma and Fortune Hi Tech, both of which were shut down by the FTC.

## H.    THE DEFENDANTS' PROMOTION OF THE PYRAMID IS A *PER SE* SCHEME TO DEFRAUD UNDER THE MAIL AND WIRE FRAUD STATUTES

150.    The Defendants have used a false and fraudulent scheme, or a scheme to defraud within the meaning of federal law, to harm Plaintiff and the class. Defendants have conducted their affairs unlawfully, intentionally, willfully and with intent to defraud, that is, knowingly and with such specific intent to deceive as is in violation of the mail and wire fraud statutes. They

have done so in order to cause financial gain for themselves and for others, all to the detriment of Smith and the class.

151.    <u>First</u>, Defendants have promoted the pyramid scheme that, by its very nature, is a *per se* scheme and artifice to defraud to obtain money by false pretenses. As detailed in this complaint, Defendants promoted and successfully expanded the pyramid scheme to victimize the named Plaintiff and the class. Each of the enumerated acts of wire and mail fraud in furtherance of the pyramid scheme is an act of racketeering.

152.    <u>Second</u>, as part of the pyramid scheme, Defendants made numerous false statements in furtherance of the scheme. Examples of the falsity of these statements include:

- Creating and disseminating the false impression that the Distributor program has "enormous" or "unlimited income potential" and that the Distributor network can make enormous money as a result of participating as a promoter for the program;

- Creating and disseminating the false impression that there are many available persons who will want to purchase the LifeVantage products and that the purchase of a Distributor enrollment will enable the purchaser to make money from legitimate sales. In reality, the defendants know that sales of the LifeVantage products are made almost exclusively to people who are promoters; and,

- Creating and disseminating the false impression that the success stories featured by LifeVantage are typical or, in some cases, even possible when defendants knew that the persons portrayed were being paid (unreal) amounts of money for committing an illegal activity and/or were assisted by the defendants in setting up a sufficiently large "downline" that the income generated was in fact large.

153.    <u>Third</u>, as part of the pyramid scheme LifeVantage omitted material facts for the purpose of and with the intention of the fraudulent pyramid scheme by obtaining money from the victims. Examples of these omissions include:

- Failure to reveal that the multilevel marketing program and its Distributor program are illegal pyramid schemes but instead

propagating the statements and impression that it is a legal enterprise.

- Failure to reveal that under the Compensation Plan the majority of the Distributors have and likely will lose their money.

- Failure to disclose that many of the top Distributor earners paraded by the company (at company-sponsored events and through other publicly disseminated events, videos, documents, and other media) as examples of what Distributors can hope to attain through following the LifeVantage Compensation Plan were in fact already well established salespeople for other network companies who were recruited to bring large, preexisting "downlines" to LifeVantage by the company and were placed in their positions, aided in their attainment of their LifeVantage ranks, and/or otherwise compensated beyond what is paid to ordinary Distributors under the Compensation Plan.

- Failure to reveal that the company knowingly spread unreal and misleading accounts and claims of the success of its "Top Achieving" Distributors throughout the web, all in an effort to attract new Distributors but avoiding disclosing a direct connection between the statements and LifeVantage.

## I.    PLAINTIFF AND THE CLASS HAVE PROXIMATELY SUFFERED RICO INJURY TO THEIR BUSINESS OR PROPERTY

154.    A "violation" of RICO is committed if "individuals and entities," use the mails or interstate wire facilities in the execution of "any scheme to defraud." 18 U.S.C. §§ 1341, 1343, Sections 1961(1) (B), 1962. Sections 1964 (a), (c) and (d) authorize persons "injured" in their "business or property,"   "by reason of" RICO's "violation" to sue for appropriate redress, including equity relief, treble damages and attorneys' fees.

155.    Plaintiff (and the class sought to be certified) suffered a loss of money composed of the cost paid to become a Distributor, together with the administrative fees and the cost of the products purchased as samples and for purposes of operating the alleged "business opportunity," the amounts charged to attend LifeVantage events, the amounts charged to Distributors for App memberships, enrollment in the Pro Audio Series program, and all other costs associated with the

"business opportunity." Plaintiff Smith lost in excess of $1,000. The losses were proximately caused by the actions described in this Count, and may be presumed from, among other things, the presumption that no one would knowingly join an illegal pyramid scheme.

156.   The precise amount lost by the class sought to be certified has not yet been determined. It is believed that each of the unwitting participants in the pyramid scheme sought to be certified as a class has lost $50 to well over $1,000 as a result of purchasing their distribution rights. Upon information and belief, the precise amounts that each and every participant in the pyramid scheme has (1) spent on costs associated with the Distributor "business opportunity" and (2) received in commissions or bonuses or other payments from LifeVantage as a result, has been tracked, maintained and accounted for by LifeVantage through a proprietary software database maintained by InfoTrax Systems. Thus, the precise loss of every class member is easily capable of being ascertained in this litigation, and the total business injury capable of being computed for the class.

157.   The predicate acts set forth in this Count each were mailings and/or wire transmission of material in furtherance of the promotion of the pyramid scheme. Each of these predicate acts was intended to falsely convey the impression to people like Plaintiff that participation as a LifeVantage Distributor was legal; that they had a reasonable opportunity to make money; that people just like them were able to make generous income; and that the commissions or bonuses they would receive would come from the sale of desirable product. The loss suffered by the Plaintiff and the class was foreseeable and a direct result of the establishment, promotion, and expansion of the pyramid scheme by the Defendants. A pyramid scheme depends on continued expansion by continual recruiting of innocent people who do not realize that the only way in which they can achieve the benefits represented by the pyramid

scheme's promoters is to recruit and victimize other innocent people into joining. In reality, like all pyramid schemes, the Compensation Plan and all aspects of the promotion of the pyramid scheme were based on recruiting over product sales, and depended on the known existence of money-losers (like the Plaintiffs and the class) to pay the small group of "winners" inherent in any pyramid scheme. There is a clear causal connection between the promotion and recruiting predicate acts alleged above and the injury suffered by the Plaintiff and the class.

158.    Certain predicate acts attributed to LifeVantage also concern promotion and recruitment. Defendant LifeVantage as a corporate entity operated the same scheme, with the same general participants, to attract the collective payment of several hundred million dollars by well over 100,000 participants to become promoters for a fraudulent enterprise. LifeVantage had the actual intent to attract such participants as evidenced by a massive web presence, publication of web-related videos, its own and related websites, and other broadly disseminated offers for people to become promoters for LifeVantage. LifeVantage disseminated quotations from participants indicating that they have joined the LifeVantage "team" as a result of the invitation. Each of the predicate acts alleged above that is directed to promotion and recruitment, is a communication made by LifeVantage or with its knowledge, intended to further the goal of the scheme. But for these false and misleading statements and/or omissions Plaintiff and the class would not have been induced to purchase the distribution rights. Plaintiff's losses were a direct and proximate cause of his innocent participation in the pyramid scheme.

159.    Participants in the LifeVantage scheme were induced to purchase distribution rights without knowledge that they could only make money by victimizing others. Each of the predicate acts concerned promotional and recruiting materials authored by, or which knowingly featured, one or more of the Defendants, and was made with the intent that it induce Plaintiff, or

the class of unwitting participants like Plaintiff, into believing that they were participating in a legal enterprise and not an illegal pyramid scheme. Each of the predicate act promotional and recruiting materials authored by, or which knowingly featured these culpable individuals was made with the intent that Plaintiff join the "downline" organization of each of them and therefore contribute money into the scheme.

## COUNT TWO

### CONSPIRACY TO VIOLATE 18 U.S.C. § 1962(c)
### IN VIOLATION OF 18 U.S.C. §§ 1961(5), 1962(d)
### AGAINST ALL DEFENDANTS

160.    Plaintiff and the class repeat and re-allege every allegation above as if set forth herein in full.

161.    Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

162.    Each of the Defendants agreed to participate in the affairs of the enterprise through a pattern of racketeering activity. Defendants have participated in a conspiracy to violate Count One.

163.    Each of the Defendants participated in the pyramid scheme and their participation is necessarily a combination of more than two individuals. Each of the Defendants committed one or more overt acts to perpetuate the unlawful pyramid scheme, as set forth previously in Count 1.

164.    Defendants' creation, support, and maintenance of the pyramid scheme is illegal.

165.    The Defendants named in this Count had a meeting of the minds on the object or course of action, specifically to create, support and maintain the pyramid scheme for their

financial benefit as evidenced by each Defendant's voluntary and knowing participation in the pyramid scheme. These agreements and understandings are described in Count 1.

166.    Each of the Defendants named in this Count and others have committed one or more overt acts to achieve or further the unlawful objects and purposes of the pyramid scheme detailed herein. They include the following:

**Darren Jensen/Justin Rose/Ryan Goodwin:** (1) serving as one of the principals and directors of the pyramid scheme; (2) creating and/or approving the creating of the Compensation Plan, which pays primarily for recruiting; (3) creating and or approving disseminating promotional materials, videos, and public appearances at LifeVantage events and trainings; (4) entering into contractual arrangements and or making deals with professional Distributors to lend the scheme an air of legitimacy to the LifeVantage business and to pay them bonuses or incentives as an inducement to further the expansion of the scheme.

167.    The Defendants named in this Count used false and fraudulent means and conducted their affairs unlawfully, intentionally, willfully and with the intent to defraud, for their own financial gain and benefit and for the financial gain and benefit of others, all to the detriment of Smith and others that purchased the Distributor rights. These acts, intent and losses are set forth in Count 1.

168.    Each of the Defendants named in this Count has violated Section 1962(c) and is liable, jointly and severally, for the business injury caused to the Plaintiff and the class by his or her actions.

## COUNT THREE

**VIOLATION OF CONN. GEN. STAT. SECTION 42-145 AGAINST ALL DEFENDANTS**

169.    Plaintiff and the class repeat and re-allege every allegation above as if set forth herein in full against Defendants.

170.    The Defendants have engaged in an unlawful practice within the meaning of Conn. Gen. Stat. § 42-145. It is unlawful to advertise or sell merchandise or rights at a price, or with a rebate or payment to the purchaser, contingent on the procurement of customers or sales. Conn. Gen. Stat. § 42-145.

171.    The Defendants have advertised and sold the business opportunity to Plaintiff and the class. The LifeVantage Compensation Plan as part of the business opportunity provides compensation and bonuses to Distributors for procuring (recruiting) additional Distributors to join LifeVantage. Recruiting individuals to become LifeVantage Distributors is the principle way for Distributors to earn money through the LifeVantage Compensation Plan because the commissions for recruiting new Distributors far exceed the commissions earned on product sales.

172.    People are induced to join LifeVantage upon the representation that they can earn untold profits by recruiting additional Distributors or customer prospects to LifeVantage.

173.    Defendants' advertisements for the sale of and actual sales of the LifeVantage "business opportunity" violate Section 42-145. As a result, Plaintiff and the class have suffered an injury in the amounts paid to enroll as a Distributor, and in addition, seek costs and attorneys' fees against the Defendants, which is compensable under Section 42-149.

## COUNT FOUR

### VIOLATION OF SECTION 42-110b(a)
### CONNECTICUT UNFAIR TRADE PRACTICES ACT
### AGAINST ALL DEFENDANTS

174.    Plaintiff and the class repeat and re-allege every allegation above as if set forth herein in full against Defendants.

175.    Defendants have engaged in unfair or deceptive acts or practices within the meaning of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a et seq.

176.    LifeVantage has engaged in "trade or commerce" within the meaning of § 42-110a.

177.    Defendants' business practices in persuading people to join an unlawful pyramid scheme constitutes an unfair or deceptive act and is unlawful under § 42-110b(a).

178.    Defendants have violated the CUTPA in that they authored or knowingly permitted and encouraged the dissemination of the LifeVantage Compensation Plan, which pays commissions and bonuses to Distributors primarily for recruiting (**Exhibits C and D**), to Plaintiff and others in the class.

179.    Plaintiff was shown and given the LifeVantage Compensation Plan described in this Complaint. The Compensation Plan misrepresents the business opportunity and omits to reveal that the benefits and commissions set forth in the Compensation Plan operate as a pyramid scheme. Plaintiff reviewed and relied upon the misrepresentations and omissions when he paid money to join LifeVantage as a Distributor.

180.    Had Plaintiff been made aware that by becoming a Distributor of LifeVantage that he was agreeing to participate in the Compensation Plan of a pyramid scheme he would not have

done so. Reliance for the class may be presumed from, among other things, the presumption that no one would knowingly join an illegal pyramid scheme.

181.    Plaintiff and the class suffered an ascertainable loss of money, including the amounts paid to join LifeVantage as a Distributor, the amounts paid to attend LifeVantage events, and other amounts paid to LifeVantage for the various administration fees and other costs associated with being a LifeVantage Distributor and as a result of the Defendants' unfair and/or deceptive acts.

## COUNT FIVE

### VIOLATIONS OF 5 U.S.C. § 78j(b) [SECTION 10B] and 17 C.F.R. § 240.10b-5 [SECTION 10B-5] AGAINST LIFEVANTAGE

182.    Plaintiff and the class repeat and re-allege every allegation above as if set forth herein in full.  Plaintiff's sworn certificate is attached as **Exhibit F**.

183.    Plaintiff alleges violations of securities laws in the alternative and without prejudice to the position that the RICO claims, set forth in Counts 1 and 2, are not preempted by the PSLRA. These allegations are not a waiver of the claims made in Counts 1 and 2.

184.    The sale and offer of sale of LifeVantage distributorships, such as those purchased by Plaintiff and the class, is in connection with and constitutes the sale of a security.

185.    LifeVantage made material misrepresentations and/or omissions in connection with the sale of distributorships to Plaintiff and the class. It falsely represented that they were conveying a legal business opportunity, when, in fact, it knew or recklessly ignored the fact that it was selling, and Plaintiff was purchasing, an interest in an illegal pyramid scheme.

186.    In the alternative, LifeVantage's actions omitted material facts, *i.e.*, that they were selling an interest in a pyramid scheme, in connection with the sale of distributorships.

187.    There is a necessary connection between the Defendants' actions set forth in this Complaint, and the Plaintiff's purchase of distributorship and other payments made in connection with that purchase. There was a necessary and immediate causal connection between Defendants' promotional activities described in this Complaint and the Plaintiff's purchase. Indeed, the constant goal of all Defendants was to expand the scheme and sell as many distributorships as possible to unsuspecting participants in the pyramid. The instances of omissions and/or misrepresentations and mail and wire fraud alleged throughout this complaint directly supported, and the misstatements therein were the only justification for, the price of the enrollment packages and the cost required of new recruits to purchase the products. The omissions and/or misrepresentations of the value of participating in the LifeVantage opportunity is directly reflected in the company's enrollment documents, the only means by which someone may participate in the company.

188.    Plaintiff necessarily and/or justifiably relied on the misrepresentations and/or omissions. Such reliance may be presumed from, among other things, the presumption that no one would knowingly join an illegal pyramid scheme. In addition, Plaintiff reviewed and relied upon the misrepresentations and misrepresentations by omission of the Compensation Plan detailed above in this Complaint. The damages caused by the omissions and/or misrepresentations were a necessary consequence of an inherently illegal scheme to defraud.

189.    Defendants' actions as set forth herein were made with such mental state to manipulate, deceive or defraud, or with such recklessness, as to constitute *scienter*, which is imputed to LifeVantage. Each of the Defendants had a motive to operate and benefit from the operation of the pyramid scheme, and opportunity to conceal the fact that they were operating a pyramid scheme. Proof of such *scienter* can be inferred from the following:

- Each of the Defendants benefitted in concrete and substantial way from the operation of the pyramid scheme. *See* averments made in connection with Count 1 (RICO);

- Each of the Defendants engaged in plainly illegal behavior. *See* averments made in connection with the commission of a pyramid scheme, Count 1 (RICO) and Count 2 (RICO Conspiracy);

- Each of the Defendants had a specific understanding that he was engaged in the commission of a pyramid scheme or that it would be substantially likely that the operation would be found to be a pyramid scheme. *See* generally Paragraph 149.

- In addition, the Corporate Defendants had personal knowledge of the contents of the Reports filed with the Securities and Exchange Commission, which specifically warned that elements of the operation, or all of the operation, could be found to be a pyramid scheme.

190.    Plaintiff and the class suffered damages in that they lost moneys through the purchase of their distributorships.

191.    Plaintiff and the class damages may be measured either in actual damages or may be rescissionary.

## COUNT SIX

### VIOLATION OF 15 U.S.C. § 77l(a)(2) [Section 12(2)]
### AGAINST LIFEVANTAGE

192.    Plaintiff and the class repeat and re-allege every allegation above as if set forth herein in full.

193.    Plaintiff alleges violations of securities laws in the alternative as permitted and without prejudice to their position that their RICO claims, set forth in Counts 1 and 2, are not preempted by the PSLRA. These allegations are not a waiver of their claims made in Counts 1 and 2.

194.    LifeVantage engaged in the offer or sale of a security in connection with the sale of distributorships. LifeVantage omitted that the distributorship is a pyramid scheme, a material

fact necessary in order to make the statement, under the circumstances, not misleading. The allegations made above relating to the operation of the scheme are specifically incorporated herein.

195.    Defendant LifeVantage is the seller of the distributorship interest. The Compensation Plan incorporated in the distributorship interest is materially false and/or misleading as it omits to disclose that the seller operates a pyramid scheme.

196.    LifeVantage offered or sold a security within the meaning of Section 12(2).

197.    Plaintiff and the class suffered damages in that they lost moneys through the purchase of their distributorships. Causation may be presumed from, among other things, the presumption that no one would knowingly join an illegal pyramid scheme.

198.    Plaintiff and the class are entitled to actual damages and/or rescission of their purchase amounts plus equitable interest.

## COUNT SEVEN

### UNJUST ENRICHMENT
### AGAINST ALL DEFENDANTS

199.    Plaintiff and the class repeat and re-allege every allegation above as if set forth herein in full.

200.    Plaintiff brings this claim on his own behalf and on behalf of each of the class members.

201.    The Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and the members of the class in that the financial benefits obtained by them came as a result of their promotion of the unlawful pyramid scheme. The financial benefits they obtained came from the Plaintiff and the members of the class, who unwittingly participated in the pyramid scheme and naturally and inevitably lost money in the process.

202.    The revenue that resulted in these payments came directly from the payments made by Plaintiff and the class. It would be unjust to permit these Defendants to retain these ill-gotten gains.

203.    The Defendants should be required to return to Plaintiff and the class members all moneys paid to LifeVantage pursuant to the unlawful pyramid scheme, less any amounts LifeVantage paid to Plaintiff and the class members.

## PRAYER FOR RELIEF

Smith and the plaintiff class request the following relief:

a.    Certification of the class;

b.    A judgment against the Defendants;

c.    Damages in the amount of the injury to business incurred by Smith and the class as a result of defendants' conduct and for injury to their business and property, all as a result of defendants' violations of 18 U.S.C. § 1962(c) and (d) and that such sum be trebled in accordance with 18 U.S.C. § 1964(c);

d.    Damages in actual amount or rescission of contracts pursuant to violations of securities laws (alternative and conditional);

e.    Temporary and permanent injunctive relief enjoining the defendants from further unfair, unlawful, fraudulent and/or deceptive acts, including, but not limited to, supporting, continuing or operating the pyramid scheme;

f.    Disgorgement of all proceeds of the pyramid scheme by each defendant;

g.    Relief under Conn. Gen. Stat. § 42-149, including but not limited to injunctive relief,  attorney's fees, and costs;

h.    Relief under the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. § 42-110a et seq.), including but not limited to injunctive relief, compensatory damages, punitive damages, attorney's fees, and costs;

i.    The costs of investigation and litigation reasonably incurred, as well as attorneys' fees in accordance with 18 U.S.C. § 1964(c); and

j.    For such other damages, relief and pre- and post-judgment interest as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Smith, on his own behalf, and on behalf of the class(es) he represents, demands a jury

trial.

Filed this 24th day of January, 2018.

Respectfully submitted,

/s/ James K. Robertson, Jr.

CARMODY TORRANCE SANDAK &
HENESSEY LLP
James K. Robertson, Jr. (ct05301)
Brian T. Henebry (ct10002)
John L. Cordani, Jr. (ct28833)
50 Leavenworth Street
P.O. Box 1110
Waterbury, CT 06721-1110
(203) 573-1200
jrobertson@carmodylaw.com
bhenebry@carmodylaw.com
jcordanijr@carmodylaw.com

SOMMERS SCHWARTZ, P.C.
Andrew Kochanowski  (to be admitted Pro Hac Vice)
Sarah L. Rickard (to be admitted Pro Hac Vice)
One Towne Square, Suite 1700
Southfield, MI 48076
(248) 355-0300
akochanowski@sommerspc.com
srickard@sommerspc.com

- and -

REID COLLINS & TSAI LLP
J. Benjamin King (to be admitted Pro Hac Vice)
bking@rctlegal.com
1601 Elm St., Suite 4250
Dallas, Texas 75201
Tel.: 214-420-8900

R. Adam Swick (to be admitted Pro Hac Vice)
aswick@rctlegal.com
1301 S. Capital of Texas Hwy.
Bldg. C, Suite 300
Austin, Texas 78746
Tel.: 512-647-6100

Attorneys for Plaintiff


Dated: January 24, 2018