**CHRISTENSEN YOUNG & ASSOCIATES, PLLC**
STEVEN A. CHRISTENSEN (#5190)
CAMERON S. CHRISTENSEN (#16015)
9980 S. 300 W. Ste. 200
Sandy, Utah 84070
Tel: (801) 676-6447
Email: steven@christensenyounglaw.com
cameron@christensenyounglaw.com

**SOMMERS SCHWARTZ, P.C.**
Andrew Kochanowski, Esquire [To be admitted *Pro Hac Vice*]
One Towne Square, Suite 1700
Southfield, MI 48076
(248) 355- 0300
Email: adochanowski@sommerspc.com

**REID COLLINS & TSAI, LLP**
J. Benjamin King [To be admitted *Pro Hac Vice*]
1601 Elm St., Suite 4250
Dallas, TX 75201
(214) 420-8900
bking@rctlegal.com

R. Adam Swich [To be admitted *Pro Hac Vice*]
1301 S. Capital of Texas Hwy.
Bldg. C, Suite 300
Austin, TX 78746
(512) 647-6100
aswick@rctlegal.com

**MARINO LAW PLLC**
Amy L. Marino [to be admitted *Pro Hac Vice*]
18977 W. Ten Mile Road, Ste 100E
Southfield, Michigan 48075
Tel.: (248) 797-9944
amy@marinopllc.com

*Attorneys for Plaintiff and the Putative Class*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | | |
|---|---|---|
| BRIAN SMITH, individually, | | |
| MICHAEL ILARDO, individually, | | Case No: 2:18-cv-00621 |
| and on behalf of all others similarly situated, | : | |
| | : | |
| Plaintiff, | : | **FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND** |

{W2967826}                    1

```
                                                :
vs.                                             :
                                                :
LIFEVANTAGE CORPORATION,                         :
a corporation, and DARREN JENSEN                :
And DARREN JENSEN, an individual,               :
                                                :
        Defendants.                             :
```
_____

## INTRODUCTION

1.       Each of the Plaintiffs paid LifeVantage Corporation ("LifeVantage") over $1,000

to participate in the company's heavily marketed "business opportunity." The opportunity they

paid into was to buy and resell a scientific-sounding supplement called "Protandim." Essentially

a capsule that contains five common herbs, known for decades for promoting anti-oxidants,

"Protandim," as marketed by LifeVantage is many times more expensive than the same herbs at

Walmart, CVS or Amazon. The "business opportunity" is similar to that sold by many

companies that sell through a multi-level marketing ("MLM") system. In a typical MLM, a

distributor buys a starter pack of the product, pays the company for the right to distribute the

product, and makes commissions on sale of his or her inventory to customers. The company may

announce a "retail" price and offer a discount to the distributor. It may sell its products directly

to customers at the higher retail price, or offer customers a preferred price without signing up as

a distributor.

2.       This MLM was different. Claims about the product were wildly overstated, and

deliberately so. The company knew that making treatment and prevention claims about an

unapproved supplement was illegal. Worse, the company claimed that the distributors would buy

a patent-protected product that no one else in the competitive supplement field could duplicate.

The company claimed that the Patent Office gave it patents for the "Protandim" product to treat

disease. The company claimed the product was the first "anti-aging" pill. The company spun a

story that it invented the breakthrough natural compound whose interaction gave the herbs a "synergistic" effect that may cure cancer.

3.      The company had tried to sell "Protandim" for years directly, failing to sell $10 million per year and suffering multi-million dollar losses. Only when it switched to a multi-level marketing "business opportunity" model did its "breakthrough" pill get market traction: by being sold to duped and unsophisticated investor-Distributors under an undecipherable Compensation Plan, the company began selling $200 million a year. Unfortunately, most of the sales were to its own Distributors, whose sales efforts were mainly rewarded only if they successfully recruited others. In other words, the "business opportunity" was a classic pyramid scheme.

4.      The company knew that whatever patents it procured on "Protandim" were procured by fraud. Its principals had actually licensed the technology, such as it was, to an "anti-aging" pill from a Massachusetts company which had filed its own application disclosing the very same invention four years earlier. The LifeVantage patents were filed by two public relations businessmen who procured the license and the technology who set out to market it themselves. A scientist was sold $2,400 worth of shares in the licensee company to provide a credible-looking "scientific" voice to the revolutionary pill. He then turned up as the "inventor" of the "breakthrough" after decades of research, and appeared on an ABC News Primetime segment suggesting that the pills may just be the Fountain of Youth. The company aggressively obtained patents from the initial disclosure by the two businessmen—it bragged about them to the public and charged a materially higher price than would have been possible for the distributors or customers to pay for generic herbs in the capsule.

5.      Pyramid schemes are engines of fraud in which participants pay money into the scheme and are rewarded based on bringing more paying participants into the scheme. The

scheme company distributes the money to the participants, with the top promoters who recruit the most new participants receiving larger shares of the distribution. Because the money is distributed unevenly, because the scheme promoters keep a share for themselves, and because no legitimate earnings from product sales rather than recruiting come in to the scheme, the vast majority of participants lose money.

6.      New recruits pay the company for the right to compete with its other Distributors. Each new recruit is encouraged to purchase an expensive product package, costing upwards of $1,000 and containing samples and other materials for their business. The new Distributors are told or strongly encouraged to agree to an automatic shipment program of $100 or more per month in product, secured by their credit cards, and to pay for "training" and other accoutrements of being a Distributor. Each new Distributor is placed in his or her recruiter's "downline," with a portion of their initial purchase being kicked "upline" to the recruiter and others up the chain. LifeVantage's MLM system further encourages Distributors to expend thousands of dollars in additional product purchases, event fees and expenses, and other miscellaneous fees.

7.      LifeVantage must operate as a pyramid scheme and even then mislead about its products to turn a profit because its products have no real medicinal or nutritional value but are priced eleven times more than products that can be purchased at the store. On its website, LifeVantage promotes itself as a "wellness and personal care company" founded on "cutting edge research in the field of nutrigenomics" combined with "a powerful entrepreneurial vehicle." The Food and Drug Administration recently sent a warning letter to LifeVantage requiring the company to refrain from making false claims about the ability of its products to cure cancer and other illnesses. Thus, LifeVantage must offer something more than just its products to make

money. That something more is the false hope of financial prosperity through LifeVantage's MLM opportunity, *i.e.*, participation in an illegal pyramid scheme disguised as a legitimate business opportunity. The Fifth Circuit, sitting *en banc*, recently held that these types of MLM schemes are ideally suited for class certification. *Torres v. S.G.E. Mgmt., L.L.C.,* 838 F.3d 629 (5th Cir. 2016), *cert. denied*, 138 S. Ct. 76 (2017).

8. Leveraging fraudulently-procured patents to charge higher prices and stifle competition is also an antitrust violation. Plaintiffs seek, on their own behalf and on behalf of a national classes of similarly situated persons, to recover from Defendants under federal securities laws, antitrust law, and Utah state law.

## I. THE PARTIES

### A. PLAINTIFFS

#### Brian Smith

9. Plaintiff, Brian Smith ("Smith"), is an individual residing in Avon, Connecticut. Smith created and runs the non-profit organization, Cancer Survivors Who Can Charities, Inc. Smith also owns a small film production company, Atlantian Films, which he formed to integrate cancer survivors into the workplace and provide them with a creative outlet.

10. Smith was introduced to LifeVantage in 2016. He was approached by a LifeVantage Distributor who suggested that LifeVantage products would be helpful to the members of his cancer organization. Smith attended two LifeVantage meetings hosted by LifeVantage Distributors before enrolling as a Distributor himself. The meetings initially promoted the products with videos and phone-ins from "doctors," but then quickly moved to the "business opportunity" offered by LifeVantage and included phone-ins from LifeVantage's top-earning Distributors. Smith was shown the Compensation Plan Highlights and materials

depicting the "income opportunities" and "financial freedom" that could be achieved by becoming a Distributor.

11.     Smith was only presented with the option to purchase three of the four "distributor enrollment packs" or "Product Packs"—the $1,200 Platinum Pack, the $600 Gold Master Edition Pack, or the $600 Gold Performance Edition Pack (in addition to the required $50 "Start Kit"). He was not presented with the option to purchase the $300 Silver Pack, nor was he told that he could become a Distributor by merely purchasing the Start Kit. Rather, he was told that he was required to also purchase one of the Product Packs.

12.     Smith enrolled as a Distributor in March, 2016. He purchased the required Start Kit for $50, the $1,200 Platinum Pack, and signed up for an auto-ship of the LifeVantage product Protandim Nrf2. He decided to enroll as a LifeVantage Distributor because he was unable to work outside of his home at the time and he thought he could earn an income selling LifeVantage products, while also providing a benefit to the members of his organization. Before enrolling he carefully considered the statements and videos about both the product claims and the "business opportunity."

13.     Smith did not fill out a Distributor application or sign-up though the LifeVantage website, but rather provided his credit card information to the LifeVantage Distributor who enrolled him without Smith ever signing—electronically or physically—an application. Smith was never shown the Terms and Conditions that LifeVantage purports bind their Distributors once they sign up and give LifeVantage their credit card information. Upon information and belief, it is common practice among LifeVantage Distributors not to show new recruits, like Smith, the actual applications, but to obtain credit card information and fill in the paperwork on behalf of the new recruit.

14.     Smith was placed in the downline of Distributor Theresa Cannavo. He attempted to sell the product by promoting his LifeVantage website on social media, but quickly discovered that there were several other LifeVantage Distributors in his area attempting to do the same. No one contacted him about purchasing the products, and he did not sell any LifeVantage products to customers or enroll any Distributors.

15.     Smith cancelled his auto-ship order after just eight (8) months. In addition to a growing realization that the "business opportunity" was a scheme to recruit others to become Distributors, and not a means of obtaining commission on sales of a wellness product, Smith began to have concerns about the side effects of the products that he and other members of his organization were noticing. He was contacted by a cancer patient in Colorado who claimed that "Protandim" negatively affected their vision. He had given free bottles of "Protandim" to several people within his cancer organization who could not afford LifeVantage' s monthly rate, and he was contacted by one of these persons who claimed to be experiencing the same negative vision effects.

16.     Smith became uncomfortable and started questioning the product testing touted by LifeVantage because, among other reasons, the test results advertised to Smith and other Distributors were devoid of independent studies or testing.

17.     In addition, he discovered that the ingredients in several LifeVantage products were mostly easily found herbs, such as turmeric, a well-known Nrf2 activator. LifeVantage claimed to provide its own special patented blend and charged upwards of $50 a month for the products, claiming it was the special blend that caused Nrf2 to occur. Smith had been influenced by the patent formulation on the product that he had seen referenced in the presentation materials.

18.     Even though he tried canceling the auto-ship order, Smith received and was charged by LifeVantage for several product shipments he did not order. He struggled to return the unordered products and never received a full refund. To stop the unauthorized shipments and charges, Smith was forced to cancel his credit card. To this day, he still receives emails from LifeVantage about updating his credit card information and renewing his orders and distributorship. LifeVantage also told Smith that if he did not purchase their products, his membership would be terminated.

19.     During his time as a Distributor, Smith learned the following: (1) he would have to recruit others to become LifeVantage Distributors in order to recoup the money he paid to become a Distributor, (2) he was required to make monthly purchases of Protandim products to get any commissions and remain a Distributor, (3) it was nearly impossible for him to break even based on retail product sales alone, and (4) he would have to pay additional costs to attend meetings to learn the "selling secrets" of the top-earning Distributors.

20.     Had Smith been informed that the LifeVantage business opportunity was actually a pyramid scheme, he would not have purchased the Start Kit or Platinum Kit, signed up for the auto-ship order, or made any of the payments necessary to maintain his Distributor rights. Not surprisingly, Plaintiff Smith lost money as a result of being a LifeVantage Distributor.

**Michael Ilardo**

21.     Michael Ilardo ("Ilardo") is an individual and a resident of Erie County, New York, Ilardo became a LifeVantage Distributor in February 16, 2017, under ID# 1726276. His distributorship was terminated on July 24, 2018. By training Ilardo is a pharmacist.

22.     Before becoming a LifeVantage Distributor, Ilardo attempted to sell deregulated energy with another multi-level marketing company. Ilardo also had been an active volunteer

"evangelist," desiring a chance for full time ministry. He believed that multi-level marketing would give him an opportunity to focus on ministry full time. However, his venture with the energy company did not pan out, as he was not paid very much in commissions. He quit and re-assessed, and decided he wanted to give it another try.

23.     Ilardo had spent the prior year reading leadership books and focusing on his relationship with God, getting spiritually stronger, and even started back in ministry. When he considered re-enrolling in the MLM energy company, he called Ron Long, one of Ilardo's upline leaders in that company, to discuss.   On February 15, 2017, he talked to Long about re-committing to selling.   Long had been one of Ilardo's upline leaders in the other company. Long came to Ilardo's house and told Ilardo that, yes, the other company was doing great for him, BUT, "Mike as a pharmacist, I want to get your opinion on something else." Long then used his laptop to show Ilardo an ABC News Primetime report about LifeVantage.

24.     Ilardo was impressed with the claims Long made about the product and impressed by the ABC News report. One of the things he found appealing was the fact that there were peer reviews and science behind the product. Based on these claims, Ilardo understood that Protandim was a natural route to cure cancer.

25.     Long then told him about the LifeVantage business opportunity and asked that he join and become a distributor. Long's wife, Beverly Long, was actually a distributor for LifeVantage, but Ron Long acted as a recruiter for her. After Ron went home, Ilardo looked at information about both "Protandim" and the company, and later talked to him on the phone. He gave Ron his credit card information and signed up as a distributor under Ron's wife Beverly Long, the actual LifeVantage distributor. The actual signup was done by Ron Long as Ilardo was on the telephone Ron walked Ilardo through what items he should buy as an initial purchase to

become the most effective LifeVantage distributor. He told Ilardo that if he wanted to be taken seriously he should order the most expensive pack, as it was the best value and the fastest way for Ilardo to start realizing income on his investment.

26.     Before actually authorizing Ron to sign him up, Ilardo read the business opportunity materials on the LifeVantage website, and became convinced that it was not a pyramid scheme but a legitimate opportunity to sell a product that provided tangible cancer-curing properties. He was familiar with how multi-level marketing companies operated. He did not believe that either the company he previously distributed for or LifeVantage were pyramid schemes. He was also impressed that the product was patented. Ilardo knew that natural herbs were long associated with anti-oxidation, and knew that they could be purchased in many places. But the fact that the "Protandim" formula was patented and that there was science behind the patents made him comfortable that the product was worth the money that LifeVantage charged.

27.     That night Ilardo ordered through Ron the most expensive $1,200 platinum distributor starter kit, as the company touted that this was the fastest way to build his new business. He signed up for the "auto-ship" program, and recalls that he spent about $1,800 in the initial purchase he authorized through Ron. In his almost 18 months in the business, Ilardo purchased approximately $300 a month of the product, much of which he never could sell to customers.  He also purchased about 30 DVD's for training, ordered business cards, and spent thousands of dollars on training and conventions.

28.     After he joined, Ilardo met another distributor, Kurt Heise, a cousin of Ron's, who claimed he made $10,000 a month as a LifeVantage distributor. Kurt worked with Ron to set up business opportunity meetings for Ilardo to recruit new distributors. Ilardo told everyone he knew about LifeVantage. He spent a significant amount of money and time and hours training

and learning and studying the product and the sales program. Like his upline leaders encouraged, he did launch calls and mass texts and live invites, and he hosted presentations at a local cafe where he bought food for the invitees.

29.     Ilardo's brother-in-law signed up for a $600 kit. His wife's boss joined, but Ilardo had few customers and was spending $200-800 a month on product and training and samples and materials and marketing materials. All the while he was being told by his upline that this was going to take off soon, that he was at the ground floor and this opportunity "was going to explode."

30.     In April 2017, Ilardo went to Utah for LifeVantage distributor training. In July 2017, he went to Denver. He attended Pennsylvania training sessions. Ilardo believed the product claims, and he started to try to sell it to customers in his pharmacy. As the company's training materials encourage, Ilardo bashed the pharmaceutical industry ("Big Pharm") and educated potential customers on how this is the "wave of the future," and showing them LifeVantage presentations on his work computer.

31.     Throughout his association with the company, in webinars, training meetings, and Facebook groups, LifeVantage and its distributors intimated and implied that the Protandim product, while not "officially" a drug, did in fact cure diseases like cancer. For example, during one café meeting, Ilardo heard Kurt Heise tell his invitees that someone he knew had breast cancer but after taking Protandim, it was gone. He said words to the effect, "I can't tell you it cured her because I'm not supposed to" but the clear implication he left was that the product did, in fact, cure cancer.

32.     This message was repeated in many different ways and many different times throughout his association. Later on, the company began making claims that it is a "bio-hacking"

company and that its products will extend life by 30 or more years. Ilardo attended two conventions, in Denver and Utah, where these or similar claims were made. At one of these, in Utah, Ilardo saw Darren Jansen speak. He saw the claims and how "successful" distributors were paraded on stage with giant checks, winning cars and trips, and these convinced Ilardo to stay in the system.

33.     However, over the course of many months Ilardo learned that few if any customers were interested in the products. During his time as a Distributor, Ilardo learned that: (1) he would have to recruit others to become LifeVantage Distributors in order to recoup the money he paid to become a Distributor; (2) he was required to make monthly purchases of Protandim products to get any commissions and remain a Distributor; (3) it was nearly impossible for him to break even based on retail product sales alone; and (4) he would have to pay additional costs to attend meetings to learn the "selling secrets" of the top-earning Distributors. Had Ilardo been informed that the LifeVantage business opportunity was actually a pyramid scheme, he would not have purchased the Platinum Kit or the Start Kit, signed up for the auto-ship order, or made any of the payments necessary to maintain his Distributor rights.

34.     Ilardo believes the promise of LifeVantage in all that it offered failed to deliver and left him footing the bill. Ilardo believes the company encouraged and then preyed on –his legitimate desires to develop residual income so he could be in the ministry and help people with drug addictions. As a result of Ilardo's enrollment as a LifeVantage distributor, he has lost a significant amount of money, in excess of $10,000, while receiving back approximately $1,000 in commissions.

B.     **DEFENDANTS**

35.     Defendant LifeVantage is a Delaware corporation headquartered in Sandy, Utah. LifeVantage originally incorporated in 1988 as a Colorado corporation under the name

Andraplex. It changed its name to Yaak River Resources, Inc. in 1992, and again in 2004 to Lifeline Therapeutics, Inc. In October 2004 and March 2005, LifeVantage acquired all of the outstanding common stock of Lifeline Nutraceuticals Corporation, the wholly owned subsidiary that owns the patent rights to LifeVantage's primary product, "Protandim," and changed its name to LifeVantage Corporation in November 2006.

36.     LifeVantage markets and sells its distributorship opportunity in the United States, Asia, and Europe. Approximately 70% of its sales and activities occur in the United States. The company reports revenues of approximately $200M per year.

37.     Defendant Darren Jensen ("Jensen") is an individual believed to reside in Utah. Jensen is the Chief Executive Officer at LifeVantage. Jensen has more than 26 years of experience in the multi-level marketing industry holding positions with several other MLM companies including Jeunesse Global, Ampegy, Agel Enterprises, Amway and Nu Skin Enterprises before joining LifeVantage in May, 2015. Some of these companies have been sued for, or have settled claims of, operating an illegal pyramid scheme. Jensen is actively involved in promoting the LifeVantage scheme to potential recruits at LifeVantage events, through social media, and through his direction of LifeVantage's top promoters. Plaintiff Ilardo personally heard Jensen speak at one of his training conventions. At these events Jensen typically states or implies that the LifeVantage product may extend life for 150 years, asking "What would you do with all this extra time?"[1]

---

[1] LifeVantage 2017 Convention, https://vimeo.com/236455463



LifeVantage Global Convention | Darren
Jensen CEO - Opening Presentation
11 months ago

## II.   <u>JURISDICTION AND VENUE</u>

38.   LifeVantage is subject to the jurisdiction of this Court. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332(d). This Court has personal jurisdiction over each defendant. Defendants continuously and systematically engaged and engage in business in Utah.

39.   LifeVantage operates its business in Utah, and a substantial part of the events or omissions giving rise to these claims occurred in this judicial district. Venue is proper in this Court pursuant to 28 U.S.C. §1391.

### III.   THE SCHEMES

**LIFEVANTAGE OPERATES AS AN INHERENTLY FRAUDULENT PYRAMID SCHEME SELLING A BUSINESS OPPORTUNITY TO DISTRIBUTE PRODUCTS ABOUT WHICH THE COMPANY MAKES ILLEGAL HEALTH CLAIMS**

#### A.  THE ILLEGAL PYRAMID SCHEME

##### 1.  The company buys the rights to "Protandim" from a third party and trademarks the name

40.    Prior to 2004, LifeVantage's only asset was 91 undeveloped lots which it carried as a $25,000 asset on its books, along with a lot of debt. There was substantial doubt about the company's ability to continue as a going concern. The company raised some early money from a private placement. It had been listed as a penny stock on the OTC Board as far back as the 1990's. Then in 2004, it connected with a Denver-area company run by a couple of former public relations men who had chanced on a Fountain of Youth.

41.    LifeVantage originally procured the rights to "Protandim" in 2004 from Lifeline Nutraceuticals, Inc.  ("Lifeline"), a company run for a few months by Paul Myhill ("Myhill") and William Driscoll ("Driscoll"). The Lifeline founders themselves got the rights to "Protandim" in October, 2003 from a Massachusetts pharmaceutical company, which had developed the concept, applied for a patent, and described the technology behind its "anti-aging" supplement several years earlier.

42.     In a 2004 and 2005 stock swap, Driscoll and Myhill ended up as principals of LifeVantage (operating then as Lifeline Therapeutics, Inc.,) The name "LifeVantage" was registered as a website at www.lifevantage.com on October 1, 2003 and a product website registered late in 2003, www.protandim.com. The first "Protandim" product shipped in February, 2005. The company officially changed its operating name to LifeVantage in 2006.

43.     The company applied for patents for various aspects of "Protandim" in March, 2004 in the names of Myhill and Driscoll. That the patent disclosure was filled with figures of lab tests and chemical formulas, and described genetic and cellular reactions while Myhill and Driscoll were former public relations operatives was not explained. Both were presented to both the SEC and the USPTO as the "original inventors" of "Protandim," As far as the USPTO, the company's investors, and its customers knew, the Massachusetts company and a pharmaceutical manufacturer that Myhill and Driscoll hired to "formulate" the pills were written out of history. Instead Myhill and Driscoll hired a scientific pitchman to give the new venture an auro of scientific credibility. His name is Dr. Joe McCord.

44.     From the very beginning "Protandim" came in a caplet form containing a "proprietary blend" of 675mg of the five ingredients. The bottles bore a legend that "Protandim is formulated utilizing high quality, potent herbal extracts processed under proprietary extraction technologies." The same 30 caplet 675mg bottle continues to be the main product sold. It is now called "Protandim NRF2 Synergizer." Its contents are still described as a "proprietary blend" however now the bottles are marked with U.S. Pat. Nos. 7,241,461, 7,579,026, and 7,923,045 issued to Myhill and Driscoll:





**2. LifeVantage initially markets "Protandim" as an anti-aging pill**

45.     Around the time of the purchase, LifeVantage began promoting "Protandim" as a "dietary supplement" and an "anti-oxidant therapy" drug. The company lost $453,000 in the first year of sales. But, in June, 2005, ABC News Primetime did a six-minute segment on "Protandim."[2] The segment began with the announcer asking, "Do you want to get an edge on turning back the clock just by taking a few pills? It's no longer science fiction but a possibility… as I found out, there may be a way to erase years at least inside my body… some scientists are wondering if a new pill I took might offer a long life."

46.     The segment continued: "I am here…to meet Dr. Joe McCord ["McCord"], a world-renowned scientist. . .his years of research might possibly prevent chronic diseases like cancer, diabetes, and heart disease. It all centers around a small yellow pill." The segment continued with McCord describing "anti-oxidative stress" which "everyone has" and which is connected to aging. Vitamin C is "not powerful enough…but this pill IS powerful enough, in fact many times more powerful… It's called Protandim, and tests on both mice and humans have already shown it revs up the manufacture of those good enzymes…"

47.     The announcer asks McCord: "Have you discovered the fountain of youth? McCord answers: "I wouldn't put it that way but we may have discovered something that will tell us a lot more about age." After showing the announcer a graph about his "oxidative stress" the announcer says, "And so ancient Eastern healing and modern Western medicine may soon be working together…. High oxidative stress has been linked to hundreds of illnesses…. Protandim does not need FDA approval."

---

[2] https://www.youtube.com/watch?v=6Wqbl1hxOso

48.     The day after it aired in 2005, the company's stock momentarily went up, but quickly collapsed again. After the ABC News segment the company sold about $1.5 million of the pills,[3] but "the product was quickly lost again in a glut of nutraceutical products on the shelf."[4]

49.     This six-minute piece has been used as a sales tool to recruit Distributors for the past 14 years: Plaintiff Ilardo was shown that video by his recruiter and it has appeared on the LifeVantage website in one link or another for many years. But the piece was only the beginning of a 14 year run of lying to customers and later to distributors like the Plaintiffs and the Classes about the product and the "business opportunity" to sell it.

### 3.   Pre-MLM retail sales of "Protandim" were a disaster

50.     Myhill and Driscoll were for a time involved in the company but were pushed out or bought out in 2006. McCord stayed and became the face of the "science" behind the pill. He also was a major shareholder and received a healthy commission on the sale of every bottle of "Protandim." The company continued trading on the OTC but raised many millions of dollars in private placements on the strength of its "science" based claims about the anti-aging and disease curing properties of its "patent-pending" formula. The company operated from Colorado for a time, then California, but it was always a small operation. It typically had between 6 and 20 employees, as all of its manufacturing and other functions were outsourced. It had no research or lab facilities—McCord was busy working a day job teaching at a university.

---

[3] https://www.sec.gov/Archives/edgar/data/849146/000102189005000094/lifeline623058k.htm

[4] https://web.archive.org/web/20111112065451/http://www.lifevantage.com/company/our-story/

51.     Between 2004 and 2009 LifeVantage attempted and failed to sell "Protandim" through traditional retail channels. The company outsourced a call center where a 1-800 telephone number could be used to order the product. Beginning in 2005, "Protandim" was sold through 4500 GNC stores, drugstore.com (an Internet seller), CVS, and other outlets. It marketed "Protandim" then, as now, to "help[] slow the aging process at the cellular level."

52.     The company charged $49.95 for a 30 day supply.[5] Its website marketed:

- **Revolutionary Product**: *Protandim*®: Protandim is a dietary supplement specifically formulated to fight oxidative stress, the cumulative cell damage caused by free radicals. Protandim is a patent-pending natural botanical formula that acts as a catalyst, triggering your body to produce more of its own free radical-fighting enzymes, Superoxide Dismutase and Catalase. These enzymes effectively and efficiently neutralize free radicals inside the cells where they are produced. Protandim has been shown to reduce oxidative stress as measured by reduced blood levels of lipid peroxides, oxidized fat molecules, in 29 human study subjects who took it daily for 30 days.
- **Science-based Platform:** LifeVantage is committed to developing science-based products that have proven efficacy. Lifeline's Director of Science, Dr. Joe McCord, is one of the foremost authorities on the body's antioxidant defense system and co-discovered the key enzyme Superoxide Dismutase in 1969.
- **Media Coverage**: ABC News' Primetime Live featured Protandim on its national program on June 2, 2005…. Consumer interest and response was tremendous, and Lifeline Therapeutics rolled out national public relations and marketing campaigns to build on the momentum created by the program.[6]

53.     The retail sales efforts were a complete failure. In 2005, even with the sales boost by the ABC News segment, LifeVantage reported a loss of $5.8 million on revenues of $2.35 million. In 2006, the company lost $2.7 million on revenues of $7.2 million. It reported "minimal

---

[5] https://web.archive.org/web/20070216073403/http://www.protandim.com:80/ProductPage.aspx

[6] https://web.archive.org/web/20070219033934/http://www.lifevantage.com:80/html/about_lifeline/about_lifeline.htm

sales history" with the GNC chain and restated its revenues accordingly.[7] In 2007, the company

lost $3.7 million on revenues of $5.05 million. In 2008, the company lost $2.05 million. In 2009,

it lost $9.1 million, bringing its total losses during the "retail" Protandim sales period to

approximately $23 million.[8]

### 4. In 2009 LifeVantage abandons retail sales in favor of MLM

54.     In October, 2008, LifeVantage announced that it would turn to a "multi-billion

dollar network marketing sales channel."[9] In its 2009 Form 10-K, the company explained:

> We develop and market branded consumer products that we believe are well suited
> for direct selling. Our distributors sell our products by educating consumers about
> the benefits and distinguishing characteristics of our products and by offering
> personalized customer service. We attempt to attract and motivate high-caliber,
> independent distributors with our focus on product innovation, our generous
> compensation plan and our distributor support programs.
>
> …    We are focused on building and maintaining our distributor network by
> offering financially rewarding career opportunities through the sale of unique,
> category-creating true products, products backed by facts and by science, to health
> conscious consumers concerned about the effects of aging….
>
> We are committed to providing professionally-designed training materials
> distributors can utilize in their sales and recruiting efforts. During the past year, we
> and our distributors have conducted thousands of training sessions to educate and
> motivate our distributors, and plan to continue to do so in the future. *These training
> events not only teach our distributors leadership skills and how to build successful
> organizations utilizing industry-proven techniques, but also how to teach the
> science behind our products and to differentiate our products to consumers.*[10]

(emphasis added)

---

[7] http://investor.lifevantage.com/news-releases/news-release-details/lifeline-therapeutics-inc-recognize-previously-deferred-retail

[8] https://www.sec.gov/Archives/edgar/data/849146/000095012309046600/d69291e10vk.htm
[9] http://investor.lifevantage.com/news-releases/news-release-details/lifevantage-announces-launch-protandimr-multi-billion-dollar

[10] https://www.sec.gov/Archives/edgar/data/849146/000095012309046600/d69291e10vk.htm

55.     Starting in late 2008 or early 2009, the company pulled its retail sales and went full-bore into MLM. Over the past several years LifeVantage has re-named this business different ways, for example, currently it is characterized as "The Ideal Side Hustle." "Whether you're looking for some extra pocket money or a full-time gig, we give you the platform and tools you need to start your business."[11]

56.     Whatever it is called, the "business opportunity" disguises the pyramid nature of LifeVantage's business by coupling its products—that were largely ignored by a real retail public for years before the MLM business-- with suggestions that the new Distributor will be able to make money in commissions by selling the miracle "Protandim" product to retail customers.

57.     Such is the power of "industry-proven techniques" that LifeVantage's sales increased, astonishingly so. Once its "scientifically-proven" "breakthrough" products were pulled off retail shelves and began to be marketed to Distributors along with commissions for recruiting other Distributors, the company's revenues on "Protandim" went from $11.4 Million in 2010 to $29 Million in 2011. In a few short years they approached then surpassed $200 million. "Protandim" and its related products account for about 70% of the company's stated sales.

58.     Unlike its money-losing store-shelf retail model, LifeVantage's MLM sales model convinced hundreds of thousands of people to become LifeVantage customers. But these customers were not paying for LifeVantage "scientific" and "patented formula" for curing cancer, diabetes, or heart disease; they were paying for the *real* product being sold, the "business

---

[11] https://www.lifevantage.com/opportunity/ (August, 2018).

opportunity" to the right to participate in LifeVantage's new business model. That model in practice was a variation of an inherently unlawful pyramid scheme.

### 5. Pyramid schemes are inherently fraudulent

59.     Pyramid schemes are a mechanism used to transfer funds from one individual to another.  They are illegal because they are structured in a way that incentivizes participants to grow their business by finding new participants with no incentive for retail sales. When the rewards are primarily based on selling the right to participate in the venture, rather than selling the merchandise, the revenue from the minimal sales of goods to consumers is insufficient to cover the marketing expenses and rewards promised for recruiting new participants, causing a collapse due to market saturation.   There is no natural market demand for the product sold by the scheme's promoters, resulting in little to no demand for the product beyond sales made internally to new recruits.  As the market for new distributors saturates, new distributors are left with unsellable, higher-than-market-price inventory and little to no chance to recoup their money from legitimate customers who actually want the product for itself.  The only market for the inventory, and the only opportunity to recoup the cost of maintaining the distributorship rights lies in recruiting another person. Pyramid schemes naturally funnel money to a small percentage of people at the top, money funded by the large base of distributors at the bottom.

60.     Federal law holds that pyramid schemes are "inherently fraudulent." Federal law and the Federal Trade Commission ("FTC") typically define a pyramid scheme (of which there are many variations) using the following test (from *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1181 (1975)):

> [Pyramid] schemes are characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users.  In general

such recruitment is facilitated by promising all participants the same 'lucrative' rights to recruit.[12]

61.     All states regulate pyramid schemes or endless chains. For example, the State of Connecticut, where Plaintiff Smith was recruited expressly prohibits pyramid schemes. "The advertisement for sale…or the actual sale… of any …rights or privileges at a price … which is contingent upon the [recruitment] of prospective customers procured by the purchaser, or the [recruitment] of … rights or privileges, to other persons procured by the purchaser, is declared to be an unlawful practice rendering any obligation incurred by the buyer in connection therewith, completely void and a nullity." Conn. Gen. Stat.  § 42-145. The State of New York, where Plaintiff Ilardo was recruited, also prohibits pyramid schemes. General Business Laws, Article 23A, Section 359-fff.

62.     One variation of the classic scheme is a product-based MLM company. The company purports to pay the distributor commissions based on the sale of the product, but in reality, the distributor is paid to recruit other distributors. In such schemes the sales of the product are mostly to distributors and not to real retail customers. In its public statement on product-based MLM pyramid schemes the FTC said the following:

> Pyramid schemes now come in so many forms that they may be difficult to recognize immediately. However, they all share one overriding characteristic. They promise consumers or investors large profits based primarily on recruiting others to join their program, not based on profits from any real investment or real sale of goods to the public. *Some schemes may purport to sell a product, but they often simply use the product to hide their pyramid structure. There are two tell-tale signs that a product is simply being used to disguise a pyramid scheme: inventory loading and a lack of retail sales.* Inventory loading occurs when a company's incentive program forces recruits to buy more products than they could ever sell, often at inflated prices. If this occurs throughout the company's distribution system, the people at the top of the pyramid reap substantial profits,

---

[12]https://www.ftc.gov/tips-advice/business-center/guidance/business-guidance-concerning-multi-level-marketing

even though little or no product moves to market. The people at the bottom make
excessive payments for inventory that simply accumulates in their basements. A
lack of retail sales is also a red flag that a pyramid exists. Many pyramid schemes
will claim that their product is selling like hot cakes. However, on closer
examination, the sales occur only between people inside the pyramid structure or
to new recruits joining the structure, not to consumers out in the general public.[13]

63.    The FTC explains the harm to consumers in an unfair and deceptive compensation

structure as follows:

> An MLM compensation structure that incentivizes participants to buy product,
> and to recruit additional participants to buy product, to advance in the marketing
> program rather than in response to consumer demand in the marketplace, poses
> particular risks of injury. Where such an unlawful compensation structure exists, a
> participant is unlikely to be able to earn money or recover his or her costs through
> selling product to the public. In such circumstances, participants will often
> attempt to recruit new participants who will buy product, and pressure existing
> recruits to buy product, with little concern for consumer demand. Where an MLM
> has a compensation structure in which participants' purchases are driven by the
> aspiration to earn compensation based on other participants' purchases rather than
> demand by ultimate users, a substantial percentage of participants will lose
> money.[14]

64.    In addition to inventory loading and lack of retail sales, the essential characteristic

of a pyramid scheme is that the compensation of participants is primarily derived from

participants' payments into the scheme and based on participants' recruitment of new

participants into the scheme. Little outside money comes into the scheme. The participants,

knowingly or not, feed off each other's money and are highly incentivized to bring new

participants into the scheme.

65.    The FTC distinguishes between legal and illegal (pyramid scheme) compensation

structures through a fact inquiry:

---

[13] https://www.ftc.gov/public-statements/1998/05/pyramid-schemes (emphasis added)

[14] https://www.ftc.gov/tips-advice/business-center/guidance/business-guidance-concerning-multi-level-marketing

> [T]he law requires that an MLM pay compensation that is based on actual sales to real customers, rather than based on mere wholesale purchases or other payments by its participants. In evaluating MLM practices, the FTC, in accord with established case law, focuses on how the structure as a whole operates in practice, and considers factors including marketing representations, participant experiences, the compensation plan, and the incentives that the compensation structure creates.

66.     Courts and the FTC have found product-based MLMs to be pyramid schemes when the following practices are present: (1) the entire scheme is more associated with recruiting other participants rather than selling the alleged product to outside customers; (2) when sales are primarily made internally to new distributors rather than to outside customers (lack of retail sales); (3) when there is a high dropout or "churn" rate among newly-signed distributors (indicating the reason why product was purchased was for the business opportunity to recruit others); (4) when the scheme's promoters spread implied or express promises of  wealth or financial independence if one is to participate in the "business opportunity;" and (5) when the scheme's promoters cause distributors to load up on the product (inventory loading) in order to receive commissions.[15] Each of these is present here.

67.     The FTC has recently strongly pursued product-based MLMs like LifeVantage based on the presence of these facts. Two such recent enforcement actions are significant as they were against companies with compensation plans for distributors virtually identical to LifeVantage, Vemma, Inc.,[16] and Fortune Hi-Tech.[17] Each of these actions received high

---

[15] https://www.ftc.gov/tips-advice/business-center/guidance/business-guidance-concerning-multi-level-marketing

[16] https://www.ftc.gov/system/files/documents/cases/150826vemmacmptf.pdf

[17] https://www.ftc.gov/sites/default/files/documents/cases/2013/01/130128fhtmcmpt.pdf

visibility in the MLM industry, especially in the Direct Sales Association ("DSA"), a lobbying group that LifeVantage belongs to and on whose board of directors Defendant Jensen sits.

68.     State regulators also pursue MLMs. Defendant Jensen joined LifeVantage in 2015 from a Chief Sales Officer position at Jeunesse, LLC, an MLM maker of cosmetic and other personal care products. Jeunesse's founder agreed to a permanent injunction with the State of Florida over a product-based MLM.  A leading consumer group charged that, during Jensen's term, the company and distributors made over 150 illegal claims that its non-FDA approved products can treat, cure, or prevent cancer and other diseases, and made false and misleading income claims.[18]

> **6. LifeVantage began its pyramid scheme with the introduction of its Compensation Plan, and secretly paid a number of professional recruiters from other MLM companies to join LifeVantage to pose as successful Distributors**

69.     The decision to change the sales model was made under direction of a new CEO, David Brown ("Brown"), a Cornell-educated lawyer who for years had worked in the MLM field. Prior to coming to LifeVantage, Brown was CEO of Metabolife, Inc., a notorious MLM that pleaded guilty to criminal federal tax evasion. Its product was an herbal supplement containing compounds made by Chemins Corporation, containing ephedra, a substance banned by the FDA. Its founders pleaded guilty to lying to the FDA, the ephedra product was banned, and the company went bankrupt shortly after Brown stepped down. Chemins was a contract manufacturer of "Protandim" for LifeVantage. The LifeVantage MLM Compensation Plan was modeled after Metabolite's.

---

[18] https://www.truthinadvertising.org/wp-content/uploads/2015/10/10-19-15-Letter-from-TINA-to-FTC-re-Jeunesse.pdf

70.     By 2009 the Compensation Plan was presented as a "Business Opportunity" at the top header of the LifeVantage website.  Links to sections called "Blueprint for Prosperity," "Success Stories" "True People." And "Financial Compensation" appeared on the site. The ABC News story from (then) 4 years earlier was prominently linked from the home page.[19]

71.     The new MLM distribution is a comprehensive system of false promotion, financial come-ons, and a Compensation Plan designed to convince Distributors to purchase an expensive set of "Protandim" products and recruit others to do the same. Only if the Distributor manages to victimize sufficiently many other people will he or she make money. This is a classic illegal pyramid scheme as explained below.

72.     To boost its entrance into the new MLM field, LifeVantage initially "purchased" a number of the top promoters in the multi-level marketing industry and entered into side agreements to their Distributor agreements with those particular distributors. The side deals paid these individuals to associate with LifeVantage as LifeVantage's "top earners."  These top earning promoters were given preferential rank status in the LifeVantage compensation plan and paid accordingly. They became the first Distributors who the company pointed to when showing its "success stories." [20]

73.     A recruiter named Burke Hedges joined the (then) brand new MLM on May 18, 2009.[21] Hedges later sued LifeVantage for the company failing to pay him his "incentives" to

---

[19]   https://web.archive.org/web/20091103111925/http://lifevantage.com (citing Nov. 3, 2009 capture)
[20] http://investor.lifevantage.com/news-releases/news-release-details/lifevantage-corporation-announces-addition-sales-record-setting

[21]  http://www.mlm-thewholetruth.com/network-marketing-news/burke-hedges-joins-lifevantage-as-a-distributor/

become a distributor.  He disclosed that his incentive was $20,000 per month, full qualification at the highest rank of the Compensation Plan (that is, be touted as a Pro 10 or higher ranking Distributor), "support, recruit, and train other LVN distributors," "work to develop sales aids to be sold to LVN's distributor using Mr. Hedge's likeness," and attend meetings and training events.[22] LifeVantage began using Hedge's name and photos and video on its website, print, and on other websites, "to promote the credibility of" LifeVantage.

74.    These professional distributors were paid for by a $3.5 million private placement: "The proceeds from this financing should allow the Company to accomplish several goals, including the expansion of our infrastructure and marketing efforts for our network marketing program."[23] In an April, 2011 "Global Convention" attended by 2,000 distributors, the company "recognized Master Pro 10" distributors who achieved a monthly organizational sales volume of $1 million."[24]

75.    To kickstart the MLM program, CEO Brown said in a press release:

Network marketing is by far the fastest growing sales channel for dietary supplements. We know that the Protandim® story is one that resonates with customers and makes them want to share the product's tremendous benefits with others. In the past, we have had many requests for independent distributorship opportunities with the Company. Until now that option was not available." Brown continued, "This latest step in our commitment to introduce Protandim® into multiple sales channels is marked by *the success we have had in recruiting successful network marketing professionals and distributors who have previously*

---

[22] http://www.mlm-thewholetruth.com/pdfs/Heges-vs-LifeVantageLawsuit.pdf

[23]    http://investor.lifevantage.com/news-releases/news-release-details/aspenwood-capital-raises-35-million-lifevantage-corporation

[24]http://investor.lifevantage.com/news-releases/news-release-details/lifevantage-holds-inaugural-global-convention-largest-gathering

*been instrumental in the success of some of the largest network marketing companies in the industry.*[25]

(emphasis added)

76.     Since 2009 the company continued to buy, entice, and secretly incentivize other professional recruiters throughout the years. In 2015, LifeVantage hired Defendant Jensen as its CEO. Jensen had been an executive at Jeunesse, LLC, a competing product-based MLM. Jeunesse accused Jensen in a lawsuit of recruiting and bringing with him to LifeVantage a number of its distributors, *i.e.,* professional recruiters.

77.     Defendant Jensen likes the practice, and has adopted the "Red Carpet Program" "to attract new experienced leaders to LifeVantage …providing activity-based incentives as they build their business." The company told investors it "had a history of success with similar programs, which have demonstrated significant return on investment."[26]

78.     These top earning Distributors are the faces behind LifeVantage's "you can do it, too" message, but no one else could do what these top earning Distributors did, because only they were inserted into the top of the compensation structure. Payments from the company, not available to unsuspecting Distributors like Smith and Ilardo, enabled these professionals to claim success and sell their own "proven" sales techniques, *i.e.,* teach how to recruit.

79.     For example, Team Heart's main web page, which is password protected to only those that join the team, offers earning guides, training academies, and weekly calls to its members.[27] Team Heart's "elites" are "Pro 7" high-level Distributors Kelly McCoy, Lisa Panton,

---

[25] http://investor.lifevantage.com/news-releases/news-release-details/lifevantage-announces-launch-protandimr-multi-billion-dollar

[26]     https://seekingalpha.com/article/4136015-lifevantage-lfvn-presents-20th-annual-icr-investor-conference-slideshow

[27]     http://www.teamheart.net/

Tanis MacDonald, Charlotte Venter, Pro 9 Distributors Rachel Jackson and Tara Wilson, and Executive Master Pro 10 Distributor Carrie Dickie. At least three of these Distributors are professional marketers who previously worked for ViSalus, Inc., a maker of weight-loss shakes and who were paid undisclosed contracts to act as "just like you" promoters for that enterprise.

80.     Another top recruiter, Tanis MacDonald was a top recruiter at ViSalus. Her former distribution business is a defendant in a RICO action alleging ViSalus was a pyramid scheme. In 2015 she and her partner announced they had left to join LifeVantage with the following press announcement directed at people like Plaintiffs:

> As global networking entrepreneurs that have built international teams producing tens of millions of dollars in revenue the move has turned heads and has many asking why? Never ones to shy away from a new challenge, they claim the move came as a result of needing a change and a new home to grow and develop their team in grounds they felt were more fertile.
>
> After more than 10 years of building and developing sale forces, the power couple was searching for a company that could assist in bringing them and their team to higher level. After months of searching and qualifying potential candidates the couple decided with a mix of heavy heart and eager excitement that LifeVantage would be their new home.
>
> "The timing is just right. All of the experience we've gained has given us total clarity on what to look for in a company. LifeVantage just seemed to keep ticking the boxes." Lorne said…. Lorne and Tanis have accumulated an impressive 5 million dollars in earnings over the last decade. Through their brand Million Dollar Mentors they have worked closely with entrepreneurs of all ages and backgrounds from around the world. Giving time and attention to developing their teammates mindsets and skill sets is what sets this dynamic duo apart. Their passion for seeing other people succeed under their tutelage is undeniable.[28]

81.     Teams of these "special" marketers work directly with members of LifeVantage management to coordinate recruiting events and attract new, unsophisticated Distributors. For

---

[28]     https://marketersmedia.com/industry-veterans-lorne-humenny-and-tanis-macdonald-partner-with-lifevantage/99054

example, on May 27, 2018, a Distributor named Rachel Jackson, a former ViSalus top distributor (and also a current defendant in a RICO action tying her to the ViSalus pyramid scheme) who left the company in 2017, held a recruiting meeting with Defendant Jensen, the LifeVantage CEO in the Netherlands to begin LifeVantage operations.[29]

### 7. The pyramid scheme: LifeVantage requires distributors to pay money to participate

81.     The first element of the *Koscot* test is whether the distributor pays money for the right to sell a product and receive rewards. Since 2009, every new Distributor like Plaintiffs and the Class must pay money to LifeVantage for the right to receive rewards.

82.     LifeVantage requires each Distributor, like Plaintiffs Smith and Ilardo, to enter into a relationship it purports to define as an "Independent Contractor." It requires each Distributor to get compensated under the terms of a common Compensation Plan ("Plan"). The Plan is marketed as part of the "business opportunity" offered by LifeVantage, and is coupled to Policies and Procedures, and a Distributor Enrollment Form. The combination of each of these is an offering for investment and a security under federal securities laws. All members of the Securities Class signed such an agreement or otherwise agreed to the agreement.

83.     The Plan has eight ways that the Distributor can earn money, seven of which are directly tied to recruiting: (1) by obtaining a "Smart Start Bonus," (2) by obtaining a "Launch Bonus," (3) by earning "Royalty Commissions, (4) by obtaining a "Generational Matching Bonus," (5) by obtaining a share of an "Elite Bonus Pool," (6) by reaching a "Rank Achievement Bonus," and (7) by participating in "Business Centers." Another bonus is available for Retail Sales—but these are so small as to be insignificant. Each of these eight bonuses or commissions

---

[29] https://www.eventbrite.com/e/lifevantage-opportunity-meeting-tickets-45915155466#

is only paid to people who have first paid LifeVantage a fee for the right to participate in the Compensation Plan.

84.     Under the Compensation Plan, LifeVantage requires Distributors to constantly spend money to participate in the business opportunity.

85.     First, an individual must "enroll" as a Distributor and purchase a Start Kit for $50, plus shipping and handling charges. Both Plaintiffs Smith and Ilardo were presented with the LifeVantage business opportunity and paid money to LifeVantage for the right to sell LifeVantage products and to participate in the LifeVantage Compensation Plan. The Start Kit constitutes one fee for the right to obtain a reward.

86.     Second, LifeVantage encourages Distributors to purchase expensive Product Packs when they first sign up. The LifeVantage Distributor Application offers several Product Pack options: the Platinum Pack at $1,200.00, the Gold Master Edition Pack at $600.00, the Gold Performance Edition Pack at $600.00, and the Silver Pack at $300.00.

87.     The various Product Packs contain a variety of LifeVantage product. For example, the $1,200 "Platinum Pack" contains six (6) bottles each of two "Protandim" supplements, "anti-aging" creams, and dog "Petandim" product. The product is too voluminous for "personal consumption," and is neither sold for personal consumption nor marketed as such. Thus, the initial purchase of product, from $300 to $1,200, constitutes another fee for the right to obtain a reward.

88.     Third, in order to receive any bonuses, a Distributor must maintain a certain amount of "PV" or "Personal Volume" every month. PV refers to the amount of product purchases for which the Distributor is directly responsible on a dollar for point basis —the

Distributor's personal purchases, purchases made by "Preferred Customers" signed up by the Distributor, and orders by retail customers.

89.     To be eligible for half bonuses, a Distributor must maintain 100-199PV every month. To be eligible for full bonuses, a Distributor must maintain at least 200PV every month. And to be eligible for any bonuses and maintain "Distributor" status, 40PV must come from a Distributor's personal purchases. Thus, each Distributor is effectively required to purchase a month's supply of "Protandim" or the other products whether or not he or she wants them for personal consumption, in addition to satisfying the remainder of the PV requirement.

90.     <u>Fourth</u>, in addition to purchasing the Product Packs, LifeVantage encourages Distributors to sign up for future automatic shipment of products. The enrollment materials call the "Autoship Program" optional, however, its recruiting materials and recruiters all emphasize that the program is necessary for success. Under that program, a new (or existing) Distributor gives his/her credit card information to the company and authorizes an automatic shipment of product unless an exacting sequence of stop orders is made in tightly-regulated time periods. The program's small print includes a statement that each shipment will be subject to (undisclosed amount) "shipping and handling fees."  LifeVantage promotes the Autoship Program as a way for Distributors to meet their monthly PV requirements. The auto-ship purchase of product constitutes another fee for the right to obtain rewards.

91.     <u>Fifth</u>, the enrollment materials also push the purchase of a "Pro Audio Series" auto-ship program. Under that program, the new Distributor also authorizes LifeVantage to debit his/her credit card to regularly receive "Pro Audio Series" training CD's. The enrollment materials also sell pre-authorized and automatically renewing "passes" to "Master Track Events" such as "Global Conventions" and "Elite Academies." For example, the Platinum Pack contains

LifeVantage event tickets, two months of "mobile technology" and/or Pro Audio Series CDs and enrollment in the program, which includes presentations from LifeVantage leaders. The continued purchase of training material constitutes another fee for the right to obtain a reward.

92.     Sixth, in order to remain in "good standing," Distributors must pay an annual renewal fee.  The renewal fee amount is not disclosed to Distributors in the U.S. Independent Distributor Application and Agreement or the LifeVantage USA Policies and Procedures. (See **Exhibits A & B**). Thus, the renewal fee constitutes another fee for the right to obtain a reward.

### 8.  The LifeVantage Compensation Plan disproportionately rewards Distributors for recruiting other participants into the program

91.     The second part of the *Koscot* test asks whether the distributor pays for the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users.  This element is also present in the LifeVantage operation. The Compensation Plan is little more than a right to receive rewards unrelated to sale of the product to ultimate users in return for recruiting other participants into the program. This is because (1) there are very few "ultimate users" who buy the product at retail, and (2) the Compensation Plan overwhelmingly pays for recruiting rather than product sales.

92.     The Compensation Plan cannot pay Distributors commissions on their own personal purchases (whether voluntary or compelled under the Compensation Plan's PV requirement), and in fact the company does not even account for those sales as commissions.

93.     What commissions does pay come under the eight bonus tiers, seven of which are based, directly or indirectly, on how many recruits are in the Distributor's "downline." The Compensation Plan works to steer Distributors into recruiting activity and reward them handsomely for recruiting and discourage "retail" sales which siphon off potential new Distributors and generate little in the way of returns for the Distributor. In effect (and by design),

the Compensation Plan makes the sales activity economically viable only if the Distributor recruits others to become a Distributor.

94.      Two key aspects of LifeVantage's Compensation Plan encourage this activity. The higher a Distributor ascends in the LifeVantage ranks, the more types of bonuses he or she is theoretically eligible for. Ascension in the ranks depends upon the recruiting and the amount of product purchased by the Distributor and his or her "downline."  The size of bonuses depends upon the amount of product purchased by a Distributor's "downline." Thus, the Plan pays the Distributor for actively maximizing both recruiting a new recruit *and* ensuring that the new recruit purchase an expensive Product Pack.

95.      On the other hand, LifeVantage provides little to no incentive for Distributors to generate retail sales to customers who do not want to become Distributors. Distributors may sell the products for more than they pay LifeVantage for the products, but this compensation is negligible compared to the potential compensation tied to recruiting. However, as Plaintiffs personally found out, since there is little real demand for the product, and substitute natural anti-oxidants exist in much cheaper alternatives, there is little to no opportunity to sell the product at a profit in any event.

### a.      The ranking system encourages recruiting and product purchases

96.      The amount of a Distributor's bonus is determined in part by the Distributor's rank. The higher the Distributor's rank, the more types of bonuses the Distributor is eligible to receive, and the greater the potential bonus. The LifeVantage Compensation Plan provides twelve ranks: Pro 1-Pro 10, Executive, and Presidential. (See **Exhibits C** and **D,** Compensation Plan Highlights and Compensation Plan).

97.     Ascending the ranks depends upon a Distributor's monthly PV, monthly OV (the product purchased by junior Distributors), the number of "legs" in the Distributor's organization (the number of directly junior Distributors), and the distribution of OV across the legs. The first five rows of the chart below summarize the ranking requirements:



| Royalty Commission (dynamically compressed) | | | | PREMIER | | | ELITE | | | MASTER | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **PAID AS RANK** | Pro 1 | Pro 2 | Pro 3 | Pro 4 | Pro 5 | Pro 6 | Pro 7 | Pro 8 | Pro 9 | Pro 10 | Executive | Presidential |
| **Minimum Monthly PV(4)** | 100 | 100 | 100 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| **Minimum Monthly OV** | 1,000 | 2,500 | 5,000 | 10,000 | 20,000 | 50,000 | 100,000 | 200,000 | 500,000 | 1,000,000 | 2,000,000 | 5,000,000 |
| **Minimum Leg Req.** | 1 | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 3 | 4 | 5 |
| **Maximum % per Leg** | 100 | 80/20 | 80/20 | 80/20 | 60/30/10* | 60/30/10* | 60/30/10* | 60/30/10* | 60/30/10* | 40/40/20 | 40/40/10/10 | 40/35/10/10/5 |
| 1st | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% | 2% |
| 2nd | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| 3rd | | | 9% | 9% | 9% | 9% | 9% | 9% | 9% | 9% | 9% | 9% |
| 4th | | | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| 5th | | | | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| 6th | | | | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| 7th | | | | | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| 8th | | | | | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| 9th | | | | | | | 2% | 2% | 2% | 2% | 2% | 2% |

*UNILEVEL* — Paid Monthly

| | Enroller | Gen 1 | Gen 2 | Gen 3 | Gen 4 | Gen 5 |
|---|---|---|---|---|---|---|
| 30% Generational Matching Bonus(6) | YOU | you earn 10% | you earn 5% | you earn 5% | you earn 5% | you earn 5% |

4% Elite Pool  4% of total commissionable sales paid to qualified Pro 7 through Master Distributors.

Pro 7, 8, 9 & 10 share 1% | Pro 8, 9 & 10 share 1% | Pro 9 & 10 share 1% | Pro 10 Executive Presidential share 1%

(1) At least 40 PV must come from personal product purchases. The remaining PV can come from purchases made by Personally enrolled Preferred Customers and Retail Customers.
(2) Receive a 30% or 40% Smart Start Bonus on all product purchased by new personally enrolled Distributors and Preferred Customers within their first calendar month, up to 1,000 CV. Product packs are available for purchase by both Preferred Customers and Distributors. Start Kits are sold separately and are required to begin your distributorship.
(3) "Paid Rank" is defined by the most recently completed and closed monthly commission period. You must have 200 PV to earn this bonus which may come from selling product to Preferred Customers, Retail Customers AND at least 40 PV in personal product purchases.
(4) Monthly minimum PV requirements may come from Preferred Customers, Retail Customers AND at least 40 PV in personal product purchases.
(5) 10% of the OV requirement must come from the equivalent of a third leg.
(6) Earn the full Generational Matching Bonus by being 'paid as' Pro 3 or higher and by maintaining a minimum of 200 PV, at least 40 of which must come from personal product purchases. The remaining PV can come from purchases made by personally enrolled Preferred Customers and Retail Customers. If your PV is between 100-199, you will earn half of the Generational Matching Bonus.

The LifeVantage Compensation Plan is unique. Any charts, illustrations and stated examples of income under the plan are potential in nature and not based on the actual performance of any individual.

©2016 LifeVantage Corporation • 9785 S. Monroe St., Ste. 300, Sandy, UT 84070 • USA • 866.460.7241 • lifevantage.com
This form may not be altered without the express written consent of LifeVantage.

16110201.06
Revised 11/07/2016

98.     The requirements for rank ascension encourage recruiting and product purchases. Maintaining monthly PV explicitly requires personal product purchases. Attaining OV levels encourages recruiting (because the more Distributors recruited, the more persons who will be buying product and contributing to OV) and personal product purchases (because personal purchases count toward OV). Maintaining a sufficient number of legs obviously encourages recruiting, as does the percentage OV requirements across the legs, because not only do the ranks require multiple legs (after Pro 1), but also enough legs must be sufficiently active.

99.     LifeVantage's Form 10-K forms reveal that in fact the majority of the product sold is to the company's own Distributors at a significant markup over cost. LifeVantage has a gross margin of 83% on the cost of its product, for example $168.4 million in 2018. It pays $158 million on overhead, most of it on commissions. Thus, it must significantly mark up its product in order to yield a profit. Each Distributor must maintain approximately $150 per month in purchases. At the company's reported level of sales and number of Distributors, at least 62% of its sales must be to Distributors.

> **b.      The bonuses encourage recruiting and product purchases by Distributors**

100.    To start with, the company requires the new Distributor to purchase a large amount of inventory and enter into a monthly automatic shipment agreement to purchase ever more inventory.

101.    The vast majority of new Distributors, like Plaintiffs Smith and Ilardo, do purchase a Product Pack. That means that each such Distributor already possesses a sizeable inventory of product before the first of the monthly auto-ship purchases begin rolling in. Unless the new Distributor can quickly sell the inventory—which he or she typically cannot as there is little to no market for the product at unrealistic "retail" pricing—from the first day of enrollment the Distributor begins to stockpile inventory.

102.    The LifeVantage Compensation Plan includes bonuses and rewards that pay based on recruiting and product purchases by Distributors:  the Smart Start Bonus, the Launch Bonus, Royalty Commissions, the Generational Matching Bonus, the Elite Bonus Pool, the Rank Achievement Bonus, and the My LifeVenture Program.

### i.      Smart Start Bonus

103.    The Smart Start Bonus is paid weekly to Distributors who personally enroll new Distributors or Preferred Customers into their organization. A Distributor who has 200PV will earn a 40% bonus of the product volume for each Silver, Gold, or Platinum Pack purchased by a newly enrolled Distributor (a Distributor with a PV of 100-199 will earn 30% rather than 40% on all newly enrolled Distributor and Preferred Customer initial purchases). Thus, a Distributor with 200PV who personally enrolls a new Distributor that purchases a Platinum Pack will earn $400, $200 on all new Distributors that purchase a Gold Pack, and $100 on all new Distributors that purchase a Silver Pack. In this way, the Smart Start Bonus encourages recruiting (because there is no bonus without a new enrollee), pressuring new enrollees to buy the most expensive product Packs (because the bonus is based on the cost of the Pack), and product purchases by the Distributor receiving the bonus (because the amount of the bonus depends on the Distributor's PV).

104.    The Smart Start Bonus will also pay 40% to a Distributor for all personally enrolled "Preferred Customer" initial purchases. A Preferred Customer is a customer who enrolls in LifeVantage's monthly autoship program and receives a selection of LifeVantage products automatically each month at the discount wholesale pricing or Distributor cost.   Although Distributors receive some compensation for signing up Preferred Customers, at every turn the Compensation Plan incentivizes a Distributor to push a prospective enrollee to become a Distributor because enrolling a Distributor increases the ability of a Distributor to grow his or her business and receive even more bonuses, while enrolling a Preferred Customer cannot lead to vertical growth (since Preferred Customers cannot enroll new Distributors).

### ii. Launch Bonus

105.     The LifeVantage Launch Bonus pays the first qualified Pro 3 or 4 Distributor above the enrolling Distributor $50 for each Platinum Pack purchased (or $25 for each Gold Pack Purchased and $12.50 for each Silver Pack Purchased). The same Pack purchased will pay up the line for another $50 to the next qualified Pro 5 or 6, then another $50 to the next qualified Pro 7, 8, or 9 upline, then $25 to the first qualified Pro 10, $15 to the first qualified Executive, and $10 to the first qualified Presidential Ranked Distributor upline. For example:



106.     The LifeVantage Launch Bonus thus incentivizes Distributors to recruit new Distributors because with more junior Distributors, the likelihood of earning a Launch Bonus increases. The Launch Bonus also encourages senior Distributors to encourage their junior Distributors to engage in recruiting, so the senior Distributor can earn a Launch Bonus.

### iii.       Royalty Commissions

107.    Royalty Commissions are paid monthly and are based on the Distributor's rank and products purchased by junior Distributors (other than initial Product Pack purchases, which are bonused via the Smart Start Bonus). As the Distributor ascends in the ranks, the Distributor may receive Royalty Commissions based on more junior Distributors' purchases. A Distributor can only achieve multiple levels in their business organization by recruiting additional Distributors to the scheme. The more directly junior Distributors recruited by a Distributor, the more opportunity there is for that Distributor to develop a long leg that will allow him to receive Royalty Commissions from more junior Distributors. The chart produced after paragraph 53, above, sets forth the details of how Royalty Commissions are paid.

### iv.       Generational Matching Bonus

108.    The Generational Matching Bonus is paid monthly to Distributors based upon the Royalty Commissions of a Distributor's organization. A Distributor must be qualified as a Pro 3 Rank or higher in order to receive the Generational Matching Bonus. A Distributor will earn 10% of the commissions earned by all of that Distributor's personally enrolled Distributors' Royalty Commissions, 5% of the Royalty Commissions of the Distributor's personally enrolled distributors' Distributors (2nd Generation), and 5% of the Royalty Commissions of each the 3rd Generation, 4th Generation, and 5th Generation Distributors' Royalty Commissions.

109.    The Generational Matching Bonus motivates Distributors to recruit new Distributors because the receipt of the bonus depends upon the existence of junior Distributors. In addition, to receive a Generational Matching Bonus, Distributors in Pro Rank 3-6 must incur 100 in new volume by a new Distributor, Preferred Customer, or Retail Customer in the month the Generational Bonus is to be awarded, which also encourages recruiting. (At Pro Rank 7 and higher, this new volume requirement is waived.)

110.    The Generational Matching Bonus encourages Distributors to recruit new Distributors rather than Preferred Customers or Retail Customers because the bonus payout is based upon vertical levels that can only be achieved with the enrollment of additional Distributors. Preferred Customers and Retail Customers do not count for vertical advancement. The following excerpt from the Compensation Plan describes the Generational Bonus:



**05  GENERATIONAL MATCHING BONUS** (paid monthly)

Not only do you earn your own Royalty Commissions, but once you achieve the rank of PRO 3, you also earn a 10% match of your personally-enrolled Distributors' Royalty Commissions.

But that is not all. You also earn a 5% match of your 2nd, 3rd, 4th, and 5th generation's Royalty Commissions.

**GENERATIONS:**

**1st generation:** any personally enrolled Distributors (downline)

**2nd generation:** any personally enrolled Distributors (downline) that are enrolled by your 1st generation Distributors

**3rd generation:** any personally enrolled Distributors (downline) that are enrolled by your 2nd generation Distributors

**4th generation:** any personally enrolled Distributors (downline) that are enrolled by your 3rd generation Distributors

**5th generation:** any personally enrolled Distributors (downline) that are enrolled by your 4th generation Distributors

|  | | | |
|---|---|---|---|
| YOU ENROLL | = | 1st GEN | = | 10% |
| THEY ENROLL | = | 2nd GEN | = | 5% |
| THEY ENROLL | = | 3rd GEN | = | 5% |
| THEY ENROLL | = | 4th GEN | = | 5% |
| THEY ENROLL | = | 5th GEN | = | 5% |

### v.      Elite Bonus Pool

111.    The Elite Bonus Pool is paid monthly to the Distributors that maintain a qualified Elite Level Rank of Pro 7 or higher. 4% of all total commissionable sales is placed in the "Elite Bonus Pool" and divided into four shares. Pro 7s earn one share of the 1% Pro 7 Pool, Pro 8s earn one share of the Pro 7 Pool and one share of the Pro 8 Pool, Pro 9s earn one share of the Pro 7 Pool, Pro 8 Pool, and Pro 9 Pool, and Pro 10s earn one share each of the Pro 7, Pro 8, Pro 9, and Pro 10 Pool. See for example:



112.    The Elite Bonus Pool motivates Distributors to recruit other Distributors into the scheme because an individual cannot achieve the Elite Ranks without enrolling Distributors who then enroll the next round of Distributors, and so on. Moreover, the more Distributors a Distributor recruits, the greater the amount of total commissionable sales.

### vi.        Achievement Bonuses

113.    The LifeVantage Achievement Bonuses are paid to Distributors that reach the highest "Master" Ranks. A Master Pro 10 is eligible to receive a $100,000 Achievement Bonus, An Executive Master Pro 10 is eligible to receive a $250,000 Achievement Bonus, and a Presidential Master Pro 10 is eligible to receive a $500,000 Achievement Bonus. To receive the Achievement Bonuses, the Distributor must remain qualified at the Master Rank and remain "actively engaged" and in good standing and be recognized on stage at a major event, *i.e.* motivate other Distributors to continue recruiting participants by providing misleading money-making representations. In fine print, LifeVantage discloses that the Master Pro 10 Achievement

Bonus is paid out over 12 months and the Presidential and Achievement Bonus is paid out over a period of 24 months and only in the months that the Distributor achieves the qualified Rank.

114.    The Achievement Bonuses encourage Distributors to remain in the LifeVantage program, to recruit, and to maintain their PV requirements.

### vii.    The My LifeVenture Program

115.    LifeVantage also offers Distributors awards through its "My LifeVenture" program where LifeVantage's top-performing Distributors are rewarded for recruiting other product-purchasing Distributors with select LifeVantage branded Jeeps, Harley Davidson motorcycles, ATV's, or other luxury toys, vacations, or shopping experiences. (See **Exhibit E,** My LifeVenture).



*    *    *

116.    Thus, the entire focus of the Compensation Plan, which ultimately controls the payouts to Distributors, is recruitment and product purchases by Distributors. Just like a classic pyramid scheme, Distributors are required and encouraged to pay their own money into the scheme and recruit others who will do the same.

82.    The plan uses professionals to market the system. The side deals and purchases of these professionals are another hallmark of a pyramid scheme. These paid-for professionals were not disclosed to people like Plaintiffs as, essentially, actors playing a "just like you" Distributor. Their likenesses being used in advertising make it appear as if they had started as a "regular" distributor, and the earnings in the LifeVantage distributor earning claims statement (claiming it "is intended to provide truthful comprehensive information regarding the income earned by LifeVantage Distributors.") is distorted by the overwhelming, and possibly exclusive, presence of these professionals in the top, over-$100K/month earners.

### 9.    The new MLM "business opportunity" sells training and materials that in reality only taught the new Distributor how to recruit others

83.    At no time between 2009 and today has LifeVantage purported to teach its Distributors anything about diagnosis of any medical condition. Instead, the company assures anyone who signs up that everyone "needs" "Protandim" because everyone ages. Likewise, the company spends virtually no time teaching its Distributors how to sell the product to customers. Instead, it provides "proven success" training in the only thing that matters: how to recruit another Distributor.

84.    LifeVantage offers incentive trips and retreats to Distributors as a reward for achieving certain ranks, that is recruiting enough people that the Distributor ascends through the "Pro" system. LifeVantage and its top professional promoters plan, participate in, and/or attend

these incentive trips. The purpose of these is twofold: to get new Distributors to buy the "proven success" guides and training, and to teach and encourage recruiting methods to get more Distributors through the door.

85.     LifeVantage and its top professional promoters provide coaching to Distributors and potential recruits through the Pro Audio Series, a collection of recordings by the top earners offering inspiration and advice on how to successfully build a LifeVantage business and the perks of becoming a Distributor. These widely-distributed materials are a carefully-worded system of teaching how to recruit. For example, the word "recruiting" is discouraged: the recruits are "enrolled."

86.     The fact that the distributorship is nothing more than a recruitment scheme was admitted in the litigation brought by Burke Hedges against LifeVantage for failing to pay him his under-the-table deal. As he described the system:

> LVN business owners develop their independent distributor organizations by recruiting other business owners to purchase their product and to further develop a customer base…[30]

### 10.   In reality little of Distributors' compensation comes from retail sales because there is very little retail selling

117.    While it is theoretically possible for Distributors to sell the products they purchased from LifeVantage for a profit, they do not in reality, for a variety of reasons.

118.    <u>First</u>, after many years of operation, the company has less than a 2 to 1 ratio of customers to Distributors. It listed 116,000 "Active Customers" to 63,000 "Active Independent Distributors" in 2018. In other words, each Distributor like Plaintiffs Smith and Ilardo, system-wide, was successful in selling to fewer than 2 customers during the time he or she was active—typically three months. The company so little values retail sales that it treats the products

---

[30] http://www.mlm-thewholetruth.com/pdfs/Heges-vs-LifeVantageLawsuit.pdf

ostensibly purchased by Distributors like Smith and Ilardo for resale (as for example the several hundred dollars a month in auto-ship purchases) not as commissionable sales but as a "sales discount." And, as discussed later, these numbers are highly suspect, as the company routinely re-classifies Distributors and customers.

119.   Second, the retail sale of LifeVantage products uncoupled form the "business opportunity" has already been deemed a failure by the marketplace. Few actual customers at 4500 GNC stores wanted the $49.95 supply of "Protandim."

120.   Third, LifeVantage knows (and as shown below publicly acknowledges to the SEC) that recruiting—not retail sales—is what makes money for LifeVantage and consequently it incentivizes distributors to recruit not sell product to customers. In a 2009 publicly filed report with the Securities and Exchange commission LifeVantage acknowledged that recruiting Distributors is the key to success and product sales, not retail customers:

> [L]ike most network marketing companies, we are likely to experience high turnover among independent distributors from year to year. Independent distributors who join to purchase our products for personal consumption or for short-term income goals may only stay with us for a short time. Independent distributors have highly variable levels of training, skills and capabilities. *As a result, in order to maintain sales and increase sales in the future, we need to continue to retain independent distributors and recruit additional independent distributors. To increase our revenue, we must increase the number of and/or the productivity of our independent distributors.*

(emphasis added).

121.   In 2011, after the company began to turn a profit, its CEO at the time announced, "We are seeing a growing number of distributors join our team, as we had record attendance at

our recent quarterly distributor convention. We look forward to building upon this positive momentum and delivering another record year for LifeVantage in fiscal 2012."[31]

122.    In its 2018 Form 10K filing, LifeVantage explicitly linked its financial success to recruiting:

> Our operating results will be harmed if we and our independent distributor leaders do not generate sufficient interest in our business to retain existing independent distributors and attract new independent distributors. The number and productivity of our independent distributors could be harmed by several factors, including…
>
> - lack of a compelling business opportunity sufficient to generate the interest and commitment of new independent distributors;
>
> - any changes we might make to our independent distributor compensation plan…

123.    In the same filing, LifeVantage said:

> Because we primarily utilize a direct selling model for the distribution of our products, the success and growth of our business depends in large part on the effectiveness of our independent distributors in selling our products and on our ability to attract new and retain existing independent distributors. Changes in our product sales are typically the result of variations in product sales volume relating to fluctuations in the number of active independent distributors and customers purchasing our products.

124.    Fourth, since recruiting is the lifeblood of its business model, LifeVantage has little interest in actual retail sales and no reason to incentivize them. If LifeVantage cared about retail sales, it would have some way to track them, such as by requiring all retail sales to be made through the LifeVantage website. LifeVantage's bonuses and compensation structure could then by tied to the distributor's verifiable retail sales. But instead, LifeVantage sells its

---

[31] http://investor.lifevantage.com/news-releases/news-release-details/lifevantage-announces-record-first-quarter-fiscal-year-2012

products to the Distributors and has no meaningful ability to verify that Distributors are actually making retail sales.

125.   <u>Fifth</u>, LifeVantage restricts Distributors from selling the products in the only fora where Distributors could reasonably expect to sell enough products to make a meaningful profit:  e-commerce sites. Similarly, LifeVantage prohibits Distributors from selling products in brick-and-mortar stores:

> LifeVantage strongly encourages the retailing and selling of its products through person-to-person contact. In an effort to reinforce this method of marketing and to help provide a standard of fairness for its Independent Distributor base, Independent Distributors may not display or sell LifeVantage products or literature in any retail establishment.

*See* **Exhibit B,** Policies and Procedures ("P&P"), Section 10/1—Commercial Outlets. LifeVantage Distributors are strictly prohibited from selling products through online retailing outside of the Distributor's own LifeVantage website and brink-and-mortar stores so Distributors can make their pitch in person and encourage what LifeVantage is really interested in—hooking potential customers on LifeVantage's "business opportunity."

126.   <u>Sixth</u>, both Plaintiffs' own experience, and the experience of other LifeVantage Distributors indicates that selling LifeVantage products at retail for a profit is extremely difficult and not a significant source of income. This is known to the company. Defendant Jensen, in an investor call in 2018 admitted that "we had a very low conversion rate [for customers] because there was a requirement for them to make a purchase or to sign up completely through a distributor. So typically we couldn't convert any of that advertising power and turn that into new customers."[32]

---

[32]     https://seekingalpha.com/article/4144310-lifevantages-lfvn-ceo-darren-jensen-q4-2017-results-earnings-call-transcript?page=7

127.   <u>Seventh</u>, the company itself reports that there are no appreciable customers for each of its distributors. Defendant Jensen admitted in a lobbying and trade group interview that two-thirds of its Distributors were first classified as customers.[33] The company's filings break out its users into Distributors and Customers without revealing that two-thirds of the customers become Distributors.

128.   Its SEC disclosures acknowledge that LifeVantage's sales are directly driven by the number of new recruits. From the time LifeVantage transitioned to a MLM model and launched its network marketing sales channel, LifeVantage's sales per year grew proportionately with the number of Distributors. Even ignoring the customer-to-distributor turnover, its own disclosures reveal only a 2:1 ratio of Preferred Customers (who receive the same price as Distributors) to Distributors.

129.   LifeVantage's own numbers show that the revenue from product sales to Preferred Customers is insufficient to cover the promised rewards to Distributors for recruiting new participants (numbers taken from LifeVantage's Company SEC filings available at https://www.sec.gov/).

|  | Sales Per Year | Preferred Customers Per Year | Independent Distributors Per Year |
|---|---|---|---|
| 2007 | $5,050,988 |  |  |
| 2008 | $3,200,174 |  |  |
| 2009 | $4,141,304 |  | More than 2,000 |
| 2010 | $11,478,460 |  |  |
| 2011 | $38,919,000 | 35,000 | 16,000 |

---

[33] http://gigeconomygroup.com/news/lifevantage-machine-learning-in-direct-selling/

| 2012 | $126,183,000 | 119,000 | 46,000 |
|------|--------------|---------|--------|
| 2013 | $208,178,000 | 138,000 | 67,000 |
| 2014 | $213,968,000 | 128,000 | 68,000 |
| 2015 | $190,336,000 | 115,000 | 65,000 |
| 2016 | $206,540,000 | 117,000 | 69,000 |

130.   But even the above numbers for Preferred Customers are inflated, as many, if not most are simply "demoted" Distributors: LifeVantage unilaterally demotes Distributors to Preferred Customers if they have not bought a product for three months.

131.   The company's own SEC-reported financials give away that the overwhelming majority of funds used to compensate Distributors comes not from retail sales, but from sales to other Distributors and Distributors' payments to LifeVantage for things such as required product purchases, Start Kits, Product Packs, Renewal Fees and the like. As the company reports to the SEC, almost 50% of its gross revenue is paid in "commissions and incentives" to the Distributors.

132.   As with every pyramid scheme, that nearly $100 million a year is not spread evenly: the majority goes to the tiny fraction of Distributors at the top of the pyramid scheme, as a direct and indirect payment for successfully recruiting money-losing Distributors like Smith and Ilardo. Thus, Distributors are primarily feeding off each other, just as in a classic pyramid scheme.

133.   The company does classify its customers, whether Distributors or Preferred Customers, as each obtaining product for "personal consumption" and not for resale. The FTC treats "personal consumption" as follows:

**How does the FTC treat personal (or internal) consumption by participants in determining if an MLM's compensation structure is unfair or deceptive?**

Product that is purchased and consumed by participants to satisfy their own genuine product demand – as distinct from all product purchased by participants that is not resold – is not in itself indicative of a problematic MLM compensation structure. For example, the final order entered in *FTC v. Herbalife* permits the payment of compensation based on personal consumption, subject to specific limitations and verification requirements. However, the FTC's law enforcement experience has shown that MLM participants may buy product – and recruit or pressure other participants to buy product – for reasons other than their own or other consumers' actual demand, such as to advance in the marketing program.[34]

The FTC is clear that treating all purchases by a Distributor or a sale-incentivized Preferred Customer as product "unrelated to" recruiting, is illegal. To the extent that product purchased by either the Plaintiff Securities Class or the Plaintiff Antitrust Class is characterized as "personal consumption" product it is subject to remedies provided under either the securities or antitrust remedies below.

> **11.   The "Business Opportunity" was sold with implied and express promises of wealth**

134.    Pyramid schemes lure in recruits with the notion that Distributors can get rich quick. Although the get-rich-quick promises are often accompanied by small print disclaimers in the company's "official" written materials, LifeVantage and its "Top Achieving" promoters message is loud and clear:  vast riches await people "just like you" who "work" the system, *i.e.,* try to sell product and recruit others to join the pyramid beneath them in their "downlines."

135.    The FTC and the courts find such statements and activities deceptive under the following principles:

- A company must have a reasonable basis for the claims it makes or disseminates to current or prospective participants about its business opportunity. A "reasonable basis" means objective evidence that supports

---

[34] https://www.ftc.gov/tips-advice/business-center/guidance/business-guidance-concerning-multi-level-marketing

the claim. If a company lacks such objective supporting evidence, the claims are likely deceptive.

- Some business opportunities may present themselves as a way for participants to get rich or lead a wealthy lifestyle. They may make such representations through words or through images such as expensive houses, luxury automobiles, and exotic vacations. If participants generally do not achieve such results, these representations likely would be false or misleading to current or prospective participants.

- Business opportunities may also claim that participants, while not necessarily becoming wealthy, can achieve career-level income. They may represent through words or images that participants can earn thousands of dollars a month, quit their jobs, "fire their bosses," or become stay-at-home parents. If participants generally do not achieve such results, these representations likely would be false or misleading to current or prospective participants.

- Even truthful testimonials from the very small minority of participants who do earn career-level income or more will likely be misleading unless the advertising or presentation also makes clear the amount earned or lost by most participants.[35]

136. Even though LifeVantage and the Individual Defendants know almost all new recruits are doomed to lose money, the illusion of easily "obtainable" wealth is spread through LifeVantage materials and numerous individual accounts on Facebook, YouTube, and Twitter, associated with the LifeVantage "opportunity."

137. The Compensation Plan was made available on the www.lifevantage.com website and was accompanied by a series of links to various sections of the site that depicted prosperous

---

[35] https://www.ftc.gov/tips-advice/business-center/guidance/business-guidance-concerning-multi-level-marketing

Distributors. For years, the Compensation Plan was captioned, "Compensation Like No Other. At LifeVantage, you're rewarded every step of the way on your path to success."[36]

138.    The LifeVantage website's first page highlights its "Opportunity" section. In large font, the following legend appears:

> PAYING THE LITTLE GUY
>
> **$80 - $5,800**
>
> Monthly Average Income for **Side Hustlers** (Pro 1-Premier Pro 6)*
>
> **$11,000 - $110,000**
>
> Monthly Average Income for **Full Timers** (Elite 7- Master 10)*
>
> https://www.lifevantage.com/opportunity/

139.    The company's website features "profiles" of "Master Pro" Distributors, like Carrie Dickie, who "over the past 25 years…built a multi-million dollar international network marketing business, finding her home with LifeVantage."[37] The site does not disclose that Dickie had been a top recruiter at Mona Vie, another MLM, and had been paid to join LifeVantage.

140.    At most times the "Business Opportunity" section or drop down menu extolled a "proven system" to "successfully attain prosperity:"[38]

---

[36]

https://web.archive.org/web/20120311195334/http://www.lifevantage.com:80/opportunity/compensation-plan/

[37] http://www.lifevantage.com/distributor/carrie-dickie/

[38]https://web.archive.org/web/20101220102051/http://lifevantage.com/opportunity-prosperity.aspx



141.    In the same section the website claimed that Distributors have access to a program of "unlimited earning potential:"



142.    At various points stock options to an "elite circle of dedicated corporate owners" were offered.

143.    LifeVantage touted the wealth of the few insiders at the top of the pyramid as examples of the riches that await new Distributors. These claims are often made at conventions attended by thousands of Distributors and potential Distributors. For example, a convention in Anaheim, headlined by Defendant Jensen, drew 5,000 attendees.[39]

144.    LifeVantage spreads the myth that LifeVantage presents a duplicable image of success in numerous ways. First, LifeVantage's Top Achievers are listed by rank on its website

---

[39] https://www.businessforhome.org/2018/07/lifevantage-elite-academy-attracts-5000-attendees/

and www.lvnmedia.com. The websites provide links to "inspirational" videos, stories, and other tools by the top ranked Distributors on how new Distributors can achieve success too.

145.   Second, Distributors and potential recruits can hear other "inspirational" stories from the top earners on how they became successful at the LifeVantage Academy. The Academy supposedly gives Distributors and recruits the "tools" for them to duplicate the success of the top-earning Distributors.

146.   Third, LifeVantage acknowledges new top-ranked Distributors at its events so that the newly enrolled Distributors or potential recruits can witness the "achievable" success.

147.   Fourth, Distributors and potential Distributors are encouraged to participate in open Facebook groups. There they and Defendant Jensen posts items like the following (September 5, 2018):



148.    <u>Fifth</u>, newly enrolled Distributors are asked to participate in daily, weekly, and monthly calls and events or "trainings" where they are able to listen to LifeVantage's Elite and Master Ranked Distributors provide advice, tools, and strategies to build their business.

149.    <u>Sixth</u>, the concept of duplication is reinforced by LifeVantage's self-styled "Proven Plan," which provides recruits with scripts and business tools "proven" to "assist a [Distributor] on the path to success and eventually become a Master Distributor."  For example:



150.    But any claim or suggestion that LifeVantage offers Distributors a route to financial success—much less at the level attained by LifeVantage's top performers—is false. These misrepresentations were all made as part of a coordinated strategy so that all Distributors

were presented with the same or similar misleading statements regarding the financial prosperity attainable through LifeVantage. Obviously, as made clear in LifeVantage's own Compensation Summary, Defendants know that almost all Distributors will lose money and that the vast majority of money distributed by LifeVantage only goes to a small percentage of Distributors.

151.    To make matters even worse, many of LifeVantage's "Top Achievers" are known professional recruiters in the industry and used as marketing tools to promote the earning potentials to new recruits. These individuals: (1) participate in and speak at LifeVantage events; (2) participate in daily/weekly/monthly calls; (3) actively promoting the scheme via social media and in numerous videos publicly available online; (4) create and disseminating training guides and "how to" advice for recruiting; and (5) create the general impression of unlimited earning potential. Using the hashtag #littleyellowpill, top promoters populate the Web with videos like "Pro 10 Leaders in LifeVantage- Million $ Interview with Brandon and Lynette Cunningham."[40]

### 12.  The company's "earned disclosure" forms are materially false and misleading

152.    None of the forms that the new Distributor is required to sign disclose that the Distributor must engage in recruiting others to the business opportunity to have any realistic opportunity to make enough money in commissions to pay for the Start Kit.  None of the forms disclose the number of customers each Distributor typically obtains; the total number of customers that the company sells its products to; or the ratio of customers to distributors. Nowhere on the LifeVantage website is this information posted. Each of these numbers and ratios is, and always was known to the company.

---

[40] https://www.youtube.com/watch?v=vx2ZHgZCYYY

153.    These omissions were material, in that the company and its top management knew that no rational investor would invest $50 much less $1,200 or more into one of its Start Kits if he/she knew that there were virtually no customers (that is people interested in the product absent the multi-level marketing business opportunity) and that most of the sales of the product were in fact made as part of or exclusively to the Distributors.

154.    The FTC treats misleading or deceptive income disclosures as a deceptive act.

155.    Data provided by LifeVantage to investors like Plaintiffs is deceptive. LifeVantage's Distributor Compensation Summary provides the following chart:

## July 1, 2016 through June 30, 2017

| Paid Rank | Total Annual Earnings | Monthly Average | Monthly Minimum | Monthly Maximum | Average % of Paid Distributors as a % of Total Distributors |
|---|---|---|---|---|---|
| DISTRIBUTOR | $1,731,282 | $13 | $0 | $9,440 | 40% |
| PRO 1 | $3,427,754 | $79 | $0 | $3,331 | 18% |
| PRO 2 | $6,484,651 | $261 | $0 | $13,610 | 9% |
| PRO 3 | $6,679,706 | $580 | $0 | $9,060 | 5% |
| PREMIER PRO 4 | $8,300,754 | $1,193 | $0 | $14,724 | 2% |
| PREMIER PRO 5 | $7,924,772 | $2,551 | $0 | $18,718 | 1% |
| PREMIER PRO 6 | $8,263,390 | $5,858 | $2 | $23,950 | <1% |
| ELITE PRO 7 | $5,678,802 | $11,292 | $224 | $32,214 | <1% |
| ELITE PRO 8 | $6,256,421 | $22,889 | $6,375 | $77,525 | <1% |
| ELITE PRO 9 | $4,336,764 | $42,641 | $16,498 | $66,955 | <1% |
| MASTER PRO 10 | $4,592,237 | $99,828 | $57,058 | $124,920 | <1% |
| EXECUTIVE MASTER PRO 10 | $1,993,294 | $110,739 | $85,258 | $154,854 | <1% |

The earnings of the Distributors in this chart are not necessarily representative of the income, if any, that a Distributor can or will earn through the LifeVantage Compensation Plan. Distributors' success will depend on individual diligence, work effort and market conditions. LifeVantage does not guarantee any income or rank success.

156.    First, the chart shows gross earnings to Distributors. The numbers do not account for the Start Kit, Product Packs, or Renewal Fees each Distributor paid upon enrolling as a

Distributor. Nor does this chart account for the money Distributors paid LifeVantage to purchase product.  Thus, the "earnings" do not reflect the investment made.

157.    <u>Second</u>, the chart disguises that most of the money paid out by LifeVantage is given to a very small number of people. Of the $65,669,827 of funds paid to Distributors, $47,346,434 (or 72%) is paid to less than about 4% of all Distributors—the ones at the very top of the LifeVantage pyramid. Almost all of the remaining 94% of Distributors lose money. They are left to split the remaining approximately $18,323,393 in funds, which averages out to about $298 per Distributor. Obviously, $298 per year does not go far in LifeVantage, especially after Starter Kits and Product Packs ($50 to $1,200), renewal fees, and monthly-required-product purchases (at least $40 per month) are made.

158.    LifeVantage had 14,500 out of 60,000 (or 24% of) Distributors who never received any compensation from LifeVantage. These Distributors necessarily received less from LifeVantage than they paid LifeVantage because every Distributor at least purchased a Starter Kit or paid a Renewal Fee. Moreover, because of the income incentives discussed above, most purchased products to maintain Distributor status and make bonuses. Consequently, another 40% of Distributors likely lost money since they only made an average of $13 per month. Assuming these Distributors purchased enough LifeVantage product to stay eligible as a Distributor (about $40), they also lost money.

159.    LifeVantage and Jensen know that new Distributors are doomed to lose money unless, and only if, they victimize other people to pay for the right to recruit and so forth. There is no meaningful way, and virtually no Distributor has or will, to make money on retail sales. The retail sales commissions, about $10/bottle, are simply too small.

160.   The Defendants have records for each Distributor showing that only a small percentage make a profit. They employ a sophisticated database that keeps track of every transaction in real time and breaks down the exact commissions due on every transaction, enrollment, achievement of a bonus, and sale. These metrics are the key economic report distributed in the company to its top management, and these numbers are immediately available to Defendant Jensen and the board.

161.   In addition to the numbers, the company and Defendant Jensen know that the "churn rate" for Distributors (how long they continue before dropping out), is abysmally low.

162.   The average "churn" in MLM companies is 56%, meaning that a distributor typically stays involved by recruiting and trying to make retail sales for 6 months. Defendant Jensen admitted in an earnings call in 2018 that the LifeVantage rate had been 38%, meaning that an average LifeVantage Distributor lasted only three months before ceasing to try to recruit and sell the product.[41] In an interview with a trade and lobbying group he admitted that distributor "attrition soars after the first month" as a distributor. He also admitted that the company knew that only distributors who quickly make a commission even re-order the product the next month.[42]

163.   The distributor numbers reflected in the company's SEC filings between 2011 and 2017 reflect that the "churn" rate those years was similar if not worse.

### 13. The Compensation Plan encourages inventory loading

[41] https://seekingalpha.com/article/4171945-lifevantages-lfvn-ceo-darren-jensen-q3-2018-results-earnings-call-transcript?page=2

[42] http://gigeconomygroup.com/news/lifevantage-machine-learning-in-direct-selling/

164.     Under the Compensation Plan, a Distributor must purchase a certain amount of product to stay eligible for commissions. To be eligible for half bonuses, a Distributor must maintain 100-199PV every month. To be eligible for full bonuses, a Distributor must maintain at least 200PV every month. Each of these requirements is substantially more than a personal consumption supply of "Protandim" product, which is sold as a 30 day supply for $40 to the Distributor. Thus, the Distributor is faced with either purchasing canine "Petandim," whether he or she has a dog or knows anyone with a dog, or anti-aging cream, or a caffeine drink ("AXIO") to maintain commission rights. This on top of the fact that most Distributors start with kits that already contain several months' supply of each of these products.

165.     These practices and requirements encourage precisely the type of harm condemned by the FTC.

### 14.     LifeVantage claims the plan is legitimate even though it knows the FTC has closed down product-based MLMs with nearly identical plans and policies

166.     Many Distributors have heard talk that MLM's are pyramid schemes. That is an issue for the MLM industry. Companies like LifeVantage must lie to their distributor base to assure them that their plan is on the "right" side of this issue.

167.     Defendants thus make false claims regarding the lawful nature of LifeVantage's scheme. For example, top corporate official Justin Rose has gone to great lengths to assure Distributors that LifeVantage is different than other MLMs found to be pyramid schemes, like Vemma.[43]     Additionally, the company in its Form 10-K recognizes that recruiting-based compensation plans in MLM companies are illegal:

---

[43] https://www.youtube.com/watch?v=nhgymaxWy8g

Direct selling activities are regulated by the FTC, as well as various federal, state and local governmental agencies in the United States and foreign countries. These laws and regulations are generally intended to prevent fraudulent or deceptive schemes, often referred to as "pyramid" schemes, which compensate participants primarily for recruiting additional participants without significant emphasis on product sales. The laws and regulations often:

• require us or our distributors to register with governmental agencies;

• impose caps on the amount of commission we can pay;

• impose reporting requirements; and

• require that we ensure, among other things, that our distributors maintain levels of product sales to qualify to receive commissions and that our distributors are being compensated primarily for sales of products and not primarily for recruiting additional participants.

168.    LifeVantage also reports that it spends less than 50% of its revenue on commissions, following a recommendation from the Direct Sales Association that staying below 50% makes the Plan "safe" from FTC action. But the numbers it reports to the SEC are false: the company treats payments to top distributors under side agreements as overhead, and treats sales to distributors for what it deems "personal consumption" not as commissions.

169.    What LifeVantage does not tell potential Distributors and new Distributors like Plaintiffs is that LifeVantage's compensation system is precisely structured in the fraudulent and deceptive ways prohibited by the FTC and every court presented with the issue: is this MLM a pyramid scheme? Its Distributors are rewarded primarily in return for recruiting others into its scheme rather than providing incentive for retail sales of its products – a structural certainty to collapse since the revenues from actual sales to actual consumers not associated with LifeVantage cannot cover the promised rewards for recruiting new participants.

**15.    LifeVantage's buyback and 70% provisions do not mitigate its pyramid scheme**

159.    LifeVantage purports to have two policies in an effort to avoid appearing as an obvious pyramid scheme: (1) the 70% certification; and (2) two refund policies. Each of these are smoke-screens designed to obscure the fact that LifeVantage is a pyramid scheme.

**a.    The 70% certification requirement is a sham**

160.    LifeVantage purports to require Distributors to be able to certify that at least 70% of products previously purchased were sold or consumed by the Distributor (the "70% Requirement"):

> By placing a new product order, an Independent Distributor is deemed to have certified that he or she has sold or consumed at least 70% of all products purchased in prior orders.[44]

161.    In a well-known decision referred to as the *Amway* decision, the FTC determined that an MLM might avoid the pyramid scheme label if its distributors actually sold to retail customers or consumed 70% of the products they purchased.[45]  The reason for this is that having turnover in the distributor purchase of product discourages inventory loading, a practice where distributors buy product just to get recruiting compensation. LifeVantage plainly had the *Amway* decision in mind when it adopted the "70% Requirement."

162.    The "70% Requirement" is a smokescreen and does not accomplish what the FTC required Amway to do in order not to be a pyramid scheme for two reasons.

163.    <u>First</u>, LifeVantage does not track retail sales, and has no real way to track retail sales by its Distributors. By leaving the self-reporting to its Distributors, LifeVantage cannot determine if a Distributor has complied with the "70% Requirement." LifeVantage knows that

---

[44] Exhibit B, Section 11.3 P&P.

[45] *In the Matter of Amway Corp., Inc.*, 93 F.T.C. 618 (1979).

Distributors routinely purchase more product than they need for personal consumption or to meet retail sales demand. For example, Plaintiff Ilardo still has a considerable amount of LifeVantage inventory he received as a result of the auto-ship program. LifeVantage knows there are only two customers per Distributor in any given three month period. It knows there are not enough sales to sustain the "70% Requirement."

164.   <u>Second</u>, LifeVantage deliberately encourages inventory loading by its auto-ship program. Under the program, a Distributor automatically receives a pre-determined amount of LifeVantage product per month, often, like Plaintiffs, several hundred dollars worth. Typically the auto-ship program is established at the outset of the affiliation, as for example for Plaintiff Ilardo, before the new Distributor even knows how many customers he or she will obtain or what his or her "personal consumption" may be. All this in addition to the new Distributor receiving a considerable amount of inventory as part of the new Start Kit, as Plaintiffs purchased. As a result, the LifeVantage Plan encourages and in real life practices precisely the inventory loading that the FTC condemns and the "70% Requirement" ostensibly is meant to prevent.

### b.  The refund policies are a smokescreen to the fact that LifeVantage operates a pyramid scheme

165.   LifeVantage offers two refund policies, but neither of these foreclose the conclusion that LifeVantage operates a pyramid scheme. First, LifeVantage allows Distributors to return product within 30 days of purchase (the "**30-Day Refunds**").[46] The products must be unopened, undamaged, and submitted for a refund within 30 days of purchase.[47] Second, LifeVantage allows Distributors to return all unopened product purchased within one year of

---

[46] Exhibit B, Section 13.1 P&P.

[47] *Id.*

purchase, but Distributors must resign from LifeVantage at the time they make the returns (the "**Resignation Refunds**").[48]

166.   LifeVantage's refund policies are inadequate to prevent the conclusion that LifeVantage is a pyramid scheme. The essential reasons why LifeVantage is a pyramid scheme are that it (a) requires and incentivizes Distributors to pay money to participate in the Compensation Plan, (b) emphasizes and rewards recruiting over retail product sales, and (c) primarily compensates Distributors with other Distributors' money. Only a complete and entire refund policy would impact the first reason why LifeVantage operates a pyramid scheme, and no refund policy can impact the second and third reasons why LifeVantage operates a pyramid scheme.

167.   LifeVantage's refund policies do not affect the conclusion that LifeVantage requires and incentivizes Distributors to pay money to participate in the Compensation Plan.

168.   Firstː, both refund policies are limited in time, so Distributors who purchased product outside the 30-day and one-year windows cannot receive refunds.

169.   Second, they are limited to a return of unopened product.

170.   Third, they provide no protection for Distributors who sold the product for less than the wholesale price, who gave away product in an effort to recruit new Distributors, or who consumed product they never would have purchased absent the incentives in the Compensation Plan.

171.   Fourth, the 30-Day Refunds do not apply to either Starter Kits, Product Packs, or Annual Fees, and the Resignation Refunds do not apply to Annual Fees. Thus, for example, the

---

[48] *Id*. at 13.3.

$1,200 worth of Platinum Product Pack purchased by Plaintiff Ilardo and Plaintiff Smith, containing dozens of bottles of various products, are not eligible for refund.

172.     Fifth, Distributors must resign before they are eligible for Resignation Refunds. Far from protecting Distributors, the requirement that Distributors resign punishes Distributors who have purchased more product than they need. Eligibility for Resignation Refunds requires Distributors to give up their places in the LifeVantage compensation structure (and contractual right to future commissions), which LifeVantage has encouraged the Distributors to achieve through hard work, recruiting, and product purchases.

173.     Sixth, both refund policies, and certainly the Resignation Refund policy, put the Distributor at risk that LifeVantage will invoke the 70% Requirement to reduce any unpaid bonuses. The return of product necessarily means that the Distributor did not consume or sell at least that much product. LifeVantage threatens its Distributors if it learns that a Distributor did not actually sell or consume 70% of the products the Distributor purchased:

> Failure to comply with this [70% R]equirement or falsely representing the amount of product sold or consumed in order to advance in the Compensation Plan constitutes a breach of the Agreement and is grounds for termination. Furthermore, a breach of this requirement entitles the Company to recover any commissions paid to the Independent Distributor for any period of time during which such documentation is not maintained or for which the provision has been breached.[49]

Moreover, a Distributor might fear that a Resignation Refund could result in threatened or actual litigation by LifeVantage to recover previously paid bonuses.

---

[49] *Id.* at 11.3.

**16.    Defendant Jansen is directly involved in running and trying to hide the pyramid scheme**

175.    LifeVantage's principals are intricately involved in promoting and maintaining LifeVantage's pyramid scheme. They promote and decide how LifeVantage is run and marketed. In short, they orchestrate the fraud. Since 2015, Defendant Jensen has been the public face of LifeVantage. He appears in its conventions, often in front of thousands of people, and spreads a story that LifeVantage is "on a mission to bio-hack the aging code." [50] According to Jensen, "We're doing it with nutrigenomics." Jensen paints a picture of a company filled with cutting-edge genetic research that has Big Pharma taking notice. Dropping references to Apple and other technology sellers, Jensen tells would-be distributors about the rosy future where LifeVantage product users may extend their life.

176.    The "bio-hack" claim is Defendant Jensen's marketing idea. Defendant Jensen knows that the company is nothing more than a MLM marketer. His mission at the company-indeed his own employment agreement gives him a large bonus if sales increase to $300 million-is to sell as much "Protandim" as he can.

177.    Its facilities contain no labs. All of its manufacturing and virtually all of the formulation and packaging is contracted out to third parties. It has no relationship with any research university. Its filings indicate that it spends $1 million per year for research and development, much of that in salaries to people posing as its Chief Scientist and the SAB. Whatever is left over goes to finding and licensing phone software apps to get the distributor force to recruit more people.[51]

---

[50] https://vimeo.com/236455463
[51] http://gigeconomygroup.com/news/onboarding-turning-training-into-first-sales/

178.   In contrast, the company has spent over $10 million during the past several years sponsoring a local professional soccer team in Salt Lake City. And it has 109 employees devoted to marketing and field support and spends over $90 million paying distributors to recruit new distributors, the real business of LifeVantage.



179.   Defendant Jensen often speaks at LifeVantage events and has a noticeable social media presence where he pushes the "business opportunity" directly to the public. Defendant Jensen knows that the company's real business model is convincing people to be distributors and has admitted what the company's real "technology" research is about: letting Distributors recruit.

180.   In public statements with the MLM trade and lobbying group DSA, Jensen admitted that two-thirds of the company's "customers" get turned into distributors, and that the company's "technology" initiatives are aimed at the distributors—to get them their "first dollar sale" faster.[52] Those technologies are aimed at getting the new distributor to recruit other

---

[52] http://gigeconomygroup.com/news/lifevantage-machine-learning-in-direct-selling/

distributors—to spread the word about the product and hit them with the "business opportunity."[53] The company's technology investment is meant to reinforce the Distributor's "psychological need to see investment in their potential" earnings.

181.    Defendant Jensen knows that the "biohacking" and "nutrigenomics" buzzwords are little more than a re-packaged claim that "Protandim" is an anti-aging pill. The implications that LifeVantage does any real science to validate its claims are false. While the distributors see and hear DNA strands flashing across the screen, in a quarterly conference call with investors in April, 2018, Jensen said:

> *A key aspect of our product strategy is to drive increased average order size.* As we announced a couple of weeks ago, we launched Vitality Stack Packets, this completes the second phase of our Vitality Stack launch combining four of our daily used products into packets for ease of use and improved affordability.
>
> The Vitality Stack Packets include our Protandim Nrf2, our Protandim NRF1, ProBio and Omega+ products. *This stack and stacks that we plan to release in the future will become the primary protocol to support the biohacking culture we are creating across the company, while increasing average order size and further diversifying our sales mix....*
>
> We have also made good progress developing our nutrigenomic story and the biohacking culture we've been building with distributors and customers. *Biohacking is becoming the underlying message for our field, leveraging our core competencies and existing products and is supporting our unique position in the market.*[54]

(emphasis added).

**B. LIFEVANTAGE FALSELY LURED DISTRIBUTORS TO PURCHASE PRODUCT AND ACT ON THE "BUSINESS OPPORTUNITY" WITH THE FICTION THAT THE DISTRIBUTION RIGHTS ARE VALUABLE BECAUSE ITS PRODUCT IS "SCIENTIFICALLY-PROVEN," AND CURES**

---

[53] http://gigeconomygroup.com/news/onboarding-turning-training-into-first-sales/
[54] https://seekingalpha.com/article/4144310-lifevantages-lfvn-ceo-darren-jensen-q4-2017-results-earnings-call-transcript?page=2

**OR   PREVENTS   DISEASES   AND   ENJOYS   PATENT PROTECTION ADVANTAGES**

182.    There are Distributors, like Smith and Ilardo, who entered into the "business opportunity" in part because LifeVantage made false claims about the products and the "business opportunity." Other members of the classes began as "Preferred Customers" who purchased product as a result of false product claims, and only later entered into the "business opportunity," because LifeVantage falsely convinced them there was a real retail market for its products (one uncoupled from the "business opportunity") and/or that there was an actual sales advantage in re-selling the product because the product had particular market advantages over competitive product. In all respects, the utility, effectiveness, and exclusivity of the product was always a main marketing point for the company intended to drive sales.

183.    "Protandim" is a trademark name for a pill form of these five ingredients, commonly sold by LifeVantage in a 675mg dose. A month supply of just these pills costs approximately $50. The capsuled combination are extracts of five natural herbs: milk thistle, Bacopa (creeping herb), ashwagandha (Indian ginseng), tea, and turmeric extracts. Each of these herbs has been commonly associated with anti-oxidant properties. Each of these is available from GNC stores, Walmart, Amazon, and natural health purveyors such as Puritan's Pride at a fraction of the cost LifeVantage charges its own Distributors and Preferred customers.

184.    The company has for years disclosed the proportions of each of the five ingredients on its label. A consumer could replicate the "formula" proportions printed on the label. The FDA has never approved any of these ingredients, individually or in combination, as a drug. The $50 price is 11X more expensive than if these herbs in extracted form, like "Protandim," were purchased from a common supply source such as Puritan's Pride.

185.   In order to charge 11X over retail cost of these commonly-purchased ingredients, LifeVantage has falsely suggested, implied, or outright said that its formula has a scientifically-based "synergistic" effect on preventing aging and that the "synergy" between the ingredients is patent protected.   The company says and implies that the patents whether marked on its "Protandim" bottles or on its website or everywhere else, give the Distributor exclusivity and confer a competitive advantage versus non-patent protected anti-oxidant formulas, which are plentiful.

186.   For years the company's claims have been to the effect of, "We haven't discovered the Fountain of Youth, but…" It has claimed that the product is the result of deep scientific research and was developed by a science-renowned inventor.

187.   The company typically claimed that the five-herb formula "revved up" the body's anti-oxidant generation more than the ingredients standing alone. It claimed that the "science" behind the combination worked on a genetic level. A common way in which the claimed "formula" worked, and how LifeVantage marketed it to investors and customers is set forth in this early press release:

> Lifeline Therapeutics, Inc. is a publicly traded company (OTCBB: LFLT) based in Denver, Colorado, that is dedicated to developing and marketing evidenced-based pharmaceutical products that *show advanced efficacy in dealing with oxidative-stress related diseases -- including cancer and diabetes -- as well as nutraceutical and cosmeceutical products that demonstrate vastly superior antioxidant protection and anti-aging results*. The Company's scientific platform *is based on breakthrough research* involving the body's natural antioxidant enzymes, Superoxide Dismutase (SOD) and Catalase (CAT). These enzymes are thousands of times more powerful than consumable antioxidants and can increase "Healthy Life Expectancy" through the avoidance or diminishing of age-related disease conditions. *Lifeline has developed a patent-pending composition, Protandim, that has been proven to be the first and only dietary supplement to simultaneously increase these two enzymes and reduce oxidative stress levels to*

*those of a 20-year-old or younger. For more information, visit www.protandim.com.*[55]

(emphasis added)

188.     Virtually every claim in this statement is false: the product has never been shown to "deal with" cancer or diabetes; there was never any "breakthrough" research and whatever research took place was the work of someone else; the company did not invent a "formula"; nor has the "formula" has never been proven to be the "first" or "only" supplement to reduce "oxidative-stress" to that of a 20-year old.

189.     But the false aura of "science" behind the "Protandim" pills and a patented product convinced Distributors to invest in the "business opportunity," and having invested, to continue to buy the product either for consumption or for resale in the belief that it does indeed have proven health benefits and is worth the money because it is patented.

### 1. LifeVantage Committed Fraud On The USPTO In Order To Give Itself A Smokescreen To Claim Its Products Were Scientifically Proven

190.     At the core of these efforts were a number of fraudulently-procured patents. The USPTO has issued patents to LifeVantage for certain formulations of the five-herb formula. LifeVantage marks its products with patent numbers. Owning and proclaiming patent protection became an important part of its strategy to convince Distributors that "Protandim" is worth $50-$150 per month charged by the company. The company touts the exclusivity of its formula in statements such as:

---

[55] https://www.businesswire.com/news/home/20050601006235/en/Lifeline-Therapeutics-Completes-8-Million-Private-Placement

[W]e're pleased to hold patents on Protandim, the most potent commercially available Nrf2 synergizing supplement on the market. This makes distribution an exclusive privilege of our independent distributors.[56]

191.   LifeVantage embarked on an aggressive patent strategy because it deliberately wanted to leverage the product with "exclusivity." Its early SEC filings describe the strategy:

*Intellectual Property, Patents, and Royalty Agreements*

*Protandim®* is a proprietary, patent-pending formulation for the purpose of enhancing SOD and CAT. The patent applications protecting this formulation are listed below and have been assigned to Lifeline Nutraceuticals.

We have taken, and will continue to take, an aggressive approach in protecting our intellectual property or license rights through patent protection and competent legal advice regarding contractual involvements. *Although the primary purpose of our intellectual property is to deter competition, it also may provide a potential revenue source through licenses. We are pursuing barriers to market entry by competitors as well as strong brand identity through the following activities with respect to our intellectual property*:

Our technology is covered by three U.S. utility patent applications on file in the U.S. Patent and Trademark Office. A Patent Cooperation Treaty (PCT) International Patent Application is also on file. These patent applications claim the benefit of priority of the seven U.S. provisional patent applications listed below and are directed to compositions and methods for alleviating inflammation and oxidative stress in a subject. The earliest filing date for this family is March 23, 2004. If issued, the expected term is through March 23, 2025 assuming there are no term extensions. These patent applications include:

- U.S. Application Serial Number 60/555,802, filed on March 23, 2004 (expired);

- U.S. Application Serial Number 11/088,323, filed on March 23, 2005 and claiming the benefit of priority to all the above-referenced U.S. provisional patent

---

[56]   https://web.archive.org/web/20130112144847/http://www.lifevantage.com:80/science/rooted-in-research/

applications.[57]

192.    After obtaining patent claims the company boasted:[58]

*Patents-LifeVantage has 6 patents on Protandim.*

Protandim is protected by six patents. Its patents protect the product from patent infringement- another party duplicating its formula and then creating and marketing an identical product. Each time a new patent is issued, Protandim, the Nrf2 Synergizer, is protected for an extended and additional period of time.[59]

Its website says:



193.    The company claims:

At the present time, we have only a single product, *Protandim™*. *We developed Protandim™, a proprietary blend of ingredients* that has (through studies on animals and humans) demonstrated the ability to enhance SOD in brain, liver, and blood, the primary battlefields for oxidative stress. .... The name *Protandim™* is derived from: "promoting the tandem" co-regulation of two of the body's anti-oxidant enzymes (SOD and CAT). *Protandim™* and the related intellectual property are owned by our subsidiary Lifeline Nutraceuticals.[60]

---

[57] http://edgar.secdatabase.com/135/102189006000015/filing-main.htm

[58] https://web.archive.org/web/20120806073443/http://www.lifevantage.com/science/patents/

[59] http://www.docmarvin.com/patents-and-science/

[60] http://edgar.secdatabase.com/135/102189006000015/filing-main.htm

(emphasis added).

180.    Several "Protandim" patents were ultimately granted. The patents were obtained through patent fraud in a variety of ways. The company willfully and deliberately falsified who invented "Protandim," concealing that it was a third-party. It failed to tell the USPTO about the third-party's invention, a license agreement, prior sales effort, and patent application. It then mis-identified and fraudulently added McCord as an inventor after one of the original inventors it had spent years claiming patents for died. The effect of these was a thorough and pervasive patent fraud on the USPTO and ultimately on Plaintiffs and the Securities Class and the Antitrust Class.

181.    LifeVantage claims it was the creator "Protandim," and its scientists are the inventors of the formula and other benefits associated with "Protandim." The patents it now holds, which it markets to the public, began with an application filed on March 23, 2004, by Myhill and Driscoll, the principals of Lifeline, the company merged or acquired by LifeVantage in 2004

182.    Myhill and Driscoll filed a provisional application in their own names, U.S. Application Serial Number 60/555,802. A number of subsequent applications and disclosures led to the issuance of the initial patent in 2007 in the names of Myhill and Driscoll.

**a.  The false inventorship fraud**

183.    Myhill and Driscoll did not invent what they told the USPTO they invented, and the applications failed to join or identify the real inventor, a scientist from Massachusetts. Seven months earlier, in October, 2003, Driscoll and Myhill licensed what they called a "revolutionary"

anti-aging pill and its technology from CereMedix, LLC ("CereMedix") a Massachusetts company. When the license was made, Lifeline had only been in operation since July, 2003.

184.   Myhill and Driscoll immediately posted on their website (the company had no real operation and apparently only two or three employees) that Lifeline would sell "Protandim" for "Increasing Healthy Life Expectancy- Up Regulating the Body's Natural Anti-Oxidants."

185.   In 2003 neither Driscoll nor Myhill had any science background nor filed for any patents although each was then in his 40's. Their careers intersected at a public relations firm, Fair Market Value, LLC. Their backgrounds were described in a private placement memorandum as follows:

*William J. Driscoll* became president and a director of Lifeline Nutraceuticals in July 2003, and of Lifeline Therapeutics upon completion of the reorganization in October 2004. Mr. Driscoll has a background in management and marketing. At 25 he was the plant manager of United Solder Wrap and became the President of Union Petroleum in 1987. He entered the financial industry in 1988, and in 1989 was promoted to branch manager, regional manager and then national sales manager of L. F. Thomson, which closed down its operations in November 1989. Including L.F. Thomson, Mr. Driscoll was employed by six brokerage firms between 1987 and 1996, including Merrill Lynch, Dean Witter and A.G. Edwards. From 1996 to 1997 Mr. Driscoll was a principal in Fair Market Value LLC, a consulting firm. From 1998 until 2003 Mr. Driscoll was a principal of Destiny Advisors LLC, a management consulting firm.

*Paul R. Myhill* became vice president and a director of Lifeline Nutraceuticals in July 2003, and of Lifeline Therapeutics upon completion of the Reorganization in October 2004. Mr. Myhill became chief financial officer and secretary of Lifeline Therapeutics in May 2005. Mr. Myhill received his BBA in honors business and finance from the University of Texas at Austin in 1989 and subsequently received his MBA in marketing and management from the University of Texas in 1990. As a self-employed entrepreneur and consultant since 1989, he has been involved in planning, funding, and launching business ventures. During that period, he has led five different business ventures that all required significant capital investment and bottom-line management. Mr. Myhill's specialization is in the area of business and product marketing. He is the former owner of an advertising and media placement agency, USAboards, Inc., co-owner of a financial public relations firm, Fair Market Value, LLC, and founder and President of NABO, Inc., a specialty

distribution business with multiple warehouse operations. Mr. Myhill has developed and overseen many marketing and product distribution plans.[61]

186.     Shortly after the initial application Myhill and Driscoll came together with Dr. Joe McCord. McCord worked at a local Denver research lab and had had involvement, as one of two authors, on an enzyme called superoxide dismutase [SOD]. Lifeline likewise operated from the Denver area.

187.     McCord purchased stock in Lifeline from Myhill and Driscoll. He also connected in some fashion with LifeVantage, which at the time was a penny stock with no assets involved in real estate. Several months later LifeVantage and Lifeline executed a stock swap resulting in a company called Lifeline Therapeutics in which the principal shareholders were Myhill, Driscoll, and McCord.[62]

188.     Myhill and Driscoll filed their preliminary patent application a month before McCord came along. They filed several more in 2004 and the application in 2005 that ultimately matured into the first patent. The initial preliminary application in essence, and sometimes in exact detail, described and copied the same technology they had licensed from CereMedix, the same solution to the problems being addressed by the CereMedix invention, and the same means to reduce to practice a supplement to allegedly solve the problem: that is, the entirety of the inventive process. In the provisional application, Myhill and Driscoll identified 14 substances "believed to contemporaneously upregulate levels of SOD, CAT, and GPX in the body…" Among them were the five that made their way to the ultimate formula.

---

[61] https://www.sec.gov/Archives/edgar/data/849146/000102189005000098/lifelinesb2.htm

[62] https://www.sec.gov/Archives/edgar/data/849146/000102189006000034/filename10.htm

189.    They signed a declaration as required by the USPTO, that swore [they] were "an original, first and joint inventor of the subject matter." For several years the company's SEC filings, between 2005 and 2007, likewise named both Myhill and Driscoll as "the original inventors" of the patent-pending invention.[63] In July, 2007, the USPTO issued Pat. No. 7,241,461 (the "'461 Patent") titled "Compositions For Alleviating Inflammation And Oxidative Stress In A Mammal," to Myhill and Driscoll. Subsequently, several more continuation patents issued in their name.

190.    Under US patent law, in order to be a named inventor on a patent, only the first, original inventor(s) can obtain patent protection for an invention. Inventorship is determined in view of the claims at the end of a patent application that define the invention, not the content of the specification. The invention must be both (1) conceived, and (2) reduced to practice in order to claim inventorship. To be an inventor, a person must make an intellectual contribution to the conception of the claimed invention. The test commonly used to determine conception is:

> [W]hether the inventor had an idea that was definite and permanent enough that one skilled in the art could understand the invention; the inventor must prove his conception by corroborating evidence, preferably by showing a contemporaneous disclosure. An idea is definite and permanent when the inventor has a specific, settled idea, a particular solution to the problem at hand, not just a general goal or research plan he hopes to pursue. The conception analysis necessarily turns on the inventor's ability to describe his invention with particularity. Until he can do so, he cannot prove possession of the complete mental picture of the invention. These rules ensure that patent rights attach only when an idea is so far developed that the inventor can point to a definite, particular invention.[64]

---

[63]

https://www.sec.gov/Archives/edgar/data/849146/000102189005000178/lifeline6300510k.htm
https://www.sec.gov/Archives/edgar/data/849146/000095013406022340/d41704a1e10ksbza.htm
https://www.sec.gov/Archives/edgar/data/849146/000103570407000701/d50106e10ksb.htm

[64] *Burroughs Wellcome Co. v. Barr Laboratories Inc.*, 40 F.3d 1223, 1227-1228, (Fed. Cir. 1994).

191.    In light of the following occurrences that became known to LifeVantage as they occurred, some of which took place during the pendency of the prosecution of the '461 Patent, and others during the prosecution of continuation patents that also listed Myhill and Driscoll as co-inventors, Myhill and Driscoll's claim to joint inventorship of the '461 Patent was false and made with deceptive intent to defraud the USPTO.

192.    First, after filing their initial application, and as they continued to file new provisional applications in 2004 and early 2005, Myhill and Driscoll made public admissions (but without disclosing them to the USPTO while the patents were pending) that show patent fraud.

193.    The first admission was made on April 12, 2004, a month after filing the initial application. After the filing was made, Driscoll publicly admitted that "Protandim" was developed between Lifeline and a third-party:

> Protandim CF is the result of months of extensive research and development by the company *and associated scientists*. Originally developed as a "Co-Factor" formulation to support and complement Lifeline's initial Protandim (CMX-1152) product candidate *(licensed from CereMedix, Inc.)*, Protandim CF now stands in its own right as "the better approach" for antioxidant therapy compared to current category offerings.[65]

194.    Second, even this statement was only partially true. The "associated scientists" identified in the press release, were employed by CereMedix a drug developer. The company's Chief Scientific Officer at the time was Dr. Victor. E. Shoshoa, PhD. CereMedix, now known as Ischemix, Inc., is a biotechnology and research company with roots at MIT and Harvard. And "Protandim CF" did not exist.

---

[65] http://tonyc.com/protandim/PR_20041204.htm

195.    Driscoll and Myhill obviously knew about their company's license with CereMedix. Lifeline described itself as a "Ceremedix-affiliated Company" soon to market "the first anti-aging product candidate to upregulate the body's primary antioxidant enzymes."[66]

196.    Their press release announced:

DENVER, COLORADO AND WORCESTER, MASSACHUSETTS, OCT. 16, 2003. Lifeline Nutraceuticals, Inc. and CereMedix, Inc. announced today that Lifeline has licensed *exclusive, worldwide* rights to an innovative oral dietary supplement that is being heralded as the <u>first serious product candidate</u> in the battle against oxidative stress. Oxidative stress is widely known to play a key role in over 100 age-related diseases and the aging process itself. This patented and proprietary product, currently known as CMX-1152, has been licensed from its inventor, CereMedix Inc., a Worcester-based biotechnology company. *CMX-1152 is one of the products resulting from over 20 years of scientific research by CereMedix founding scientist, Dr. Victor Shashoua and has received much international media and scientific community attention recently as a "breakthrough" anti-aging product. So significant is this advance in anti-aging technology that a nationally-syndicated television news magazine recently interviewed Lifeline's President, Bill Driscoll, with the intention of publishing a feature story on CMX-1152 in the coming months.*[67]

(emphasis added).

197.    In October, 2003, Myhill and Driscoll publicized that CMX-1152 would be marketed as "Rejuven8r," and would be available by June, 2004. Driscoll and Myhill further publicized their "partnership" with CereMedix for providing Lifeline with, "an independently-verified scientific platform."[68] A nutritional supplement website posted this information in late October, 2003:

---

[66] https://www.highbeam.com/doc/1G1-112356866.html

[67] https://web.archive.org/web/20031203055803/http://www.lifelinenutraceuticals.com:80/contact.html

[68] https://web.archive.org/web/20031203134304/http://www.lifelinenutraceuticals.com:80/about_lifeline.html

Touted Antiaging Pill Slated for 2004 Release

*Betterhumans Staff*

*Friday, October 24, 2003, 4:40:48 PM CT*

A compound touted as the first dietary supplement that can increase the body's production of antioxidants to fight aging could be on the market as early as next year. Denver, Colorado-based Lifeline Nutraceuticals has announced that it aims to market the supplement, currently known as CMX-1152, by June 2004. The compound was developed by Boston, Massachusetts-based CereMedix and announced earlier this year. …Lifeline claims that CMX-1152 is a step forward for dietary products that aim to provide antioxidants for fighting diseases and aging. Rather than providing external antioxidants, the compound causes the body to increase its own production of natural antioxidants. CMX-1152 is made of a patented peptide derived from ependymin, a protein that occurs naturally in the human brain.  Lifeline says that it causes the body to mobilize defense and repair mechanisms and rescue tissues and organs damaged by oxidative stress. Studies show that the body's production of antioxidants decreases with age, which may partly explain why aging is a such a major risk factor for so many diseases.

198.    CereMedix was known in the nutritional supplements community because as far back as 2002, before CereMedix began to work with Lifeline (and before Lifeline even existed), CereMedix itself publicized  CMX-1152.  CereMedix advertised:

Restoration Of Healthy Life Expectancy: Nutraceutical (ROHLEN) Product / CMX-1152

Oxidative stress is widely known to play a key role in the aging process as the body's defenses against oxidative stress and free radicals decrease with age. A compound that could mitigate oxidative stress would play a significant role in improving "healthy life expectancy". Healthy life expectancy is a term used to describe general improvement in health, increased energy, reduction of incidence and severity of age related diseases typically experienced in the last ten years of life and general improvement in the quality of life in these latter years. Particularly in the United States and Western world, the last ten years of life tend to be plagued by various degenerative diseases and illnesses often associated with oxidative                                                  stress.
…. CereMedix's peptide technology for decreasing age-related deterioration, resulting from accelerating and cumulative oxidative damage has the potential to be of major benefit in this regard. One potential candidate for the healthy life expectancy has already been identified, CMX-1152. This is an orally available,

naturally occurring peptide, **which has demonstrated improved longevity in mice**.

199.    In May, 2004, a potential user posted in another Web forum:

I have been following an [sic] new supplement that was slated to come out in June of this year. It has now been delayed by CereMedix. It has the ability to boost glutathione levels using your own body's mechanism. Go to google and type in Lifelinenutraceuticals. You can also go to CereMedix or do a search for CMX 1152 or Protandim. I was very excited to hear about this supplement (2 years ago) and have been waiting for its release. However there has been some licensing problems. It's sounds like they are on to something. CMX 1152 is an anti-aging agent and has been shown to reverse stroke damage in mice by causing your own brain to produce SOD, CAT, and glutathione. It is an anti-aging supplement. The research has been done by some pretty credible scientists. Lifelinenutraceuticals is coming out with Protandim CF which was supposed to be a companion to CMX 1152. That is coming out in a few months.[69]

CereMedix has recently entered into a licensing agreement with Lifeline Nutraceuticals, Inc. (LNI). For information on LNI, please visit their website at www.lifelinenutraceuticals.com. LNI, in association with CereMedix, plans to complete animal and human testing of CMX-1152 in 2004. The marketing and distribution for this product will be conducted via partnering and licensing arrangements with multiple companies in order to address different geographic and commercial market segments.[70]

200.    <u>Third</u>, months before seeking to patent the product themselves, Driscoll and Myhill publicly credited "Protandim's" discovery to Dr. Shashoua on the Lifeline website:

*How was protandim™ discovered?*

Dr. Victor Shashoua, the Chief Scientific Officer of CereMedix, Inc., and member of Lifeline's Scientific Advisory Board, discovered ependymin while doing some pioneering work in the molecular biology of memory. The protandim™ compound was identified in an *in vitro* cell protection assay used to screen for compounds that up regulate genetic expression of endogenous antioxidant enzymes. The compound is related to peptide fragments derived from ependymin.

---

[69] http://forums.prohealth.com/forums/index.php?threads/please-check-out-ceremedix-or-cmx-1152.101450/

[70] https://www.longecity.org/forum/topic/2082-evolving-protandim-and-misleading-advertising/?hl=lifeline

{W2967826}

Dr. Shashoua has now developed a class of peptides, <u>the result of over 20 years of research</u>, that promote protection against and recovery from oxidative stress-induced conditions. This unique therapeutic approach represents a potential paradigm shift in the way aging-related diseases may be treated in the future. *These proprietary and patented peptides, that include protandim™ as the nutrient supplement variant*, are now the property of CereMedix, Inc. CereMedix, in turn, has contracted with Lifeline as its exclusive, global marketing partner for protandim™.[71]

(emphasis added).

201.    And both Driscoll and Myhill publicly cited CereMedix as the entity behind "Protandim" in a February, 2004 local Denver news story:

DENVER - In just a few months, a company in Denver will launch a so-called "long life pill" that promises to not only make you live longer, but make you feel younger. Lifeline Nutraceuticals says the pill is a scientific breakthrough and unlike anything ever achieved. One anti-aging expert said if they can do what they say they can do, "they just might be onto something." Is it a dream product or just a dream?

Three Denver businessmen say they have unraveled one of the biggest mysteries behind growing old. All it takes is one pill a day, and not only will you live to be about 120 years old, but you will also feel like a teenager all over again. "It restores your system to its peak efficiency; something akin to when you were 18 years old," Bill Driscoll, Lifeline Nutraceuticals, said. And the businessmen say they have the science to back it.

"We have decades of scientific experience that we can draw upon - that's where our credibility comes from," added Paul Myhill, Lifeline Nutraceuticals The pill was developed by Ceremedix, a pharmaceutical company based in Massachusetts.

Protandim increases the body's production of three enzymes: Superoxide Dismutase [SOD], Catalase [CAT] and Glutathion Peroxidase.

They are supposed to prevent gradual loss of antioxidants, which battle free radicals. Free radicals are what cause oxidative stress on cells, making rust like metal or brown like a cut apple. The makers of Protandim say there's nothing like

---

[71] https://web.archive.org/web/20031205112342/http://www.lifelinenutraceuticals.com:80/the_product.html (December 5, 2003 capture)

it. They say it will slow wrinkling and probably even reverse it. But if it sounds to good to be true, it probably is, according to Denver's leading authority on anti-aging. "I don't think there's any single pill at this time that has the proof behind it that would lead one to believe that it would increase lifespan to 120 years in all individuals," Dr. John Repine, Webb Warning Institute, said. "And that we can recommend that without saying there'd be some side effects that might be unwanted and unrecognized at this time."[72]

202.   When they applied for the provisional patent, Myhill and Driscoll omitted telling the USPTO about the CereMedix work, technology, or license.

203.   Myhill and Driscoll had initially acknowledged that the CereMedix technology they licensed was "patented." And indeed Dr. Shashoua had filed for a number of patents, assigned to CereMedix, based on disclosures that dated to 1999, years before Myhill and Driscoll's application.

204.   An application by Dr. Shashoua dated November 17, 2000, from a 1999 application, was titled "Compositions And Methods For Counteracting Effects Of Reactive Oxygen Species And Free Radicals" resulted in U.S. Pat. No. 6,890,896. The subject matter and disclosure in these patents closely matched the initial Driscoll and Myhill application, indeed it used many of the same terms, words, and of course concepts.

205.   In the application Dr. Shashoua disclosed every piece of the scientific claims subsequently made by LifeVantage for "Protandim:" (1) that anti-oxidants are associated with disease and aging; (2) that enzymes like SOD and CAT can be "upregulated" (the same word used by Myhill and Driscoll in their preliminary application) by artificially or naturally-occurring compounds, and (3) those compounds result in encouraging SOD or CAT to increase production of anti-oxidants. The disclosure described a multitude of such compounds, both in structure and

---

[72] https://www.longecity.org/forum/topic/2082-evolving-protandim-and-misleading-advertising/?hl=lifeline

effect, disclosed that natural versions of those compounds exist, gave examples, and showed tests of results on mice. In short, the application showed both conception and reduction to practice.

206.    The initial applications filed by Myhill had two fatal fraudulent problems. First, in light of Dr. Shoshoua's prior description of both the problem and the solution, the CereMedix technology was clear prior art. Since it was sitting in their hands as they applied for a patent, Myhill and Driscoll committed fraud by failing to disclose the application, or whatever embodiment was expressed by CMX-1152 as prior art. Second, even if they had added something of sufficient note to justify as co-inventors to CMX-1152 (which they did not), the failure to apply for the patent in the names of themselves and Dr. Shoshoua, that is mis-joinder, was fraud.

207.    The key question of patentability in the '461 Patent application revolved around the unexpected effect of the formula, a composition of herbs well known in the art to promote anti-oxidants. The Examiner had rejected the initial claims made by Myhill and Driscoll. In response, they argued that:

> It is clear from the specification that the disclosed composition is not an antioxidant preparation in the conventional usage of the term, *but rather the composition functions to increase the body's antioxidant capacity by inducing the expression of genes encoding antioxidant enzymes, specifically superoxide dismutase (SOD) and catalase (CAT).*

(emphasis added)

208.    The CereMedix application and subsequent patent set forth how the natural or artificial substances at issue provided the unexpected benefit. The CereMedix disclosure provided the following summary:

> *Abstract*
>
> *Peptide compounds and methods for upregulating expression of a gene encoding an antioxidative enzyme, such as superoxide dismutase [SOD]*

> *or catalase [CAT],* to counteract harmful oxidative effects of reactive oxygen species and other free radicals are described. The peptide compounds may be used to treat or prevent diseases and conditions characterized by undesireable elevation of reactive oxygen species…The peptide compounds may be used as components of pharmaceuticals and dietary supplements.

(emphasis added).

209. The patent specification the described the SOD enzyme and its role in the body's anti-oxidant defense system. It described that an elevated level of free radicals was linked to a variety of diseases. The disclosure claimed compositions of a peptide compound administered to treat or prevent these diseases. These compounds were believed to stimulate the genes to produce antioxidants. "In a preferred embodiments of the invention, the peptide compounds of the invention stimulate (upregulate) expression of gene(s) encoding superoxide dismutase (SOD) and/or catylase (CAT) enzymes, which enzymes are capable of detoxifying ROS and free radicals in cells and tissues of animals, including humans." The patent then disclosed.

> Patients having a variety of diseases or conditions have been found to possess undesirable levels of ROS and/or free radicals. … Specifically, this invention provides methods in which a composition comprising a peptide compound described herein is administered to an individual to treat or prevent a disease or condition that is characterized by the generation of toxic levels of ROS or free radicals, including but not limited to tissue and/or cognitive degeneration during aging (senescence), senility, Tardive dyskinesia, cerebral ischemia (stroke), myocardial infarct (heart attack), head trauma, brain and/or spinal cord trauma, reperfusion damage, oxygen toxicity in premature infants, Huntington's disease, Parkinson's disease, amyotrophic lateral sclerosis, Alzheimer's disease, diabetes, ulcerative colitis, human leukemia and other cancers characterized by elevation of ROS or free radicals, age-related elevation of ROS or free radicals, Down syndrome, macular degeneration, cataracts, schizophrenia, epilepsy, septic shock, polytraumatous shock, burn injuries and radiation-induced elevation of ROS and free radicals (including UV-induced skin damage).

210. The disclosure then what substances or their equivalents could be used :

Another aspect of the invention *provides dietary supplement compositions (also referred to as "nutraceuticals")* comprising a natural source, purified composition obtained from an organism (animal, plant, or microorganism), which

contains or is enriched for an endogenous peptide compound described herein, which upregulates expression of one or more genes encoding an antioxidative enzyme, such as SOD and/or CAT in cells or tissues. *Preferably, dietary supplements of the invention additionally comprise an exogenously provided peptide compound described herein. In a more preferred embodiment, a natural source of a purified composition from an organism used in making dietary supplement compositions of the invention is green velvet antler from a ruminant, such as deer or elk, or various plant material, such as roots, stems, leaves, flowers, foliage, herbal mixtures, and tea plants.*

(emphasis added).

211.   Dr. Shashoua's disclosure also addresses the role of SOD and CAT's anti-

oxidative activity and their relationship to aging:

A number of diseases or conditions, including the aging process (senescence), have also been characterized by an elevation of [reactive oxygen species] and/or free radicals to toxic levels that in fact damage cells and tissues. Accordingly, the peptide compounds described herein are valuable therapeutic and prophylactic compounds for countering the generation of harmful levels of ROS and free radicals in an individual.

212.   Finally, the disclosure specifically pointed to "nutraceuticals," synonymous with

"dietary supplements," and disclosed what they are:

"Nutraceutical" and "dietary supplement", as understood and used herein, are synonymous terms, which describe compositions that are prepared and marketed for sale as non-regulated, orally administered, sources of a nutrient and/or other compound that is purported to contain a property or activity that may provide a benefit to the health of an individual. A desirable component compound identified in a dietary supplement is referred to as a "nutrichemical." Nutrichemicals may be present in only trace amounts and still be a desirable and marketable component of a dietary supplement.

*Commonly known nutrichemicals include trace metals, vitamins, enzymes that have an activity that is considered beneficial to the health of an individual, and compounds that upregulate such enzymes. Such enzymes include antioxidative enzymes, such as superoxide dismutase (SOD) and catalase (CAT), which counteract the harmful oxidative effects of reactive oxygen species (ROS) and other free radicals. Accordingly, one or more peptide compounds described herein that is endogenously present and/or added exogenously to a composition manufactured for sale as a dietary supplement is a nutrichemical of that dietary supplement.*

(emphasis added).

213.    Inventorship requires a reduction to practice. But here, Myhill and identified 14 broad substance classes, like those identified by CereMedix. A month later Driscoll and Myhill they acknowledged that the alleged "formulation" for "Protandim" was *not* finished.

214.    After its application, Lifeline announced that "to expedite the development" of the product it had engaged the Chemins Company, to assist the company in the *future* "formulation" of the product:

> Lifeline has established a key partnership in order to expedite *the development* and delivery of Protandim CF:
>
> *Lifeline has enlisted The Chemins Company (Chemins) of Colorado Springs, CO to finalize the formulation* and produce the product under a contract manufacturing agreement. Chemins was founded in 1974 by James Cameron, an industry visionary determined to bring high-quality nutritional products to consumers. The 200-employee work-force operates in a 300,000 square foot state-of-the-art facility producing specialty formulas for a wide range of dietary supplements. *Chemins was chosen because of its unparalleled formulary expertise,* dedication to quality assurance, and high-volume manufacturing capabilities.
>
> Lifeline is a privately held, Denver-based company formed to manufacture, market and distribute nutraceutical supplements that promote "Healthy Life Expectancy." Lifeline is presently focusing exclusively on unique antioxidant therapies under its Protandim brand. The therapies center on the body's primary defense mechanism against oxidative stress - the natural antioxidant enzymes, Superoxide Dismutase (SOD), Catalase (CAT), and Glutathione Peroxidase (GPX). Discussions have commenced regarding license agreements and other collaborative arrangements in order to aggressively place its Protandim product candidates into the global marketplace.
>
> For more information, please contact Bill Driscoll at info@lifelinenutraceuticals.com

(emphasis added).

215.    It is plausible that it was Chemins, not Myhill or Driscoll, who eventually whittled down the 14 compounds to 5—a process that occurred in 2004 and early 2005. If so,

Chemins should have been named if Myhill and Driscoll had added anything inventive to CereMedix (which they had not). Chemins stayed with the project and became the first manufacturer of "Protandim:"

> We have retained The Chemins Company of Colorado Springs, Colorado ("Chemins") to *produce* Protandim ™ under a contract manufacturing agreement dated January 17, 2005.[73]

216.    By the time they wrote the release, Myhill and Driscoll knew that Chemins had a shady history. Chemins was founded in 1974 by James Cameron, but some years earlier became the subject of a series of criminal investigations in 1994 after a woman died and more than 100 other people became ill after taking one of the company's products marketed under the brand name Nature's Nutrition Formula One. The company had doctored records, misled FDA investigators, and purposely hindered inspections. Cameron was sentenced to 21 months in prison, and he and the company were fined $4.7 million.  Chemins later made products for another MLM company, Metabolife, whose former executive became LifeVantage's CEO in 2008.

217.    In a plea agreement, Cameron admitted that Chemins had spiked the product with ephedrine and caffeine and had done so with numerous other products without notifying consumers. Chemins actively conspired to hide from the FDA the fact that it possessed the undisclosed ingredients.

218.    Evidence exists that both Myhill and Driscoll had every incentive to misrepresent their inventorship to the USPTO when they applied for the initial patent. If CereMedix was named, it would have the right to control the technology as a joint inventor. And they were both

---

[73] http://edgar.secdatabase.com/135/102189006000015/filing-main.htm

being offered a lot of money by LifeVantage and later investors, for the "revolutionary" anti-aging pill. Their being bought out by LifeVantage depended on LifeVantage's acquisition of what they represented to be very valuable IP.

219.    The deal between LifeVantage and Myhill and Driscoll was as follows:

> The Company entered into a Plan and Agreement with Lifeline Nutraceuticals
> Corp. whereby Lifeline Nutraceuticals Corp. agreed to propose to its shareholder
> an exchange of the outstanding shares of Lifeline stock for 95% of the issued and
> outstanding shares of [LifeVantage, then named Yaak River Resources] on a post
> reverse split basis (assuming all of the Lifeline shareholders participate). …
> Lifeline note holders will become creditors of Yaak following the completion of
> the transaction. The two members of the Yaak Board of directors will appoint two
> persons designated by Lifeline to the Board, and the two Yaak directors will
> remain on the Yaak Board until their resignation or their successors have been
> duly elected. The tow[sic] directors to be appointed at the request of Lifeline are
> expected to be William Driscoll and Paul Myhill, both founders of Lifeline.
> Management of YAAK will resign and the new Board of Directors will appoint
> the officers (expected to be Messrs. Driscoll as President, secretary and
> treasurer).[74]

220.    After the October, 2004 deal Myhill and Driscoll effectively became LifeVantage's principals. Driscoll was the CEO and Myhill was Director of Public Relations and Outreach. Myhill and Driscoll continued working with LifeVantage through at least 2006 after the stock purchase buyout of their company.[75] During that time the new enterprise raised many millions of dollars on the strength of little more than a claim to an "anti-aging" pill and the assertion that LifeVantage owned its rights and patents pending.

### b.  Patent Fraud by failure to disclose CereMedix science and product

221.    The USPTO required Myhill, Driscoll, and later McCord to submit the following:

---

[74] https://www.sec.gov/Archives/edgar/data/849146/000107258804000357/yaak8klifeline.txt

[75]

https://web.archive.org/web/20050605002622/http://www.lifelinetherapeutics.com:80/html/about_lifeline/board_directors.htm

> The closest information over which individuals associated with the filing or prosecution of a patent application believe any pending claim patentably defines, to make sure that any material information contained therein is disclosed to the Office. … Under this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and … it establishes, by itself or in combination with other information, a *prima facie* case of unpatentability of a claim.

222. Throughout 2004 to 2007, when the first patent issued, LifeVantage did not correct the initial applications but rather prosecuted them solely in the name of Myhill and Driscoll. It did not explain to the USPTO why Myhill and Driscoll had reported that they had hired Chemins to assist in the formulation of the compound a month after filing the initial application. Nor did it report or explain why the original formulation of "Protandim" had been "licensed" from CereMedix nor that Lifeline had publicly identified Dr. Shoshoua as its discoverer. It did not disclose Dr. Shoshua's prior applications as prior art to the Myhill and Driscoll applications. It did not disclose that the CereMedix application disclosed the family of all of the anti-oxidation compounds it put into "Protandim," all of which would have been and was known to McCord in 2004.

223. None of the CereMedix product, formula, or science, much less the pending applications were ever cited to the USPTO. LifeVantage, through Myhill and Driscoll (and later through McCord, when he was falsely named as an original inventor in a continuation application in 2011), knew about the application and technology. It was far broader than any art its counsel cited and far broader than any art cited by the examiner. The failure to provide it was deliberate and made with fraudulent intent.

224. The USPTO would not have granted these patents, nor any patent in the chain dating to the original March, 2004 application had this art been presented to the USPTO ("no patent will be granted on an application in connection with which fraud on the Office was

practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct."). 37 CFR 1.56**.**

### 2. The introduction of Dr. Joe McCord to give a veneer of science to the new "anti-aging" pill marketing effort

225.    Myhill and Driscoll knew that a pill "invented" by a pair of marketers with no scientific experience or training, in a company that had no revenue or assets, manufactured by a company with a criminal history of doctoring products, does not make for good ad copy. They wanted to dress up the "science" behind "Protandim" and to claim that it (and they) "invented" the five-herb "formula" behind "Protandim."

226.    McCord most likely heard about CMX-1152 from the Denver news story in which his colleague at the Webb-Warning Institute, Dr. John Repine, was quoted doubting that the pill was effective. Through unknown means, McCord got together with Myhill and Driscoll. In April, 2004, they sold $2,400 worth of stock to McCord, likely because he was a scientist associated with "oxidative-stress" research and the SOD enzyme identified in the CereMedix patents. McCord became the fourth largest Lifeline shareholder before its takeover by LifeVantage.[76] McCord also had a financial relationship with LifeVantage, and when LifeVantage purchased Lifeline, McCord came along.

---

[76]    https://www.sec.gov/Archives/edgar/data/849146/000107258804000357/0001072588-04-000357.txt

227.   After the stock swap, McCord's Lifeline interest was converted to 9.8% ownership in LifeVantage.[77] Driscoll became a 30.7% owner and Myhill a 28.6% owner in LifeVantage, which then began operating as Lifeline Therapeutics.

228.   In April, 2004, a month after the initial Myhill/Driscoll application, LifeVantage and Lifeline began collaborating on giving Lifeline some "scientific" backing to the product. McCord became associated with first Lifeline and later LifeVantage once the two companied effectively merged as the face behind the invention.

229.   There were good reasons for claiming that LifeVantage, as opposed to two public relations men who got a license from Massachusetts had invented the Fountain of Youth. Immediately after the transaction, Driscoll, Myhill, and McCord filed a private placement and raised $1.255 million for the new company. Shortly later an additional $8 million was raised, some of which went to pay off debt. Much of the fund-raising was based on the "science" behind the "Protandim" product, its patent applications and potential in a billion dollar supplements industry. Having an "anti-aging" pill with a reputable scientist behind it was a lot better than $25,000 worth of undeveloped land and debt.

230.   Beginning in late 2004, Driscoll, Myhill and McCord were in effect and in control of Lifeline Therapeutics. LifeVantage had by then abandoned its Texas-and Colorado-based real estate ventures and committed to its new "science" based nutraceutical identity. They established a separate website for "Protandim." They began to claim on www.protandim.com that they had developed "Protandim." The website left out any mention of CereMedix, Dr. Shashoua, or even Chemins:

---

[77]   https://www.sec.gov/Archives/edgar/data/849146/000100009605000009/0001000096-05-000009.txt

> **Protandim**, a patent-pending formulation of botanical extracts, is the result of extensive research, development and scientific testing by <u>Lifeline Therapeutics, Inc.</u> [78]

231.    McCord became the marketer to sell the "science" to would-be customers. In April, 2004, (*after* Myhill and Drisoll had filed their initial application) McCord was announced as LifeVantage's "Director of Science." In March, 2006 McCord joined its Board of Directors.[79] He began appearing on behalf of the company on radio and talk shows and in print repeating the story of the invention, how the little yellow pill upregulated the SOD and CAT enzymes, and so forth.[80]

232.    After April, 2004, the names of Myhill or Driscoll disappeared from the promotional websites. McCord was identified as *the* man behind "Protandim:"

> **Protandim** was co-formulated by <u>Dr. Joe McCord</u>, who discovered Superoxide Dismutase, the body's most potent antioxidant enzyme, in 1969 and is considered the foremost expert in the field.[81]

233.    But simultaneously Myhill, Driscoll, and McCord were forced to acknowledge that the CereMedix license and the CereMedix work was the real "science" behind what Myhill and Driscoll were claiming to have invented.

---

[78] https://web.archive.org/web/20050615081140/http://www.protandim.com:80/about-protandim.htm

[79] http://investor.lifevantage.com/news-releases/news-release-details/dr-joe-m-mccord-joins-lifeline-therapeutics-inc-board-0

[80] http://investor.lifevantage.com/news-releases/news-release-details/dr-joe-mccord-appear-tom-martino-syndicated-radio-show

[81] https://web.archive.org/web/20050615081140/http://www.protandim.com:80/about-protandim.htm

234.     This took place when they settled litigation in early 2005 by former shareholder, Michael Barber. Barber was paid $300,000 by a company that had no revenues to go away and not report their questionable practices to the SEC, FTC, or the USPTO.

235.     In exchange for approximately $300,000 for 19% Lifeline stock, Barber agreed that:

> [H]e will never … voluntarily advertise, publicize or publicly disclose, any former or present association with LN [Lifeline] or LT [LifeVantage]. …In addition, Barber agrees that he will not be involved with any type of communication intended for public viewing that compare the benefits of any LT or LN product with any product with which Barber has any involvement. Further, Barber agrees that he will not refer to or cite or cause others to refer or cite to Dr. Joe McCord, including, but not limited to, (i) any comment or other communication of any kind that directly or ultimately emanated from Dr. Mc Cord or that describes Dr. Mc Cord and any of his scientific work and (ii) any test or study in which Dr. McCord has had some role, including any report of such test or study.[82]

236.     The same settlement agreement not only identified the CereMedix involvement in "Protandim," it equated the "formula" then the subject of the pending patent application as an equivalent CereMedix composition:

> (1) Barber agrees that for one year from the date of this Agreement that he will and shall not knowingly (a) apply for or be employed by or contract with, and (b) acquire, either directly or indirectly, any ownership or other interest in, any individual or entity, throughout the world, that at that time markets, sells, distributes or manufactures any dietary or food supplement product that competes or is intended to compete with Protandim or CMX-1152 or both of them, including knockoffs or derivatives of either Protandim or CMX-1152. *A product will be conclusively deemed to compete or intended to compete with Protandim or CMX-1152 if*:
>
> a. *That product contains two or more of the following ingredients or extracts of those ingredients, all of which are in or intended to be in Protandim: (i) Ashwagandha, (ii) Bacopa, (iii) Green Tea, (iv) Milk Thistle, (v) Tumeric, (vi) Gotu Kola, (vii) Ginkgo Biloba, (viii) Aloe Vera; or if*

---

[82] https://www.sec.gov/Archives/edgar/data/849146/000100009605000160/lifeline8kexh101.txt

b. That product is promoted, in any way, as being able to provide or deliver a health benefit to a human being by affecting, in any way, one or more of the following substances or the production by the human body of one or more of those substances: (i) SOD, which is superoxide dismutases and (ii) CAT, which is catalase; or if

c. That product is promoted, designed or formulated to affect the human body in any way that is similar to the way in which CMX-1152 or Protandim is now or may be promoted, designed or formulated, as described on Protandim.com and lifelinenutraceuticals.com or any other website owned or controlled by LN, LT or CereMedix. …

**No Dissemination of Information or Documents**. Barber represents and warrants that he shall not send, deliver or otherwise disseminate any information about LN or LT, including but not limited to their products, marketing plans, schedules, agreements, contacts, business relationships, business plans, employees, internal-decisions and decision-making, contracts, company structure, members, investors, finances, and financial plans, or anything that would constitute a trade secret under the Colorado Trade Secrets Act, to any third-party, including but not limited to competitors of LN and LT, the FDA, FTC or SEC, and any other governmental entity or agency…

(emphasis added).

237.    The settlement agreement thus effectively admitted that CMX-1152 and "Protandim" were one and the same.

238.    All three men profited from the patent-pending status and their claims of inventorship. Myhill became the CFO of the new company after Barber's settlement. The company raised an additional $2.3 million in another private offering to in part pay for future patent filings.[83] On July 1, 2005, Driscoll was bought out.[84] The buyout came immediately after the ABC News report and the company's $1.5 million in sales resulting from the report. McCord

---

[83]

https://www.sec.gov/Archives/edgar/data/849146/000100009605000359/lifeline8k5162005.txt

[84] https://www.sec.gov/Archives/edgar/data/849146/000102189005000100/lifeline701058k.htm

joined the Board of Directors in February, 2006. An employment contract between LifeVantage

and McCord also paid off McCord. Among the terms of that agreement:

> Obligations and Representations of Dr. McCord.

> 2.1 Dr. McCord agrees to and shall provide the following services to LifeVantage:

> 2.1.7 Dr. McCord agrees that LifeVantage may disclose Dr. McCord's participation on the SAB and LifeVantage's Board of Directors and may utilize Dr. McCord's name, likeness and statements on LifeVantage's website and in marketing materials; provided, however, that Dr. McCord reserves the right to approve all such announcements and usage of his likeness or statements prior to publication. ...

> Compensation to Dr. McCord.

> 3.1 Monthly Compensation. Dr. McCord shall receive the sum of $10,000.00 per calendar month for all of his services pursuant to this Agreement, payable in the time and manner that the Company customarily pays its employees, less applicable payroll taxes.

> 3.2 Monthly Commission. In addition to the Monthly Compensation set forth above, upon a finding of the Company's CEO that all of Dr. McCord's obligations under this contract have been performed satisfactorily, Dr. McCord shall receive a monthly commission equal to Fifty Cents ($.50) multiplied by the total net bottle sales of Protandim® during the preceding month. This commission shall also apply to any new products that are substantially equivalent to the original Protandim product (e.g., the Mexican formulation, or a yet to be determined hypoallergenic Protandim formulation). It shall also apply (at an equitable rate to be determined by the parties) to future Protandim- or Nrf2 activation-based products (such as, e.g., a pet supplement, or a topical gel formulation).[85]

239.    McCord's paid endorser status was never publicly disclosed. McCord was used by

LifeVantage to promote an aura of "science" to its pills. McCord was pitched as the scientist

behind "Protandim." He appeared at events to act as the chief scientific spokesperson. The

---

[85]

https://www.sec.gov/Archives/edgar/data/849146/000119312511258536/d225491dex1031.htm

company compared him to Madame Curie, Alexander Graham Bell, Orville Wright and Henry Ford. Eventually McCord officially "retired" and was paid off by $1.7 million in exit payments.

240.    McCord also became the primary facilitator of a number of paid studies that the company funded in an effort—years after Myhill and Driscoll "invented" the formula to the "anti-aging" wonder pill—to prove that it does anything to humans.

241.    The company began to publicly use the following language to describe McCord's "status" as the "inventor" of "Protandim:"

Dr. Joe McCord:

LifeVantage Director of Science

Our *breakthrough product, Protandim, was created by Dr. Joe McCord, a world-renowned scientist,* pioneer of Free Radical Biology, and discoverer of the anti-aging enzyme Superoxide Dismutase in 1969.

At LifeVantage, we talk a lot about breakthroughs because we have one—not the "breakthough" many companies claim and market today. *LifeVantage has a true breakthrough, a breakthrough that is real; founded and proven by science. And unlike other companies today, we can back up our claim. At LifeVantage, not only do we have our own version of the light bulb—a revolutionary breakthrough, a proven product, backed by science and poised to alter history—we have its inventor as well. ....* Developed after 40 years of research, featured on ABC, NBC, PBS, in "The Wall Street Journal," and described in CNN Chief Medical Correspondent Dr. Sanjay Gupta's book, "Chasing Life," and available exclusively through LifeVantage, our breakthrough product is specially formulated to fight aging at the source.[86]

---

[86]

https://web.archive.org/web/20110721233521/http://www.lifevantage.com/products-breakthrough.aspx.

(emphasis added). In other versions of this story, LifeVantage touted McCord as the "scientist behind "Protandim" on its "Protandim" products page.[87] Nowhere on these websites or conventions did LifeVantage (or McCord) disclose his paid status as a marketer, nor his monthly stipend or his 50-cents-a-bottle interest in selling "Protandim."

242.    LifeVantage identifying only *McCord* as the product's "inventor" contradicted the statements it simultaneously made to the SEC (that Myhill and Driscoll were "Protandim's" "original inventors") and to the USPTO (in sworn statements under penalty of perjury that Myhill and Driscoll were the original and joint inventors of the claimed invention).

### 3.    Myhill publicly disputes that McCord had anything to do with inventing "Protandim" and publishes McCord's letter that McCord agreed

243.    The company had a falling out with Myhill over Myhill's claims that it failed to give stock to a charitable organization, that it falsely promoted "Protandim" as a drug, and other issues. On November 11, 2005, Myhill resigned from LifeVantage's board, but not the company itself. He sent the company a letter which said, in part that he was "the initial researcher and developer of the Protandim concept and … its primary inventor."[88]

244.    LifeVantage knew that Myhill objected to McCord being credited with the formula for "Protandim." Its CEO essentially told Myhill to drop the issue. But on at least three occasions while the patents were being prosecuted, Myhill publicly claimed that McCord had nothing to do with the formula and that he had evidence to prove it.

---

[87]

https://web.archive.org/web/20141120122453/http://www.lifevantage.com:80/products/protandi m/ (2014 capture)

[88]

https://www.sec.gov/Archives/edgar/data/849146/000102189005000208/lifeline1111058kex991. htm

245.   First, in April, 2005 Myhill published a letter from McCord in which McCord acknowledged that Myhill, not he, was the inventor. In that letter McCord said, "I do not honestly feel that I have made contributions to the intellectual property, up to this point, that would qualify me as an inventor...I must congratulate you and Paul for having framed the concept of Protandim so close to its final embodiment, prior to the beginnings of our association."

246.   Second, in a letter posted on the Web and sent to LifeVantage in March, 2009, Myhill said, "we initially decided to hide the fact [that Myhill derived the composition] for marketing purposes and rely on the impeccable background of Dr. McCord."

247.   Third, in a published interview in 2009, Myhill said outright that *he* was the original inventor of the "formula/patent." [89]

248.   Fourth, in yet another statement he posted on his Facebook page, Myhill said:

*It is with great sadness that I write this on the eve of my Birthday – not exactly the "gift" I was hoping for . . . or hoping to give. Since 2008, I have been pleading with the company to correct its marketing materials – to reflect that Joe is not the "Inventor" or "Creator" or "Scientist behind" Protandim; that Protandim wasn't "developed after 40 years of research;" and that it didn't consist of a "laundry list" of 40 ingredients that Joe whittled down to the current formula. This is all simply untrue. I'm sure the company will try to put some sort of further spin on this now and try to convince people otherwise, but the truth is the truth and will always come out in the end. Darkness can't hide from the light....*

*The CORE botanical formula I forwarded to Joe [McCord] included the current five botanicals, plus one additional one – all in the EXACT same proportions/weights as the current formula (all 1/3 of the original to get it into one pill), but with Milk Thistle subsequently bumped up at my suggestion. The other ingredients were part of an "all-in-one" (multi-formula) addition to that CORE*

---

[89]

https://web.archive.org/web/20100314163037/http://www.blogtalkradio.com/lifevantage/blog/2009/03/09/inside-protandim-the-paul-myhill-interview.

*botanical formula that I developed. Given such indisputable facts (and that the
initial patent was filed one month before we even met Joe), how am I NOT the
creator? How is Joe THE creator? The simple email record, and even a letter from
Joe himself, clearly show that the current company communications are downright
false and misleading . . . and, in the eyes of many, perpetuate an ongoing fraud –
one that the SEC and FTC should be made aware of.....*[90]

249.    Shortly thereafter, and after Driscoll died in 2010, LifeVantage made a deal with

Myhill, and for a period of time he re-appeared on the website as a Distributor, pitching a

"ground-floor" opportunity for distributors to get in on the "Protandim" action. The McCord

letter and Myhill's Facebook page statements that he, not McCord, invented the herb formula,

were purged from the Web.

250.    The company knew about Myhill's contradicting of its story and backed McCord-

but not to the USPTO until 2011, when it applied for a continuation-in-part patent for McCord

based on Myhill and Driscoll's disclosure.

251.    In 2013, a consumer website called *Lazy Man and His Money*, wrote about

LifeVantage. As described below in Par. 216, LifeVantage sued its owner and eventually the site

took down the information posted about LifeVantage. During the pendency of the lawsuit,

LifeVantage posted a document for its Distributors encouraging them not to believe the site. The

so-called FAQ's stated yet another version of the inventorship issue:

Q. Is there any validity to the Lazyman claim that Paul Myhill, a founder of
Lifeline Therapeutics Inc., was really the creator of Protandim and that Dr. Joe
McCord was only used for promotion purposes, and that LifeVantage later bribed
Myhill to change his story?

A. In 2004, Myhill approached Dr. McCord, an expert in antioxidants and free
radical diseases, to review and improve a nutritional supplement formula that
would increase the level of antioxidants superoxide dismutase (SOD), catalase,
and glutathione peroxidase in the human body. Myhill had created a core
botanical composition of ingredients, as well as options to include numerous other

---

[90] https://strangelyperfect.tv/12482/paul-myhill-publishes-joe-mccord-letter-on-facebook/

supporting ingredients, that he believed could increase the level of antioxidants in our body and also provide other benefits. Using that information, Myhill and Dr. McCord created Protandim from a list of 41 potential ingredients. Dr. McCord suggested that they work with 8 of the original ingredients. After further research and testing, Dr. McCord further suggested reducing the ingredients to the five currently used in Protandim to ensure the safety of the product and reduce potential side effects. The five ingredients in the final product were specific quantities of milk thistle, bacopa, ashwagandha, green tea, and turmeric, which ultimately became known as Protandim. While Paul Myhill initially had the leading role in creating Protandim and is the inventor on its patents, Myhill has always recognized the significant contributions of Dr. McCord in refining, testing, and developing Protandim, including in several public statements, all of which McFarland chooses to ignore.

Q. Lazyman writes about a Lifeline product called CMX-1152 being the same thing as Protandim. Is this information true?

A. No, CMX-1152 is not the same product as Protandim. Protandim was created by Myhill and Dr. McCord as described above. CMX-1152 is a completely different product.[91]

### 4. After reaching a financial deal with Myhill, LifeVantage fraudulently claims McCord was an inventor in a later application

252.    In 2011 the company filed yet another application from the original 2004 Myhill and Driscoll applications. This matured into U.S. Pat. No. 9,265,808, (the "'808 Patent") in 2013. This application for the first time claimed to the USPTO that McCord was another "inventor" of "Protandim" dating back to the initial applications. Unlike all other applications in the parent chains, this application originally listed McCord and Driscoll as inventors.

253.    During prosecution on September 20, 2013 (three years after Driscoll's death) LifeVantage submitted a declaration from its legal counsel, who had joined the company in 2012, that, "Upon information and belief… The original joint inventors of the above-referenced application are Joe Milton McCord and William J. Driscoll."  Later, in an *unsworn* request to

---

[91] http://www.spiritofhealthkc.com/wp/wp-content/uploads/2014/06/Lazyman-FAQs.pdf

correct inventorship dated December 11, 2015, LifeVantage submitted a request to "correct inventor-ship" [sic] to substitute Myhill for Driscoll's name.

254.    Thus, eight years after Myhill and Driscoll were represented as "joint inventors" of "Protandim" (and subject to the requirements of 35 U.S.C. Sec. 116), LifeVantage claimed that the actual "joint inventors" for the entire chain were *McCord,* Myhill and Driscoll. When the Examiner found only one claim patentable, the company, *without* a sworn declaration from Myhill (and conveniently three years after Driscoll died) substituted Myhill as the "joint" inventor for *Driscoll* with no explanation how McCord contributed to the subject matter for the only claim that was sought and ultimately issued—a claim LifeVantage told the Examiner had been invented by Myhill. The Examiner overlooked these contradictory occurrences and granted the patent to McCord and Myhill.

255.    As a matter of Defendant's own admissions and the patent prosecution record (not to mention the SEC statements and Myhill's own published claims), McCord could not have been an inventor of the same claim whose inventorship was being reassigned from Driscoll to Myhill based on the assertion that it was Myhill, not Driscoll (much less McCord) who invented Claim 24.

256.    When the '808 Patent issued, it with the single claim essentially identical to the claims previously granted to Myhill and Driscoll in the '461 Patent. LifeVantage did not withdraw or "correct" the alleged inventorship of McCord with respect to the sole claim either before issuance or after. The naming of McCord as a "joint" inventor in light of the company's

multiple previous identifications of Myhill and Driscoll as the joint inventors over the same subject matter perpetrated a fraud on the USPTO.[92]

257.    Had the USPTO known the true facts concerning the inventorship claims, it would not have granted a patent on this disclosure. Were LifeVantage to seek to enforce this patent, the entire chain, leading back to the '461 would be invalid. This is something that LifeVantage knows. It employed both specialized patent counsel and had an in-house counsel, who filed a declaration in the prosecution, presumably to spare McCord from having to submit a false declaration of how he came to claim inventorship.

### c.    The rejected "synergy" claim and LifeVantage's misuse of its granted patents to falsely claim the Patent Office had found its formula to have a "synergistic' effect

258.    During prosecution of the earlier '461 Patent, McCord submitted a sworn statement. that cast further substantial doubt on his later claim to "joint" inventorship. His declaration claimed that the five-herb combination that made up "Protandim" caused "synergistic" health benefits to humans. That "synergistic" claim (in the vernacular, not patent sense) was the cornerstone of LifeVantage's public marketing that the five ingredients together were more efficacious than alone. When he made that declaration—while Driscoll was still alive—McCord did not claim to be a co-inventor.

259.    McCord made the claim because LifeVantage asked him to help to to overcome a rejection of all of the initial claims based on obviousness. The Patent Office had decided that the five-herb combination was previously disclosed and, "[it was] well known in the art at the time of the invention to use the claimed ingredients in compositions," and "absent some demonstration of unexpected results" which were not presented, "this optimization of ingredient

---

[92] 35 U.S.C. Secs. 102(f), 256.

amount would have been obvious at the time of applicant's invention." A final rejection focused

on the lack of data to support the "synergistic" claim.

260.     McCord's declaration summarized the science he claimed supported the

"synergy" argument. The Patent Office considered and rejected the claims claimed for the

formula on the basis of McCord's declaration:

> The declaration of February 6, 2007 has been considered.
>
> As discussed in MPEP section 716.02(d), a showing of unexpected results must be commensurate in scope with the claimed invention. The results shown in the declaration does not show that the synergistic effects would be seen over the entire broad range claimed in claim 1. Thus, claims 1-41 [of the original invention] are still considered properly rejected for the reasons of record.

261.     It allowed a very basic, narrow claim of the five-herb combination for the '461

Patent. No patent has subsequently allowed any claim based on the "synergism" of the five herbs

nor could it have since these patents all come from the same common Myhill and Driscoll

disclosure.

262.     In spite of the USPTO's unequivocal rejection, for years LifeVantage falsely

represented that the USPTO *had* granted it patent protection over its claim that the five-herb

combination provides a "synergistic" benefit.   Statements to that effect began to be made to

customers and investors at the end of 2007, shortly after the '461 Patent had been granted:

> ### Research Technology- Patent Received!
> No single ingredient alone shows significant gene induction. All five ingredients together(the patented Protandim formula)produced a substantial increase in the expression of this antioxidant gene. The Protandim formula works **many times more effectively than the sum of its parts. This remarkable synergy provides the basis for intellectual property rights.**[93]
> (emphasis in original)

---

[93] https://www.sec.gov/Archives/edgar/data/849146/000095013407024731/d51990exv99w1.htm

263.   To Distributors and customers in its literature for the product, LifeVantage says, "Protandim is a patented, science-based formula that has been researched, tested and validated by renowned universities and institutions."

264.   In a video released to Distributors and customers McCord "explained" how the "synergy" of "Protandim" ingredients is 18 times more powerful than taking one of them individually.[94] LifeVantage even called one of its new "Protandim" products the "NFR1 Synergizer." And, crucial to its marketing to people who may not have read the details of an obscure file wrapper at the USPTO, it explains in the FAQ section of its site:

**Can I take these ingredients individually and achieve the same effect?**

No, the blend of ingredients and their special formulation is unique to Protandim and holds patents. The combination of ingredients creates a synergy that has been studied and proven to provide much more antioxidant power than any food or conventional supplements. The five natural ingredients working together in Protandim have a *synergistic effect 18 times greater than the sum of their individual contributions.*[95]

(emphasis added)

265.   In its website's "science" section, LifeVantage claims:

[W]e're pleased to hold patents on Protandim, the most powerful Nrf2 synergizing supplement on the market. This makes its distribution an exclusive privilege of our independent distributors.[96]

266.   In its SEC Form 10-K (2009) LifeVantage claimed:

In September 2009, we announced that we had been granted a third patent for Protandim. The patent, "*Methods for Enhancing Antioxidant Enzyme Activity and Reducing C-Reactive Protein Levels,*" was issued on August 25, 2009. This patent claims the use of Protandim for increasing antioxidant enzyme activity and further

---

[94] https://www.youtube.com/watch?v=PcJ6chXSrC8

[95]   https://hk-en.lifevantage.com/faqs/can-i-take-these-ingredients-individually-and-achieve-the-same-effect/

[96] http://www.lifevantage.com/science/

documents Protandim's effect on antioxidant enzymes in vivo, describing anti-inflammatory effects such as the lowering of C-reactive protein. C-reactive protein is widely considered by doctors and researchers as an indicator of the amount of inflammation present in the body. Elevated basal levels of C-reactive protein are considered risk factors for diabetes, hypertension, and cardiovascular disease.

267.    It said on its website, www.lifevantage.com:



268.    Each time that patents were granted, LifeVantage issued a press release that materially falsified the claims of the patent. When the '461 Patent issued on July 10, the company's release said:

> LifeVantage Corporation (OTCBB: LFVN), formerly Lifeline Therapeutics, Inc., maker of Protandim®, today announced a patent was granted on July 10, 2007 for its antioxidant therapy formula used in Protandim®. The patent, titled "Compositions for Alleviating Inflammation and Oxidative Stress in a Mammal," is the first patent granted to LifeVantage Corporation. Two other patent applications have been filed by LifeVantage for Protandim®-based science.

> Dr. Joe McCord, LifeVantage's Director of Science and co-discoverer of the important antioxidant enzyme superoxide dismutase, stated, "The issuance of this first U.S. patent underscores *the unique nature of Protandim®'s approach to antioxidant therapy, and the remarkable synergy of its five phytochemical components working together. We believe this adds substantial validation to the science that has led to the creation of Protandim®*."

> James J. Krejci, CEO of LifeVantage, added, "This patent reinforces LifeVantage's approach to developing science-based, natural solutions that deliver significant health benefits to our customers in helping them reach their health and wellness

goals. *The patent, which is the basis of the Protandim®formula, also provides conclusive evidence to our customers, retail partners, and healthcare professionals that they have chosen a proven solution in reducing oxidative stress and supporting healthy aging.*" [97]

(emphasis added)

269.   When the corresponding method patent issued, the company said:

*LifeVantage Corporation Awarded Second Patent for Protandim(R), the Antioxidant Therapy Product Proven to Reduce Key Aging Factors by 40 Percent*

LifeVantage Corporation (OTCBB: LFVN), the maker of Protandim (www.protandim.com), announced a second patent was awarded on June 10, 2008 for its Protandim® antioxidant therapy product. Protandim is clinically proven to slow the progressive rate of aging by reducing oxidative stress, which is a key factor in aging. Researchers believe that Protandim's unique ability to reduce aging factors at the cellular level will play a pivotal role in helping consumers age gracefully. The newly issued patent is entitled, "Preparation of Compositions to Alleviate Inflammation and Oxidative Stress in a Mammal."

Dr. Joe McCord, one of the foremost authorities on the body's antioxidant defense system and the co-discoverer of the important antioxidant enzyme superoxide dismutase, said, "The granting of this second U.S. patent underscores *the unique ability of Protandim* to modulate important physiological events involved in the inflammatory process, and known to be common to hundreds of human diseases and to the aging process itself. *Because of the remarkable synergy of Protandim's five phytochemical components working together to increase the body's network of antioxidant enzymes, it achieves protection against oxidative stress that greatly exceeds that produced by conventional therapies.*"

David Brown, CEO and president of LifeVantage, said, "Our mission is to develop science-based, natural solutions for healthy aging. Health and wellness is a primary concern for our partners including our customers, retailers and healthcare professionals. *The issuance of a second patent for Protandim further supports the fact that there is no other product in the marketplace that can provide consumers a proven solution in reducing the negative effects caused by oxidative stress, which is the primary culprit in aging."* [98]

(emphasis added)

---

[97]   http://investor.lifevantage.com/news-releases/news-release-details/lifevantage-corporation-obtains-patent-science-based-dietary
[98]http://investor.lifevantage.com/news-releases/news-release-details/lifevantage-corporation-awarded-second-patent-protandimr

270.    When it published its FAQ's about the *Lazy Man and His Money* website in 2012, the company flatly lied about what the USPTO actually granted. It said:

> Q. Lazyman claims that LifeVantage illegally obtained patents on Protandim and that this is demonstrated by the fact that Dr. McCord is not listed on the patent.
>
> A. The patent application for Protandim was submitted by Paul Myhill in 2004. This application was initially denied by the United States Patent and Trademark Office (USPTO) in 2006 due to the need for further supporting evidence. Shortly thereafter*, Dr. McCord validated the mutually synergistic effect of Protandim. Dr. McCord described the new data in a Declaration to the USPTO and was granted a meeting to present his findings. That meeting resulted in the patent denial being reversed and the patent was issued in 2007.* Dr. McCord was not required to be listed on the patent but was extremely instrumental in achieving its final approval.[99]

(emphasis added)

271.    The reason why LifeVantage falsely pushed the "synergistic" nature of the "Protandim" product was to fool potential Distributors and customers like Smith and Ilardo that they would be involved in a legitimate business. When these claims were made, no one at LifeVantage, from McCord to its CEO, was not aware that the company had no patent claims that were based on the "synergy" claim.

### 5. In Order To Perpetuate The Belief Its Products Were Worth Buying, LifeVantage Made False Drug Claims Concerning "Protandim"

272.    LifeVantage has for years authored promotional literature that stated or implied, that "Protandim" in fact cures diseases. These statements are prohibited by the FDA.  Both Plaintiffs Smith and Ilardo were lured into the scheme by these types of statements, which were ubiquitous in the many forms of promotion practiced by the company: training materials, training sessions, conventions (often attended by McCord), the company's websites for "Protandim,"

---

[99] http://www.spiritofhealthkc.com/wp/wp-content/uploads/2014/06/Lazyman-FAQs.pdf

"Nrf2", and its own, and testimonials in the form of videos posted on YouTube and other aggregator sites.

273.    The patent *disclosures* by Myhill and Driscoll, which are not considered marketing materials, do list a Britannica-length list of diseases and ailments that its anti-oxidants allegedly cure:

> The compositions of the present invention are useful to prevent or treat the following disorders and diseases: memory loss; Parkinson's disease; aging; toxin-induced hepatotoxicity; inflammation; liver cirrhosis; chronic hepatitis; and diabetes due to cirrhosis; indigestion; fatigue; stress; cough; infertility; tissue inflammation; cancer; anxiety disorders; panic attacks; rheumatism; pain; manic depression; alcoholic paranoia; schizophrenia; fever; insomnia; infertility; aging; skin inflammations and disorders; alcoholism; anemia; carbuncles; convalescence; emaciation; HIV; AIDS; immune system problems; lumbago; multiple sclerosis; muscle energy loss; paralysis; swollen glands; ulcers; breathing difficulties; inflammation; psoriasis; cancer (e.g.; prostate cancer, lung cancer and breast cancer); pain; cardiovascular disease (e.g.; arteriosclerosis and atherosclerosis); ischemia/reperfusion injury; anxiety; attention deficit disorder; leprosy; arthritis (e.g., psoriatic arthritis; spondylitis; and rheumatoid arthritis); hemorrhoids; tuberculosis; high blood pressure; congestive heart failure; venous insufficiency (pooling of blood in the veins; usually in the legs); sore throat; hepatitis; syphilis; stomach ulcers; epilepsy; diarrhea; asthma; burns; piles; sunburn; wrinkles; headache; insect bites; cuts; ulcers; sores; herpes; jaundice; bursitis; canker sores; sore gums; poison ivy; gastritis; high cholesterol; heart disease; bacterial infection; viral infection; acne; aging; immune disorders; dental caries; periodontitis; halitosis; dandruff; cardiovascular disease (e.g., hypertension; thrombosis; arteriosclerosis); migraine headaches, diabetes; elevated blood glucose; diseases of the alimentary canal and respiratory system; age-related physical and mental deterioration (e.g., Alzheimer's Disease and age-related dementia); cardiovascular disease; cerebral vascular insufficiency and impaired cerebral performance; congestive symptoms of premenstrual syndrome; allergies; age-related vision loss; depression; Raynaud's disease; peripheral vascular disease; intermittent claudication; vertigo; equilibrium disorder; prevention of altitude sickness; tinnitus (ringing in the ear); liver fibrosis; macular degeneration; asthma; graft rejection; and immune disorders that induce toxic shock; bronchoulmonary disease as cystic fibrosis; chronic bronchitis; gastritis; heart attack; angina pectoris; arthritis, chronic obstructive pulmonary disease; kidney damage during coronary angiography; Unverricht-Lundborg disease; pseudoporphyria; pneumonia; and paracetamol hepatotoxicity.

274.    The reason why LifeVantage mislabeled its products and falsely pushed the "scientific" nature of the "Protandim" product was to fool potential Distributors like Smith and Ilardo that they would be involved in a legitimate business that would help people. Another reason was so that LifeVantage could charge a higher price for the product it claimed was patented. To that end for years LifeVantage pushed the connection between the "scientific," cancer-curing "Protandim" and the MLM distribution system as a means of masking the fact that it was just another pyramid scheme. It did so in a variety of ways.

275.    On YouTube, LifeVantage posted videos titled, for example, "Protandim-NRF2 and Cancer" featuring McCord. McCord appeared at LifeVantage conventions, for example in 2015 in a 46 minute speech entitled "McCord PhD on Creation of Protandim Nrf2 Activator,"[100] and "Protandim Nr Breakthroughs Research For Cancer Treatment,"[101] "NRf2 cancer, chemo and radiation,"[102] "What is Peer Reviewed Research? Protandim Cancer Chemo Radiotherapy,"[103] "Dr. Joe McCord Discusses the Science of Protandim, 2011."[104] In each of these videos McCord makes the clear implication that "Protandim" cures, assists in curing, or alleviates cancer. Those videos are still available today.

---

[100] https://www.youtube.com/watch?v=0RouYRTFmx4

[101] https://www.youtube.com/watch?v=QB8wn4vm2lQ

[102] https://www.youtube.com/watch?v=hbYQhKma9wI

[103] https://www.youtube.com/watch?v=vR-k3ucVj2o

[104] https://www.youtube.com/watch?v=eb8Qs55ylAM

276.    LifeVantage also claimed that "Protandim" cures Alzheimers, Parkinsons and arthritis. Another of its SAB members, Dr. David Perlmutter, gave a speech about the five-herb formula combating these diseases.[105] That video has been accessible since 2009.

277.    The company either published or promoted publishing health claims statements on its behalf on the Web, findable by a search for "Protandim patents," "Protandim health benefits," and similar. For example on a site called www.pforprotandim.com the following statements were posted in 2017 (available September, 2018):

> What's Protandim?
>
> PROTANDIM reduced oxidative stress by an average of 40% in 30 days. A claim that no other product or company can make
>
> Our flagship product we mentioned called Protandim, is made up of 5 synergistically combined herbs backed by 7 patents and 26 peer reviewed published studies. *It protects the blood, the bones, and the organs*.

(emphasis added)

278.    When it announced one of its patents, it did so by illegally claiming they have an effect on disease. On August 31, 2009, LifeVantage sent out a press release that said:

> LifeVantage Corporation has been granted a third patent for its flagship product Protandim(R) from the United States Patent and Trademark Office. Protandim(R) has been clinically proven in earlier studies to slow the progressive rate of aging by reducing oxidative stress and this new patent further documents Protandim's(R) effect on antioxidant enzymes in vivo, describing anti-inflammatory effects such as the lowering of C-reactive protein. C-reactive protein is widely considered by doctors and researchers as an indicator of the amount of inflammation present in the body. Elevated basal levels of C-reactive protein are considered risk factors for diabetes, hypertension, and cardiovascular disease. The patent, "Methods for Enhancing Antioxidant Enzyme Activity and Reducing C-Reactive Protein Levels," was issued on August 25, 2009.
>
> Dr. Joe McCord, one of the foremost authorities on the body's antioxidant defense system and the co-discoverer of the important antioxidant enzyme superoxide

---

[105]  http://vimeo.com/6816652

dismutase or SOD, said, "*This patent further underscores the unique and powerful actions of Protandim(R) as a tool against not only oxidative stress, but also inflammation. Chronic, low-level inflammation is now known to be associated with many of the major diseases we face as we age, including atherosclerosis, diabetes, obesity, and neurodegenerative diseases.*"

David W. Brown, LifeVantage President and CEO commented, "The issuance of a third patent for Protandim(R) builds upon our previous two patents and further separates LifeVantage and Protandim(R) from other dietary supplements. It is difficult to receive a patent for a dietary supplement. Protandim(R) is uniquely and solidly based upon sound and proven science and the issuance of this third patent marks a historic day for LifeVantage, and sets an unparalleled standard in the dietary supplement industry." [106]

(emphasis added)

279.    On April 14, 2016, LifeVantage issued a press release, quoting Defendant Jensen, that claimed:

 SALT LAKE CITY, April 14, 2016 (GLOBE NEWSWIRE) -- LifeVantage Corporation (Nasdaq:LFVN), has announced the receipt of United States Patent No. 9,289,374 B2, issued March 22, 2016, for topical compositions and methods for reducing oxidative stress for its TrueScience skin care products.

*According to the patent, topical application of the compositions in the TrueScience skin care products have been demonstrated to stimulate the reduction of oxidative stress and improve the appearance of the skin's epidermal rete ridges, which are believed to improve the appearance and overall health of the skin.*

"The receipt of this patent continues to differentiate LifeVantage from other companies in the direct selling and skin care industries," said LifeVantage President and Chief Executive Officer, Darren Jensen. "The peer reviewed studies related to our products demonstrate their effectiveness and position LifeVantage at the forefront of skin care."[107]

---

[106]    https://www.newhope.com/supplements/lifevantage-granted-third-patent-protandimr-and-method-reducing-important-inflammation-b

[107]    https://globenewswire.com/news-release/2016/04/14/828906/0/en/US-Patent-Issued-to-LifeVantage-for-TrueScience-Product-Composition.html

(emphasis added).

280.   The statements were false. The only independent claim of the patent was for the

topical application of natural herbs:

> A composition consisting essentially of: an extract of a *Brassica* species
> containing one or more isothiocyanates, wherein the one or more isothiocyanates
> is present in the composition in an amount of 500 ppm to 1,500 ppm; an extract of
> a *Camellia* species; an extract of *Curcuma longa;* an extract of *Piper nigrum;* an
> extract of *Plantago lanceolata* containing plantamajoside, wherein the
> plantamajoside is present in the composition in an amount of 500 ppm to 1,500
> ppm; an extract of *Silybum marianum;* an extract of *Wasabi japonica*; and a
> humectant, wherein the humectant is selected from at least one of propylene
> glycol, butylene glycol, or pentylene glycol.

281.   At the same time as these false statements were put up by itself and others,

LifeVantage aggressively demanded that "sceptics" who pointed out that the claims it was

making for "Protandim" were dubious or worse pull that criticism from the Web. In 2012

LifeVantage engaged in litigation with an Internet-based consumer critic, Paul McFarland, who

authors a well-known consumer-advocate website called *Lazy Man and His Money*. McFarland

published a series of articles detailing his concerns with the pyramid nature of the business

opportunity and the costs involved. LifeVantage sued him for defamation in California state

court, and after McFarland lost his anti-SLAPP suit motion, forced him into a cost-based

settlement[108] to take down the article, even from the Internet Archive.

282.   At the same time, LifeVantage made a concerted decision to allow

unsubstantiated claims that "Protandim" cures cancer to remain on the Web. Numerous people

have posted "testimonials" on YouTube that "Protandim" "reversed brain cancer" and similar

---

[108] https://www.lazymanandmoney.com/?s=lifevantage

that LifeVantage has permitted to be available, even though Google will take down any video with a trademark notice upon request.

283.    On April 17, 2017 the Food and Drug Administration took the unusual step and delivered a "Warning Letter"[109] to Defendant Jensen, that said, in relevant part:

Dear Mr. Jensen,

This is to advise you that the Food and Drug Administration (FDA) reviewed your websites at the Internet addresses www.nrf2science.com, www.lifevantage.com, and www.protandim.com in January 2017 and has determined that the claims on your websites establish that your Protandim NRF2 Synergizer product is a drug under Section 201(g)(1)(B) of the Federal Food, Drug, and Cosmetic Act (the Act) [21 U.S.C. § 321(g)(1)(B)], because it is intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease. As explained further below, introducing or delivering this product for introduction into interstate commerce for such uses violates the Act....

Your product Protandim NRF2 Synergizer is intended for treatment of one or more diseases that are not amenable to self-diagnosis or treatment without the supervision of a licensed practitioner. Furthermore, your product is intended for prevention of one or more diseases that are not amenable to prevention by consumers without the supervision of a licensed practitioner. Therefore, it is impossible to write adequate directions for a layperson to use your product safely for its intended purposes. Accordingly, your product is misbranded under section 502(f)(1) of the Act [21 U.S.C. 352(f)(1)]. The introduction or delivery for introduction into interstate commerce of this misbranded drug violates section 301(a) of the Act [21 U.S.C. 331(a)].

284.    The letter delineated where on its websites LifeVantage made its false claims:

"Examples of claims found on your websites that establish the intended use of your Protandim NRF2 Synergizer product as a drug include, but may not be limited to, the following:

On the www.nrf2science.com home page:

- "Anti-inflammatory"

---

[109]

HTTPS://WWW.FDA.GOV/ICECI/ENFORCEMENTACTIONS/WARNINGLETTERS/2017/UCM554234.HTM

- "Cardiovascular diseases prevention"
- "Diabetes prevention"
- "Alzheimers [sic] prevention"
- "Cancer prevention"
- "Cellular stress … can lead to skin cancer. In the body, cellular stress is linked to cardiovascular disease, alzheimers [sic], cancer and other life threatening diseases … When activated, Nrf2 turns on the production of specific antioxidants the body needs to fight cellular stress effectively"

Under the "Nrf2 & the Body," "Nervous System" tab, www.nrf2science.com/nervous-system:

- "Nrf2-activating phytonutrients such as EGCG from green tea, curcumin from turmeric, and quercetin from onions are known to reduce amyloid plaque accumulation (Alzheimer's) and increase regeneration of dopamine fibers (Parkinson's), suggesting a general neuro-protective benefit."
- "Oxidative damage occurs early in virtually all nervous system disorders, including chronic conditions such as Alzheimer's, Parkinson's, Multiple Sclerosis, and ALS … as well as acute brain injury such as stroke and traumatic brain injury (TBI, including concussions), suggesting that oxidative stress plays a prominent role in disease progression … neurons with low Nrf2 activity are more susceptible to oxidative stress, but cellular damage can be reduced through Nrf2 activation"

Under the "Nrf2 & the Body," "Cardiovascular System" tab, www.nrf2science.com,/cardiovascular-system/:

- "Increases production of specific anti-atherogenic (heart-protecting) enzymes"
- "Protects blood vessels from inflammation"
- "Reduces high blood pressure"
- "Several cardiovascular diseases are associated with suboptimal cellular defenses, (and thus with elevated cellular stress), including atherosclerosis (blockage of blood vessels), hypertension (elevated blood pressure), and heart failure (loss of contraction ability)…Nrf2, a key protein that activates the body's ultra-powerful antioxidant enzymes, has been shown by science to protect and benefit the cardiovascular system"
- "protects heart muscle cells in rats with hypertension (high blood pressure)"
- "keep blood vessels open by reducing overgrowth of the interior linings of specific blood vessels used in coronary bypass grafts"

Under the "Nrf2 & the Body," "Skin Health" tab, www.nrf2science.com,/skin-health/:

- "Minimizes inflammation"

- "Protects against UV radiation exposure"

- "Minimizes risk of skin cancers"

- "Nrf2 pathway can have a wide range of beneficial effects on skin, including reduced rates of skin cancers, protection from ultraviolet radiation, reduced inflammation … and improved wound healing."
  Under the "Cancer" tab, www.nrf2science.com,/cancer/:

- "Nrf2 Help Fight Against Cancer"

- "Restrict/modulate underlying mechanisms involved in carcinogenesis (formation of cancer cells)"

- "Positively influences genes involved in formation of cancer cells"

- "Shows ability to slow progression of and 'kill' cancer cells"

- "'Nrf2 as a promising molecular target for cancer prevention'"

- "'protection against … carcinogens'"

- "Nrf2 is indeed a potentially powerful weapon against cancer."

- "suppress both the development and spread of skin cancer … 57% reduction in number of skin tumors"

- "significantly reduced the development of skin cancer"

- "chemopreventive agent due to their ability to modulate underlying mechanisms involved in carcinogenesis"

- "'Nrf2 … target the so-called 'diseases of aging,' including cancer, cardiovascular diseases, inflammatory and autoimmune diseases, and neurodegenerative diseases."

- "suppress the growth and spread of breast cancer"

- "anti-cancer effects against ovarian cancer and myeloma (bone marrow cancer)"

- "anti-tumor and anti-proliferative effects (reduced tumor formation and growth) across 8 different ovarian cancer cell lines.
  Under the "Nrf2 Studies" tab, www.nrf2science.com,/studies/:

- "Prostate Cancer Prevention Trial"

- "associated with lower lung cancer risk"

- "mineral supplement use to prevent cancer"

On the blog posts, www.protandim.com/blog/ :

Under the April 1, 2012 post, "Long-Used, Much-Studied Turmeric a key Protandim Ingredient":

- "helpful for the following conditions: … Stomach ulcers … Osteoarthritis … Heart Disease … Bacterial and viral infections … Cancer … Alzheimer's disease"

Under the April 6, 2012 post, "Ultra-Popular Green Tea has its Place in Protandim":

- "lowering cholesterol… and fending off dementia"
- "reduce the risks of developing cancers such as breast, stomach, prostate, pancreatic and colorectal cancer."

On the blog post, www.lifevantage.com/blog/study-confirms-protandim-nrf2-synergizer-extends-lifespan/ :

Under the August 5, 2016 post, "Study Confirms Protandim Nrf2 Synergizer Extends Lifespan":

- "Suppresses tumor-promoting oxidative stress… and inflammation"
- "Protects the heart from ... fibrosis'"

285.    These statements were made with knowledge of their falsity. LifeVantage and Defendant Jensen knew at all times what statements the FDA prohibited. The company never performed drug trials, even in an initial phase, on "Protandim." The company never intended to perform such trials. The company knew at all times that absent approval of "Protandim" as a drug, each such statement was illegal, misleading and deceptive.

286.    The purpose of these statements was to convince Plaintiffs like Smith and Ilardo that purchasing "Protandim" was a good "business opportunity." Another reason was so that LifeVantage could charge a higher price for the product it claimed was patented.

## 6.  CLASS ACTION ALLEGATIONS

287.   With respect to Counts 1, 2 and 4 under federal securities laws and Utah unjust enrichment, Plaintiffs bring this suit as a class action pursuant to the FED. R. CIV. P. 23(b)(2) and (3) individually and for a class tentatively defined as:

> All purchasers of the LifeVantage "business opportunity" (the "Securities Class"). Excluded from the Class are all persons named as a Defendant (or a spouse of a Defendant or a related entity of Defendant) and any purchaser who has not experienced a financial loss as a result of their LifeVantage Distributor enrollment.

288.   With respect to Count 3 under the Sherman Act, Plaintiffs bring this suit individually and for a class tentatively defined as:

> All direct purchasers of "Protandim" at the price charged to Distributors and Preferred Customers during the Class Period (the "Antitrust Class"). Excluded from the Class are all persons named as a Defendant (or a spouse of a Defendant or a related entity of Defendant).

289.   Smith's and Ilardo's claims are typical of the claims of the Securities Class in that each paid money to become a Distributor and lost money as Distributor. Each Plaintiff will fairly and adequately represent the interests of the class because their claims are typical of those of the class and their interests are fully aligned with those of the class. Plaintiffs have retained attorneys who are experienced and skilled in complex class action litigation, including in class action pyramid scheme litigation and securities litigation.

290.   Smith's and Ilardo's claims are typical of the claims of the Antitrust Class in that each paid money to purchase "Protandim" product during the Class period. Each Plaintiff will fairly and adequately represent the interests of the class because their claims are typical of those of the class and their interests are fully aligned with those of the class. Plaintiffs have retained attorneys who are experienced and skilled in complex class action litigation, including in antitrust litigation.

291.   Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.

292.   The Defendants have acted on grounds that apply generally to each class, *i.e.*, running a product-based pyramid scheme, selling each class member "Protandim" product, so that class-wide damages, final injunctive relief, or corresponding declaratory relief is appropriate respecting the class as a whole.

293.   This case presents questions of law or fact common to class members that predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. (FED. R. CIV. P. 23(b)(3)).

294.   The questions of law and/or fact common to each class, include but are not limited to the following:

    a.   Whether the Defendants were operating an unlawful product-based pyramid scheme;

    b.   Whether the Defendants were operating a fraudulent overpricing scheme;

    c.   Whether the Defendants encouraged class members to pay money to LifeVantage for the illusory "right" to sell LifeVantage products;

    d.   Whether the Defendants engaged in acts of securities fraud when operating the unlawful pyramid scheme;

    e.   Whether the Defendants engaged in acts of securities fraud by omitting to inform Distributors they were joining a pyramid scheme;

122

f.      Whether the Defendants engaged in acts of securities fraud by
omitting material facts relating to the "business opportunity"
investment;

g.      Whether the Defendants failed to register the "business
opportunity" with the SEC;

h.      Whether the Defendant monopolized or attempted to monopolize
the market for "Protandim" with anti-competitive activity
including patent fraud;

i.      Whether the Defendants caused injury to the Securities and/or
Antitrust Class members and, if so, the amount thereof;

j.      Whether the Antitrust Class suffered an antitrust injury.

295.    These and other questions of law and/or fact that are common to the class
predominate over any questions affecting only individual class members. No element of
establishing liability requires individualized proof.

296.    A class action under Fed. R. Civ. P. 23(b)(3) is superior because:

a.      No class member has an interest in individually controlling the
prosecution of his/her/its separate action. No class member can be
expected to incur the cost of attorneys' fees and cost to recover
their $1,200, $600, or $300 Enrollment Pack plus other payments
to become a Distributor and maintain Distributor status.

b.      There is no other pending litigation over these issues.

c.      It is manifestly desirable to concentrate the litigation of the class's
claims in Utah and this district.

d.      The Court will encounter no difficulties in managing this case as a
class action.

## CLAIMS FOR RELIEF

### COUNT ONE
### Violation of Section 10(b) of the Securities Exchange Act And
### Rule 10b-5, 17 C.F.R. Sec. 240.10b-5

297.    Plaintiffs repeat and re-allege each and every allegation contained above as if
fully set forth herein.

298.    The sale and offer of sale of LifeVantage distributorships, such as those purchased by Plaintiffs and the Securities Class, is in connection with and constitutes the sale of a security. Plaintiff Smith's sworn certificate was attached as an Exhibit to the Complaint.

299.    The Defendants have engaged in activities that affect interstate and foreign commerce. The scheme has operated in the United States and in Canada, Australia, Japan, Hong Kong, Mexico, Netherlands, Germany, Thailand, and the United Kingdom with its basis in the United States. Federal securities laws regulate Defendants' actions and this Court has jurisdiction to apply Section 10b-5 with respect to all activities described herein.

1.   **Section 10b(5) Subsections (a) and (c) Scheme Liability**

300.    Subsections (a) and (c) make it illegal "to employ any device, scheme, or artifice to defraud" and "to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." Defendants are liable under Subsections (a) and (c) of Rule 10b-5 as follows.

- During the Class Period, Defendants employed a plan, scheme, and course of business to operate as a product-based pyramid scheme. The scheme had as its defined target unsophisticated investors like Plaintiffs and the Class. The scheme went beyond omissions: it was designed to act and did in fact operate as an illegal pyramid scheme that masqueraded as a product-based multi-level marketing system. The scheme depended on a fiction that acted as a fraud or deceit on Plaintiffs ad the Class—that the Distributors were engaging in an activity that was legal, where they would sell a product to a base of customers and in turn be paid commissions for that sale. In fact Defendants knew the Compensation Plan they required each Distributor to sign in practice required Distributors to pay for the right to receive rewards unrelated to the sale of products to retail customers; the Compensation Plan paid for recruiting others into the scheme; the bulk of product sales were to other Distributors, the Defendants enticed Distributors with false promises of financial opportunity; the Defendants failed to disclose the true earnings of Distributors; and otherwise operated as a pyramid scheme as defined by the courts and the FTC. The allegations concerning the existence of a pyramid scheme are contained in Pars. 40 to 181 and are expressly repeated here. A product-based pyramid scheme is inherently fraudulent

under federal law and as such imposes Subsection (a) and (c) scheme liability on the Defendants.[110]

- During the Class Period, LifeVantage created a scheme and practiced a course of business to create the false appearance of being a legitimate purveyor of "scientifically proven" products that can cure disease such as cancer. The purpose of the scheme was to entice unsuspecting people like Plaintiffs to invest in the "business opportunity" to Distribute what was portrayed as a patented formula. In fact, the company product was a common combination of ingredients, the USPTO never granted a patent on its efficacy, Defendants committed patent fraud on the USPTO to obtain at least some patents; the Defendants improperly and illegally made health claims regarding the product and continue to make them even after the FDA sent Defendants a warning letter. The purpose of the scheme was to deceive and mislead investors like Plaintiffs and the Class into believing that the "business opportunity" was valuable. The allegations concerning the existence of a scheme to cloak "Protandim," the product underlying the pyramid scheme, with false claims and veneer of science are contained in Pars. 182 to 286 and are expressly repeated here. The planning and carrying out of a comprehensive scheme, by specific steps, to mislead prospective and active Distributors, like Plaintiffs and the Class, as to LifeVantage's legitimacy and the value of the distribution rights creates scheme liability under Subsections (a) and (c).

## 2. <u>Subsection 10b-5(b) Liability</u>

301. Defendants made numerous omissions in furtherance of the scheme. Plaintiffs claim the omissions in this action are subject to the *Affiliated Ute*[111] presumption from individualized questions of reliance on misrepresentations. During the Class Period Defendants omitted material facts from Distributors offered the "business opportunity" to become investors:

- Each Plaintiff and the Class were offered terms and conditions, policies and procedures, and the Compensation Plan as the offering materials for their investment. None of these materials, and no information on the www.lifevantage.com or other related websites revealed that the multilevel marketing program and its Distributor program are an illegal pyramid scheme but instead propagated the impression that it is a legal enterprise;

---

[110]. *Kerrigan v. ViSalus, Inc.*, 2016 U.S. Dist. LEXIS 29958 at *47, 50 (E.D. Mich. Mar 9, 2016); *SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 445-46 (E.D.N.Y. 2016).
[111] *Affiliated Ute Citizens v. U.S.*, 406 U.S. 128 (1972).

- Each Plaintiff and the Class were offered terms and conditions, policies and procedures, and the Compensation Plan as the offering materials for their investment. None of these materials, and no information on the www.lifevantage.com or other related websites revealed that the majority of the Distributors have and likely will lose their money.

**Proximate Cause And Reliance**

302.   The loss suffered by the Plaintiffs and the Securities Class was foreseeable and a direct result of the establishment, promotion, and expansion of the schemes by the Defendants because the ultimate collapse of the scheme, and harm to its participants, is a direct and foreseeable consequence of the structure of the scheme.[112] A pyramid scheme depends on continued expansion by continual recruiting of innocent people who do not realize that the only way in which they can achieve the benefits represented by the pyramid scheme's promoters is to recruit and victimize other innocent people into joining. In reality, like all pyramid schemes, the Compensation Plan and all aspects of the promotion of the pyramid scheme were based on recruiting over product sales, and depended on the known existence of money-losers (like the Plaintiffs and the Securities Class) to pay the small group of "winners" inherent in any pyramid scheme. Participants in the LifeVantage scheme were induced to purchase distribution rights without knowledge that they could only make money by victimizing others. Each of the acts of preparing and distributing promotional and recruiting materials authored by, or which knowingly featured these culpable individuals, was made with the intent that Plaintiff join the "downline" organization of each of them and therefore contribute money into the scheme. There is a clear causal connection between the acts alleged above and the injury suffered by the Plaintiff and the class.

---

[112] *Torres v. Stream Energy, LLC.*, 838 F.3d 629 (5th Cir. 2016).

303.    Defendants' promotion of the "Protandim" product independently caused Plaintiffs and the Class to join the "business opportunity" and lose money. LifeVantage had the actual intent to attract participants, as evidenced by a massive web presence, publication of web-related videos, its own and related websites, and other broadly disseminated offers for people to become promoters for LifeVantage on the basis of scientific "evidence" of its health and disease cure effects. But for these false and misleading schemes described, Plaintiffs and the Securities Class would not have been induced to purchase the distribution rights. Plaintiffs' losses were a direct and proximate cause of their innocent participation in the schemes. Plaintiffs necessarily and/or justifiably relied on the promotion of "Protandim" and the patent issuance and scope claims surrounding the product to invest in a distributorship. Such reliance may be presumed from, among other things, the presumption that no one would knowingly purchase a product for 11X what a generic version would cost absent a belief that the Defendants' product is unique and patented in such a way as to protect its uniqueness. In addition, Plaintiffs reviewed and relied upon the omissions of material facts in the Plan detailed above in this Complaint. The damages caused by the scheme and/or omissions were a necessary consequence of an inherently illegal scheme to defraud.

304.    Individual reliance is not an element of a scheme liability Section 10b-5(a) or (c) cause of action. In the alternative, Plaintiffs and the Securities Class rely on the presumption of reliance where plaintiffs must show a speculative state of facts, established by *Affiliated Ute, CGC Holding Co., LLC v. Broad and Cassel*, 773 F.3d 1076 (10th Cir. 2014), and *Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000). In this case generalized, class-wide proof shows evidence of reliance on Defendants' omissions and schemes to defraud such as to permit a commonsense inference of reliance applicable to the entire class to answer a predominating

question. Here, each Securities Class member, including the individual Plaintiffs was required to sign an identical or essentially identical agreement, and agree to unilaterally-imposed terms and conditions and Compensation Plan. Each of these documents exposed each Securities Class member to the representations made by Defendants on their website or through other recruiting distributors. Each Securities Class member was presented with a unified, consistent set of exaggerations and omissions about the product in the same context where Defendants alleged that the product-based MLM and Plaintiffs' investment was legal. It is proper to infer that no reasonable Plaintiff would have joined an illegal scheme: rational people do not sign up for pyramid schemes or pay multiple times what they paid for a product available elsewhere.

## Damages

305.    Plaintiffs (and the Securities Class sought to be certified) suffered a loss of money composed of the cost paid to become a Distributor, together with the administrative fees and the cost of the products purchased as samples and for purposes of operating the alleged "business opportunity," the amounts charged to attend LifeVantage events, the amounts charged to Distributors for App memberships, enrollment in the Pro Audio Series program, and all other costs associated with the "business opportunity." Plaintiff Smith lost in excess of $1,000. Plaintiff Ilardo lost over $8,000. The precise amount lost by the class sought to be certified has not yet been determined. It is believed that each of the unwitting participants in the pyramid scheme sought to be certified as a class has lost $50 to well over $1,000 as a result of purchasing their distribution rights. Upon information and belief, the precise amounts that each and every participant in the pyramid scheme has (1) spent on costs associated with the Distributor "business opportunity" and (2) received in commissions or bonuses or other payments from LifeVantage as a result, has been tracked, maintained and accounted for by LifeVantage through a proprietary software database maintained by InfoTrax Systems. Thus, the precise loss of every

class member is easily capable of being ascertained in this litigation, and the total business injury capable of being computed for the class.

<u>Scienter</u>

306.    Defendants' actions as set forth herein were made with such mental state to manipulate, deceive or defraud, or with such recklessness, as to constitute *scienter*, which is imputed to LifeVantage. Both Defendants had a motive to operate and benefit from the operation of the pyramid scheme, and opportunity to conceal the fact that they were operating a pyramid scheme. Proof of such *scienter* can be inferred from the following:

- Both Defendants benefitted in concrete and substantial way from the operation of the pyramid scheme. LifeVantage shows an operating profit of approximately $10 million per year. Prior to embarking on the MLM pyramid scheme it lost several million dollars a year on the sale of the same products.

- Both Defendants engaged in plainly illegal behavior. *See* averments made in connection with the commission of a pyramid scheme;

- Both Defendants had a specific understanding that each was engaged in the commission of a pyramid scheme or that it would be substantially likely that the operation would be found to be a pyramid scheme:

    a.    LifeVantage knew and acknowledged that the network marketing industry is subject to regulation, including regulation by the FTC and that there was a risk that the FTC or other governmental agency could determine that LifeVantage was not complying with the existing laws and regulations. Its management, including Defendant Jensen and prior CEO Brown, took steps to masquerade the actual effect of the Compensation Plan in SEC filings and from their Distributors while knowing, because each Distributor's spending, commissions, and purchases is tracked in real time and reports of these are made available to management, that the vast majority of payments to Distributors is for recruiting, and that the vast majority of Distributors lose money.

    b.    Prior CEO Brown had personal knowledge of the FDA regulation of illegal natural supplements, FDA regulation of natural supplements in connection with his tenure at Metabolife. Brown also knew that the MLM model was likely a pyramid scheme. He personally recruited professional marketers from other companies and entered into side contracts with them

to pose as "successful" LifeVantage distributors. Brown therefore knew that the depictions of those distributors as "just like you" distributors, and the inclusion of their "earnings" in income disclosure statements was false.

c.      Current CEO Jensen has the same knowledge concerning undisclosed side agreements as Brown. Jensen has admitted that the company still hires professional recruiters to act like typical distributors.

d.      Defendant Jensen is the regular participant and speaker at earnings calls with analysts and investors. As such he is privy to all financial reports at the company. Jensen obtained regular reports in the course of his operation that showed the 2:1 ratio, at best, of people deemed customers versus people deemed Distributors. He was regularly made aware of sales reports that showed that at least 62% of sales were made to Distributors. Jensen appeared at training events and conventions where he was made aware, and personally participated in, recruitment sessions, training for recruitment, and presentations of checks and prized to successful Distributor recruiters. He understood how the Compensation Plan worked and was privy to information that showed each of the metrics set forth in this Complaint, and specifically that only the top few percent of Distributors, most often those with special, undisclosed incentives and deals, made money acting as LifeVantage Distributors.

e.      Defendant Jensen understood that the operation of the business is an illegal pyramid scheme if the Compensation Plan paid substantially for recruiting others rather than for product sales to legitimate, third-parties. Jensen had at his disposal all facts necessary to know that in all substantial respects LifeVantage was conducting its business as did other product-based MLMs Vemma and Fortune Hi-Tech, both of which were shut down by the FTC. Jensen is a high-ranking member of the Direct Selling Association, and was named to its Board of Directors in 2018. The DSA closely monitored both the Vemma and Fortune Hi-Tech FTC cases and has provided funds to these and similar litigations in order to assist the MLM company against the FTC or private litigants. During his association with the DSA, Jensen knew and participated in study and monitoring groups about the Vemma and Fortune Hi-Tech pyramid litigations. Jensen knew all of the details surrounding both the DSA strategy to defend these MLMs and the facts underlying the FTC actions, including specifically the similarity between the Vemma and FHT compensation plans and LifeVantage's Compensation Plan.

f.      Defendant Jensen often speaks and appears at panels with the DSA along with FTC enforcement personnel. He is scheduled, for example to appear at the DSA's November meeting on this topic. He has given interviews in which he admitted to knowing detailed metrics on distributor

retention and licensing technology to increase distributor recruiting efforts.

g.      Defendant Jensen has written articles purporting to teach Distributors how to get the money in MLM. These articles have been published by MLM websites. One such article is entitled "The First Dollar Principle."

h.      Defendant Jensen is personally aware of claims by a leading consumer group, Truth in Advertising.org ("TINA") that its website contains deceptive advertising for its "business opportunity." TINA sent Jensen, among others at LifeVantage, a letter dated December 18, 2017 identifying numerous deceptive terms, including "financial freedom" and photos of Jeeps and other incentives. A return letter dated January 3, 2018 from LifeVantage copied to Jensen admitted "such promotions with insufficient context could be interpreted as a misleading lifestyle claim." These claims mirrored the same type of TINA claims that took place under Jensen's tenure as Chief Sales Officer at Jeunesse, LLC. Jensen was therefore personally aware that unsubstantiated health claims, unsubstantiated income claims, and suggestions that distributors can get rich violate FTC laws. Notwithstanding such acknowledgment, Jensen himself on his personal Facebook page posted on September 6, 2018 a photo of the Bahamas Atlantis hotel referencing a distributor incentive.

•     In addition, both LifeVantage and Jensen had personal knowledge of the contents of the reports filed with the Securities and Exchange Commission, which specifically warned that elements of the operation, or all of the operation, could be found to be a pyramid scheme.

307.    Plaintiff and the Securities Class suffered damages in that they lost moneys through the purchase of their distributorships.

308.    Plaintiff and the Securities Class damages may be measured either in actual damages or may be rescissionary.

## COUNT TWO

### VIOLATION OF 15 U.S.C. § 77l(a)(1) and (2) [Sections 12(1) and (2)] AGAINST LIFEVANTAGE

309.    Plaintiffs and the class repeat and re-allege every allegation above as if set forth herein in full.

310.    LifeVantage engaged in the offer or sale of a security in connection with the sale of distributorships. LifeVantage omitted that the distributorship is a pyramid scheme, a material fact necessary in order to make the statement, under the circumstances, not misleading. The allegations made above relating to the operation of the scheme are specifically incorporated herein.

311.    Under Section 12(1) any person who offers or sells a security required to be registered under the Securities Act but not so registered is liable to the person purchasing the security. Defendant LifeVantage offered the sale of an unregistered security to the Plaintiffs and the Securities Class. Each Plaintiff and the Securities Class purchased a security offered by the Defendant. Defendant is liable to each Plaintiff and the Securities Class under Section 12(1).

312.    To the extent required under the law, each Plaintiff offers to tender the interest conveyed or purportedly conveyed under the offering back to LifeVantage.

313.    Defendant had an obligation to register these securities. There is no valid exemption from registration for these offerings. Defendant cannot meet the requirements of 17 C.F.R. 230.701 as the basis for an exemption. No other statutory or rule exemption from registration exists.

314.    Under Section 12(2) any person who by use of any means of interstate commerce offers or sells a security on the basis of a materially false or misleading prospectus or offering circular or materially false or misleading oral statements is liable to the person purchasing from him. The Compensation Plan offering, including marketing and website disclosures, constitutes a prospectus within the meaning of Section 12(2). Defendant sold a security on the basis of materially false statements for purposes of Section 12(2).

315.    Defendant LifeVantage is the seller of the distributorship interest. The Compensation Plan incorporated in the distributorship interest is materially false and/or misleading. Plaintiffs and the Securities Class incorporate the description of the fraudulent schemes described in Count One for their pleading in this Count.

316.    Plaintiffs and the Securities Class suffered damages in that they lost moneys through the purchase of their distributorships. Causation may be presumed from, among other things, the presumption that no one would knowingly join an illegal pyramid scheme. Reliance is not an element of a Section 12 claim.

317.    Plaintiffs and the Securities Class restate and rely on their averments of proximate cause and scienter in Count 1.

318.    Plaintiffs and the Securities Class are entitled to actual damages and/or rescission of their purchase amounts plus equitable interest.

## COUNT THREE
## VIOLATION OF SECTIONS 1 AND 2 OF THE SHERMAN ACT, 15 U.S.C. §1, 2, AND SECTIONS 4 OF THE CLAYTON ACT, 15 U.S.C. § 15

319.    Plaintiffs and the Antitrust Class repeat and re-allege every allegation above as if set forth herein in full.

320.    Section 1 of the Sherman Act prohibits, "every contract…in restraint of trade." Section 2 of the Sherman Act prohibits any person to, "monopolize, or attempt to monopolize… any part of the trade or commerce among the several States, or with foreign nations . . ."

321.    Plaintiffs brings this claim on their own behalf and on behalf of each of the Antitrust Class members who purchased the "Protandim" product for personal consumption. Plaintiffs have standing to bring this antitrust claim because Plaintiffs and the Antitrust Class were direct purchasers of the "Protandim" product at issue.

### The *Walker Process* Antitrust Claim

322.   Every member of the Antitrust Class has been identified as a purchaser of product for "personal consumption." Some, like individuals identified as "Preferred Customers" purchased the product at the same price offered to Distributors and are offered certain Distributor-like incentives. Two-thirds of those individuals eventually become Distributors. Others start out as Distributors and may be re-classified as "Preferred Customers." In all cases, LifeVantage treats every member of the Antitrust Class as a direct purchaser of its product independent of the use of the product for distribution and resale purposes:

> An independent distributor in our company is someone who participates in our direct sales business opportunity by purchasing our products at wholesale prices and selling our products to others. … Many of our independent distributors are attracted by the opportunity to sell unique, scientifically-validated products without incurring significant start-up costs. … *Independent distributors purchase product from us for individual consumption*, but also purchase small quantities of product from us to use for demonstrations and one-off, person-to-person retailing opportunities. They also encourage others to purchase our products, either for personal consumption or resale.[113]

323.   LifeVantage's "Protandim" brand a reported 70% of sales for "personal consumption." These are described by the company as follows:

> *Protandim® Nrf2 Synergizer*
>
> Protandim® Nrf2 Synergizer is a patented dietary supplement that has been shown in a clinical trial to reduce the age-dependent increase in markers of oxidative stress… We hold multiple U.S. and international patents relating to Protandim® Nrf2 Synergizer. We believe these patents set Protandim® apart from other dietary supplements and protect the original formula as well as certain formula modifications we could create to extend our Protandim® product line. We sell Protandim® Nrf2 Synergizer in three formulas.

---

[113]

https://www.sec.gov/Archives/edgar/data/849146/000084914618000074/lfvn_06302018x10k.htm#s84D2C5F5E56851EEB25801D0D1D48045

*Protandim* ® *NRF1 Synergizer*

Protandim® NRF1 Synergizer is a dietary supplement which was formulated to strengthen the mitochondria, the powerhouse of all cells, for better cellular health. It is designed to work in tandem with our flagship Protandim ® Nrf2 Synergizer and further enhance the body's internal ability to naturally produce antioxidants and reduce the effects of cellular stress.

(emphasis added).

324.    A relevant antitrust market consists of "commodities reasonably interchangeable by consumers for the same purposes."[114] Such market may consist of a single product. There is an antitrust market for natural extracts of herbs in the formula marketed as "Protandim." The geographic boundary for the market is the United States, although some of the purchasers are located elsewhere.

325.    LifeVantage had the specific intent to monopolize the market for "Protandim." LifeVantage had the market power to price "Protandim" substantially above the competitive level and persisted in doing so for a significant period without erosion by new entry or expansion. LifeVantage took concrete steps to achieve this market power. It obtained patents to define and differentiate its product from other anti-oxidant natural supplements. It used its patent monopoly to dissuade other manufacturers from marketing a similar supplement.

326.    Direct evidence of market power exists. LifeVantage enjoys a substantial premium on the price of "Protandim" over an equivalent extracted natural herb mixture in the same formula as that in "Protandim." Its gross margin on each bottle sold is over 80%, reflecting the facts that while the extracted compounds that make up "Protandim" are inexpensive to purchase in the marketplace, the company is able to charge a significant mark-up on the product in its sales to consumers.  LifeVantage charged approximately 11 times higher price to its

---

[114] *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 482 (1992).

Distributors for "Protandim" product than a generic combination of the five ingredients that LifeVantage discloses comprise the "Protandim" formula. The formula has been printed on "Protandim" packaging since 2005. Any consumer who wished to take an anti-oxidant in the "Protandim" formula without purchasing it from LifeVantage could do so.

327.    Each of the herbs that make up "Protandim" is widely available, and has been available for years in versions easily purchased by consumers. Each of these is available in measurable doses in extracted form, in pills, capsule, or suspensions. Generic versions of the extracted herb mixture could be assembled by customers for approximately 10% of the cost of "Protandim." Ready-made anti-oxidant capsules, pills, or suspensions that incorporate the same herbs as used in the "Protandim" formula are readily available at a much lesser per dose cost. For example, NOW Super Antioxidants are available for $20.50 for 120 capsules, a cost of $.17 per capsule. This product contains green tea extract, milk thistle extract, curcumin extract, and several others. GNC Preventive Nutrition Cellular Antioxidant Formula, containing milk thistle, turmeric and other ingredients, costs $34.99 for 60 capsules.

328.    LifeVantage sells the product to approximately 100,000 Distributors each year, and an unknown number of Preferred Customers. Its revenues for "Protandim" product for the past several years have averaged $130-140 million per year and $100-110 million within the United States. All sales of "Protandim" are made in the United States for ultimate delivery to foreign purchasers.

329.    Plaintiffs and the Antitrust Class purchased "Protandim" product that LifeVantage claimed was covered by United States patents, including Pat. Nos. '461 and '808. Because the '461 and '808 Patents and the other patents in their chain which claim the "Protandim" formula

was invented by Myhill, Driscoll, and McCord, were procured through fraud, antitrust liability attaches.[115]

330.     LifeVantage used its patents to charge substantially higher prices than generic and unpatented product available to the Antirust Class. LifeVantage has admitted that these patents have given Defendant a "competitive advantage" against competitors in this "key" area:

> Our Products: We have a focus in nutrigenomics, the study of how nutrition and naturally occurring compounds affect our genes. We have developed quality, scientifically-validated nutrigenomics products focused on helping individuals look, feel and perform better. Our products are the Protandim® product line…Petandim™ for Dogs… The Protandim® product line includes Protandim® NRF1 and Nrf2 Synergizers™. The Protandim® NRF1 Synergizer is formulated to increase cellular energy and performance by boosting mitochondria to support cellular repair and slow cellular aging. The Protandim® Nrf2 Synergizer™ contains a patented blend of ingredients and has been shown to combat oxidative stress by increasing the body's natural antioxidant protection at the gene level, inducing the production of naturally-occurring protective antioxidant enzymes including superoxide dismutase, catalase, and glutathione synthase….
>
> We hold multiple U.S. and international patents relating to Protandim® Nrf2 Synergizer. We believe these patents set Protandim® apart from other dietary supplements and protect the original formula as well as certain formula modifications we could create to extend our Protandim® product line. We sell Protandim® Nrf2 Synergizer in three formulas.[116]

331.     The patents were acquired collectively between LifeVantage, its general counsel, and several parties, including Lifeline, Myhill, Driscoll and McCord. These entities and individuals also conspired to monopolize the relevant market. The overt acts in furtherance are described Par. 182 to 286.

---

[115] *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965).
[116] https://www.sec.gov/Archives/edgar/data/849146/000084914618000074/lfvn_06302018x10k.htm#s84D2C5F5E56851EEB25801D0D1D48045

332.    LifeVantage anti-competitively enforced the patent rights. Its actions were intended to and succeeded in willfully acquiring monopoly position.

333.    LifeVantage has published and spread the following statement on its site, in social media, and in direct communications to several hundred thousand Distributors and customers: "Protandim is protected by [ X ] patents. *Its patents protect the product from patent infringement*- another party duplicating its formula and the creating and marketing an identical product. Every time a new patent is issued, Protandim, the Nrf2 Synergizer, is protected for an extended and additional period of time" (emphasis added).

334.    LifeVantage fraudulently distinguished its products against generic manufacturers of anti-oxidative herb extracts by referencing its patents.  It repeatedly told Plaintiffs and the Antitrust Class that it is both an infringing activity and illegal to purchase the five natural substances from generic manufacturers and compound them in the "Protandim" formula.  The purpose of these actions was to acquire and then maintain monopoly power and restrain competition. Another purpose of these actions was to enforce the patents against Plaintiffs and the Antitrust Class.

335.    LifeVantage also coupled its fraudulently-procured patents to misrepresentations about the scope of the patents. The purpose of these actions was to acquire and then maintain monopoly power and restrain competition. Another purpose of these actions was to enforce the patents against Plaintiffs and the Antitrust Class.

336.    For example, LifeVantage falsely claimed the formula in "Protandim" has a "synergistic" effect, discouraging its Distributors or Preferred Customers from buying the ingredients from alternate sources. Members of the Antitrust Class repeatedly asked why they could not achieve the same benefits as claimed by LifeVantage by purchasing the ingredients

available from other manufacturers. LifeVantage repeatedly since 2007, and each time one of the

'461 Patent continuations issued, forbid this substitution:

> *"Can I take these ingredients individually and achieve the same effect?*

> NO, THE BLEND OF INGREDIENTS AND THEIR SPECIAL FORMULATION IS UNIQUE TO PROTANDIM AND HOLDS PATENTS. THE COMBINATION OF INGREDIENTS CREATES A SYNERGY THAT HAS BEEN STUDIED AND PROVEN TO PROVIDE MUCH MORE ANTIOXIDANT POWER THAN ANY FOOD OR CONVENTIONAL SUPPLEMENTS. THE FIVE NATURAL INGREDIENTS WORKING TOGETHER IN PROTANDIM HAVE A SYNERGISTIC EFFECT 18 TIMES GREATER THAN THE SUM OF THEIR INDIVIDUAL CONTRIBUTIONS"

337.    Another form of this statement was as follows:

While it is certainly true that one could buy and consume each of the ingredients in Protandim, they would not have the same exponential effect as if Protandim was consumed. It is the unique blend of Protandim that synergistically works to lower your oxidative stress and combat free radicals. This synergistic effect was the reason Protandim was originally granted a patent from the Patent and Trademark Office.[117]

338.    Claims that the USPTO had patented "Protandim" for its "synergistic" effect were

false and known to be false by, among many LifeVantage employees, its general counsel and

McCord.

339.    By making exaggerated and false claims as to the scope of its patent claims,

LifeVantage has kept competing manufacturers from entering the market with lower-priced

product. LifeVantage also leverages its improperly-acquired patents by requiring Distributors not

to resell their product at less than a "retail" price.[118] It enforces this policy by policing eBay and

---

[117] http://www.spiritofhealthkc.com/wp/wp-content/uploads/2014/06/Lazyman-FAQs.pdf
[118] LifeVantage Policies and Procedures, Section 8.8.

other sites and punishing Distributors who do not adhere to the requirement. Another purpose of these actions was to enforce the patents against Plaintiffs and the Antitrust Class.

340.    LifeVantage also falsely imputed that the patents showed the efficacy of "Protandim" in preventing or curing diseases such as cancer. In April, 2017 the FDA found such statements to be illegal and ordered LifeVantage to cease making these statements. LifeVantage made these statements to enforce the illegally procured patents. Another purpose of these actions was to acquire and then maintain monopoly power and restrain competition.

341.    The patent-related enforcement caused an antitrust injury. The actions taken by LifeVantage decreased competition. Many manufacturers do make anti-oxidant supplements, some composed of many of the same ingredients, but absent patent marking and claims of "synergistic" behavior. LifeVantage is able to charge an 11X mark-up in large part because it has fraudulently patented the products.

342.    There is direct evidence that the patents prevented consumers from purchasing the ingredients in separate purchases as nutritional supplements from lower-priced alternatives. On a message board, for example, a forum member asked about doing precisely that. The forum moderator said:

> This is a reply to # 1,887,682
>
>  Hv & mtl,
>
> I know we're all about helping people here but unfortunately you're violating the Terms of Service Agreement here on CureZone as the ingredients you have listed are protected under U.S. Patents #7,241,461, #7,384,655, #7,579,026 and #7,923,045.[119]

---

[119] https://www.curezone.org/forums/am.asp?i=1886701

343.     In the event there is no finding of patent fraud, the actions described above impose Sherman Act liability under a rule of reason standard.

344.     Formulators of extracted natural anti-oxidants could easily and cheaply formulate capsule versions of "Protandim" but for the claims of patent protection widely disseminated by LifeVantage. Plaintiffs and the Antitrust Class suffered antitrust damages.

**COUNT FOUR**
**UNJUST ENRICHMENT**
**AGAINST BOTH DEFENDANTS**

345.     The Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and the members of the Securities Class in that the financial benefits obtained by them came as a result of their promotion of the unlawful pyramid scheme. The financial benefits they obtained came from the Plaintiff and the members of the class, who unwittingly participated in the pyramid scheme and naturally and inevitably lost money in the process.

346.     The revenue that resulted in these payments came directly from the payments made by Plaintiffs and the Securities Class. It would be unjust to permit these Defendants to retain these ill-gotten gains.

347.     The Defendants should be required to return to Plaintiffs and the Securities Class members all moneys paid to LifeVantage pursuant to the unlawful pyramid scheme, less any amounts LifeVantage paid to Plaintiffs and the Securities Class members.

**PRAYER FOR RELIEF**

Smith, Ilardo, and the Plaintiff classes request the following relief:

a.      Certification of the Securities Class;

b.      Certification of the Antitrust Class;

c.      A judgment against the Defendants;

c.      Damages in the amount of the injury incurred by Plaintiffs and the class as a result of defendants' conduct;

d.      Damages in actual amount or rescission of contracts pursuant to violations of securities laws;

e.      Temporary and permanent injunctive relief enjoining the defendants from further unfair, unlawful, fraudulent and/or deceptive acts, including, but not limited to, supporting, continuing or operating the pyramid scheme;

f.      Disgorgement of all proceeds of the pyramid scheme by each defendant;

g.      Treble damages under the Clayton Act.

h.      For such other damages, relief and pre- and post-judgment interest as the Court may deem just and proper.


## DEMAND FOR A JURY TRIAL

Smith and Ilardo, on their own behalf, and on behalf of the class(es) they represent, demand a jury trial.

Filed this _____ day of September, 2018.


Respectfully submitted,

CHRISTENSEN YOUNG & ASSOCIATES


/s/ Steven A. Christensen
      Steven A. Christensen
      9980 South 300 West, Suite 200
      Sandy, UT 84070
      Tel.: (866) 676-6447
      steven@christensenyounglaw.com


      SOMMERS SCHWARTZ, P.C.
      Andrew Kochanowski (to be admitted Pro Hac Vice)
      One Towne Square, Suite 1700
      Southfield, MI 48076
      Tel.: (248) 355-0300
      akochanowski@sommerspc.com

{W2967826}                                     142

- and –

REID COLLINS & TSAI LLP
J. Benjamin King (to be admitted Pro Hac Vice)
bking@rctlegal.com
1601 Elm St., Suite 4250
Dallas, Texas 75201
Tel.: 214-420-8900

R. Adam Swick (to be admitted Pro Hac Vice)
aswick@rctlegal.com
1301 S. Capital of Texas Hwy.
Bldg. C, Suite 300
Austin, Texas 78746
Tel.: 512-647-6100

- and –

MARINO LAW PLLC
Amy L. Marino (to be admitted Pro Hac Vice)
18977 W. Ten Mile Road, Ste 100E
Southfield, Michigan 48075
Tel.: (248) 797-9944
amy@marinopllc.com

Attorneys for Plaintiffs