**CHRISTENSEN YOUNG & ASSOCIATES, PLLC**
STEVEN A. CHRISTENSEN (#5190)
CAMERON S. CHRISTENSEN (#16015)
9980 S. 300 W. Ste. 200
Sandy, Utah 84070
Tel: (801) 676-6447
steven@christensenyounglaw.com
cameron@christensenyounglaw.com

**REID COLLINS & TSAI, LLP**
J. Benjamin King [*Pro Hac Vice*]
1601 Elm St., Suite 4250
Dallas, TX 75201
Tel: (214) 420-8900
bking@rctlegal.com

R. Adam Swick [*Pro Hac Vice*]
1301 S. Capital of Texas Hwy.
Bldg. C, Suite 300
Austin, TX 78746
Tel: (512) 647-6100
aswick@rctlegal.com

**SOMMERS SCHWARTZ, P.C.**
Andrew Kochanowski [*Pro Hac Vice*]
One Towne Square, Suite 1700
Southfield, MI 48076
Tel: (248) 355- 0300
akochanowski@sommerspc.com

**MARINO LAW, PLLC**
Amy L. Marino [*Pro Hac Vice*]
18977 W. Ten Mile Road, Ste 100E
Southfield, Michigan 48075
Tel.: (248) 797-9944
amy@marinopllc.com

*Attorneys for Plaintiffs and the Putative Class*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRIAN SMITH and MICHAEL ILARDO, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>vs.<br><br>LIFEVANTAGE CORPORATION, a corporation, and DARREN JENSEN, an individual,<br><br>      Defendants. | Case No: 2:18-cv-00621-DN-PMW<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND**<br><br>**[PROPOSED CLASS ACTION]**<br><br>District Judge David Nuffer<br>Chief Magistrate Judge Paul M. Warner |

## OVERVIEW

1.     This Second Amended Complaint is filed pursuant to leave granted in this Court's *Memorandum Decision and Order Denying in Part and Granting in Part Defendants' Motion To Dismiss*, dated December 5, 2019[1]. This Second Amended Complaint retains in Count I Plaintiffs' claims under Section 10b-5(a) and (c) of the Securities Act of 1934 for scheme liability originally pleaded in the Amended Complaint. It re-pleads in Count II claims under Sections 12(1) and (2) of the Securities Act of 1933 dismissed by the Court's Memorandum Decision, and in Count III re-pleads class claims for unjust enrichment. The Second Amended Complaint does not re-plead claims sounding under Section 10b-5(b) (omissions or representations) or in antitrust, both dismissed in the Memorandum Decision.

## INTRODUCTION

2.     Each of the Plaintiffs paid LifeVantage Corporation ("LifeVantage") over $1,000 to participate in the company's heavily marketed "business opportunity." The opportunity they paid into was to buy and resell a scientific-sounding supplement called "Protandim." Essentially a capsule that contains five common herbs, known for decades for promoting antioxidants, "Protandim," as marketed by LifeVantage is many times more expensive than the same herbs at Walmart, CVS, or Amazon. The "business opportunity" is similar to that sold by many companies that sell their products through a multi-level marketing ("MLM") system. In a typical MLM, a distributor buys a starter pack of the product, pays the company for the right to distribute the product, and makes commissions on sale of his or her inventory to customers. The company may announce a "retail" price and offer a discount to the distributor. It may sell its products directly to

---

[1] Doc. 106 at 18, filed Dec. 5, 2019.

customers at the higher retail price or offer customers a preferred price without signing up as a distributor.

3.      This MLM was different. Claims about the product were wildly overstated, and deliberately so. The company knew that making treatment and prevention claims about an unapproved supplement was illegal. Worse, the company claimed that LifeVantage distributors ("Distributors") would buy a patent-protected product that no one else in the competitive supplement field could duplicate. The company claimed that the Patent Office gave it patents for the "Protandim" product to treat disease. The company claimed the product was the first "anti-aging" pill. The company spun a story that it invented the breakthrough natural compound whose interaction gave the herbs a "synergistic" effect that may cure cancer.

4.      The company had tried to sell "Protandim" for years directly, failing to even sell $10 million per year and suffering multi-million-dollar losses. Only when it switched to a multi-level marketing "business opportunity" model did its "breakthrough" pill get market traction: by being sold to duped and unsophisticated investor-Distributors under an undecipherable Compensation Plan ("Plan"). Unfortunately, most of the sales were to its own Distributors, whose sales efforts were mainly rewarded only if they successfully recruited others. In other words, the "business opportunity" was a classic pyramid scheme.

5.      The "business opportunity" depended on pitching "Protandim" as a unique, efficacious supplement that resulted from years of research. "Protandim" is LifeVantage's trademark name for a pill form of common herbal ingredients: milk thistle, Bacopa (creeping herb), ashwagandha (Indian ginseng), tea, and turmeric extracts. The company discloses the proportions of each of the five ingredients on its label. LifeVantage's then-principals, two public relations businessmen, had actually licensed the formula, such as it was, to an "anti-aging" pill from a

Massachusetts company. Once they had procured the license, they simply created a figure to be the pitchman to provide a credible-looking "scientific" voice to the "revolutionary" pill. The scientist, who became a stockholder in the new company, then turned up as the "inventor" of the "breakthrough" after alleged decades of research, and appeared on an ABC News Primetime segment suggesting that the pills may just be the Fountain of Youth.

6.    Pyramid schemes are engines of fraud in which participants pay money into the scheme and are rewarded based on bringing more paying participants into the scheme. The scheme company distributes the money to the participants, with the top promoters who recruit the most new participants receiving larger shares of the distribution. Because the money is distributed unevenly, because the scheme promoters keep a share for themselves, and because no legitimate earnings from product sales rather than recruiting come in to the scheme, the vast majority of participants lose money.

7.    New recruits pay the company for the right to compete with its other Distributors. Each new recruit is encouraged to purchase an expensive product package, costing upwards of $1,000 and containing samples and other materials for their business. The new Distributors are told or strongly encouraged to agree to an automatic shipment program of $100 or more per month in product, secured by their credit cards, and to pay for "training" and other accoutrements of being a Distributor. Each new Distributor is placed in his or her recruiter's "downline," with a portion of their initial purchase being kicked "upline" to the recruiter and others up the chain. LifeVantage's MLM system further encourages Distributors to expend thousands of dollars in additional product purchases, event fees and expenses, and other miscellaneous fees.

8.    LifeVantage must operate as a pyramid scheme and even then mislead about its products to turn a profit because its products are grossly overpriced. On its website, LifeVantage

promotes itself as a "wellness and personal care company" founded on "cutting edge research in the field of nutrigenomics" combined with "a powerful entrepreneurial vehicle." The Food and Drug Administration recently sent a warning letter to LifeVantage requiring the company to refrain from making false claims about the ability of its products to cure cancer and other illnesses. Thus, LifeVantage must offer something more than just its products to make money. That something more is the false hope of financial prosperity through LifeVantage's MLM opportunity, *i.e.*, participation in an illegal pyramid scheme disguised as a legitimate business opportunity. The Fifth Circuit, sitting *en banc*, recently held that these types of MLM schemes are ideally suited for class certification. *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629 (5th Cir. 2016), *cert. denied*, 138 S. Ct. 76 (2017).

9.     Plaintiffs seek, on their own behalf and on behalf of a national class of similarly situated persons ("Class"), to recover from Defendants under federal securities laws and Utah state law.

## I.     THE PARTIES

### A.     PLAINTIFFS

#### a.   Brian Smith

10.     Plaintiff Brian Smith ("Smith") is an individual residing in Avon, Connecticut. Smith created and runs the non-profit organization, Cancer Survivors Who Can Charities, Inc. Smith also owns a small film production company, Atlantian Films, which he formed to integrate cancer survivors into the workplace and provide them with a creative outlet.

11.     Smith was introduced to LifeVantage in 2016. He was approached by a LifeVantage Distributor who suggested that LifeVantage products would be helpful to the members of his cancer organization. Smith attended two LifeVantage meetings hosted by

LifeVantage Distributors before enrolling as a Distributor himself. The meetings initially promoted the products with videos and phone-ins from "doctors," but then quickly moved to the "business opportunity" offered by LifeVantage and included phone-ins from LifeVantage's top-earning Distributors. Smith was shown the Plan Highlights and materials depicting the "income opportunities" and "financial freedom" that could be achieved by becoming a Distributor.

12.     Smith was only presented with the option to purchase three of the four "distributor enrollment packs" or "Product Packs"—the $1,200 Platinum Pack, the $600 Gold Master Edition Pack, or the $600 Gold Performance Edition Pack (in addition to the required $50 "Start Kit"). He was not presented with the option to purchase the $300 Silver Pack, nor was he told that he could become a Distributor by merely purchasing the Start Kit. Rather, he was told that he was required to also purchase one of the Product Packs.

13.     Smith enrolled as a Distributor in March 2016. He purchased the required Start Kit for $50, the $1,200 Platinum Pack, and signed up for an auto-ship of the LifeVantage product "Protandim Nrf2." He decided to enroll as a LifeVantage Distributor because he was unable to work outside of his home at the time, and he thought he could earn an income selling LifeVantage products, while also providing a benefit to the members of his organization. Before enrolling he carefully considered the statements and videos about both the product claims and the "business opportunity."

14.     Smith did not fill out a Distributor application or sign-up though the LifeVantage website, but rather provided his credit card information to the LifeVantage Distributor who enrolled him without Smith ever signing—electronically or physically—an application. Nonetheless, by paying the money, Smith was deemed to have read and been bound by the

application, enrolled as a Distributor, and given a unique identifying number for purpose of payment of commissions.

15.    The Distributor Agreement, Policies and Procedures ("P&P"), Plan, and Plan Highlights (**Exhibits A**, **B, C,** and **D,** respectively) were standard documents that LifeVantage used to classify buyers as Distributors and impose terms on their distribution business. Each document purported to be related to one another; for example, the Distributor Agreement states, "I have received, read, understand and agree to the LifeVantage Compensation Plan and the LifeVantage Policies and Procedures which are incorporated herein and made part of this agreement." (For purposes of Plaintiffs' securities claims, the Distributor Agreement, P&P, and Plan will be referred to as the "**Distribution Prospectus**").

16.    After being enrolled, Smith was placed in the downline of Distributor Theresa Cannavo. He attempted to sell the product by promoting his LifeVantage website on social media, but quickly discovered that there were several other LifeVantage Distributors in his area attempting to do the same. No one contacted him about purchasing the products, and he did not sell any LifeVantage products to customers or enroll any Distributors.

17.    Smith cancelled his auto-ship order after just eight (8) months. In addition to a growing realization that the "business opportunity" was a scheme to recruit others to become Distributors, and not a means of obtaining commission on sales of a wellness product, Smith began to have concerns about the side effects of the products that he and other members of his organization were noticing. He was contacted by a cancer patient in Colorado who claimed that "Protandim" negatively affected their vision. He had given free bottles of "Protandim" to several people within his cancer organization who could not afford LifeVantage' s monthly rate, and he

was contacted by one of these persons who claimed to be experiencing the same negative vision effects.

18.     Smith became uncomfortable and started questioning the product testing touted by LifeVantage because, among other reasons, the test results advertised to Smith and other Distributors were devoid of independent studies or testing.

19.     In addition, he discovered that the ingredients in several LifeVantage products were mostly easily found herbs, such as turmeric, a well-known Nrf2 activator. LifeVantage claimed to provide its own special patented blend and charged upwards of $50 a month for the products, claiming it was the special blend that caused Nrf2 to occur. Smith had been influenced by the patent formulation on the product that he had seen referenced in the presentation materials.

20.     Even though he tried canceling the auto-ship order, Smith received and was charged by LifeVantage for several product shipments he did not order. He struggled to return the unordered products and never received a full refund. To stop the unauthorized shipments and charges, Smith was forced to cancel his credit card. To this day, he still receives emails from LifeVantage about updating his credit card information and renewing his orders and distributorship. LifeVantage also told Smith that if he did not purchase their products, his membership would be terminated.

21.     During his time as a Distributor, Smith learned the following: (1) he would have to recruit others to become LifeVantage Distributors in order to recoup the money he paid to become a Distributor, (2) he was required to make monthly purchases of "Protandim" products to get any commissions and remain a Distributor, (3) it was nearly impossible for him to break even based on retail product sales alone, and (4) he would have to pay additional costs to attend meetings to learn the "selling secrets" of the top-earning Distributors.

22.     Had Smith been informed that the LifeVantage business opportunity was actually a pyramid scheme, he would not have purchased the Start Kit or Platinum Kit, signed up for the auto-ship order, or made any of the payments necessary to maintain his Distributor rights. Not surprisingly, Plaintiff Smith lost money as a result of being a LifeVantage Distributor.

### b. Michael Ilardo

23.     Michael Ilardo ("Ilardo") is an individual and a resident of Erie County, New York. Ilardo became a LifeVantage Distributor in February 16, 2017, under ID# 1726276. His distributorship was terminated on July 24, 2018. By training, Ilardo is a pharmacist.

24.     Before becoming a LifeVantage Distributor, Ilardo attempted to sell deregulated energy with another multi-level marketing company. Ilardo also had been an active volunteer evangelist, desiring a chance for full-time ministry, and he believed that multi-level marketing would give him that chance. However, his venture with the energy company did not pan out, as he was not paid very much in commissions. He quit, re-assessed, and decided he wanted to give it another try.

25.     Ilardo had spent the prior year reading leadership books and focusing on his relationship with God, getting spiritually stronger, and even started back in ministry. When he considered re-enrolling in the MLM energy company, he called Ron Long, one of Ilardo's upline leaders in that company, to discuss. On February 15, 2017, he talked to Long about re-committing to selling. Long had been one of Ilardo's upline leaders in the other company. Long came to Ilardo's house and told Ilardo that, yes, the other company was doing great for him, *but*, "Mike as a pharmacist, I want to get your opinion on something else." Long then used his laptop to show Ilardo an ABC News Primetime report about LifeVantage.

26.     Ilardo was impressed with the claims Long made about the product and impressed by the ABC News report. One of the things he found appealing was the fact that there were peer reviews and science behind the product. Based on these claims, Ilardo understood that "Protandim" was a natural route to cure cancer.

27.     Long then told him about the LifeVantage business opportunity and asked that he join and become a distributor. Long's wife, Beverly Long, was actually a distributor for LifeVantage, but Ron Long acted as a recruiter for her. After Ron went home, Ilardo looked at information about both "Protandim" and the company, and later talked to him on the phone. He gave Ron his credit card information and signed up as a distributor under Ron's wife Beverly Long, the actual LifeVantage distributor. The actual signup was done by Ron Long as Ilardo was on the telephone Ron walked Ilardo through what items he should buy as an initial purchase to become the most effective LifeVantage distributor. He told Ilardo that if he wanted to be taken seriously, he should order the most expensive pack, as it was the best value and the fastest way for Ilardo to start realizing income on his investment.

28.     Before actually authorizing Ron to sign him up, Ilardo read the "business opportunity" materials on the LifeVantage website, including the Distribution Prospectus, and became convinced that it was not a pyramid scheme but a legitimate opportunity to sell a product that provided tangible cancer-curing properties. He was generally familiar with how multi-level marketing companies operated. He did not believe at the time that either the company he previously distributed for or LifeVantage were pyramid schemes. He was also impressed that the product was patented. Ilardo knew that natural herbs were long associated with antioxidation, and he knew that they could be purchased in many places. But the fact that the "Protandim" formula was patented

and that there was alleged science behind the patents made him comfortable that the product was worth the money that LifeVantage charged.

29.     That night Ilardo ordered through Ron the most expensive $1,200 platinum distributor starter kit, as the company touted that this was the fastest way to build his new business. He signed up for the "auto-ship" program and recalls that he spent about $1,800 in the initial purchase he authorized through Ron. In his almost 18 months in the business, Ilardo purchased approximately $300 a month of the product, much of which he never could sell to customers. He also purchased about 30 DVD's for training, ordered business cards, and spent thousands of dollars on training and conventions.

30.     After he joined, Ilardo met another distributor, Kurt Heise, a cousin of Ron's, who claimed he made $10,000 a month as a LifeVantage distributor. Kurt worked with Ron to set up business opportunity meetings for Ilardo to recruit new distributors. Ilardo told everyone he knew about LifeVantage. He spent a significant amount of money and time and hours training and learning and studying the product and the sales program. Like his upline leaders encouraged, he did launch calls and mass texts and live invites, and he hosted presentations at a local cafe where he bought food for the invitees.

31.     Ilardo's brother-in-law signed up for a $600 kit. His wife's boss joined, but Ilardo had few customers and was spending $200-800 a month on product and training and samples and materials and marketing materials. All the while he was being told by his upline that this was going to take off soon, that he was at the ground floor and this opportunity "was going to explode."

32.     In April 2017, Ilardo went to Utah for LifeVantage distributor training. In July 2017, he went to Denver. He attended Pennsylvania training sessions. Ilardo believed the product claims, and he started to try to sell it to customers in his pharmacy. As the company's training

materials encourage, Ilardo bashed the pharmaceutical industry ("Big Pharm") and educated potential customers on how this is the "wave of the future," and showing them LifeVantage presentations on his work computer.

33.     Throughout his association with the company, in webinars, training meetings, and Facebook groups, LifeVantage and its distributors intimated and implied that the "Protandim" product, while not "officially" a drug, did in fact cure diseases like cancer. For example, during one café meeting, Ilardo heard Kurt Heise tell his invitees that someone he knew had breast cancer but after taking "Protandim," it was gone. He said words to the effect, "I can't tell you it cured her because I'm not supposed to," but the clear implication he left was that the product did, in fact, cure cancer.

34.     This message was repeated in many different ways and many different times throughout his association. Later on, the company began making claims that it is a "bio-hacking" company and that its products will extend life by 30 or more years. Ilardo attended two conventions, in Denver and Utah, where these or similar claims were made. At one of these, in Utah, Ilardo saw Darren Jansen speak. He saw the claims and how "successful" distributors were paraded on stage with giant checks, winning cars and trips, and these convinced Ilardo to stay in the system.

35.      However, over the course of many months Ilardo learned that few if any customers were interested in the products. During his time as a Distributor, Ilardo learned that: (1) he would have to recruit others to become LifeVantage Distributors in order to recoup the money he paid to become a Distributor; (2) he was required to make monthly purchases of "Protandim" products to get any commissions and remain a Distributor; (3) it was nearly impossible for him to break even based on retail product sales alone; and (4) he would have to pay additional costs to attend meetings

to learn the "selling secrets" of the top-earning Distributors. Had Ilardo been informed that the LifeVantage business opportunity was actually a pyramid scheme, he would not have purchased the Platinum Kit or the Start Kit, signed up for the auto-ship order, or made any of the payments necessary to maintain his Distributor rights.

36.     Ilardo believes the promise of LifeVantage in all that it offered failed to deliver and left him footing the bill. Ilardo believes the company encouraged and then preyed on –his legitimate desires to develop residual income so he could be in the ministry and help people with drug addictions. As a result of Ilardo's enrollment as a LifeVantage distributor, he has lost a significant amount of money, at least $8,000, while receiving back approximately $1,000 in commissions.

**B.     DEFENDANTS**

37.     Defendant LifeVantage is a Delaware corporation headquartered in Sandy, Utah. LifeVantage originally incorporated in 1988 as a Colorado corporation under the name Andraplex. It changed its name to Yaak River Resources, Inc. in 1992, and again in 2004 to Lifeline Therapeutics, Inc. In October 2004 and March 2005, LifeVantage acquired all of the outstanding common stock of Lifeline Nutraceuticals Corporation, the wholly owned subsidiary that owns the patent rights to LifeVantage's primary product, "Protandim," and changed its name to LifeVantage Corporation in November 2006.

38.     LifeVantage markets and sells its distributorship opportunity in the United States, Asia, and Europe. Approximately 70% of its sales and activities occur in the United States. The company reports revenues of approximately $200M per year.

39.     Defendant Darren Jensen ("Jensen") is an individual believed to reside in Utah. Jensen is the Chief Executive Officer at LifeVantage. Jensen has more than 26 years of experience

in the multi-level marketing industry holding positions with several other MLM companies including Jeunesse Global, Ampegy, Agel Enterprises, Amway and Nu Skin Enterprises before joining LifeVantage in May 2015. Some of these companies have been sued for, or have settled claims of, operating an illegal pyramid scheme. Jensen is actively involved in promoting the LifeVantage scheme to potential recruits at LifeVantage events, through social media, and through his direction of LifeVantage's top promoters. Plaintiff Ilardo personally heard Jensen speak at one of his training conventions. At these events Jensen typically states or implies that the LifeVantage product may extend life for 150 years, asking "What would you do with all this extra time?"[2]



**II.   JURISDICTION AND VENUE**

40.    LifeVantage is subject to the jurisdiction of this Court. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332(d). This Court has personal jurisdiction over each Defendant. Defendants continuously and systematically engaged and engage in business in Utah.

---

[2] LifeVantage 2017 Convention, https://vimeo.com/236455463.

41.     LifeVantage operates its business in Utah, and a substantial part of the events or omissions giving rise to these claims occurred in this judicial district. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

### III.     THE SCHEMES

### A.     LIFEVANTAGE OPERATES AS AN INHERENTLY FRAUDULENT PYRAMID SCHEME SELLING A BUSINESS OPPORTUNITY TO DISTRIBUTE PRODUCTS ABOUT WHICH THE COMPANY MAKES IMPROPER AND ILLEGAL HEALTH CLAIMS

#### a.   The Illegal Pyramid Scheme

##### 1.   The company buys the rights to "Protandim" from a third party and trademarks the name

42.     Prior to 2004, LifeVantage's only asset was 91 undeveloped lots which it carried as a $25,000 asset on its books, along with a lot of debt. There was substantial doubt about the company's ability to continue as a going concern. The company raised some early money from a private placement. It had been listed as a penny stock on the OTC Board as far back as the 1990's. Then in 2004, it connected with a Denver-area company run by a couple of former public relations men who had chanced on a Fountain of Youth.

43.     LifeVantage originally procured the rights to "Protandim" in 2004 from Lifeline Nutraceuticals, Inc. ("Lifeline"), a company run for a few months by Paul Myhill ("Myhill") and William Driscoll ("Driscoll"). The Lifeline founders themselves got the rights to "Protandim" in October 2003 from an unrelated Massachusetts pharmaceutical company, which had developed the concept, applied for a patent, and described the technology behind its "anti-aging" supplement several years earlier.

44.      In a 2004 and 2005 stock swap, Driscoll and Myhill ended up as principals of LifeVantage (operating then as Lifeline Therapeutics, Inc.,) The name "LifeVantage" was

registered as a website at www.lifevantage.com on October 1, 2003, and a product website registered late in 2003, www.protandim.com. The first "Protandim" product shipped in February 2005. The company officially changed its operating name to LifeVantage in 2006. Its shares traded on the OTC board as, essentially, a penny stock.

45.     The company applied for patents for various aspects of "Protandim" in March 2004 in the names of Myhill and Driscoll.

46.     From the very beginning "Protandim" came in a caplet form containing a "proprietary blend" of 675mg of five herbal ingredients. The bottles bore a legend that "Protandim is formulated utilizing high quality, potent herbal extracts processed under proprietary extraction technologies." The same 30 caplet 675mg bottle continues to be the main product sold. It is now called "Protandim NRF2 Synergizer." Its contents are still described as a "proprietary blend" however now the bottles are marked with U.S. Pat. Nos. 7,241,461, 7,579,026, and 7,923,045:





**2.   LifeVantage initially markets "Protandim" as an anti-aging pill**

47.     LifeVantage began promoting "Protandim" as a "dietary supplement" and an "antioxidant therapy" drug. However, the company lost $453,000 in the first year of sales. But, in June 2005, ABC News Primetime did a six-minute segment on "Protandim."[3] The segment began with the announcer asking, "Do you want to get an edge on turning back the clock just by taking a few pills? It's no longer science fiction but a possibility… as I found out, there may be a way to erase years at least inside my body… some scientists are wondering if a new pill I took might offer a long life."

48.     The segment continued: "I am here…to meet Dr. Joe McCord ["McCord"], a world-renowned scientist. . . his years of research might possibly prevent chronic diseases like cancer, diabetes, and heart disease. It all centers around a small yellow pill." The segment continued with McCord describing "antioxidative stress" which "everyone has" and which is connected to aging. Vitamin C is "not powerful enough…but this pill IS powerful enough, in fact

---

[3] https://www.youtube.com/watch?v=6Wqbl1hxOso

many times more powerful… It's called Protandim, and tests on both mice and humans have already shown it revs up the manufacture of those good enzymes…"

49.     McCord was not involved with the Massachusetts company that licensed the product to Myhill and Driscoll.

50.     In the news segment, the announcer asks McCord: "Have you discovered the fountain of youth? McCord answers: "I wouldn't put it that way but we may have discovered something that will tell us a lot more about age." After showing the announcer a graph about his "oxidative stress" the announcer says, "And so ancient Eastern healing and modern Western medicine may soon be working together…. High oxidative stress has been linked to hundreds of illnesses…. Protandim does not need FDA approval."

51.     The day after it aired in 2005, the company's stock momentarily went up, but quickly collapsed again. After the ABC News segment the company sold about $1.5 million of the pills,[4] but "the product was quickly lost again in a glut of nutraceutical products on the shelf."[5]

52.     Nonetheless, for over a decade this six-minute promotional piece has been used as a sales tool to recruit Distributors: Plaintiff Ilardo was shown that same video by his recruiter and it has appeared on the LifeVantage website in one link or another for many years. But the piece was only the beginning of a 14-year run of lying to customers and later to distributors like the Plaintiffs and the Class about the product and the "business opportunity" to sell it.

### 3.   Pre-MLM retail sales of "Protandim" were a disaster

---

[4] https://www.sec.gov/Archives/edgar/data/849146/000102189005000094/lifeline623058k.htm

[5] https://web.archive.org/web/20111112065451/http://www.lifevantage.com/company/our-story/

53.     The two public relations businessmen, Myhill and Driscoll, were initially involved in the company but were pushed out or bought out in 2006. McCord stayed and became the face of the "science" behind the pill. He also was a major shareholder and received a healthy commission on the sale of every bottle of "Protandim." The company continued trading on the OTC. It raised many millions of dollars in private placements on the strength of its "science" based claims about the anti-aging and disease curing properties of its "patent-pending" formula.

54.     The company operated from Colorado for a time, then California, but it was always a small operation. It typically had between 6 and 20 employees, as all of its manufacturing and other functions were outsourced. It had no research or lab facilities—McCord was busy working a day job teaching at a university.

55.     Between 2004 and 2009 LifeVantage attempted and failed to sell "Protandim" through traditional retail channels. The company outsourced a call center where a 1-800 telephone number could be used to order the product. Beginning in 2005, "Protandim" was sold through 4500 GNC stores, drugstore.com (an Internet seller), CVS, and other retail outlets. It marketed "Protandim" then, as now, to "help[] slow the aging process at the cellular level."

56.     The company charged $49.95 for a 30-day supply.[6] Its website marketed:

**Revolutionary Product**: ***Protandim®***: Protandim is a dietary supplement specifically formulated to fight oxidative stress, the cumulative cell damage caused by free radicals. Protandim is a patent-pending natural botanical formula that acts as a catalyst, triggering your body to produce more of its own free radical-fighting enzymes, Superoxide Dismutase and Catalase. These enzymes effectively and efficiently neutralize free radicals inside the cells where they are produced. Protandim has been shown to reduce oxidative stress as measured by reduced blood levels of lipid peroxides, oxidized fat molecules, in 29 human study subjects who took it daily for 30 days.

**Science-based Platform:** LifeVantage is committed to developing science-based products that have proven efficacy. Lifeline's Director of Science, Dr. Joe McCord, is

---

[6] https://web.archive.org/web/20070216073403/http://www.protandim.com:80/ProductPage.aspx

one of the foremost authorities on the body's antioxidant defense system and co-discovered the key enzyme Superoxide Dismutase in 1969.

**Media Coverage**: ABC News' Primetime Live featured Protandim on its national program on June 2, 2005…. Consumer interest and response was tremendous, and Lifeline Therapeutics rolled out national public relations and marketing campaigns to build on the momentum created by the program.[7]

57.     The company's retail sales efforts were a complete failure. In 2005, even with the sales boost by the ABC News segment, LifeVantage reported a loss of $5.8 million on revenues of $2.35 million. In 2006, the company lost $2.7 million on revenues of $7.2 million. It reported "minimal sales history" with the GNC chain and restated its revenues accordingly.[8] In 2007, the company lost $3.7 million on revenues of $5.05 million. In 2008, the company lost $2.05 million. In 2009, it lost $9.1 million, bringing its total losses during the "retail" "Protandim" sales period to approximately $23 million.[9]

### 4.   In 2009 LifeVantage abandons retail sales in favor of MLM

58.     In October 2008, LifeVantage announced that it would turn to a "multi-billion dollar network marketing sales channel."[10] In its 2009 Form 10-K, the company explained:

We develop and market branded consumer products that we believe are well suited for direct selling. Our distributors sell our products by educating consumers about the benefits and distinguishing characteristics of our products and by offering personalized customer service. We attempt to attract and motivate high-caliber,

---

[7] https://web.archive.org/web/20070219033934/http://www.lifevantage.com:80/html/about_lifeline/about_lifeline.htm

[8] http://investor.lifevantage.com/news-releases/news-release-details/lifeline-therapeutics-inc-recognize-previously-deferred-retail

[9] https://www.sec.gov/Archives/edgar/data/849146/000095012309046600/d69291e10vk.htm

[10] http://investor.lifevantage.com/news-releases/news-release-details/lifevantage-announces-launch-protandimr-multi-billion-dollar

independent distributors with our focus on product innovation, our generous compensation plan and our distributor support programs.

…We are focused on building and maintaining our distributor network by offering financially rewarding career opportunities through the sale of unique, category-creating true products, products backed by facts and by science, to health conscious consumers concerned about the effects of aging….

We are committed to providing professionally-designed training materials distributors can utilize in their sales and recruiting efforts. During the past year, we and our distributors have conducted thousands of training sessions to educate and motivate our distributors, and plan to continue to do so in the future. *These training events not only teach our distributors leadership skills and how to build successful organizations utilizing industry-proven techniques, but also how to teach the science behind our products and to differentiate our products to consumers*.[11]

(emphasis added).

59.     Starting in late 2008 or early 2009, the company pulled its retail sales and went full-bore into MLM. Over the past several years LifeVantage has re-named this business different ways, for example, currently it is characterized as "The Ideal Side Hustle." "Whether you're looking for some extra pocket money or a full-time gig, we give you the platform and tools you need to start your business."[12]

60.     Whatever it is called, the "business opportunity" disguises the illegal pyramid nature of LifeVantage's business by coupling its products—that were largely ignored by a real retail public for years before the MLM business-- with suggestions that the new Distributor will be able to make money in commissions by selling the miracle "Protandim" product to retail customers.

61.     Such is the power of "industry-proven techniques" that LifeVantage's sales increased, astonishingly so. Once its "scientifically-proven" "breakthrough" products were pulled off retail shelves and began to be marketed to Distributors along with commissions for recruiting

---

[11] https://www.sec.gov/Archives/edgar/data/849146/000095012309046600/d69291e10vk.htm

[12] https://www.lifevantage.com/opportunity/ (August 2018).

other Distributors, the company's revenues on "Protandim" went from $11.4 Million in 2010 to $29 Million in 2011. In a few short years they approached then surpassed $200 million. "Protandim" and its related products account for about 70% of the company's stated sales.

62.     Unlike its money-losing store-shelf retail model, LifeVantage's MLM sales model convinced hundreds of thousands of people to become LifeVantage customers. But these customers were not paying for LifeVantage "scientific" and "patented formula" for curing cancer, diabetes, or heart disease; they were paying for the *real* product being sold, the "business opportunity" to the right to participate in LifeVantage's new business model. That model in practice was a variation of an inherently unlawful pyramid scheme.

### 5. Pyramid schemes are inherently fraudulent

63.     Pyramid schemes are a mechanism used to transfer funds from one individual to another. They are illegal because they are structured in a way that incentivizes participants to grow their business by finding new participants with no incentive for retail sales. When the rewards are primarily based on selling the right to participate in the venture, rather than selling the merchandise, the revenue from the minimal sales of goods to consumers is insufficient to cover the marketing expenses and rewards promised for recruiting new participants, causing a collapse due to market saturation. There is no natural market demand for the product sold by the scheme's promoters, resulting in little to no demand for the product beyond sales made internally to new recruits. As the market for new distributors saturates, new distributors are left with unsellable, higher-than-market-price inventory and little to no chance to recoup their money from legitimate customers who actually want the product for itself. The only market for the inventory, and the only opportunity to recoup the cost of maintaining the distributorship rights lies in recruiting another

person. Pyramid schemes naturally funnel money to a small percentage of people at the top, money funded by the large base of distributors at the bottom.

64.     Federal law holds that pyramid schemes are "inherently fraudulent." Federal law and the Federal Trade Commission ("FTC") typically define a pyramid scheme (of which there are many variations) using the following test (from *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1181 (1975)):

> [Pyramid] schemes are characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users. In general such recruitment is facilitated by promising all participants the same 'lucrative' rights to recruit.[13]

65.     All states regulate pyramid schemes or endless chains. For example, the State of Connecticut, where Plaintiff Smith was recruited expressly prohibits pyramid schemes. "The advertisement for sale…or the actual sale… of any …rights or privileges at a price … which is contingent upon the [recruitment] of prospective customers procured by the purchaser, or the [recruitment] of … rights or privileges, to other persons procured by the purchaser, is declared to be an unlawful practice rendering any obligation incurred by the buyer in connection therewith, completely void and a nullity." Conn. Gen. Stat. Ann. § 42-145. The State of New York, where Plaintiff Ilardo was recruited, also prohibits pyramid schemes. General Business Laws, Article 23-a, § 359-fff.

66.     One variation of the classic scheme is a product-based MLM company. The company purports to pay the distributor commissions based on the sale of the product, but in reality, the distributor is paid to recruit other distributors. In such schemes the sales of the product

---

[13]https://www.ftc.gov/tips-advice/business-center/guidance/business-guidance-concerning-multi-level-marketing

are mostly to distributors and not to real retail customers. In its public statement on product-based

MLM pyramid schemes the FTC said the following:

> Pyramid schemes now come in so many forms that they may be difficult to recognize immediately. However, they all share one overriding characteristic. They promise consumers or investors large profits based primarily on recruiting others to join their program, not based on profits from any real investment or real sale of goods to the public. ***Some schemes may purport to sell a product, but they often simply use the product to hide their pyramid structure. There are two tell-tale signs that a product is simply being used to disguise a pyramid scheme: inventory loading and a lack of retail sales.*** Inventory loading occurs when a company's incentive program forces recruits to buy more products than they could ever sell, often at inflated prices. If this occurs throughout the company's distribution system, the people at the top of the pyramid reap substantial profits, even though little or no product moves to market. The people at the bottom make excessive payments for inventory that simply accumulates in their basements. A lack of retail sales is also a red flag that a pyramid exists. Many pyramid schemes will claim that their product is selling like hot cakes. However, on closer examination, the sales occur only between people inside the pyramid structure or to new recruits joining the structure, not to consumers out in the general public.[14]

> 67.    The FTC explains the harm to consumers in an unfair and deceptive compensation

structure as follows:

> An MLM compensation structure that incentivizes participants to buy product, and to recruit additional participants to buy product, to advance in the marketing program rather than in response to consumer demand in the marketplace, poses particular risks of injury. Where such an unlawful compensation structure exists, a participant is unlikely to be able to earn money or recover his or her costs through selling product to the public. In such circumstances, participants will often attempt to recruit new participants who will buy product, and pressure existing recruits to buy product, with little concern for consumer demand. Where an MLM has a compensation structure in which participants' purchases are driven by the aspiration to earn compensation based on other participants' purchases rather than demand by ultimate users, a substantial percentage of participants will lose money.[15]

---

[14] https://www.ftc.gov/public-statements/1998/05/pyramid-schemes (emphasis added)

[15] https://www.ftc.gov/tips-advice/business-center/guidance/business-guidance-concerning-multi-level-marketing

68.     In addition to inventory loading and lack of retail sales, the essential characteristic of a pyramid scheme is that the compensation of participants is primarily derived from participants' payments into the scheme and based on participants' recruitment of new participants into the scheme. Little outside money comes into the scheme. The participants, knowingly or not, feed off each other's money and are highly incentivized to bring new participants into the scheme.

69.     The FTC distinguishes between legal and illegal (pyramid scheme) compensation structures through a fact inquiry:

> [T]he law requires that an MLM pay compensation that is based on actual sales to real customers, rather than based on mere wholesale purchases or other payments by its participants. In evaluating MLM practices, the FTC, in accord with established case law, focuses on how the structure as a whole operates in practice, and considers factors including marketing representations, participant experiences, the compensation plan, and the incentives that the compensation structure creates.

70.     Courts and the FTC have found product-based MLMs to be pyramid schemes when the following practices are present: (1) the entire scheme is more associated with recruiting other participants rather than selling the alleged product to outside customers; (2) when sales are primarily made internally to new distributors rather than to outside customers (lack of retail sales); (3) when there is a high dropout or "churn" rate among newly-signed distributors (indicating the reason why product was purchased was for the business opportunity to recruit others); (4) when the scheme's promoters spread implied or express promises of wealth or financial independence if one is to participate in the "business opportunity;" and (5) when the scheme's promoters cause distributors to load up on the product (inventory loading) in order to receive commissions.[16] Each of these is present here.

---

[16] https://www.ftc.gov/tips-advice/business-center/guidance/business-guidance-concerning-multi-level-marketing

71.     The FTC has recently strongly pursued product-based MLMs like LifeVantage based on the presence of these facts. Two such recent enforcement actions are significant as they were against companies with compensation plans for distributors virtually identical to LifeVantage: Vemma, Inc.,[17] and Fortune Hi-Tech.[18] Each of these actions received high visibility in the MLM industry, especially in the Direct Sales Association ("DSA"), a lobbying group that LifeVantage belongs to and on whose board of directors Defendant Jensen now sits.

72.     A third such action recently occurred when the FTC obtained a $150 million equitable relief settlement in its enforcement action AdvoCare International, L.P., which as a result agreed to abandon its MLM compensation plan.[19] AdvoCare's counsel (who also represent LifeVantage in this action), publicly acknowledged that the FTC continues to pursue schemes that contain elements of the following behaviors:

> Well, what are those principles? First, companies must strictly police misrepresentations and misleading income and lifestyle claims concerning the business opportunity presented to potential recruits. Second, companies must avoid having a culture that focuses on recruitment over a focus on real sales to consumers who use and consume the products. The focus should always be, first and foremost, on the product and selling that product to consumers. And third, companies with policies that require distributors to personally buy a specific amount of product to be eligible for compensation are suspect and will raise a red flag. The FTC has been repeating these same warnings for a very long time. Thus, although the AdvoCare settlement might embolden the FTC in future enforcement actions, the simple truth remains that the *Koscot* test and the FTC's previous guidance on the bounds of legitimate multi-level marketing still stand.[20]

---

[17] https://www.ftc.gov/system/files/documents/cases/150826vemmacmptf.pdf

[18] https://www.ftc.gov/sites/default/files/documents/cases/2013/01/130128fhtmcmpt.pdf

[19] https://www.ftc.gov/news-events/press-releases/2019/10/multi-level-marketer-advocare-will-pay-150-million-settle-ftc

[20] https://www.winston.com/en/direct-sellers-update-regulation-law-and-policy/ftc-v-advocare-enforcement-action-demonstrates-importance-of-compliance-programs.html

73.     State regulators also pursue MLMs. Defendant Jensen joined LifeVantage in 2015 from a Chief Sales Officer position at Jeunesse, LLC, an MLM maker of cosmetic and other personal care products. Jeunesse's founder agreed to a permanent injunction with the State of Florida over a product-based MLM. A leading consumer group charged that, during Jensen's term, the company and distributors made over 150 illegal claims that its non-FDA approved products can treat, cure, or prevent cancer and other diseases, and made false and misleading income claims.[21]

**6.     LifeVantage began its pyramid scheme with the introduction of its Plan and secretly paid a number of professional recruiters from other MLM companies to join LifeVantage to pose as successful Distributors**

74.     The decision to change the sales model from failing retail to an MLM was made under direction of a new CEO, David Brown ("Brown"), a Cornell-educated lawyer who for years had worked in the MLM field. Prior to coming to LifeVantage, Brown was CEO of Metabolife, Inc., a notorious MLM that pleaded guilty to criminal federal tax evasion. Its product was an herbal supplement containing compounds made by Chemins Corporation, containing ephedra, a substance banned by the FDA. Its founders pleaded guilty to lying to the FDA, the ephedra product was banned, and the company went bankrupt shortly after Brown stepped down. Chemins was a contract manufacturer of "Protandim" for LifeVantage. The LifeVantage Plan (**Exhibit C**) was modeled after Metabolite's.

75.     By 2009 the Plan was presented as a "Business Opportunity" at the top header of the LifeVantage website. Links to sections called "Blueprint for Prosperity," "Success Stories"

---

[21] https://www.truthinadvertising.org/wp-content/uploads/2015/10/10-19-15-Letter-from-TINA-to-FTC-re-Jeunesse.pdf

"True People." And "Financial Compensation" appeared on the site. The ABC News story from (then) 4 years earlier was prominently linked from the home page.[22]

76.     LifeVantage's MLM system is little more than a scheme designed to convince Distributors like Smith and Ilardo and the Class of other Distributors (described below) to purchase an expensive set of "Protandim" products and recruit others to do the same. The way the LifeVantage MLM works is that the Distributor will make money only if he or she manages to victimize sufficiently many other people. This is a classic illegal pyramid scheme as explained below.

77.     To boost its entrance into the new MLM field, LifeVantage initially "purchased" a number of the top promoters in the multi-level marketing industry and entered into side agreements to their Distributor agreements with those particular distributors. The side deals paid these individuals to associate with LifeVantage as LifeVantage's "top earners." These top earning promoters were given preferential rank status in the LifeVantage Plan and paid accordingly. They became the first Distributors who the company pointed to when showing its "success stories." [23]

78.     A recruiter named Burke Hedges joined the (then) brand new MLM on May 18, 2009.[24] Hedges later sued LifeVantage for the company failing to pay him his "incentives" to become a distributor. He disclosed that his incentive was $20,000 per month, full qualification at the highest rank of the Plan (that is, be touted as a Pro 10 or higher ranking Distributor), "support,

---

[22] https://web.archive.org/web/20091103111925/http://lifevantage.com (citing Nov. 3, 2009 capture)

[23] http://investor.lifevantage.com/news-releases/news-release-details/lifevantage-corporation-announces-addition-sales-record-setting

[24] http://www.mlm-thewholetruth.com/network-marketing-news/burke-hedges-joins-lifevantage-as-a-distributor/

recruit, and train other LVN distributors," "work to develop sales aids to be sold to LVN's distributor using Mr. Hedge's likeness," and attend meetings and training events.[25] LifeVantage began using Hedge's name and photos and video on its website, print, and on other websites, "to promote the credibility of" LifeVantage.

79.     These professional distributors were paid for by a $3.5 million private placement: "The proceeds from this financing should allow the Company to accomplish several goals, including the expansion of our infrastructure and marketing efforts for our network marketing program."[26] In an April 2011 "Global Convention" attended by 2,000 distributors, the company "recognized Master Pro 10" distributors who achieved a monthly organizational sales volume of $1 million."[27]

80.     To kickstart the MLM program, CEO Brown said in a press release:

> Network marketing is by far the fastest growing sales channel for dietary supplements. We know that the Protandim® story is one that resonates with customers and makes them want to share the product's tremendous benefits with others. In the past, we have had many requests for independent distributorship opportunities with the Company. Until now that option was not available." Brown continued, "This latest step in our commitment to introduce Protandim® into multiple sales channels is marked by *the success we have had in recruiting successful network marketing professionals and distributors who have previously been instrumental in the success of some of the largest network marketing companies in the industry.*[28]

(emphasis added).

---

[25] http://www.mlm-thewholetruth.com/pdfs/Heges-vs-LifeVantageLawsuit.pdf

[26] http://investor.lifevantage.com/news-releases/news-release-details/aspenwood-capital-raises-35-million-lifevantage-corporation

[27] http://investor.lifevantage.com/news-releases/news-release-details/lifevantage-holds-inaugural-global-convention-largest-gathering

[28] http://investor.lifevantage.com/news-releases/news-release-details/lifevantage-announces-launch-protandimr-multi-billion-dollar

81.     Since 2009 the company continued to buy, entice, and secretly incentivize other professional recruiters throughout the years. In 2015, LifeVantage hired Defendant Jensen as its CEO. Jensen had been an executive at Jeunesse, LLC, a competing product-based MLM. Jeunesse accused Jensen in a lawsuit of recruiting and bringing with him to LifeVantage a number of its distributors, *i.e.,* professional recruiters.

82.     Defendant Jensen likes the practice, and has adopted the "Red Carpet Program" "to attract new experienced leaders to LifeVantage …providing activity-based incentives as they build their business." The company told investors it "had a history of success with similar programs, which have demonstrated significant return on investment."[29]

83.     These top-earning Distributors are the faces behind LifeVantage's "you can do it, too" message, but no one else could do what these top earning Distributors did, because only they were inserted into the top of the compensation structure. Payments from the company, not available to unsuspecting Distributors like Smith and Ilardo, enabled these professionals to claim success and sell their own "proven" sales techniques, *i.e.*, teach how to recruit.

84.     For example, Team Heart's main web page, which is password protected to only those that join the team, offers earning guides, training academies, and weekly calls to its members.[30] Team Heart's "elites" are "Pro 7" high-level Distributors Kelly McCoy, Lisa Panton, Tanis MacDonald, Charlotte Venter, Pro 9 Distributors Rachel Jackson and Tara Wilson, and Executive Master Pro 10 Distributor Carrie Dickie. At least three of these Distributors are

---

[29] https://seekingalpha.com/article/4136015-lifevantage-lfvn-presents-20th-annual-icr-investor-conference-slideshow

[30] http://www.teamheart.net/

professional marketers who previously worked for ViSalus, Inc., a maker of weight-loss shakes

and who were paid undisclosed contracts to act as "just like you" promoters for that enterprise.

85.     Another top recruiter, Tanis MacDonald, was a top recruiter at ViSalus. Her former

distribution business is a defendant in a RICO action alleging ViSalus was a pyramid scheme. In

2015 she and her partner announced they had left to join LifeVantage with the following press

announcement directed at people like Plaintiffs:

> As global networking entrepreneurs that have built international teams producing tens of millions of dollars in revenue the move has turned heads and has many asking why? Never ones to shy away from a new challenge, they claim the move came as a result of needing a change and a new home to grow and develop their team in grounds they felt were more fertile.
>
> After more than 10 years of building and developing sale forces, the power couple was searching for a company that could assist in bringing them and their team to higher level. After months of searching and qualifying potential candidates the couple decided with a mix of heavy heart and eager excitement that LifeVantage would be their new home.
>
> "The timing is just right. All of the experience we've gained has given us total clarity on what to look for in a company. LifeVantage just seemed to keep ticking the boxes." Lorne said…. Lorne and Tanis have accumulated an impressive 5 million dollars in earnings over the last decade. Through their brand Million Dollar Mentors they have worked closely with entrepreneurs of all ages and backgrounds from around the world. Giving time and attention to developing their teammates mindsets and skill sets is what sets this dynamic duo apart. Their passion for seeing other people succeed under their tutelage is undeniable.[31]

86.     Teams of these "special" marketers work directly with members of LifeVantage

management to coordinate recruiting events and attract new, unsophisticated Distributors. For

example, on May 27, 2018, a Distributor named Rachel Jackson, a former ViSalus top distributor

(and also a defendant in a recently-settled RICO action tying her to the ViSalus pyramid scheme)

---

[31] https://marketersmedia.com/industry-veterans-lorne-humenny-and-tanis-macdonald-partner-with-lifevantage/99054

who left the company in 2017, held a recruiting meeting with Defendant Jensen, the LifeVantage CEO in the Netherlands to begin LifeVantage operations.[32]

### 7. The pyramid scheme: LifeVantage requires Distributors to pay money to participate

82.     The first element of the *Koscot* test is whether the distributor pays money for the right to sell a product and receive rewards. Since 2009, every new Distributor like Plaintiffs and the Class must pay money to LifeVantage for the right to receive rewards.

83.     LifeVantage requires each Distributor, like Plaintiffs Smith and Ilardo, to enter into a relationship it purports to define as an "Independent Contractor." It requires each Distributor to get compensated under the terms of the common Plan. The Plan (**Exhibit C**) is marketed as part of the "business opportunity" offered by LifeVantage, and it is coupled to P&P (**Exhibit B**), and a Distributor Agreement (**Exhibit A**). The combination of each of these is an offering for investment and a security under federal securities laws.

84.     The Plan has eight ways that the Distributor can earn money, seven of which are directly tied to recruiting: (1) by obtaining a "Smart Start Bonus," (2) by obtaining a "Launch Bonus," (3) by earning "Royalty Commissions, (4) by obtaining a "Generational Matching Bonus," (5) by obtaining a share of an "Elite Bonus Pool," (6) by reaching a "Rank Achievement Bonus," and (7) by participating in "Business Centers." Another bonus is available for Retail Sales—but these are so small as to be insignificant. Each of these eight bonuses or commissions is only paid to people who have first paid LifeVantage a fee for the right to participate in the Plan.

85.     Under the Plan, LifeVantage requires Distributors to constantly spend money to participate in the business opportunity.

---

[32] https://www.eventbrite.com/e/lifevantage-opportunity-meeting-tickets-45915155466#

86.   <u>First</u>, an individual must "enroll" as a Distributor and purchase a Start Kit for $50, plus shipping and handling charges. Both Plaintiffs Smith and Ilardo were presented with the LifeVantage business opportunity and paid money to LifeVantage for the right to sell LifeVantage products and to participate in the LifeVantage Plan. The Start Kit constitutes one fee for the right to obtain a reward.

87.   <u>Second</u>, LifeVantage encourages Distributors to purchase expensive Product Packs when they first sign up. The LifeVantage Distributor Application offers several Product Pack options: the Platinum Pack at $1,200.00, the Gold Master Edition Pack at $600.00, the Gold Performance Edition Pack at $600.00, and the Silver Pack at $300.00.

88.   The various Product Packs contain a variety of LifeVantage product. For example, the $1,200 "Platinum Pack" contains six (6) bottles each of two "Protandim" supplements, "anti-aging" creams, and dog "Petandim" product. The product is too voluminous for "personal consumption," and is neither sold for personal consumption nor marketed as such. Thus, the initial purchase of product, from $300 to $1,200, constitutes another fee for the right to obtain a reward.

89.   <u>Third</u>, in order to receive any bonuses, a Distributor must maintain a certain amount of "PV" or "Personal Volume" every month. PV refers to the amount of product purchases for which the Distributor is directly responsible on a dollar for point basis —the Distributor's personal purchases, purchases made by "Preferred Customers" signed up by the Distributor, and orders by retail customers.

90.   To be eligible for half bonuses, a Distributor must maintain 100-199PV every month. To be eligible for full bonuses, a Distributor must maintain at least 200PV every month. And to be eligible for any bonuses and maintain "Distributor" status, 40PV must come from a Distributor's personal purchases. Thus, each Distributor is effectively required to purchase a

month's supply of "Protandim" or the other products whether or not he or she wants them for personal consumption, in addition to satisfying the remainder of the PV requirement.

91.     Fourth, in addition to purchasing the Product Packs, LifeVantage encourages Distributors to sign up for future automatic shipment of products. The enrollment materials call the "Autoship Program" optional, however, its recruiting materials and recruiters all emphasize that the program is necessary for success. Under that program, a new (or existing) Distributor gives his/her credit card information to the company and authorizes an automatic shipment of product unless an exacting sequence of stop orders is made in tightly-regulated time periods. The program's small print includes a statement that each shipment will be subject to (undisclosed amount) "shipping and handling fees." LifeVantage promotes the Autoship Program as a way for Distributors to meet their monthly PV requirements. The auto-ship purchase of product constitutes another fee for the right to obtain rewards.

92.     Fifth, the enrollment materials also push the purchase of a "Pro Audio Series" auto-ship program. Under that program, the new Distributor also authorizes LifeVantage to debit his/her credit card to regularly receive "Pro Audio Series" training CD's. The enrollment materials also sell pre-authorized and automatically renewing "passes" to "Master Track Events" such as "Global Conventions" and "Elite Academies." For example, the Platinum Pack contains LifeVantage event tickets, two months of "mobile technology" and/or Pro Audio Series CDs and enrollment in the program, which includes presentations from LifeVantage leaders. The continued purchase of training material constitutes another fee for the right to obtain a reward.

93.     Sixth, in order to remain in "good standing," Distributors must pay an annual renewal fee. The renewal fee amount is not disclosed to Distributors in the U.S. Independent

Distributor Application and Agreement or the LifeVantage USA P&P. (*See* **Exhibits A** and **B**). Thus, the renewal fee constitutes another fee for the right to obtain a reward.

### 8. The LifeVantage Plan disproportionately rewards Distributors for recruiting other participants into the program

94.     The second part of the *Koscot* test asks whether the distributor pays for the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users. This element is also present in the LifeVantage operation. The Plan is little more than a right to receive rewards unrelated to sale of the product to ultimate users in return for recruiting other participants into the program. This is because (1) there are very few "ultimate users" who buy the product at retail, and (2) the Plan overwhelmingly pays for recruiting rather than product sales.

95.     The Plan cannot pay Distributors commissions on their own personal purchases (whether voluntary or compelled under the Plan's PV requirement), and in fact the company does not even account for those sales as commissions.

96.     What commissions does pay come under the eight bonus tiers, seven of which are based, directly or indirectly, on how many recruits are in the Distributor's "downline." The Plan works to steer Distributors into recruiting activity and reward them handsomely for recruiting and discourage "retail" sales which siphon off potential new Distributors and generate little in the way of returns for the Distributor. In effect (and by design), the Plan makes the sales activity economically viable only if the Distributor recruits others to become a Distributor.

97.     Two key aspects of LifeVantage's Plan encourage this activity. The higher a Distributor ascends in the LifeVantage ranks, the more types of bonuses he or she is theoretically eligible for. Ascension in the ranks depends upon the recruiting and the amount of product purchased by the Distributor and his or her "downline." The size of bonuses depends upon the

amount of product purchased by a Distributor's "downline." Thus, the Plan pays the Distributor for actively maximizing both recruiting a new recruit *and* ensuring that the new recruit purchase an expensive Product Pack.

98.     On the other hand, LifeVantage provides little to no incentive for Distributors to generate retail sales to customers who do not want to become Distributors. Distributors may sell the products for more than they pay LifeVantage for the products, but this compensation is negligible compared to the potential compensation tied to recruiting. However, as Plaintiffs personally found out, since there is little real demand for the product, and substitute natural antioxidants exist in much cheaper alternatives, there is little to no opportunity to sell the product at a profit in any event.

### a.     The ranking system encourages recruiting and product purchases

99.     The amount of a Distributor's bonus is determined in part by the Distributor's rank. The higher the Distributor's rank, the more types of bonuses the Distributor is eligible to receive, and the greater the potential bonus. The LifeVantage Plan provides twelve ranks: Pro 1-Pro 10, Executive, and Presidential. (**Exhibits C** and **D**).

100.     Ascending the ranks depends upon a Distributor's monthly PV, monthly OV (the product purchased by junior Distributors), the number of "legs" in the Distributor's organization (the number of directly junior Distributors), and the distribution of OV across the legs. The first five rows of the chart below summarize the ranking requirements:



101.    The requirements for rank ascension encourage recruiting and product purchases. Maintaining monthly PV explicitly requires personal product purchases. Attaining OV levels encourages recruiting (because the more Distributors recruited, the more persons who will be buying product and contributing to OV) and personal product purchases (because personal purchases count toward OV). Maintaining a sufficient number of legs obviously encourages recruiting, as does the percentage OV requirements across the legs, because not only do the ranks require multiple legs (after Pro 1), but also enough legs must be sufficiently active.

102.    LifeVantage's Form 10-K forms reveal that in fact the majority of the product sold is to the company's own Distributors at a significant markup over cost. LifeVantage has a gross margin of 83% on the cost of its product, for example $168.4 million in 2018. It pays $158 million on overhead, most of it on commissions. Thus, it must significantly mark up its product in order

to yield a profit. Each Distributor must maintain approximately $150 per month in purchases. At the company's reported level of sales and number of Distributors, at least 62% of its sales or roughly $120M per year must be to Distributors.

**b.    The bonuses encourage recruiting and product purchases by Distributors**

103.    To start with, the company requires the new Distributor to purchase a large amount of inventory and enter into a monthly automatic shipment agreement to purchase ever more inventory.

104.    The vast majority of new Distributors, like Plaintiffs Smith and Ilardo, do purchase a Product Pack. That means that each such Distributor already possesses a sizeable inventory of product before the first of the monthly auto-ship purchases begin rolling in. Unless the new Distributor can quickly sell the inventory—which he or she typically cannot as there is little to no market for the product at unrealistic "retail" pricing—from the first day of enrollment the Distributor begins to stockpile inventory.

105.    The LifeVantage Plan includes bonuses and rewards that pay based on recruiting and product purchases by Distributors: the Smart Start Bonus, the Launch Bonus, Royalty Commissions, the Generational Matching Bonus, the Elite Bonus Pool, the Rank Achievement Bonus, and the My LifeVenture Program.

**i.    Smart Start Bonus**

106.    The Smart Start Bonus is paid weekly to Distributors who personally enroll new Distributors or Preferred Customers into their organization. A Distributor who has 200PV will earn a 40% bonus of the product volume for each Silver, Gold, or Platinum Pack purchased by a newly enrolled Distributor (a Distributor with a PV of 100-199 will earn 30% rather than 40% on all newly enrolled Distributor and Preferred Customer initial purchases). Thus, a Distributor with

200PV who personally enrolls a new Distributor that purchases a Platinum Pack will earn $400, $200 on all new Distributors that purchase a Gold Pack, and $100 on all new Distributors that purchase a Silver Pack. In this way, the Smart Start Bonus encourages recruiting (because there is no bonus without a new enrollee), pressuring new enrollees to buy the most expensive product Packs (because the bonus is based on the cost of the Pack), and product purchases by the Distributor receiving the bonus (because the amount of the bonus depends on the Distributor's PV).

107.     The Smart Start Bonus will also pay 40% to a Distributor for all personally enrolled "Preferred Customer" initial purchases. A Preferred Customer is a customer who enrolls in LifeVantage's monthly autoship program and receives a selection of LifeVantage products automatically each month at the discount wholesale pricing or Distributor cost. Although Distributors receive some compensation for signing up Preferred Customers, at every turn the Plan incentivizes a Distributor to push a prospective enrollee to become a Distributor because enrolling a Distributor increases the ability of a Distributor to grow his or her business and receive even more bonuses, while enrolling a Preferred Customer cannot lead to vertical growth (since Preferred Customers cannot enroll new Distributors).

### ii.        Launch Bonus

108.     The LifeVantage Launch Bonus pays the first qualified Pro 3 or 4 Distributor above the enrolling Distributor $50 for each Platinum Pack purchased (or $25 for each Gold Pack Purchased and $12.50 for each Silver Pack Purchased). The same Pack purchased will pay up the line for another $50 to the next qualified Pro 5 or 6, then another $50 to the next qualified Pro 7, 8, or 9 upline, then $25 to the first qualified Pro 10, $15 to the first qualified Executive, and $10 to the first qualified Presidential Ranked Distributor upline. For example:



109.     The LifeVantage Launch Bonus thus incentivizes Distributors to recruit new Distributors because with more junior Distributors, the likelihood of earning a Launch Bonus increases. The Launch Bonus also encourages senior Distributors to encourage their junior Distributors to engage in recruiting, so the senior Distributor can earn a Launch Bonus.

### iii.      Royalty Commissions

110.     Royalty Commissions are paid monthly and are based on the Distributor's rank and products purchased by junior Distributors (other than initial Product Pack purchases, which are bonused via the Smart Start Bonus). As the Distributor ascends in the ranks, the Distributor may receive Royalty Commissions based on more junior Distributors' purchases. A Distributor can only achieve multiple levels in their business organization by recruiting additional Distributors to the scheme. The more directly junior Distributors recruited by a Distributor, the more opportunity

there is for that Distributor to develop a long leg that will allow him to receive Royalty Commissions from more junior Distributors.

### iv.    Generational Matching Bonus

111.    The Generational Matching Bonus is paid monthly to Distributors based upon the Royalty Commissions of a Distributor's organization. A Distributor must be qualified as a Pro 3 Rank or higher in order to receive the Generational Matching Bonus. A Distributor will earn 10% of the commissions earned by all of that Distributor's personally enrolled Distributors' Royalty Commissions, 5% of the Royalty Commissions of the Distributor's personally enrolled distributors' Distributors (2nd Generation), and 5% of the Royalty Commissions of each the 3rd Generation, 4th Generation, and 5th Generation Distributors' Royalty Commissions.

112.    The Generational Matching Bonus motivates Distributors to recruit new Distributors because the receipt of the bonus depends upon the existence of junior Distributors. In addition, to receive a Generational Matching Bonus, Distributors in Pro Rank 3-6 must incur 100 in new volume by a new Distributor, Preferred Customer, or Retail Customer in the month the Generational Bonus is to be awarded, which also encourages recruiting. (At Pro Rank 7 and higher, this new volume requirement is waived.)

113.    The Generational Matching Bonus encourages Distributors to recruit new Distributors rather than Preferred Customers or Retail Customers because the bonus payout is based upon vertical levels that can only be achieved with the enrollment of additional Distributors. Preferred Customers and Retail Customers do not count for vertical advancement. The following excerpt from the Plan describes the Generational Bonus:

_05  **GENERATIONAL MATCHING BONUS** (paid monthly)

Not only do you earn your own Royalty Commissions, but once you achieve the rank of **PRO 3**, you also earn a 10% match of your personally-enrolled Distributors' Royalty Commissions.

But that is not all. You also earn a 5% match of your 2nd, 3rd, 4th, and 5th generation's Royalty Commissions.

**GENERATIONS:**

**1st generation:** any personally enrolled Distributors (downline)

**2nd generation:** any personally enrolled Distributors (downline) that are enrolled by your 1st generation Distributors

**3rd generation:** any personally enrolled Distributors (downline) that are enrolled by your 2nd generation Distributors

**4th generation:** any personally enrolled Distributors (downline) that are enrolled by your 3rd generation Distributors

**5th generation:** any personally enrolled Distributors (downline) that are enrolled by your 4th generation Distributors



### v.        Elite Bonus Pool

114.    The Elite Bonus Pool is paid monthly to the Distributors that maintain a qualified Elite Level Rank of Pro 7 or higher. 4% of all total commissionable sales is placed in the "Elite Bonus Pool" and divided into four shares. Pro 7s earn one share of the 1% Pro 7 Pool, Pro 8s earn one share of the Pro 7 Pool and one share of the Pro 8 Pool, Pro 9s earn one share of the Pro 7 Pool, Pro 8 Pool, and Pro 9 Pool, and Pro 10s earn one share each of the Pro 7, Pro 8, Pro 9, and Pro 10 Pool. See for example:



115.    The Elite Bonus Pool motivates Distributors to recruit other Distributors into the scheme because an individual cannot achieve the Elite Ranks without enrolling Distributors who then enroll the next round of Distributors, and so on. Moreover, the more Distributors a Distributor recruits, the greater the amount of total commissionable sales.

### vi.    Achievement Bonuses

116.    The LifeVantage Achievement Bonuses are paid to Distributors that reach the highest "Master" Ranks. A Master Pro 10 is eligible to receive a $100,000 Achievement Bonus, An Executive Master Pro 10 is eligible to receive a $250,000 Achievement Bonus, and a Presidential Master Pro 10 is eligible to receive a $500,000 Achievement Bonus. To receive the Achievement Bonuses, the Distributor must remain qualified at the Master Rank and remain "actively engaged" and in good standing and be recognized on stage at a major event, *i.e.* motivate other Distributors to continue recruiting participants by providing misleading money-making representations. In fine print, LifeVantage discloses that the Master Pro 10 Achievement Bonus is

paid out over 12 months and the Presidential and Achievement Bonus is paid out over a period of

24 months and only in the months that the Distributor achieves the qualified Rank.

117.   The Achievement Bonuses encourage Distributors to remain in the LifeVantage

program, to recruit, and to maintain their PV requirements.

### vii.        The My LifeVenture Program

118.   LifeVantage also offers Distributors awards through its "My LifeVenture" program

where LifeVantage's top-performing Distributors are rewarded for recruiting other product-

purchasing Distributors with select LifeVantage branded Jeeps, Harley Davidson motorcycles,

ATV's, or other luxury toys, vacations, or shopping experiences. (**Exhibit E,** My LifeVenture).



\*      \*      \*

119.    Thus, the entire focus of the Plan, which ultimately controls the payouts to Distributors, is recruitment and product purchases by Distributors. Just like a classic pyramid scheme, Distributors are required and encouraged to pay their own money into the scheme and recruit others who will do the same.

120.    The plan uses professionals to market the system. The side deals and purchases of these professionals are another hallmark of a pyramid scheme. These paid-for professionals were not disclosed to people like Plaintiffs as, essentially, actors playing a "just like you" Distributor. Their likenesses being used in advertising make it appear as if they had started as a "regular" distributor, and the earnings in the LifeVantage distributor earning claims statement (claiming it "is intended to provide truthful comprehensive information regarding the income earned by LifeVantage Distributors.") is distorted by the overwhelming, and possibly exclusive, presence of these professionals in the top, over-$100K/month earners.

**9.      The new MLM "business opportunity" sells training and materials that, in reality, only taught the new Distributor how to recruit others**

121.    At no time has LifeVantage purported to teach its Distributors anything about diagnosis of any medical condition. Instead, the company assures anyone who signs up that everyone "needs" "Protandim" because everyone ages. Likewise, the company spends virtually no time teaching its Distributors how to sell the product to customers. Instead, it provides "proven success" training in the only thing that matters: how to recruit another Distributor.

122.    LifeVantage offers incentive trips and retreats to Distributors as a reward for achieving certain ranks, that is recruiting enough people that the Distributor ascends through the "Pro" system. LifeVantage and its top professional promoters plan, participate in, and/or attend these incentive trips. The purpose of these is twofold: to get new Distributors to buy the "proven

success" guides and training, and to teach and encourage recruiting methods to get more Distributors through the door.

123.    LifeVantage and its top professional promoters provide coaching to Distributors and potential recruits through the Pro Audio Series, a collection of recordings by the top earners offering inspiration and advice on how to successfully build a LifeVantage business and the perks of becoming a Distributor. These widely distributed materials are a carefully worded system for teaching how to recruit. For example, the word "recruiting" is discouraged: the recruits are "enrolled."

124.    The fact that the distributorship is nothing more than a recruitment scheme was admitted in the litigation brought by Burke Hedges against LifeVantage for failing to pay him his under-the-table deal. As he described the system:

> LVN business owners develop their independent distributor organizations by recruiting other business owners to purchase their product and to further develop a customer base…[33]

### 10.    In reality, little of Distributors' compensation comes from retail sales because there is very little retail selling

125.    While it is theoretically possible for Distributors to sell the products they purchased from LifeVantage for a profit, they do not in reality, for a variety of reasons.

126.    <u>First</u>, after many years of operation, the company has less than a 2-to-1 ratio of customers to Distributors. It listed 116,000 "Active Customers" to 63,000 "Active Independent Distributors" in 2018. In other words, each Distributor like Plaintiffs Smith and Ilardo, system-wide, was successful in selling to fewer than 2 customers during the time he or she was active— typically three months. The company so little values retail sales that it treats the products ostensibly

---

[33] http://www.mlm-thewholetruth.com/pdfs/Heges-vs-LifeVantageLawsuit.pdf

purchased by Distributors like Smith and Ilardo for resale (as for example the several hundred dollars a month in auto-ship purchases) not as commissionable sales but as a "sales discount." And, as discussed later, these numbers are highly suspect, as the company routinely re-classifies Distributors and customers.

127.   <u>Second</u>, the retail sale of LifeVantage products uncoupled form the "business opportunity" has already been deemed a failure by the marketplace. Few actual customers at 4500 GNC stores wanted the $49.95 supply of "Protandim."

128.   <u>Third</u>, LifeVantage knows (and as shown below publicly acknowledges to the SEC) that recruiting—not retail sales—is what makes money for LifeVantage and consequently it incentivizes distributors to recruit not sell product to customers. In a 2009 publicly filed report with the Securities and Exchange commission (which is *not* linked to, shown, or disclosed to potential Distributors like the Distribution Prospectus materials) LifeVantage acknowledged that recruiting Distributors is the key to success and product sales, not retail customers:

> [L]ike most network marketing companies, we are likely to experience high turnover among independent distributors from year to year. Independent distributors who join to purchase our products for personal consumption or for short-term income goals may only stay with us for a short time. Independent distributors have highly variable levels of training, skills and capabilities. *As a result, in order to maintain sales and increase sales in the future, we need to continue to retain independent distributors and recruit additional independent distributors. To increase our revenue, we must increase the number of and/or the productivity of our independent distributors.*

(emphasis added).

129.   In 2011, after the company began to turn a profit, its CEO at the time announced, "We are seeing a growing number of distributors join our team, as we had record attendance at our

recent quarterly distributor convention. We look forward to building upon this positive momentum

and delivering another record year for LifeVantage in fiscal 2012."[34]

130.    In its 2018 Form 10K filing, LifeVantage explicitly linked its financial success to

recruiting:

> Our operating results will be harmed if we and our independent distributor leaders
> do not generate sufficient interest in our business to retain existing independent
> distributors and attract new independent distributors. The number and productivity
> of our independent distributors could be harmed by several factors, including…
>
> - lack of a compelling business opportunity sufficient to generate the interest
>   and commitment of new independent distributors;
>
> - any changes we might make to our independent distributor compensation
>   plan…

131.    In the same filing, LifeVantage said:

> Because we primarily utilize a direct selling model for the distribution of our
> products, the success and growth of our business depends in large part on the
> effectiveness of our independent distributors in selling our products and on our ability
> to attract new and retain existing independent distributors. Changes in our product
> sales are typically the result of variations in product sales volume relating to
> fluctuations in the number of active independent distributors and customers
> purchasing our products.

132.    Fourth, since recruiting is the lifeblood of its business model, LifeVantage has little

interest in actual retail sales and no reason to incentivize them. If LifeVantage cared about retail

sales, it would have some way to track them, such as by requiring all retail sales to be made

through the LifeVantage website. LifeVantage's bonuses and compensation structure could then

by tied to the distributor's verifiable retail sales. But instead, LifeVantage sells its products to the

Distributors and has no meaningful ability to verify that Distributors are actually making retail

sales.

---

[34] http://investor.lifevantage.com/news-releases/news-release-details/lifevantage-announces-
record-first-quarter-fiscal-year-2012

133.   <u>Fifth</u>, LifeVantage restricts Distributors from selling the products in the only fora where Distributors could reasonably expect to sell enough products to make a meaningful profit: e-commerce sites. Similarly, LifeVantage prohibits Distributors from selling products in brick-and-mortar stores:

> LifeVantage strongly encourages the retailing and selling of its products through person-to-person contact. In an effort to reinforce this method of marketing and to help provide a standard of fairness for its Independent Distributor base, Independent Distributors may not display or sell LifeVantage products or literature in any retail establishment.

(*See* **Exhibit B,** Section 10/1—Commercial Outlets.) LifeVantage Distributors are strictly prohibited from selling products through online retailing outside of the Distributor's own LifeVantage website and brink-and-mortar stores so Distributors can make their pitch in person and encourage what LifeVantage is really interested in—hooking potential customers on LifeVantage's "business opportunity."

134.   <u>Sixth</u>, both Plaintiffs' own experience, and the experience of other LifeVantage Distributors indicates that selling LifeVantage products at retail for a profit is extremely difficult and not a significant source of income. This is known to the company. Defendant Jensen, in an investor call in 2018 admitted that "we had a very low conversion rate [for customers] because there was a requirement for them to make a purchase or to sign up completely through a distributor. So typically we couldn't convert any of that advertising power and turn that into new customers."[35]

135.   <u>Seventh</u>, the company itself reports that there are no appreciable customers for each of its distributors. Defendant Jensen admitted in a lobbying and trade group interview that two-

---

[35] https://seekingalpha.com/article/4144310-lifevantages-lfvn-ceo-darren-jensen-q4-2017-results-earnings-call-transcript?page=7

thirds of its Distributors were first classified as customers.[36] The company's filings break out its users into Distributors and Customers without revealing that two-thirds of the customers become Distributors.

136.    Its SEC disclosures acknowledge that LifeVantage's sales are directly driven by the number of new recruits. From the time LifeVantage transitioned to a MLM model and launched its network marketing sales channel, LifeVantage's sales per year grew proportionately with the number of Distributors. Even ignoring the customer-to-distributor turnover, its own disclosures reveal only a 2:1 ratio of Preferred Customers (who receive the same price as Distributors) to Distributors.

137.    LifeVantage's own numbers show that the revenue from product sales to Preferred Customers is insufficient to cover the promised rewards to Distributors for recruiting new participants (numbers taken from LifeVantage's Company SEC filings available at https://www.sec.gov/).

|  | Sales Per Year | Preferred Customers Per Year | Independent Distributors Per Year |
|---|---|---|---|
| 2007 | $5,050,988 |  |  |
| 2008 | $3,200,174 |  |  |
| 2009 | $4,141,304 |  | More than 2,000 |
| 2010 | $11,478,460 |  |  |
| 2011 | $38,919,000 | 35,000 | 16,000 |
| 2012 | $126,183,000 | 119,000 | 46,000 |
| 2013 | $208,178,000 | 138,000 | 67,000 |

---

[36] http://gigeconomygroup.com/news/lifevantage-machine-learning-in-direct-selling/

| 2014 | $213,968,000 | 128,000 | 68,000 |
|------|--------------|---------|--------|
| 2015 | $190,336,000 | 115,000 | 65,000 |
| 2016 | $206,540,000 | 117,000 | 69,000 |

138.    But even the above numbers for Preferred Customers are inflated, as many, if not most are simply "demoted" Distributors: LifeVantage unilaterally demotes Distributors to Preferred Customers if they have not bought a product for three months.

139.    The company's own SEC-reported financials give away that the overwhelming majority of funds used to compensate Distributors comes not from retail sales, but from sales to other Distributors and Distributors' payments to LifeVantage for things such as required product purchases, Start Kits, Product Packs, Renewal Fees and the like. As the company reports to the SEC, almost 50% of its gross revenue is paid in "commissions and incentives" to the Distributors.

140.    As with every pyramid scheme, that nearly $100 million a year is not spread evenly: the majority goes to the tiny fraction of Distributors at the top of the pyramid scheme, as a direct and indirect payment for successfully recruiting money-losing Distributors like Smith and Ilardo. Thus, Distributors are primarily feeding off each other, just as in a classic pyramid scheme.

### 11.    The "Business Opportunity" was sold with implied and express promises of wealth

141.    Pyramid schemes lure in recruits with the notion that Distributors can get rich quick. Although the get-rich-quick promises are often accompanied by small print disclaimers in the company's "official" written materials, LifeVantage and its "Top Achieving" promoters message is loud and clear: vast riches await people "just like you" who "work" the system, *i.e.,* try to sell product and recruit others to join the pyramid beneath them in their "downlines."

142.    The FTC and the courts find such statements and activities deceptive under the

following principles:

- A company must have a reasonable basis for the claims it makes or disseminates to current or prospective participants about its business opportunity. A "reasonable basis" means objective evidence that supports the claim. If a company lacks such objective supporting evidence, the claims are likely deceptive.

- Some business opportunities may present themselves as a way for participants to get rich or lead a wealthy lifestyle. They may make such representations through words or through images such as expensive houses, luxury automobiles, and exotic vacations. If participants generally do not achieve such results, these representations likely would be false or misleading to current or prospective participants.

- Business opportunities may also claim that participants, while not necessarily becoming wealthy, can achieve career-level income. They may represent through words or images that participants can earn thousands of dollars a month, quit their jobs, "fire their bosses," or become stay-at-home parents. If participants generally do not achieve such results, these representations likely would be false or misleading to current or prospective participants.

- Even truthful testimonials from the very small minority of participants who do earn career-level income or more will likely be misleading unless the advertising or presentation also makes clear the amount earned or lost by most participants.[37]

143.    Even though LifeVantage and the Individual Defendants know almost all new

recruits are doomed to lose money, the illusion of easily "obtainable" wealth is spread through

LifeVantage materials and numerous individual accounts on Facebook, YouTube, and Twitter,

associated with the LifeVantage "opportunity."

144.    The Plan was made available on the www.lifevantage.com website and was

accompanied by a series of links to various sections of the site that depicted prosperous

---

[37] https://www.ftc.gov/tips-advice/business-center/guidance/business-guidance-concerning-multi-level-marketing

Distributors. For years, the Plan was captioned, "Compensation Like No Other. At LifeVantage, you're rewarded every step of the way on your path to success."[38]

145.    The LifeVantage website's first page highlights its "Opportunity" section. In large font, the following legend appears:

>  PAYING THE LITTLE GUY
>
>  **$80 - $5,800**
>
>  Monthly Average Income for **Side Hustlers** (Pro 1-Premier Pro 6)*
>
>  **$11,000 - $110,000**
>
>  Monthly Average Income for **Full Timers** (Elite 7- Master 10)*
>
>  https://www.lifevantage.com/opportunity/

146.    The company's website features "profiles" of "Master Pro" Distributors, like Carrie Dickie, who "over the past 25 years…built a multi-million dollar international network marketing business, finding her home with LifeVantage."[39] The site does not disclose that Dickie had been a top recruiter at Mona Vie, another MLM, and had been paid to join LifeVantage.

147.    At most times the "Business Opportunity" section or drop-down menu extolled a "proven system" to "successfully attain prosperity:"[40]

---

[38]https://web.archive.org/web/20120311195334/http://www.lifevantage.com:80/opportunity/compensation-plan/

[39] http://www.lifevantage.com/distributor/carrie-dickie/

[40] https://web.archive.org/web/20101220102051/http://lifevantage.com/opportunity-prosperity.aspx



148.     In the same section the website claimed that Distributors have access to a program of "unlimited earning potential:"



149.   At various points, stock options were offered to an "elite circle of dedicated corporate owners."

150.   LifeVantage touted the wealth of the few insiders at the top of the pyramid as examples of the riches that await new Distributors. These claims are often made at conventions attended by thousands of Distributors and potential Distributors. For example, a convention in Anaheim, headlined by Defendant Jensen, drew 5,000 attendees.[41]

151.   LifeVantage spreads the myth that LifeVantage presents a duplicable image of success in numerous ways. <u>First</u>, LifeVantage's Top Achievers are listed by rank on its website

---

[41] https://www.businessforhome.org/2018/07/lifevantage-elite-academy-attracts-5000-attendees/

and www.lvnmedia.com. The websites provide links to "inspirational" videos, stories, and other

tools by the top ranked Distributors on how new Distributors can achieve success too.

152.    Second, Distributors and potential recruits can hear other "inspirational" stories

from the top earners on how they became successful at the LifeVantage Academy. The Academy

supposedly gives Distributors and recruits the "tools" for them to duplicate the success of the top-

earning Distributors.

153.    Third, LifeVantage acknowledges new top-ranked Distributors at its events so that

the newly enrolled Distributors or potential recruits can witness the "achievable" success.

154.    Fourth, Distributors and potential Distributors are encouraged to participate in open

Facebook groups. There they and Defendant Jensen posts items like the following (September 5,

2018):



155.   <u>Fifth</u>, newly enrolled Distributors are asked to participate in daily, weekly, and monthly calls and events or "trainings" where they are able to listen to LifeVantage's Elite and Master Ranked Distributors provide advice, tools, and strategies to build their business.

156.   <u>Sixth</u>, the concept of duplication is reinforced by LifeVantage's self-styled "Proven Plan," which provides recruits with scripts and business tools "proven" to "assist a [Distributor] on the path to success and eventually become a Master Distributor." For example:

## BUSINESS TRAINING: OUR PROVEN PLAN

At LifeVantage, we are here to support you every step of the way as you work to create and live the life you've always dreamed of.

We are here with you as you build your LifeVantage business and as you embark on your journey of personal development of helping yourself and others find financial freedom.

We have created a proven system that will assist you on the path to success and to eventually become a Master distributor.

The idea is simple. When you grow, we grow.

Providing you with the advanced tools, ongoing support, and daily motivation you need to get started is just the beginning. With proven science, amazing products, and a sure-fire plan, there's no telling how far we can go together.

Your Start Kit has all the tools you need to not just start your business, but to launch your business in your first thirty days.



157.   But any claim or suggestion that LifeVantage offers Distributors a route to financial success—much less at the level attained by LifeVantage's top performers—is false. These misrepresentations were all made as part of a coordinated strategy so that all Distributors were

presented with the same or similar misleading statements regarding the financial prosperity attainable through LifeVantage. Obviously, as made clear in LifeVantage's own Compensation Summary, Defendants know that almost all Distributors will lose money and that the vast majority of money distributed by LifeVantage only goes to a small percentage of Distributors.

158.    To make matters even worse, many of LifeVantage's "Top Achievers" are known professional recruiters in the industry and used as marketing tools to promote the earning potentials to new recruits. These individuals: (1) participate in and speak at LifeVantage events; (2) participate in daily/weekly/monthly calls; (3) actively promoting the scheme via social media and in numerous videos publicly available online; (4) create and disseminating training guides and "how to" advice for recruiting; and (5) create the general impression of unlimited earning potential. Using the hashtag #littleyellowpill, top promoters populate the Web with videos like "Pro 10 Leaders in LifeVantage- Million $ Interview with Brandon and Lynette Cunningham."[42]

### 12.    The company's "earned disclosure" forms are materially false and misleading

159.    None of the forms that the new Distributor is required to sign disclose that the Distributor must engage in recruiting others to the business opportunity to have any realistic opportunity to make enough money in commissions to pay for the Start Kit. None of the forms disclose the number of customers each Distributor typically obtains; the total number of customers that the company sells its products to; or the ratio of customers to distributors. Nowhere on the LifeVantage website is this information posted. Each of these numbers and ratios is, and always was known to the company.

---

[42] https://www.youtube.com/watch?v=vx2ZHgZCYYY

160.    These omissions were material, in that the company and its top management knew that no rational investor would invest $50 much less $1,200 or more into one of its Start Kits if he/she knew that there were virtually no customers (that is people interested in the product absent the multi-level marketing business opportunity) and that most of the sales of the product were in fact made as part of or exclusively to the Distributors.

161.    The FTC treats misleading or deceptive income disclosures as a deceptive act.

162.    Data provided by LifeVantage to investors like Plaintiffs is deceptive. LifeVantage's Distributor Compensation Summary provides the following chart:

## July 1, 2016 through June 30, 2017

| Paid Rank | Total Annual Earnings | Monthly Average | Monthly Minimum | Monthly Maximum | Average % of Paid Distributors as a % of Total Distributors |
|---|---|---|---|---|---|
| DISTRIBUTOR | $1,731,282 | $13 | $0 | $9,440 | 40% |
| PRO 1 | $3,427,754 | $79 | $0 | $3,331 | 18% |
| PRO 2 | $6,484,651 | $261 | $0 | $13,610 | 9% |
| PRO 3 | $6,679,706 | $580 | $0 | $9,060 | 5% |
| PREMIER PRO 4 | $8,300,754 | $1,193 | $0 | $14,724 | 2% |
| PREMIER PRO 5 | $7,924,772 | $2,551 | $0 | $18,718 | 1% |
| PREMIER PRO 6 | $8,263,390 | $5,858 | $2 | $23,950 | <1% |
| ELITE PRO 7 | $5,678,802 | $11,292 | $224 | $32,214 | <1% |
| ELITE PRO 8 | $6,256,421 | $22,889 | $6,375 | $77,525 | <1% |
| ELITE PRO 9 | $4,336,764 | $42,641 | $16,498 | $66,955 | <1% |
| MASTER PRO 10 | $4,592,237 | $99,828 | $57,058 | $124,920 | <1% |
| EXECUTIVE MASTER PRO 10 | $1,993,294 | $110,739 | $85,258 | $154,854 | <1% |

The earnings of the Distributors in this chart are not necessarily representative of the income, if any, that a Distributor can or will earn through the LifeVantage Compensation Plan. Distributors' success will depend on individual diligence, work effort and market conditions. LifeVantage does not guarantee any income or rank success.

163.    First, the chart shows gross earnings to Distributors. The numbers do not account for the Start Kit, Product Packs, or Renewal Fees each Distributor paid upon enrolling as a

Distributor. Nor does this chart account for the money Distributors paid LifeVantage to purchase product. Thus, the "earnings" do not reflect the investment made.

164.     <u>Second</u>, the chart disguises that most of the money paid out by LifeVantage is given to a very small number of people. Of the $65,669,827 of funds paid to Distributors, $47,346,434 (or 72%) is paid to less than about 4% of all Distributors—the ones at the very top of the LifeVantage pyramid. Almost all of the remaining 94% of Distributors lose money. They are left to split the remaining approximately $18,323,393 in funds, which averages out to about $298 per Distributor. Obviously, $298 per year does not go far in LifeVantage, especially after Starter Kits and Product Packs ($50 to $1,200), renewal fees, and monthly-required-product purchases (at least $40 per month) are made.

165.     LifeVantage had 14,500 out of 60,000 (or 24% of) Distributors who never received any compensation from LifeVantage. These Distributors necessarily received less from LifeVantage than they paid LifeVantage because every Distributor at least purchased a Starter Kit or paid a Renewal Fee. Moreover, because of the income incentives discussed above, most purchased products to maintain Distributor status and make bonuses. Consequently, another 40% of Distributors likely lost money since they only made an average of $13 per month. Assuming these Distributors purchased enough LifeVantage product to stay eligible as a Distributor (about $40), they also lost money.

166.     LifeVantage and Jensen know that new Distributors are doomed to lose money unless, and only if, they victimize other people to pay for the right to recruit and so forth. There is no meaningful way, and virtually no Distributor has or will, to make money on retail sales. The retail sales commissions, about $10/bottle, are simply too small.

167.    The Defendants have records for each Distributor showing that only a small percentage make a profit. They employ a sophisticated database that keeps track of every transaction in real time and breaks down the exact commissions due on every transaction, enrollment, achievement of a bonus, and sale. These metrics are the key economic report distributed in the company to its top management, and these numbers are immediately available to Defendant Jensen and the board.

168.    In addition to the numbers, the company and Defendant Jensen know that the "churn rate" for Distributors (how long they continue before dropping out), is abysmally low.

169.    The average "churn" in MLM companies is 56%, meaning that a distributor typically stays involved by recruiting and trying to make retail sales for 6 months. Defendant Jensen admitted in an earnings call in 2018 that the LifeVantage rate had been 38%, meaning that an average LifeVantage Distributor lasted only three months before ceasing to try to recruit and sell the product.[43] In an interview with a trade and lobbying group he admitted that distributor "attrition soars after the first month" as a distributor. He also admitted that the company knew that only distributors who quickly make a commission even re-order the product the next month.[44]

170.    The distributor numbers reflected in the company's SEC filings between 2011 and 2017 reflect that the "churn" rate those years was similar if not worse.

### 13.    The Plan encourages inventory loading

171.    Under the Plan, a Distributor must purchase a certain amount of product to stay eligible for commissions. To be eligible for half bonuses, a Distributor must maintain 100-199PV

---

[43] https://seekingalpha.com/article/4171945-lifevantages-lfvn-ceo-darren-jensen-q3-2018-results-earnings-call-transcript?page=2

[44] http://gigeconomygroup.com/news/lifevantage-machine-learning-in-direct-selling/

every month. To be eligible for full bonuses, a Distributor must maintain at least 200PV every month. Each of these requirements is substantially more than a personal consumption supply of "Protandim" product, which is sold as a 30-day supply for $40 to the Distributor. Thus, the Distributor is faced with either purchasing canine "Petandim," whether he or she has a dog or knows anyone with a dog, or anti-aging cream, or a caffeine drink ("AXIO") to maintain commission rights. This on top of the fact that most Distributors start with kits that already contain several months' supply of each of these products.

172.     These practices and requirements encourage precisely the type of harm condemned by the FTC.

### 14.     LifeVantage claims the plan is legitimate even though it knows the FTC has closed down product-based MLMs with nearly identical plans and policies

173.     Many Distributors have heard talk that MLM's are pyramid schemes. That is an issue for the MLM industry. Companies like LifeVantage must lie to their distributor base to assure them that their plan is on the "right" side of this issue.

174.     Defendants thus make false claims regarding the lawful nature of LifeVantage's scheme. For example, top corporate official Justin Rose has gone to great lengths to assure Distributors that LifeVantage is different than other MLMs found to be pyramid schemes, like Vemma.[45] Additionally, the company in its Form 10-K recognizes that recruiting-based compensation plans in MLM companies are illegal:

> Direct selling activities are regulated by the FTC, as well as various federal, state and local governmental agencies in the United States and foreign countries. These laws and regulations are generally intended to prevent fraudulent or deceptive schemes, often referred to as "pyramid" schemes, which compensate participants

---

[45] https://www.youtube.com/watch?v=nhgymaxWy8g

primarily for recruiting additional participants without significant emphasis on product sales. The laws and regulations often:

• require us or our distributors to register with governmental agencies;

• impose caps on the amount of commission we can pay;

• impose reporting requirements; and

• require that we ensure, among other things, that our distributors maintain levels of product sales to qualify to receive commissions and that our distributors are being compensated primarily for sales of products and not primarily for recruiting additional participants.

175.    LifeVantage also reports that it spends less than 50% of its revenue on commissions, following a recommendation from the Direct Sales Association that staying below 50% makes the Plan "safe" from FTC action. But the numbers it reports to the SEC are false: the company treats payments to top distributors under side agreements as overhead, and treats sales to distributors for what it deems "personal consumption" not as commissions.

176.    What LifeVantage does not tell potential Distributors and new Distributors like Plaintiffs is that LifeVantage's compensation system is precisely structured in the fraudulent and deceptive ways prohibited by the FTC and every court presented with the issue: is this MLM a pyramid scheme? Its Distributors are rewarded primarily in return for recruiting others into its scheme rather than providing incentive for retail sales of its products – a structural certainty to collapse since the revenues from actual sales to actual consumers not associated with LifeVantage cannot cover the promised rewards for recruiting new participants.

### 15.    LifeVantage's buyback and 70% provisions do not mitigate its pyramid scheme

178.    LifeVantage purports to have two policies in an effort to avoid appearing as an obvious pyramid scheme: (1) the 70% certification; and (2) two refund policies. Each of these are smokescreens designed to obscure the fact that LifeVantage is a pyramid scheme.

### a.   The 70% certification requirement is a sham

179.    LifeVantage purports to require Distributors to be able to certify that at least 70% of products previously purchased were sold or consumed by the Distributor (the "70% Requirement"):

> By placing a new product order, an Independent Distributor is deemed to have certified that he or she has sold or consumed at least 70% of all products purchased in prior orders.[46]

180.    In a well-known decision referred to as the *Amway* decision, the FTC determined that an MLM might avoid the pyramid scheme label if its distributors actually sold to retail customers or consumed 70% of the products they purchased.[47] The reason for this is that having turnover in the distributor purchase of product discourages inventory loading, a practice where distributors buy product just to get recruiting compensation. LifeVantage plainly had the *Amway* decision in mind when it adopted the "70% Requirement."

181.    The "70% Requirement" is a smokescreen and does not accomplish what the FTC required Amway to do in order not to be a pyramid scheme for two reasons.

182.    <u>First</u>, LifeVantage does not track retail sales, and has no real way to track retail sales by its Distributors. By leaving the self-reporting to its Distributors, LifeVantage cannot determine if a Distributor has complied with the "70% Requirement." LifeVantage knows that Distributors routinely purchase more product than they need for personal consumption or to meet retail sales demand. For example, Plaintiff Ilardo still has a considerable amount of LifeVantage inventory he received as a result of the auto-ship program. LifeVantage knows there are only two

---

[46] **Exhibit B**, P&P, Section 11.3.

[47] *See In the Matter of Amway Corp., Inc.*, 93 F.T.C. 618 (1979), ¶¶ 73, 75, and 146.

customers per Distributor in any given three-month period. It knows there are not enough sales to sustain the "70% Requirement."

183.    Second, LifeVantage deliberately encourages inventory loading by its auto-ship program. Under the program, a Distributor automatically receives a pre-determined amount of LifeVantage product per month, often, like Plaintiffs, several hundred dollars' worth. Typically, the auto-ship program is established at the outset of the affiliation, as for example for Plaintiff Ilardo, before the new Distributor even knows how many customers he or she will obtain or what his or her "personal consumption" may be. All this in addition to the new Distributor receiving a considerable amount of inventory as part of the new Start Kit, as Plaintiffs purchased. As a result, the LifeVantage Plan encourages and in real life practices precisely the inventory loading that the FTC condemns and the "70% Requirement" ostensibly is meant to prevent.

### b. The refund policies are a smokescreen to hide the fact that LifeVantage operates a pyramid scheme

184.    LifeVantage offers two refund policies, but neither of these foreclose the conclusion that LifeVantage operates a pyramid scheme. First, LifeVantage allows Distributors to return product within 30 days of purchase (the "**30-Day Refunds**").[48] The products must be unopened, undamaged, and submitted for a refund within 30 days of purchase.[49] Second, LifeVantage allows Distributors to return all unopened product purchased within one year of purchase, but Distributors must resign from LifeVantage at the time they make the returns (the "**Resignation Refunds**").[50]

---

[48] **Exhibit B**, P&P, Section 13.1.

[49] *Id.*

[50] *Id.* at 13.3.

185.    LifeVantage's refund policies are inadequate to prevent the conclusion that LifeVantage is a pyramid scheme. The essential reasons why LifeVantage is a pyramid scheme are that it (a) requires and incentivizes Distributors to pay money to participate in the Plan, (b) emphasizes and rewards recruiting over retail product sales, and (c) primarily compensates Distributors with other Distributors' money. Only a complete and entire refund policy would impact the first reason why LifeVantage operates a pyramid scheme, and no refund policy can impact the second and third reasons why LifeVantage operates a pyramid scheme.

186.    LifeVantage's refund policies do not affect the conclusion that LifeVantage requires and incentivizes Distributors to pay money to participate in the Plan.

187.    First, both refund policies are limited in time, so Distributors who purchased product outside the 30-day and one-year windows cannot receive refunds.

188.    Second, they are limited to a return of unopened product.

189.    Third, they provide no protection for Distributors who sold the product for less than the wholesale price, who gave away product in an effort to recruit new Distributors, or who consumed product they never would have purchased absent the incentives in the Plan.

190.    Fourth, the 30-Day Refunds do not apply to either Starter Kits, Product Packs, or Annual Fees, and the Resignation Refunds do not apply to Annual Fees. Thus, for example, the $1,200 worth of Platinum Product Pack purchased by Plaintiff Ilardo and Plaintiff Smith, containing dozens of bottles of various products, are not eligible for refund.

191.    Fifth, Distributors must resign before they are eligible for Resignation Refunds. Far from protecting Distributors, the requirement that Distributors resign punishes Distributors who have purchased more product than they need. Eligibility for Resignation Refunds requires Distributors to give up their places in the LifeVantage compensation structure (and contractual

right to future commissions), which LifeVantage has encouraged the Distributors to achieve through hard work, recruiting, and product purchases.

192.    <u>Sixth</u>, both refund policies, and certainly the Resignation Refund policy, put the Distributor at risk that LifeVantage will invoke the 70% Requirement to reduce any unpaid bonuses. The return of product necessarily means that the Distributor did not consume or sell at least that much product. LifeVantage threatens its Distributors if it learns that a Distributor did not actually sell or consume 70% of the products the Distributor purchased:

> Failure to comply with this [70% R]equirement or falsely representing the amount of product sold or consumed in order to advance in the Compensation Plan constitutes a breach of the Agreement and is grounds for termination. Furthermore, a breach of this requirement entitles the Company to recover any commissions paid to the Independent Distributor for any period of time during which such documentation is not maintained or for which the provision has been breached.[51]

Moreover, a Distributor might fear that a Resignation Refund could result in threatened or actual litigation by LifeVantage to recover previously paid bonuses.

### 16.    Defendant Jansen is directly involved in running and trying to hide the pyramid scheme

193.    LifeVantage's principals are intricately involved in promoting and maintaining LifeVantage's pyramid scheme. They promote and decide how LifeVantage is run and marketed. In short, they orchestrate the fraud. Since 2015, Defendant Jensen has been the public face of LifeVantage. He appears in its conventions, often in front of thousands of people, and spreads a story that LifeVantage is "on a mission to bio-hack the aging code." [52] According to Jensen, "We're doing it with nutrigenomics." Jensen paints a picture of a company filled with cutting-edge genetic research that has Big Pharma taking notice. Dropping references to Apple and other

---

[51] *Id.* at 11.3.

[52] https://vimeo.com/236455463

technology sellers, Jensen tells would-be distributors about the rosy future where LifeVantage product users may extend their life.

194.    The "bio-hack" claim is Defendant Jensen's marketing idea. Defendant Jensen knows that the company is nothing more than a MLM marketer. His mission at the company- indeed his own employment agreement gives him a large bonus if sales increase to $300 million- is to sell as much "Protandim" as he can.

195.    Its facilities contain no labs. All of its manufacturing and virtually all of the formulation and packaging is contracted out to third parties. It has no relationship with any research university. Its filings indicate that it spends $1 million per year for research and development, much of that in salaries to people posing as its Chief Scientist and the SAB. Whatever is left over goes to finding and licensing phone software apps to get the distributor force to recruit more people.[53]

196.    In contrast, the company has spent over $10 million during the past several years sponsoring a local professional soccer team in Salt Lake City. And it has 109 employees devoted to marketing and field support and spends over $90 million paying distributors to recruit new distributors, the real business of LifeVantage.

---

[53] http://gigeconomygroup.com/news/onboarding-turning-training-into-first-sales/



LifeVantage Global

More from LifeVantage

197.    Defendant Jensen often speaks at LifeVantage events and has a noticeable social media presence where he pushes the "business opportunity" directly to the public. Defendant Jensen knows that the company's real business model is convincing people to be distributors and has admitted what the company's real "technology" research is about: letting Distributors recruit.

198.    In public statements with the MLM trade and lobbying group DSA, Jensen admitted that two-thirds of the company's "customers" get turned into distributors, and that the company's "technology" initiatives are aimed at the distributors—to get them their "first dollar sale" faster.[54] Those technologies are aimed at getting the new distributor to recruit other distributors—to spread the word about the product and hit them with the "business opportunity."[55] The company's technology investment is meant to reinforce the Distributor's "psychological need to see investment in their potential" earnings.

---

[54] http://gigeconomygroup.com/news/lifevantage-machine-learning-in-direct-selling/

[55] http://gigeconomygroup.com/news/onboarding-turning-training-into-first-sales/

199.    Defendant Jensen knows that the "biohacking" and "nutrigenomics" buzzwords are little more than a re-packaged claim that "Protandim" is an anti-aging pill. The implications that LifeVantage does any real science to validate its claims are false. While the distributors see and hear DNA strands flashing across the screen, in a quarterly conference call with investors in April 2018, Jensen said:

> *A key aspect of our product strategy is to drive increased average order size.* As we announced a couple of weeks ago, we launched Vitality Stack Packets, this completes the second phase of our Vitality Stack launch combining four of our daily used products into packets for ease of use and improved affordability.
>
> The Vitality Stack Packets include our Protandim Nrf2, our Protandim NRF1, ProBio and Omega+ products. *This stack and stacks that we plan to release in the future will become the primary protocol to support the biohacking culture we are creating across the company, while increasing average order size and further diversifying our sales mix….*
>
> We have also made good progress developing our nutrigenomic story and the biohacking culture we've been building with distributors and customers. *Biohacking is becoming the underlying message for our field, leveraging our core competencies and existing products and is supporting our unique position in the market.*[56]

(emphasis added).

**B.    LIFEVANTAGE FALSELY LURED DISTRIBUTORS TO ACT ON THE PYRAMID "BUSINESS OPPORTUNITY" WITH THE FICTION THAT THE DISTRIBUTED PRODUCT IS "SCIENTIFICALLY-PROVEN," AND CURES OR PREVENTS DISEASES LIKE CANCER**

200.    The "business opportunity" offered to Distributors contained fraudulent claims that there was a real retail market for its "scientifically-proven," "patented" products. LifeVantage has at all times priced "Protandim" for at least $50 for a month's supply. Each of the five herbs that make up its publicly-disclosed formula is available from GNC stores, Walmart, Amazon, and

---

[56] https://seekingalpha.com/article/4144310-lifevantages-lfvn-ceo-darren-jensen-q4-2017-results-earnings-call-transcript?page=2

natural health purveyors such as Puritan's Pride at a fraction of the cost LifeVantage charges its own Distributors. The FDA has never approved any of these ingredients, individually or in combination, as a drug.

### a. The False "Synergy" Claims

201.    One of the ways in which LifeVantage falsely promotes its "business opportunity" is that the "synergy" between the common, disclosed herbal ingredients is "patent protected." Specifically, LifeVantage falsely implies that the grant of certain narrow patent claims that adorn its "Protandim" bottles means that the Patent Office has found that the "formula" has efficacious, "synergistic" effects, *i.e.,* that a consumer (or Distributor) cannot replicate the disclosed formula on their own by buying the common herbs because the formula itself is patented. includes the "synergy" efficacy claim. This false claim has the effect of making the distribution interest more enticing. The claims, however, are false.

202.    Prior to its first narrow patent claims, LifeVantage touted that the five-herb formula "revved up" the body's antioxidant generation more than the ingredients standing alone. It claimed that the "science" behind the combination worked on a genetic level. A common way in which the claimed "formula" worked, and how LifeVantage marketed it to investors and customers is set forth in this early press release:

> Lifeline Therapeutics, Inc. is a publicly traded company (OTCBB: LFLT) based in Denver, Colorado, that is dedicated to developing and marketing evidenced-based pharmaceutical products that *show advanced efficacy in dealing with oxidative-stress related diseases -- including cancer and diabetes -- as well as nutraceutical and cosmeceutical products that demonstrate vastly superior antioxidant protection and anti-aging results*. The Company's scientific platform *is based on breakthrough research* involving the body's natural antioxidant enzymes, Superoxide Dismutase (SOD) and Catalase (CAT). These enzymes are thousands of times more powerful than consumable antioxidants and can increase "Healthy Life Expectancy" through the avoidance or diminishing of age-related disease conditions. *Lifeline has developed a patent-pending composition, Protandim, that has been proven to be the first and only dietary supplement to simultaneously*

*increase these two enzymes and reduce oxidative stress levels to those of a 20-year-old or younger. For more information, visit www.protandim.com.*[57]

(emphasis added).

203.    Virtually every claim in this statement is false: the product has never been shown to "deal with" cancer or diabetes; there was never any "breakthrough" research and whatever research took place was the work of someone else; the company did not invent a "formula"; nor has the "formula" has never been proven to be the "first" or "only" supplement to reduce "oxidative-stress" to that of a 20-year old.

204.    After the first patent had been obtained, however, the company began claiming:

> [W]e're pleased to hold patents on Protandim, the most potent commercially available Nrf2 synergizing supplement on the market. This makes distribution an exclusive privilege of our independent distributors.[58]

205.    In its literature for the product, LifeVantage began touting, "Protandim is a patented, science-based formula that has been researched, tested and validated by renowned universities and institutions." In a video released to Distributors and customers McCord "explained" how the "synergy" of "Protandim" ingredients is 18 times more powerful than taking one of them individually.[59] LifeVantage even called one of its new "Protandim" products the "NFR1 Synergizer." And, crucial to its marketing to people who may not have read the details of an obscure file wrapper at the USPTO, it explains in the FAQ section of its site:

---

[57] https://www.businesswire.com/news/home/20050601006235/en/Lifeline-Therapeutics-Completes-8-Million-Private-Placement

[58] https://web.archive.org/web/20130112144847/http://www.lifevantage.com:80/science/rooted-in-research/

[59] https://www.youtube.com/watch?v=PcJ6chXSrC8

> **Can I take these ingredients individually and achieve the same effect?**
> No, the blend of ingredients and their special formulation is unique to Protandim and holds patents. The combination of ingredients creates a synergy that has been studied and proven to provide much more antioxidant power than any food or conventional supplements. The five natural ingredients working together in Protandim have a *synergistic effect 18 times greater than the sum of their individual contributions.*[60]

(emphasis added).

206.    Contrary to these public claims, the USPTO had never issued LifeVantage a claim for the so-called "synergistic" effect (or any other alleged efficacious effect) and had, in fact, expressly *refused* to issue it such coverage.

207.    Rejecting "synergistic" claims in patent prosecution, the Patent Office informed LifeVantage that the five-herb formula was previously disclosed by others and that, "[it was] well known in the art at the time of the invention to use the claimed ingredients in compositions." The examiner informed LifeVantage that, "absent some demonstration of unexpected results," which were not presented, "this optimization of ingredient amount would have been obvious at the time of applicant's invention." A final rejection to certain claims focused on the *lack* of data to support the "synergistic" claim:

> As discussed in MPEP section 716.02(d), a showing of unexpected results must be commensurate in scope with the claimed invention. The results shown in the declaration does not show that the synergistic effects would be seen over the entire broad range claimed in claim 1. Thus, claims 1-41 [of the original invention] are still considered properly rejected for the reasons of record.

208.    Nevertheless, for years, continuing to today, LifeVantage falsely represents that the USPTO *had* granted it patent protection over its claim that the five-herb combination provides a

---

[60] https://hk-en.lifevantage.com/faqs/can-i-take-these-ingredients-individually-and-achieve-the-same-effect/

"synergistic" benefit. Statements to that effect began to be made to customers and investors at the

end of 2007:

> **Research Technology- Patent Received!**
> No single ingredient alone shows significant gene induction. All five ingredients together(the patented Protandim formula)produced a substantial increase in the expression of this antioxidant gene. The Protandim formula works **many times more effectively than the sum of its parts. This remarkable synergy provides the basis for intellectual property rights.**[61]

(emphasis in original).

209.    In its SEC Form 10-K (2009) LifeVantage claimed:

In September 2009, we announced that we had been granted a third patent for Protandim. The patent, "*Methods for Enhancing Antioxidant Enzyme Activity and Reducing C-Reactive Protein Levels,*" was issued on August 25, 2009. This patent claims the use of Protandim for increasing antioxidant enzyme activity and further documents Protandim's effect on antioxidant enzymes in vivo, describing anti-inflammatory effects such as the lowering of C-reactive protein. C-reactive protein is widely considered by doctors and researchers as an indicator of the amount of inflammation present in the body. Elevated basal levels of C-reactive protein are considered risk factors for diabetes, hypertension, and cardiovascular disease.

210.    It said on its website, www.lifevantage.com:



211.    LifeVantage even issued a press release that materially falsified what its patented

claims covered:

> LifeVantage Corporation (OTCBB: LFVN), formerly Lifeline Therapeutics, Inc.,
> maker of Protandim®, today announced a patent was granted on July 10, 2007 for its
> antioxidant therapy formula used in Protandim®. The patent, titled "Compositions
> for Alleviating Inflammation and Oxidative Stress in a Mammal," is the first patent
> granted to LifeVantage Corporation. Two other patent applications have been filed
> by LifeVantage for Protandim®-based science.
>
> Dr. Joe McCord, LifeVantage's Director of Science and co-discoverer of the
> important antioxidant enzyme superoxide dismutase, stated, "The issuance of this
> first U.S. patent underscores *the unique nature of Protandim®'s approach to*
> *antioxidant therapy, and the remarkable synergy of its five phytochemical*
> *components working together. We believe this adds substantial validation to the*
> *science that has led to the creation of Protandim®.*"
>
> James J. Krejci, CEO of LifeVantage, added, "This patent reinforces LifeVantage's
> approach to developing science-based, natural solutions that deliver significant
> health benefits to our customers in helping them reach their health and wellness
> goals. *The patent, which is the basis of the Protandim®formula, also provides*
> *conclusive evidence to our customers, retail partners, and healthcare professionals*
> *that they have chosen a proven solution in reducing oxidative stress and supporting*
> *healthy aging.*" [62]

(emphasis added).

212.    When the corresponding method patent issued, the company said:

> *LifeVantage Corporation Awarded Second Patent for Protandim(R), the Antioxidant*
> *Therapy Product Proven to Reduce Key Aging Factors by 40 Percent*
>
> LifeVantage Corporation (OTCBB: LFVN), the maker of Protandim
> (www.protandim.com), announced a second patent was awarded on June 10, 2008
> for its Protandim® antioxidant therapy product. Protandim is clinically proven to slow
> the progressive rate of aging by reducing oxidative stress, which is a key factor in
> aging. Researchers believe that Protandim's unique ability to reduce aging factors at
> the cellular level will play a pivotal role in helping consumers age gracefully. The
> newly issued patent is entitled, "Preparation of Compositions to Alleviate
> Inflammation and Oxidative Stress in a Mammal."

---

[62] http://investor.lifevantage.com/news-releases/news-release-details/lifevantage-corporation-
obtains-patent-science-based-dietary

Dr. Joe McCord, one of the foremost authorities on the body's antioxidant defense system and the co-discoverer of the important antioxidant enzyme superoxide dismutase, said, "The granting of this second U.S. patent underscores *the unique ability of Protandim* to modulate important physiological events involved in the inflammatory process, and known to be common to hundreds of human diseases and to the aging process itself. *Because of the remarkable synergy of Protandim's five phytochemical components working together to increase the body's network of antioxidant enzymes, it achieves protection against oxidative stress that greatly exceeds that produced by conventional therapies."*

David Brown, CEO and president of LifeVantage, said, "Our mission is to develop science-based, natural solutions for healthy aging. Health and wellness is a primary concern for our partners including our customers, retailers and healthcare professionals*. The issuance of a second patent for Protandim further supports the fact that there is no other product in the marketplace that can provide consumers a proven solution in reducing the negative effects caused by oxidative stress, which is the primary culprit in aging."*[63]

(emphasis added).

213.   When it published its FAQ's about a consumer watchdog, *Lazy Man and His Money*, the company flatly lied about what the USPTO actually granted. It said:

Q. Lazyman claims that LifeVantage illegally obtained patents on Protandim and that this is demonstrated by the fact that Dr. McCord is not listed on the patent.

A. The patent application for Protandim was submitted by Paul Myhill in 2004. This application was initially denied by the United States Patent and Trademark Office (USPTO) in 2006 due to the need for further supporting evidence. Shortly thereafter*, Dr. McCord validated the mutually synergistic effect of Protandim. Dr. McCord described the new data in a Declaration to the USPTO and was granted a meeting to present his findings. That meeting resulted in the patent denial being reversed and the patent was issued in 2007.* Dr. McCord was not required to be listed on the patent but was extremely instrumental in achieving its final approval.[64]

(emphasis added).

---

[63] http://investor.lifevantage.com/news-releases/news-release-details/lifevantage-corporation-awarded-second-patent-protandimr

[64] http://www.spiritofhealthkc.com/wp/wp-content/uploads/2014/06/Lazyman-FAQs.pdf

214.    The reason why LifeVantage falsely pushed the "synergistic" nature of the "Protandim" product was to fool potential Distributors and customers like Smith and Ilardo that they would be involved in a legitimate business. When these claims were made, no one at LifeVantage, from McCord to its CEO, was not aware that the company had no patent claims that were based on the "synergy" claim.

### b.   False Claims That LifeVantage Invented the Product

215.    Another false representation made by LifeVantage as part of the "business opportunity" centers on the untrue assertion that it was "invented" in-house by a "scientist" and that LifeVantage is somehow a research entity capable of conceiving a medically efficacious product.

216.    Since it entered the market with "Protandim," LifeVantage falsely claimed that it was invented by McCord, a scientist in its employ. The company has always hid the fact that the product was licensed from CereMedix, LLC ("CereMedix"). Myhill and Driscoll then filed for a patent naming themselves as the original inventors of the formula, notwithstanding that a real scientist from CereMedix had himself applied for patents on the biotechnology. Large parts of that application eventually found their way to the LifeVantage patent applications without disclosure to the patent examiner. In July 2007, the USPTO issued Pat. No. 7,241,461 (the "'461 Patent") titled "Compositions For Alleviating Inflammation And Oxidative Stress In A Mammal," to Myhill and Driscoll. Subsequently, several more continuation patents issued in their name.

217.    Myhill and Driscoll knew that a pill "invented" by a pair of marketers with no scientific experience or training good ad copy. They wanted to dress up the "science" behind "Protandim" and to claim that it (and they) "invented" the five-herb "formula" behind

"Protandim." A plan was made to have McCord become the public "inventor" of "Protandim." McCord worked at a local Denver research lab.

218.    McCord purchased stock in Lifeline from Myhill and Driscoll, and when LifeVantage purchased Lifeline, McCord came along. McCord became the fourth largest Lifeline shareholder before its takeover by LifeVantage.[65] Several months later (after the original application was made) LifeVantage and Lifeline executed a stock swap resulting in a company called Lifeline Therapeutics in which the principal shareholders were Myhill, Driscoll, and McCord.[66] After the stock swap, McCord's Lifeline interest was converted to 9.8% ownership in LifeVantage.[67]

219.    LifeVantage and Lifeline then began collaborating on giving Lifeline some "scientific" backing to the product. They established a separate website for "Protandim." They began to claim on www.protandim.com that they had developed "Protandim." The website left out any mention of CereMedix,

> **Protandim**, a patent-pending formulation of botanical extracts, is the result of extensive research, development and scientific testing by Lifeline Therapeutics, Inc. [68]

220.    McCord thus became the marketer to sell the "science" to would-be customers. In April 2004, McCord was announced as LifeVantage's "Director of Science." In March 2006,

---

[65] https://www.sec.gov/Archives/edgar/data/849146/000107258804000357/0001072588-04-000357.txt

[66] https://www.sec.gov/Archives/edgar/data/849146/000102189006000034/filename10.htm

[67] https://www.sec.gov/Archives/edgar/data/849146/000100009605000009/0001000096-05-000009.txt

[68] https://web.archive.org/web/20050615081140/http://www.protandim.com:80/about-protandim.htm

McCord joined its Board of Directors.[69] He began appearing on behalf of the company on radio and talk shows and in print repeating the false story of the invention.[70]

221.    After April 2004, the names of Myhill or Driscoll even disappeared from the promotional websites. McCord was identified as *the* man behind "Protandim:"

> **Protandim** was co-formulated by <u>Dr. Joe McCord</u>, who discovered Superoxide Dismutase, the body's most potent antioxidant enzyme, in 1969 and is considered the foremost expert in the field.[71]

222.    Unknown to the public, and never disclosed in LifeVantage promotional literature or to its countless videos available to Distributors, Myhill, Driscoll, and McCord were forced to acknowledge that the CereMedix license and the CereMedix work was the real "science" behind what Myhill and Driscoll were claiming to have invented.

223.    This took place when they settled litigation in early 2005 by former shareholder, Michael Barber. In exchange for approximately $300,000 for 19% Lifeline stock, Barber agreed that:

> [H]e will never … voluntarily advertise, publicize or publicly disclose, any former or present association with LN [Lifeline] or LT [LifeVantage]. …In addition, Barber agrees that he will not be involved with any type of communication intended for public viewing that compare the benefits of any LT or LN product with any product with which Barber has any involvement. Further, Barber agrees that he will not refer to or cite or cause others to refer or cite to Dr. Joe McCord, including, but not limited to, (i) any comment or other communication of any kind that directly or ultimately emanated from Dr. Mc Cord or that describes Dr. Mc Cord and any of

---

[69] http://investor.lifevantage.com/news-releases/news-release-details/dr-joe-m-mccord-joins-lifeline-therapeutics-inc-board-0

[70] http://investor.lifevantage.com/news-releases/news-release-details/dr-joe-mccord-appear-tom-martino-syndicated-radio-show

[71] https://web.archive.org/web/20050615081140/http://www.protandim.com:80/about-protandim.htm

his scientific work and (ii) any test or study in which Dr. McCord has had some role, including any report of such test or study.[72]

224.    The same settlement agreement not only identified the CereMedix involvement in "Protandim," it equated the "formula" then the subject of the pending patent application as an equivalent CereMedix composition:

(1) Barber agrees that for one year from the date of this Agreement that he will and shall not knowingly (a) apply for or be employed by or contract with, and (b) acquire, either directly or indirectly, any ownership or other interest in, any individual or entity, throughout the world, that at that time markets, sells, distributes or manufactures any dietary or food supplement product that competes or is intended to compete with Protandim or CMX-1152 or both of them, including knockoffs or derivatives of either Protandim or CMX-1152. *A product will be conclusively deemed to compete or intended to compete with Protandim or CMX-1152 if*:

a. *That product contains two or more of the following ingredients or extracts of those ingredients, all of which are in or intended to be in Protandim: (i) Ashwagandha, (ii) Bacopa, (iii) Green Tea, (iv) Milk Thistle, (v) Tumeric, (vi) Gotu Kola, (vii) Ginkgo Biloba, (viii) Aloe Vera;* or if

b. That product is promoted, in any way, as being able to provide or deliver a health benefit to a human being by affecting, in any way, one or more of the following substances or the production by the human body of one or more of those substances: (i) SOD, which is superoxide dismutases and (ii) CAT, which is catalase; or if

c. That product is promoted, designed or formulated to affect the human body in any way that is similar to the way in which CMX-1152 or Protandim is now or may be promoted, designed or formulated, as described on Protandim.com and lifelinenutraceuticals.com or any other website owned or controlled by LN, LT or CereMedix. …

**No Dissemination of Information or Documents**. Barber represents and warrants that he shall not send, deliver or otherwise disseminate any information about LN or LT, including but not limited to their products, marketing plans, schedules, agreements, contacts, business relationships, business plans, employees, internal-decisions and decision-making, contracts, company structure, members, investors, finances, and financial plans, or anything that would constitute a trade secret under the Colorado Trade Secrets Act, to any third-party, including but not limited to competitors of LN and LT, the FDA, FTC or SEC, and any other governmental entity or agency…

---

[72] https://www.sec.gov/Archives/edgar/data/849146/000100009605000160/lifeline8kexh101.txt

(emphasis added).

225.    The settlement agreement thus effectively admitted that the Cere-Medix CMX-1152 and "Protandim" were one and the same.

226.    An employment contract between LifeVantage and McCord paid off McCord for falsely promoting his role in "Protandim." Among the terms of that agreement were the following:

Obligations and Representations of Dr. McCord.

2.1 Dr. McCord agrees to and shall provide the following services to LifeVantage:

2.1.7 Dr. McCord agrees that LifeVantage may disclose Dr. McCord's participation on the SAB and LifeVantage's Board of Directors and may utilize Dr. McCord's name, likeness and statements on LifeVantage's website and in marketing materials; provided, however, that Dr. McCord reserves the right to approve all such announcements and usage of his likeness or statements prior to publication.

Compensation to Dr. McCord.

3.1 Monthly Compensation. Dr. McCord shall receive the sum of $10,000.00 per calendar month for all of his services pursuant to this Agreement, payable in the time and manner that the Company customarily pays its employees, less applicable payroll taxes.

3.2 Monthly Commission. In addition to the Monthly Compensation set forth above, upon a finding of the Company's CEO that all of Dr. McCord's obligations under this contract have been performed satisfactorily, Dr. McCord shall receive a monthly commission equal to Fifty Cents ($.50) multiplied by the total net bottle sales of Protandim® during the preceding month. This commission shall also apply to any new products that are substantially equivalent to the original Protandim product (e.g., the Mexican formulation, or a yet to be determined hypoallergenic Protandim formulation). It shall also apply (at an equitable rate to be determined by the parties) to future Protandim- or Nrf2 activation-based products (such as, e.g., a pet supplement, or a topical gel formulation).[73]

---

[73] https://www.sec.gov/Archives/edgar/data/849146/000119312511258536/d225491dex1031.htm

227.    But McCord's paid endorser status was never publicly disclosed. McCord was used by LifeVantage to promote an aura of "science" to its pills. McCord was pitched as the scientist behind "Protandim." He appeared at events to act as the chief scientific spokesperson. The company compared him to Madame Curie, Alexander Graham Bell, Orville Wright and Henry Ford. Eventually McCord officially "retired" and was paid off by $1.7 million in exit payments.

228.    McCord also became the primary facilitator of a number of paid studies that the company funded in an effort—years after Myhill and Driscoll "invented" the formula to the "anti-aging" wonder pill—to prove that it does anything to humans.

229.    The company began to publicly use the following language to describe McCord's "status" as the "inventor" of "Protandim:"

Dr. Joe McCord:

LifeVantage Director of Science

Our *breakthrough product, Protandim, was created by Dr. Joe McCord, a world-renowned scientist,* pioneer of Free Radical Biology, and discoverer of the anti-aging enzyme Superoxide Dismutase in 1969.

At LifeVantage, we talk a lot about breakthroughs because we have one—not the "breakthough" many companies claim and market today. *LifeVantage has a true breakthrough, a breakthrough that is real; founded and proven by science. And unlike other companies today, we can back up our claim. At LifeVantage, not only do we have our own version of the light bulb—a revolutionary breakthrough, a proven product, backed by science and poised to alter history—we have its inventor as well. ....* Developed after 40 years of research, featured on ABC, NBC, PBS, in "The Wall Street Journal," and described in CNN Chief Medical Correspondent Dr. Sanjay Gupta's book, "Chasing Life," and available exclusively through LifeVantage, our breakthrough product is specially formulated to fight aging at the source.[74]

---

[74] https://web.archive.org/web/20110721233521/http://www.lifevantage.com/products-breakthrough.aspx.

(emphasis added). In other versions of this story, LifeVantage touted McCord as the "scientist behind "Protandim" on its "Protandim" products page.[75] Nowhere on these websites or conventions did LifeVantage (or McCord) disclose his paid status as a marketer, nor his monthly stipend or his 50-cents-a-bottle interest in selling "Protandim."

### c.   <u>**"Protandim" as a Cure for Any and All Diseases, Including Cancer**</u>

230.    LifeVantage has for years authored promotional literature that stated or implied, that "Protandim" *in fact* cures diseases. These statements are prohibited by the FDA. Both Plaintiffs Smith and Ilardo were lured into the scheme by these types of statements, which were ubiquitous in the many forms of promotion practiced by the company: training materials, training sessions, conventions (often attended by McCord), the company's websites for "Protandim," "Nrf2", and its own, and testimonials in the form of videos posted on YouTube and other aggregator sites.

231.    The reason why LifeVantage mislabeled its products and falsely pushed the "scientific" nature of the "Protandim" product was to fool potential Distributors like Smith and Ilardo that they would be involved in a legitimate business that would help people. To that end for years LifeVantage pushed the connection between the "scientific," cancer-curing "Protandim" and the MLM distribution system as a means of masking the fact that it was just another pyramid scheme. It did so in a variety of ways.

232.    On YouTube, LifeVantage posted videos titled, for example, "Protandim-NRF2 and Cancer" featuring McCord. McCord appeared at LifeVantage conventions, for example in

---

[75]https://web.archive.org/web/20141120122453/http://www.lifevantage.com:80/products/protandim/ (2014 capture)

2015 in a 46 minute speech entitled "McCord PhD on Creation of Protandim Nrf2 Activator,"[76] and "Protandim Nr Breakthroughs Research For Cancer Treatment,"[77] "NRf2 cancer, chemo and radiation,"[78] "What is Peer Reviewed Research? Protandim Cancer Chemo Radiotherapy,"[79] "Dr. Joe McCord Discusses the Science of Protandim, 2011."[80] In each of these videos McCord makes the clear implication that "Protandim" cures, assists in curing, or alleviates cancer. Those videos are still available today.

233.    LifeVantage also claimed that "Protandim" cures Alzheimers, Parkinsons and arthritis. Another of its SAB members, Dr. David Perlmutter, gave a speech about the five-herb formula combating these diseases.[81] That video has been accessible since 2009.

234.    The company either published or promoted publishing health claims statements on its behalf on the Web, findable by a search for "Protandim patents," "Protandim health benefits," and similar. For example on a site called www.pforprotandim.com the following statements were posted in 2017 (available September 2018):

> What's Protandim?
> PROTANDIM reduced oxidative stress by an average of 40% in 30 days. A claim that no other product or company can make
> Our flagship product we mentioned called Protandim, is made up of 5 synergistically combined herbs backed by 7 patents and 26 peer reviewed published studies. *It protects the blood, the bones, and the organs.*

---

[76] https://www.youtube.com/watch?v=0RouYRTFmx4

[77] https://www.youtube.com/watch?v=QB8wn4vm2lQ

[78] https://www.youtube.com/watch?v=hbYQhKma9wI

[79] https://www.youtube.com/watch?v=vR-k3ucVj2o

[80] https://www.youtube.com/watch?v=eb8Qs55ylAM

[81] http://vimeo.com/6816652

(emphasis added).

235.    On August 31, 2009, LifeVantage sent out a press release that said:

LifeVantage Corporation has been granted a third patent for its flagship product Protandim(R) from the United States Patent and Trademark Office. Protandim(R) has been clinically proven in earlier studies to slow the progressive rate of aging by reducing oxidative stress and this new patent further documents Protandim's(R) effect on antioxidant enzymes in vivo, describing anti-inflammatory effects such as the lowering of C-reactive protein. C-reactive protein is widely considered by doctors and researchers as an indicator of the amount of inflammation present in the body. Elevated basal levels of C-reactive protein are considered risk factors for diabetes, hypertension, and cardiovascular disease. The patent, "Methods for Enhancing Antioxidant Enzyme Activity and Reducing C-Reactive Protein Levels," was issued on August 25, 2009.

Dr. Joe McCord, one of the foremost authorities on the body's antioxidant defense system and the co-discoverer of the important antioxidant enzyme superoxide dismutase or SOD, said, "*This patent further underscores the unique and powerful actions of Protandim(R) as a tool against not only oxidative stress, but also inflammation. Chronic, low-level inflammation is now known to be associated with many of the major diseases we face as we age, including atherosclerosis, diabetes, obesity, and neurodegenerative diseases.*"

David W. Brown, LifeVantage President and CEO commented, "The issuance of a third patent for Protandim(R) builds upon our previous two patents and further separates LifeVantage and Protandim(R) from other dietary supplements. It is difficult to receive a patent for a dietary supplement. Protandim(R) is uniquely and solidly based upon sound and proven science and the issuance of this third patent marks a historic day for LifeVantage, and sets an unparalleled standard in the dietary supplement industry." [82]

(emphasis added).

236.    On April 14, 2016, LifeVantage issued a press release, quoting Defendant Jensen,

that claimed:

SALT LAKE CITY, April 14, 2016 (GLOBE NEWSWIRE) -- LifeVantage Corporation (Nasdaq:LFVN), has announced the receipt of United States Patent No. 9,289,374 B2, issued March 22, 2016, for topical compositions and methods for reducing oxidative stress for its TrueScience skin care products.

---

[82] https://www.newhope.com/supplements/lifevantage-granted-third-patent-protandimr-and-method-reducing-important-inflammation-b

*According to the patent, topical application of the compositions in the TrueScience skin care products have been demonstrated to stimulate the reduction of oxidative stress and improve the appearance of the skin's epidermal rete ridges, which are believed to improve the appearance and overall health of the skin.*

"The receipt of this patent continues to differentiate LifeVantage from other companies in the direct selling and skin care industries," said LifeVantage President and Chief Executive Officer, Darren Jensen. "The peer reviewed studies related to our products demonstrate their effectiveness and position LifeVantage at the forefront of skin care."[83]

(emphasis added).

237. The statements were false. The only independent claim of the patent that was described was for the topical application of natural herbs:

A composition consisting essentially of: an extract of a *Brassica* species containing one or more isothiocyanates, wherein the one or more isothiocyanates is present in the composition in an amount of 500 ppm to 1,500 ppm; an extract of a *Camellia* species; an extract of *Curcuma longa;* an extract of *Piper nigrum;* an extract of *Plantago lanceolata* containing plantamajoside, wherein the plantamajoside is present in the composition in an amount of 500 ppm to 1,500 ppm; an extract of *Silybum marianum;* an extract of *Wasabi japonica;* and a humectant, wherein the humectant is selected from at least one of propylene glycol, butylene glycol, or pentylene glycol.

238. At the same time as these false statements were put up by itself and others, LifeVantage aggressively demanded that "sceptics" who pointed out that the claims it was making for "Protandim" were dubious or worse pull that criticism from the Web. In 2012 LifeVantage engaged in litigation with an Internet-based consumer critic, Paul McFarland, who authors a well-known consumer-advocate website called *Lazy Man and His Money*. McFarland published a series of articles detailing his concerns with the pyramid nature of the business opportunity and the costs involved. LifeVantage sued him for defamation in California state court, and after McFarland lost

---

[83] https://globenewswire.com/news-release/2016/04/14/828906/0/en/US-Patent-Issued-to-LifeVantage-for-TrueScience-Product-Composition.html

his anti-SLAPP suit motion, forced him into a cost-based settlement[84] to take down the article, even from the Internet Archive.

239.    At the same time, LifeVantage made a concerted decision to allow unsubstantiated claims that "Protandim" cures cancer to remain on the Web. Numerous people have posted "testimonials" on YouTube that "Protandim" "reversed brain cancer" and similar that LifeVantage has permitted to be available, even though Google will take down any video with a trademark notice upon request.

240.    On April 17, 2017 the Food and Drug Administration took the unusual step and delivered a "Warning Letter"[85] to Defendant Jensen, that said, in relevant part:

> Dear Mr. Jensen,
>
> This is to advise you that the Food and Drug Administration (FDA) reviewed your websites at the Internet addresses www.nrf2science.com, www.lifevantage.com, and www.protandim.com in January 2017 and has determined that the claims on your websites establish that your Protandim NRF2 Synergizer product is a drug under Section 201(g)(1)(B) of the Federal Food, Drug, and Cosmetic Act (the Act) [21 U.S.C. § 321(g)(1)(B)], because it is intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease. As explained further below, introducing or delivering this product for introduction into interstate commerce for such uses violates the Act….
>
> Your product Protandim NRF2 Synergizer is intended for treatment of one or more diseases that are not amenable to self-diagnosis or treatment without the supervision of a licensed practitioner. Furthermore, your product is intended for prevention of one or more diseases that are not amenable to prevention by consumers without the supervision of a licensed practitioner. Therefore, it is impossible to write adequate directions for a layperson to use your product safely for its intended purposes. Accordingly, your product is misbranded under section 502(f)(1) of the Act [21 U.S.C. 352(f)(1)]. The introduction or delivery for introduction into interstate commerce of this misbranded drug violates section 301(a) of the Act [21 U.S.C. 331(a)].

---

[84] https://www.lazymanandmoney.com/?s=lifevantage

[85] https://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2017/ucm554234.htm

241.    The letter delineated where on its websites LifeVantage made its false claims:

"Examples of claims found on your websites that establish the intended use of your Protandim NRF2 Synergizer product as a drug include, but may not be limited to, the following:

On the www.nrf2science.com home page:

- "Anti-inflammatory"
- "Cardiovascular diseases prevention"
- "Diabetes prevention"
- "Alzheimers [sic] prevention"
- "Cancer prevention"
- "Cellular stress … can lead to skin cancer. In the body, cellular stress is linked to cardiovascular disease, alzheimers [sic], cancer and other life threatening diseases … When activated, Nrf2 turns on the production of specific antioxidants the body needs to fight cellular stress effectively"

Under the "Nrf2 & the Body," "Nervous System" tab, www.nrf2science.com/nervous-system:

- "Nrf2-activating phytonutrients such as EGCG from green tea, curcumin from turmeric, and quercetin from onions are known to reduce amyloid plaque accumulation (Alzheimer's) and increase regeneration of dopamine fibers (Parkinson's), suggesting a general neuro-protective benefit."
- "Oxidative damage occurs early in virtually all nervous system disorders, including chronic conditions such as Alzheimer's, Parkinson's, Multiple Sclerosis, and ALS … as well as acute brain injury such as stroke and traumatic brain injury (TBI, including concussions), suggesting that oxidative stress plays a prominent role in disease progression … neurons with low Nrf2 activity are more susceptible to oxidative stress, but cellular damage can be reduced through Nrf2 activation"

Under the "Nrf2 & the Body," "Cardiovascular System" tab, www.nrf2science.com,/cardiovascular-system/:

- "Increases production of specific anti-atherogenic (heart-protecting) enzymes"
- "Protects blood vessels from inflammation"
- "Reduces high blood pressure"
- "Several cardiovascular diseases are associated with suboptimal cellular defenses, (and thus with elevated cellular stress), including atherosclerosis (blockage of blood vessels), hypertension (elevated blood pressure), and heart failure (loss of contraction ability)…Nrf2, a key protein that activates the body's ultra-powerful antioxidant enzymes, has been shown by science to protect and benefit the cardiovascular system"
- "protects heart muscle cells in rats with hypertension (high blood pressure)"

- "keep blood vessels open by reducing overgrowth of the interior linings of specific blood vessels used in coronary bypass grafts"

Under the "Nrf2 & the Body," "Skin Health" tab, www.nrf2science.com,/skin-health/:

- "Minimizes inflammation"
- "Protects against UV radiation exposure"
- "Minimizes risk of skin cancers"
- "Nrf2 pathway can have a wide range of beneficial effects on skin, including reduced rates of skin cancers, protection from ultraviolet radiation, reduced inflammation … and improved wound healing."
  Under the "Cancer" tab, www.nrf2science.com,/cancer/:
- "Nrf2 Help Fight Against Cancer"
- "Restrict/modulate underlying mechanisms involved in carcinogenesis (formation of cancer cells)"
- "Positively influences genes involved in formation of cancer cells"
- "Shows ability to slow progression of and 'kill' cancer cells"
- "'Nrf2 as a promising molecular target for cancer prevention'"
- "'protection against … carcinogens'"
- "Nrf2 is indeed a potentially powerful weapon against cancer."
- "suppress both the development and spread of skin cancer … 57% reduction in number of skin tumors"
- "significantly reduced the development of skin cancer"
- "chemopreventive agent due to their ability to modulate underlying mechanisms involved in carcinogenesis"
- "'Nrf2 … target the so-called 'diseases of aging,' including cancer, cardiovascular diseases, inflammatory and autoimmune diseases, and neurodegenerative diseases."
- "suppress the growth and spread of breast cancer"
- "anti-cancer effects against ovarian cancer and myeloma (bone marrow cancer)"
- "anti-tumor and anti-proliferative effects (reduced tumor formation and growth) across 8 different ovarian cancer cell lines.
  Under the "Nrf2 Studies" tab, www.nrf2science.com,/studies/:
- "Prostate Cancer Prevention Trial"
- "associated with lower lung cancer risk"
- "mineral supplement use to prevent cancer"

On the blog posts, www.protandim.com/blog/ :

Under the April 1, 2012 post, "Long-Used, Much-Studied Turmeric a key Protandim Ingredient":

- "helpful for the following conditions: … Stomach ulcers … Osteoarthritis … Heart Disease … Bacterial and viral infections … Cancer … Alzheimer's disease"

Under the April 6, 2012 post, "Ultra-Popular Green Tea has its Place in Protandim":

- "lowering cholesterol… and fending off dementia"
- "reduce the risks of developing cancers such as breast, stomach, prostate, pancreatic and colorectal cancer."

On the blog post, www.lifevantage.com/blog/study-confirms-protandim-nrf2-synergizer-extends-lifespan/ :

Under the August 5, 2016 post, "Study Confirms Protandim Nrf2 Synergizer Extends Lifespan":

- "Suppresses tumor-promoting oxidative stress… and inflammation"
- "Protects the heart from ... fibrosis'"

242.    These statements were made with knowledge of their falsity. LifeVantage and Defendant Jensen knew at all times what statements the FDA prohibited. The company never performed drug trials, even in an initial phase, on "Protandim." The company never intended to perform such trials. The company knew at all times that absent approval of "Protandim" as a drug, each such statement was illegal, misleading and deceptive. The purpose of these statements was to convince Plaintiffs like Smith and Ilardo that purchasing "Protandim" was a good "business opportunity."

## CLASS ACTION ALLEGATIONS

243.    Plaintiffs bring this suit as a class action pursuant to the FED. R. CIV. P. 23(b)(2) and (3) individually and for a Class of at least 200,000 Distributors in the United States, and elsewhere who have entered into distribution agreements in the United States or to whom the securities fraud was directed from within the United States, during such period as is recoverable under the causes set forth herein (the "Class Period") tentatively defined as follows:

*All purchasers of the LifeVantage "business opportunity" (the " Class") during the Class Period. Excluded from the Class are all persons named as a Defendant (or a spouse of a Defendant or a related entity of Defendant) and any purchasers who have not experienced a financial loss as a result of their LifeVantage Distributor enrollment.*

244.    Each proposed class member is a LifeVantage customer or Distributor who at any point during the class period signed a Distribution Agreement. Smith and Ilardo's claims are typical of the claims of the Class in that each paid money to become a Distributor and lost money as Distributor. (Hereafter, Smith and Ilardo will be referred to as "Named Plaintiffs"). Each Plaintiff will fairly and adequately represent the interests of the Class because their claims are typical of those of the Class and their interests are fully aligned with those of the Class. Plaintiffs have retained attorneys who are experienced and skilled in complex class action litigation, including in class action pyramid scheme litigation and securities litigation.

245.    This proposed class action would give notice to all Distributors who have experienced a financial loss as a Distributor. Plaintiffs expect that LifeVantage has records in its possession that precisely identify all such proposed class members, since all records concerning all purchases, payments, and payment of commissions, are maintained in a database by LifeVantage. Plaintiffs propose that a preliminary notice of the pendency of this action may be sent as soon as practicable.

246.    Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.

247.   The Defendants have acted on grounds that apply generally to the Class, *i.e.*, running a product-based pyramid scheme, selling each Class member "Protandim" product, so that class-wide damages, final injunctive relief, or corresponding declaratory relief is appropriate respecting the Class as a whole.

248.   This case presents questions of law or fact common to Class members that predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fᴇᴅ. R. Cɪᴠ. P. 23(b)(3).

249.   The questions of law and/or fact common to the Class, include but are not limited to the following:

      a.      Whether the Defendants were operating an unlawful product- based pyramid scheme;

      b.      Whether the Defendants were operating a fraudulent overpricing scheme;

      c.      Whether the Defendants encouraged Class members to pay money to LifeVantage for the illusory "right" to sell LifeVantage products;

      d.      Whether the Defendants engaged in acts of securities fraud when operating the unlawful pyramid scheme;

      e.      Whether the Defendants engaged in acts of securities fraud by omitting to inform Distributors they were joining a pyramid scheme;

      f.      Whether the Defendants engaged in acts of securities fraud by omitting material facts relating to the Distribution Prospectus;

g.     Whether the Defendants failed to register the Distribution Prospectus with the SEC; and

h.     Whether the Defendants caused damages to the Class members and, if so, the amount thereof.

250.     These and other questions of law and/or fact that are common to the Class predominate over any questions affecting only individual Class members. No element of establishing liability requires individualized proof.

251.     A class action under FED. R. CIV. P. 23(b)(3) is superior because:

a.     No Class member has an interest in individually controlling the prosecution of his/her/its separate action. No Class member can be expected to incur the cost of attorneys' fees and cost to recover their $1,200, $600, or $300 Enrollment Pack plus other payments to become a Distributor and maintain Distributor status.

b.     There is no other pending litigation over these issues.

c.     It is manifestly desirable to concentrate the litigation of the Class's claims in Utah and this district.

d.     The Court will encounter no difficulties in managing this case as a class action.

## IV.     CLAIMS FOR RELIEF

### COUNT ONE
**Violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5, 17 C.F.R. § 240.10b-5**

252.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

253.     The sale and offer of sale of LifeVantage distribution interests, such as those purchased by Plaintiffs and the Class, is in connection with and constitutes the sale of a security. Plaintiff Smith's sworn certificate was attached as an exhibit to the original Complaint. Plaintiff Ilardo's sworn certificate is attached here as **Exhibit F**. The writings, prospectus, offering, or other written materials comprising the distribution interest purchased by the Named Plaintiffs and the Class are comprised of the Distribution Prospectus (**Exhibits A, B, C** and **D**).

254.     The Defendants have engaged in activities that affect interstate and foreign commerce. The scheme has operated in the United States and in Canada, Australia, Japan, Hong Kong, Mexico, Netherlands, Germany, Thailand, and the United Kingdom with its basis in the United States. Federal securities laws regulate Defendants' actions and this Court has jurisdiction to apply Section 10b-5 with respect to all activities described herein.

### a. Section 10b(5) Subsections (a) and (c) Scheme Liability

255.     Subsections (a) and (c) make it illegal "to employ any device, scheme, or artifice to defraud" and "to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." Defendants are liable under Subsections (a) and (c) of Rule 10b-5 as follows.

   a. During the Class Period, Defendants employed a plan, scheme, and
      course of business to operate as a product-based pyramid scheme. The
      scheme had as its defined target unsophisticated investors like Plaintiffs
      and the Class. The scheme went beyond omissions: it was designed to
      act and did in fact operate as an illegal pyramid scheme that
      masqueraded as a product-based multi-level marketing system. The
      scheme depended on a fiction that acted as a fraud or deceit on Plaintiffs

and the Class—that the Distributors were engaging in an activity that was legal, where they would sell a product to a base of customers and in turn be paid commissions for that sale. In fact Defendants knew the Plan they required each Distributor to sign in practice required Distributors to pay for the right to receive rewards unrelated to the sale of products to retail customers; the Plan paid for recruiting others into the scheme; the bulk of product sales were to other Distributors, the Defendants enticed Distributors with false promises of financial opportunity; the Defendants failed to disclose the true earnings of Distributors; and otherwise operated as a pyramid scheme as defined by the courts and the FTC. The allegations concerning the existence of a pyramid scheme are expressly repeated here. A product-based pyramid scheme is inherently fraudulent under federal law and as such imposes Subsection (a) and (c) scheme liability on the Defendants.[86]

b.   During the Class Period, LifeVantage created a scheme and practiced a course of business to create the false appearance of being a legitimate purveyor of "scientifically proven" products that can cure disease such as cancer. The purpose of the scheme was to entice unsuspecting people like Plaintiffs and the Class to invest in the "business opportunity" to Distribute what was portrayed as a patented formula. In fact, the

---

[86] *Kerrigan v. ViSalus, Inc.*, Case No. 14-cv-12693, 2016 WL 892804, 2016 U.S. Dist. LEXIS 29958 at *47, 50 (E.D. Mich. Mar. 9, 2016); *SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 445-46 (E.D.N.Y. 2016).

company product was a common combination of ingredients, the USPTO never granted a patent on its efficacy; the Defendants improperly and illegally made health claims regarding the product and continue to make them even after the FDA sent Defendants a warning letter. The purpose of the scheme was to deceive and mislead investors like Plaintiffs and the Class into believing that the "business opportunity" was valuable. The allegations concerning the existence of a scheme to cloak "Protandim," the product underlying the pyramid scheme, with false claims and veneer of science are are expressly repeated here. The planning and carrying out of a comprehensive scheme, by specific steps, to mislead prospective and active Distributors, like Plaintiffs and the Class, as to LifeVantage's legitimacy and the value of the distribution rights creates scheme liability under Subsections (a) and (c).

### b. Proximate Cause and Reliance

256.   The loss suffered by the Plaintiffs and the Class was foreseeable and a direct result of the establishment, promotion, and expansion of the schemes by the Defendants because the ultimate collapse of the scheme, and harm to its participants, is a direct and foreseeable consequence of the structure of the scheme.[87] A pyramid scheme depends on continued expansion by continual recruiting of innocent people who do not realize that the only way in which they can achieve the benefits represented by the pyramid scheme's promoters is to recruit and victimize other innocent people into joining. In reality, like all pyramid schemes, all aspects of the promotion

---

[87] *Torres v. Stream Energy, LLC.*, 838 F.3d 629, 639-640 (5th Cir. 2016).

of the pyramid scheme were based on recruiting over product sales, and depended on the known existence of money-losers (like the Plaintiffs and the Class) to pay the small group of "winners" inherent in any pyramid scheme. Participants in the LifeVantage scheme were induced to purchase distribution rights without knowledge that they could only make money by victimizing others. Each of the acts of preparing and distributing promotional and recruiting materials authored by, or which knowingly featured these culpable individuals, was made with the intent that Plaintiffs join the "downline" organization of each of them and therefore contribute money into the scheme. There is a clear causal connection between the acts alleged above and the injury suffered by the Plaintiffs and the Class.

257.    Defendants' promotion of the "Protandim" product independently caused Plaintiffs and the Class to join the "business opportunity" and lose money. LifeVantage had the actual intent to attract participants, as evidenced by a massive web presence, publication of web-related videos, its own and related websites, and other broadly disseminated offers for people to become promoters for LifeVantage on the basis of scientific "evidence" of its health and disease cure effects. But for these false and misleading schemes described, Plaintiffs and the Class would not have been induced to purchase the distribution rights. Plaintiffs' losses were a direct and proximate cause of their innocent participation in the schemes. Plaintiffs necessarily and/or justifiably relied on the promotion of "Protandim" and the patent issuance and scope claims surrounding the product to invest in a distributorship. Such reliance may be presumed from, among other things, the presumption that no one would knowingly purchase a product for 11X what a generic version would cost absent a belief that the Defendants' product is unique and patented in such a way as to protect its uniqueness. The damages caused by the scheme were a necessary consequence of an inherently illegal scheme to defraud.

258.     Individual reliance is not an element of a scheme liability Section 10b-5(a) or (c) cause of action. In the alternative, Plaintiffs and the Class rely on the presumption of reliance, established by *Affiliated Ute, CGC Holding Co., LLC v. Broad and Cassel*, 773 F.3d 1076 (10th Cir. 2014), and *Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000). In this case, generalized, class-wide proof shows evidence of reliance on Defendants' schemes to defraud such as to permit a commonsense inference of reliance applicable to the entire class to answer a predominating question. Here, each Class member, including the Named Plaintiffs, was required to sign an identical or essentially identical agreement and agree to unilaterally imposed terms and conditions of the Distribution Agreement, P&P, and Plan. Each of these documents exposed each Class member to the representations made by Defendants on their website or through other recruiting distributors. Each Class member was presented with a unified, consistent set of exaggerations and omissions about the product in the same context where Defendants alleged that the product-based MLM and Plaintiffs' investment was legal. It is proper to infer that no reasonable plaintiff would have joined an illegal scheme: rational people do not sign up for pyramid schemes or pay multiple times what they paid for a product available elsewhere.

c. **Damages**

259.     Named Plaintiffs and the Class suffered a loss of money composed of the cost paid to become a Distributor, together with administrative fees, the cost of the products purchased as samples and for purposes of operating the alleged "business opportunity," the amounts charged to attend LifeVantage events, the amounts charged to Distributors for App memberships, enrollment in the Pro Audio Series program, and all other costs associated with the "business opportunity." Plaintiff Smith lost in excess of $1,000. Plaintiff Ilardo lost over $8,000. The precise amount lost by the Class sought to be certified has not yet been determined. It is believed that

each of the unwitting participants in the pyramid scheme sought to be certified as a Class has lost $50 to well over $1,000 as a result of purchasing their distribution rights. Upon information and belief, the precise amounts that each and every participant in the pyramid scheme has (1) spent on costs associated with the Distributor "business opportunity" and (2) received in commissions or bonuses or other payments from LifeVantage as a result, has been tracked, maintained and accounted for by LifeVantage through a proprietary software database maintained by InfoTrax Systems. Thus, the precise loss of every Class member is easily capable of being ascertained in this litigation, and the total business injury capable of being computed for the Class.

### d.  Scienter

a.      Defendants' actions as set forth herein were made with such mental state to manipulate, deceive or defraud, or with such recklessness, as to constitute *scienter*, which is imputed to LifeVantage. Both Defendants had a motive to operate and benefit from the operation of the pyramid scheme, and opportunity to conceal the fact that they were operating a pyramid scheme. Proof of such *scienter* can be inferred from the following:

a.   Both Defendants benefitted in concrete and substantial way from the operation of the pyramid scheme. LifeVantage shows an operating profit of approximately $10 million per year. Prior to embarking on the MLM pyramid scheme it lost several million dollars a year on the sale of the same products.

b.   Both Defendants engaged in plainly illegal behavior. *See* averments made in connection with the commission of a pyramid scheme;

c.   Both Defendants had a specific understanding that each was engaged in the commission of a pyramid scheme or that it would be substantially likely that the operation would be found to be a pyramid scheme.

d.  LifeVantage knew and acknowledged that the network marketing industry is subject to regulation, including regulation by the FTC and that there was a risk that the FTC or other governmental agency could determine that LifeVantage was not complying with the existing laws and regulations. Its management, including Defendant Jensen and prior CEO Brown, took steps to masquerade the actual effect of the Plan in SEC filings and from their Distributors while knowing, because each Distributor's spending, commissions, and purchases is tracked in real time and reports of these are made available to management, that the vast majority of payments to Distributors is for recruiting, and that the vast majority of Distributors lose money.

e.  Prior CEO Brown had personal knowledge of the FDA regulation of illegal natural supplements, FDA regulation of natural supplements in connection with his tenure at Metabolife. Brown also knew that the MLM model was likely a pyramid scheme. He personally recruited professional marketers from other companies and entered into side contracts with them to pose as "successful" LifeVantage distributors. Brown therefore knew that the depictions of those distributors as "just like you" distributors, and the inclusion of their "earnings" in income disclosure statements was false.

f.  Current CEO Jensen has the same knowledge concerning undisclosed side agreements as Brown. Jensen has admitted that the company still hires professional recruiters to act like typical distributors.

g.  Defendant Jensen is the regular participant and speaker at earnings calls with analysts and investors. As such he is privy to all financial reports at the

company. Jensen obtained regular reports in the course of his operation that showed the 2:1 ratio, at best, of people deemed customers versus people deemed Distributors. He was regularly made aware of sales reports that showed that at least 62% of sales were made to Distributors. Jensen appeared at training events and conventions where he was made aware, and personally participated in, recruitment sessions, training for recruitment, and presentations of checks and prized to successful Distributor recruiters. He understood how the Plan worked and was privy to information that showed each of the metrics set forth in this Complaint, and specifically that only the top few percent of Distributors, most often those with special, undisclosed incentives and deals, made money acting as LifeVantage Distributors.

h. Defendant Jensen understood that the operation of the business is an illegal pyramid scheme if the Plan paid substantially for recruiting others rather than for product sales to legitimate, third parties. Jensen had at his disposal all facts necessary to know that in all substantial respects LifeVantage was conducting its business as did other product-based MLMs Vemma and Fortune Hi-Tech, both of which were shut down by the FTC. Jensen is a high-ranking member of the Direct Selling Association and was named to its Board of Directors in 2018. The DSA closely monitored both the Vemma and Fortune Hi-Tech FTC cases and has provided funds to these and similar litigations in order to assist the MLM company against the FTC or private litigants. During his association with the DSA, Jensen knew and participated in study and monitoring groups about the Vemma and Fortune Hi-Tech pyramid litigations. Jensen knew all of the

details surrounding both the DSA strategy to defend these MLMs and the facts underlying the FTC actions, including specifically the similarity between the Vemma and FHT compensation plans and LifeVantage's Plan.

i. Defendant Jensen often speaks and appears at panels with the DSA along with FTC enforcement personnel. He is scheduled, for example to appear at the DSA's November meeting on this topic. He has given interviews in which he admitted to knowing detailed metrics on distributor retention and licensing technology to increase distributor recruiting efforts.

j. Defendant Jensen has written articles purporting to teach Distributors how to get the money in MLM. These articles have been published by MLM websites. One such article is entitled "The First Dollar Principle."

k. Defendant Jensen is personally aware of claims by a leading consumer group, Truth in Advertising.org ("TINA") that its website contains deceptive advertising for its "business opportunity." TINA sent Jensen, among others at LifeVantage, a letter dated December 18, 2017 identifying numerous deceptive terms, including "financial freedom" and photos of Jeeps and other incentives. A return letter dated January 3, 2018 from LifeVantage copied to Jensen admitted "such promotions with insufficient context could be interpreted as a misleading lifestyle claim." These claims mirrored the same type of TINA claims that took place under Jensen's tenure as Chief Sales Officer at Jeunesse, LLC. Jensen was therefore personally aware that unsubstantiated health claims, unsubstantiated income claims, and suggestions that distributors can get rich violate FTC laws. Notwithstanding such acknowledgment, on September 6,

2018, Jensen himself posted on his personal Facebook page a photo of the

Bahamas Atlantis hotel referencing a distributor incentive.

l.  In addition, both LifeVantage and Jensen had personal knowledge of the

contents of the reports filed with the Securities and Exchange Commission,

which specifically warned that elements of the operation, or all of the operation,

could be found to be a pyramid scheme.

260.   Named Plaintiffs and the Class suffered damages in that they lost moneys through the purchase of their distributorships.

261.   Named Plaintiffs and the Class's damages may be measured either in actual damages or may be rescissionary.

**COUNT TWO**
**VIOLATION OF 15 U.S.C. § 77*l*(a)(1) and (2) [Sections 12(1) and (2)]**
**AGAINST LIFEVANTAGE**

275.   Plaintiffs and the Class repeat and re-allege every allegation above as if set forth herein in full. The allegations made above relating to the operation of the scheme are specifically incorporated herein.

a.  **Violation of Section 12(1)**

276.   Defendant LifeVantage sells distribution interests to the public. This Section 12 action concerns only those offerings made within three years of the date of this Complaint. These offerings were publicly made to over 2,000 Distributor investors each year.

277.   Each offer and sale of a security in the United States is required to be registered[88] with the Securities and Exchange Commission unless it is expressly exempted from registration

---

[88] Section 5 of the Securities Exchange Act of 1933, 15 U.S.C. § 77e, provides:

under the Securities Exchange Act of 1934 ("Exchange Act of 1934").[89] Section 12(1) of the Securities Act of 1933 provides for strict liability against any person who sells a security if: (1) the seller used interstate commerce or the mails (2) to offer to sell or to sell an unregistered security to the purchaser.[90]

---

(a) Sale or Delivery After Sale Of Unregistered Securities
*Unless a registration statement is in effect as to a security,* it shall be unlawful for any person, directly or indirectly— (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise…

(b) Necessity of filing registration statement
It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails *to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security*

[89] Section 12(g)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*l*, provides:

(g) REGISTRATION OF SECURITIES BY ISSUER; EXEMPTIONS
(1) Every issuer which is engaged in interstate commerce, or in a business affecting interstate commerce, or whose securities are traded by use of the mails or any means or instrumentality of interstate commerce shall—

(A) within 120 days after the last day of its first fiscal year ended on which the issuer has total assets exceeding $10,000,000 and a class of equity security (other than an exempted security) held of record by either—

(i) 2,000 persons, or

(ii) 500 persons who are not accredited investors (as such term is defined by the Commission)…

[90] Section 12(a)(1) of the Exchange Act of 1933, 15 U.S.C. § 77*l* (a)(1) (Civil liabilities arising in connection with prospectuses and communications) provides:

278.     Defendant LifeVantage is the seller of a distribution interest purchased by Named Plaintiffs and the Class (*i.e.*, the Distribution Agreement offered through the Distribution Prospectus). Each such interest was sold or offered to be sold through interstate commerce or the mails. The distribution interest purchased by the Named Plaintiffs and the Class is an unregistered public security offering that required registration.

279.     The requirements of Section 12(g)(1) establish the following threshold at which an issuer is required to register a class of securities with the SEC under the Exchange Act:

- it has more than $10 million of total assets; and
- the securities are "held of record" by either 2,000 persons, or 500 persons who are not accredited investors.

280.     LifeVantage sold tens of thousands of distribution interests each year at issue (more than 2,000) and each year at issue had total assets in excess of $10 Million. Each distribution interest is held of record by a Distributor member of the Class. LifeVantage did not meet the exemption requirements of Section 12(g)(1) and had a duty to register the security offering.

281.     An exempted securities offering is also defined in Section 4(2) of the 1933 Act.[91] There, only some defined transactions involving private placements to certain accredited or

---

(a) Any person who— (1) offers or sells a security *in violation of section 77e of this title*…

    shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

[91] Section 4, 15 U.S.C. § 77d provides in part:

  (a) The provisions of section 77e of this title shall not apply to—
    (1) transactions by any person other than an issuer, underwriter, or dealer.
    (2) transactions by an issuer not involving any public offering.

sophisticated investors, or transactions involving no more than 35 non-accredited investors, are exempted from registration and requirements. In addition, all issuers who rely on such exemption must file a Form D with the SEC after first sale of the securities.

282.   Defendant LifeVantage's offer and sale of the distribution interest purchased by the Named Plaintiffs and the Class also failed to meet the exemption for a private placement under Section 4(2). Each annual sale of distributorship securities involved more than 35 investors and failed to meet any other exemption requirement under Rule D promulgated under Section 4(2). Additionally, LifeVantage did not file a Form D with the SEC seeking a private placement exemption or disclosing the sale.

283.   Because LifeVantage sold an unregistered, un-exempt security to the public, it has violated Section 12(1).

**b.   <u>Violation of Section 12(2)</u>**

284.   Section 12(2)[92] provides for strict liability if: (1) the seller used interstate commerce or the mails (2) to offer to sell or to sell a security to the purchaser (3) by means of a prospectus

---

(5) transactions involving offers or sales by an issuer solely to one or more accredited investors…
(6) transactions involving the offer or sale of securities by an issuer (including all entities controlled by or under common control with the issuer), provided that—
(A) the aggregate amount sold to all investors by the issuer, including any amount sold in reliance on the exemption provided under this paragraph during the 12-month period preceding the date of such transaction, is not more than $1,000,000;

[92] Section 12(a)(2) of the Exchange Act of 1933, 15 U.S.C. § 77*l* (Civil liabilities arising in connection with prospectuses and communications), provides:

(a) Any person who—

(2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title)… by the use of any means or instruments of

or oral communication (4) that misstated or omitted a material fact (5) of which the purchaser did

not have knowledge.

285.    The Supreme Court has interpreted "prospectus" as "a document soliciting the

public to acquire securities."[93] The distributorship securities involved the use of a prospectus

within the meaning of the term in the Securities Exchange Acts of 1933 and 1934.[94] Here, each

Named Plaintiffs and the Class received the same, or substantially same Distribution Prospectus

transmitted through interstate commerce and the mails (**Exhibits A, B, C** and **D**).

286.    The Distribution Prospectus contained the following omissions:

a.  Nothing in the Distribution Prospectus or associated information on

www.lifevantage.com or other related websites that contained the

prospectus revealed that the MLM program and its Distributor program

are an illegal pyramid scheme but instead propagated the impression

that it is a legal enterprise;

---

transportation or communication in interstate commerce or of the mails, *by means of a prospectus* or oral communication, *which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading* (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission[.]

[93] *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995) (a prospectus under §10 is confined to documents related to public offerings by an issuer or its controlling shareholders).

[94] Section 10(a)(10) of the Securities Exchange Act of 1933, 15 U.S.C. § 77b, defines "prospectus" as follows:

The term "prospectus" means any prospectus, notice, circular, advertisement, letter, or communication, written or by radio or television, which offers any security for sale or confirms the sale of any security.

b. Nothing in the Distribution Prospectus or associated information on www.lifevantage.com or other related websites that contained the prospectus revealed that the majority of the Distributors have and likely will lose money unless they operate their business opportunity as an illegal pyramid scheme, and instead implied or said that distributors can make substantial money by selling product to retail customers when, in fact, this was false.

286.   Named Plaintiffs and the Class suffered damages in that they lost moneys through the purchase of their distributorships. Scienter, reliance, or causation are not elements of a Section 12 claim. In the event these elements need to be established, causation may be presumed from, among other things, the presumption that no one would knowingly join an illegal pyramid scheme. Named Plaintiffs and the Class restate and rely on their averments of proximate cause and scienter in Count 1.

287.   Named Plaintiffs and the Class did not know, and in the exercise of reasonable care and diligence could not have known that the Distribution Prospectus contained untrue omissions when they purchased the securities. Defendants took affirmative steps to hide the true facts that would have disclosed that Named Plaintiffs and the Class were joining an illegal pyramid scheme.

288.   This action is brought within one year of the date when Named Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based, and within three years of the date that the securities upon which this Count is brought were sold to the public.

289.   Named Plaintiffs and the Class are entitled to actual damages and/or rescission of their purchase amounts plus equitable interest.

**COUNT THREE**
**UNJUST ENRICHMENT**
**AGAINST BOTH DEFENDANTS**

345.    Plaintiffs and the Class repeat and re-allege every allegation above as if set forth herein in full.

346.    Plaintiffs and the Class conferred a valuable benefit upon the Defendants; to wit, each Defendant profited directly from the payments made by Plaintiffs and the Class to participate in the LifeVantage "business opportunity."

347.    Defendants accepted this valuable benefit and appreciated, and each retained the moneys paid by Plaintiffs and the Class.

348.    The moneys paid to Defendants by Plaintiffs and the Class were the result of Plaintiffs unknowingly becoming ensnared in the unlawful pyramid scheme Defendants were promoting by misrepresenting it as a legitimate business opportunity. The financial benefits Defendants obtained came from Plaintiffs and Class members naturally and inevitably losing money to the pyramid scheme. Furthermore, Defendants' misrepresentations about the qualities, effects, and characteristics of the "Protandim" product, including misrepresentations about its patents, enabled Defendants to lure unsuspecting Class members into the business opportunity with a false veneer of scientific legitimacy. Under these circumstances, steeped as they are in Defendants' wrongdoing, allowing Defendants to retain the moneys paid by Plaintiffs and the Class would be unequitable.

349.    Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and the members of the Class. Defendants should be required to return to Named Plaintiffs and the Class members all moneys paid to LifeVantage pursuant to the unlawful pyramid scheme, less any amounts LifeVantage paid to Named Plaintiffs and the Class members.

## PRAYER FOR RELIEF

Smith, Ilardo, and the Plaintiff Class request the following relief:

a.      Certification of the Class;

b.      A judgment against the Defendants;

c.      Damages in the amount of the injury incurred by Plaintiffs and the Class as a result of Defendants' conduct;

d.      Damages in actual amount or rescission of contracts pursuant to violations of securities laws;

e.      Temporary and permanent injunctive relief enjoining the Defendants from further unfair, unlawful, fraudulent and/or deceptive acts, including, but not limited to, supporting, continuing or operating the pyramid scheme;

f.      Disgorgement of all proceeds of the pyramid scheme by each Defendant;

g.      For such other damages, relief and pre- and post-judgment interest as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Smith and Ilardo, on their own behalf, and on behalf of the Class, demand a jury trial.

Filed this 19th day of December, 2019.

Respectfully submitted,

**CHRISTENSEN YOUNG & ASSOCIATES**

*/s/ Steven A. Christensen*
Steven A. Christensen
9980 South 300 West, Suite 200
Sandy, UT 84070
Tel.: (866) 676-6447
steven@christensenyounglaw.com

**SOMMERS SCHWARTZ, P.C.**
Andrew Kochanowski [*Pro Hac Vice*]
One Towne Square, Suite 1700
Southfield, MI 48076
Tel.: (248) 355-0300
akochanowski@sommerspc.com

**REID COLLINS & TSAI LLP**
J. Benjamin King [*Pro Hac Vice*]
1601 Elm St., Suite 4250
Dallas, Texas 75201
Tel.: 214-420-8900
bking@rctlegal.com

R. Adam Swick [*Pro Hac Vice*]
1301 S. Capital of Texas Hwy.
Bldg. C, Suite 300
Austin, Texas 78746
Tel.: 512-647-6100
aswick@rctlegal.com

**MARINO LAW PLLC**
Amy L. Marino [*Pro Hac Vice*]
18977 W. Ten Mile Road, Ste 100E
Southfield, Michigan 48075
Tel.: (248) 797-9944
amy@marinopllc.com

*Attorneys for Plaintiffs and the Putative Class*