## THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| BRIAN SMITH and MICHAEL ILARDO, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LIFEVANTAGE CORPORATION, a Delaware Corporation, and DARREN JENSEN, an individual,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER DENYING [169] LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Case No. 2:18-cv-621<br><br>District Judge David Barlow<br><br>Magistrate Judge Jared C. Bennett |

This matter is before the court on Plaintiffs' Motion for Class Certification under Federal Rule of Civil Procedure 23.[1] They seek to represent a class of individuals who lost money participating in Defendant LifeVantage Corporation's (LifeVantage) distributorship program.[2] Defendants have filed a response opposing certification on various grounds,[3] and Plaintiffs have filed a reply.[4] The court has also held a hearing.[5] For the reasons that follow, Plaintiffs' Motion for Class Certification is DENIED WITHOUT PREJUDICE.

---

[1] ECF No. 169.

[2] *Id.* at 1–5.

[3] ECF No. 187.

[4] ECF No. 195.

[5] ECF No. 213.

## BACKGROUND

LifeVantage is a multinational corporation based in Utah that develops and sells wellness supplements and personal care products.[6] Since 2009, its business model has been based on multi-level marketing (MLM), meaning that its products are sold primarily through a hierarchical "network of independent distributors."[7] Under LifeVantage's model, recruiting and educating new distributors is left primarily to already existing distributors.[8] When a distributor recruits a new distributor, the recruited distributor becomes part of the recruiter's "downline" and the recruiter is in the recruited distributor's "upline."[9] As this process repeats with each new generation of distributors, multiple levels of distributors are created, hence the name "multi-level marketing."[10]

LifeVantage presents its distributorship program as a "business opportunity" through which individuals can earn commissions and other financial rewards by buying and selling products and recruiting new distributors.[11] To become a distributor, individuals must be sponsored by another distributor, submit an application, agree to LifeVantage's Distributor Agreement, and purchase an "Enrollment Pack."[12] New distributors are required to purchase at

---

[6] ECF Nos. 169-3 at 10–11; 187-4 at 7–8.

[7] ECF No. 185-2 at 5, 39; *see also* ECF Nos. 169-3 at 10–11; 187-4 at 7–8. The MLM model is sometimes referred to as "direct sales or network marketing." ECF No. 187 at 3. Before converting to an MLM model in 2009, LifeVantage sold a single product through traditional retail stores. ECF Nos. 169-3 at 10–11; 187-4 at 7–8. The court will refer to participants in LifeVantage's distributorship program simply as distributors.

[8] ECF No. 185-2 at 11–12.

[9] *See* ECF Nos. 108-1 at 5; 108-2 at 6, 8, 12, 35–37; 108-3 at 5; 185-2 at 11–12.

[10] ECF No. 185-2 at 11–12.

[11] *See id.* at 11 ("An independent distributor is someone who participates in our direct sales opportunity by purchasing our products at wholesale prices and selling our products to others. We believe our independent distributors are typically entrepreneurs who believe in our product and desire to earn income by building a business of their own."); *see also* ECF Nos. 169-3 at 13; 185-2 at 12, 40; 187-4 at 7–8.

[12] ECF Nos. 185-3 at 3, 5; 187-1 at 2–3. The "Distributor Agreement" includes LifeVantage's Policies and Procedures, Sales Compensation Plan, Privacy Policy and Website Use Agreement, Virtual Office (Back Office) Agreement, and "any other applicable Business Entity forms." ECF Nos. 169-3 at 13 & n.15; 185-3 at 5; 187-1 at 2–3.

least a $50 "Start Kit," though they are strongly encouraged to purchase much more expensive enrollment packs that include extra marketing materials and samples of LifeVantage products.[13]

Once enrolled, distributors must satisfy a minimum "Personal Sales Volume" (PV) requirement each month to qualify for almost all forms of compensation under LifeVantage's compensation plan.[14] A portion of this monthly PV requirement must come from purchases made by the distributor.[15] Otherwise, the forms and amount of compensation a distributor receives are based on which of LifeVantage's 12 distributor ranks the distributor has reached.[16] Distributors move up in rank, and thus qualify for additional and larger commissions and bonuses, by recruiting additional distributors and satisfying specific "Organizational Sales Volume" (OV) requirements.[17] A distributor's monthly OV is the combination of their own PV and the volume of product bought or sold by all distributors in their downline that month.[18]

Plaintiffs Brian Smith and Michael Ilardo both participated in LifeVantage's distributorship program.[19] Smith is a Connecticut resident who became a distributor in March 2016 after hearing about LifeVantage's products and "business opportunity" from another

---

[13] ECF Nos. 169-3 at 25–29; 185-3 at 3.

[14] ECF Nos. 108-2 at 26–27; 108-3 at 3–7; 108-4 at 1; 169-3 at 22–25; 185-6 at 36. LifeVantage's sales volume requirements are based on commissionable value points it assigns to each product bought or sold by distributors. *See* ECF Nos. 108-3 at 6; 185-4 at 38. The only form of compensation that does not appear to have a PV requirement is profit from retail sales, which are sales to a customer out of the distributor's personal inventory. *See* ECF No. 108-3 at 2. However, distributors must satisfy minimum PV requirements if they do not want to risk losing their distributorship, as failure to do so over 12 consecutive months gives LifeVantage the right to cancel their distributorship agreement. ECF No. 185-6 at 35.

[15] ECF Nos. 108-3 at 3–7; 108-4 at 1; 169-3 at 24–25.

[16] *See generally* ECF No. 108-3.

[17] ECF Nos. 108-3 at 4–5; 185-4 at 26; 108-6 at 27.

[18] ECF Nos. 108-3 at 4–5; 185-4 at 26; 108-6 at 27.

[19] For purposes of Plaintiffs' motion for class certification, the court "must accept the substantive allegations of the complaint as true, although 'it need not blindly rely on conclusory allegations which parrot Rule 23' and 'may consider the legal and factual issues presented by [their] complaints.'" *Shook v. El Paso Cty.*, 386 F.3d 963, 968 (10th Cir. 2004) (*Shook I*) (quoting *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999)).

distributor.[20] However, soon after joining the distributorship program, Smith discovered that he was but one of several distributors trying to sell in his area, and he was unable to sell any products or recruit downline distributors, despite his best efforts.[21] Smith came to believe that the only real way to make money in the program was to recruit other distributors, and he became further disenchanted with the program upon realizing that he personally would have to purchase LifeVantage products every month to qualify for commissions and remain a distributor.[22] Smith estimates that he spent well over $1,000 to be a distributor and received few, if any, commission payments.[23]

Ilardo's story is much the same. He is a New York resident who became a LifeVantage distributor in February 2017.[24] He had previously sold products for another MLM company and came across LifeVantage's distributorship program while speaking with an upline leader from his former MLM company.[25] Ilardo remained a distributor for 18 months, during which he purchased the most expensive enrollment pack, approximately $300 in product, training videos and business materials each month, and tickets for LifeVantage training events and conventions.[26] Ilardo was able to recruit a couple of distributors to his downline and earn some commissions but overall found that customers showed little, if any, interest in buying LifeVantage's products.[27] He came to believe that the only way he could recoup the costs of

---

[20] ECF No. 108 at 5–6.

[21] *Id.* at 7.

[22] *Id.* at 7–8.

[23] ECF Nos. 108 at 98; 169 at 7; 169-10 at 4–5.

[24] ECF No. 108 at 9.

[25] *Id.*

[26] *Id.* at 11–12.

[27] *Id.* at 12.

becoming and remaining a distributor was by recruiting other distributors.[28] He estimates that he lost over $8,000 participating in LifeVantage's distributorship program.[29]

On January 24, 2018, Smith filed a class action complaint against LifeVantage and several individual defendants in the United States District Court for the District of Connecticut, claiming that LifeVantage's distributorship program is a pyramid scheme.[30] The case was transferred to the District of Utah several months later,[31] after which Smith amended his complaint to add a new plaintiff, Ilardo, and drop all but one of the individual defendants, Darren Jensen, LifeVantage's CEO at the time.[32]

In November 2018, Defendants moved to dismiss Plaintiffs' amended class action complaint.[33] The court granted the motion in part, dismissing all except Plaintiffs' "scheme liability" claim under § 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5(a) and (c), and granted Plaintiffs leave to amend their complaint.[34] Plaintiffs filed a second amended class action complaint soon thereafter, asserting a scheme liability claim under § 10(b) and Rule 10b-5, unjust enrichment, and new claims under § 12(a)(1) and (2) of the Securities and Exchange Act of 1933.[35] Another motion to dismiss Plaintiffs' § 12(a) and unjust enrichment claims soon followed.[36] And, in November 2020, the court granted the motion except as to

---

[28] *Id.* at 12–13.

[29] ECF Nos. 108 at 98; 169-12 at 5.

[30] ECF No. 1.

[31] ECF No. 58.

[32] ECF No. 75.

[33] ECF No. 94.

[34] ECF No. 106.

[35] ECF No. 108.

[36] ECF No. 114.

Plaintiffs' claim under § 12(a)(2).[37] Accordingly, Plaintiffs' case now proceeds on two claims of securities fraud: (1) a scheme liability claim under § 10(b) and Rule 10-b5(a) and (c) and (2) a fraudulent prospectus claim under § 12(a)(2).[38]

Plaintiffs filed the present motion for class certification on June 15, 2021.[39] Defendants filed a response on July 13, 2021, and Plaintiffs replied on July 27, 2021.[40] Defendants, who had sought leave to file an amended answer and assert a counterclaim against Ilardo on April 30, 2021, were granted leave to do so on July 21, 2021, shortly after filing their response to Plaintiffs' motion for class certification.[41] Defendants filed their amended answer and counterclaim against Ilardo on July 23, 2021, and Ilardo filed an answer on August 13, 2021.[42] The court held a hearing on Plaintiffs' motion for class certification on March 28, 2022.[43]

## STANDARD

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."[44] Federal Rule of Civil Procedure 23(a) allows individuals to litigate on behalf of a class only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

---

[37] ECF No. 150.

[38] Section 10(b) is codified at 15 U.S.C. § 78j(b) and Rule 10b-5 at 17 C.F.R § 240.10b-5. Section 12(a) is codified at 28 U.S.C. § 77*l*(a).

[39] ECF No. 169.

[40] ECF Nos. 185, 193.

[41] ECF Nos. 157, 190.

[42] ECF Nos. 191, 192, 202.

[43] ECF No. 213.

[44] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)).

     (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

     (4) the representative parties will fairly and adequately protect the interests of the class.[45]

These requirements are known, respectively, as the "numerosity," "commonality," "typicality," and "adequacy" requirements.

If the requirements of Rule 23(a) have been met, the party seeking class certification must then show that the proposed class action is maintainable under Rule 23(b). Here, Plaintiffs seek certification under Rule 23(b)(2) and (3). Rule 23(b)(2) permits a class action when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." And Rule 23(b)(3) permits a class action when "the court finds that the questions of law or fact common to class members predominate over any question affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[46] Rule 23(b)(3)'s requirements are known as the "predominance" and "superiority" requirements.

The parties seeking class certification bear the burden of showing that each of these requirements is "clearly met."[47] And the court is required to conduct a "rigorous analysis" to assure that the parties seeking class certification have met their burden.[48]

---

[45] Fed. R. Civ. P. 23(a)(1)–(4).

[46] Fed. R. Civ. P. 23(b)(3).

[47] *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006) (quoting *Reed v. Bowen*, 849 F.2d 1307, 1309 (10th Cir. 1888)).

[48] *Wal-Mart*, 564 U.S. at 350–51 ("[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982))).

## DISCUSSION

Plaintiffs seek certification of the following class:

> All purchasers of the LifeVantage "business opportunity" during the Class Period. Excluded from the Class are all persons named as a Defendant (or a spouse of a Defendant or a related entity of a Defendant) and any purchaser who has not experienced a financial loss as a result of their LifeVantage Distributor enrollment.[49]

The proposed "Class Period" runs from January 24, 2015, until the present.[50] Plaintiffs assert that class membership can be determined from LifeVantage's records, which show the total amount each distributor paid to LifeVantage (for the right to be a distributor, products, training materials, etc.) and the total amount of compensation each distributor received from LifeVantage (as commissions, bonuses, etc.).[51] Distributors who paid more than they made would be part of the class, while those who made more than they were paid would not. According to one of Plaintiffs' expert's calculations, over 157,000 distributors collectively lost more than $389 million between January 2014 and February 2020.[52]

Defendants argue that Plaintiffs' motion for class certification should be denied for three reasons.[53] First, Defendants argue that the proposed class is not sufficiently ascertainable to be certified under Rule 23(b)(3).[54] Although "ascertainability" is not an explicit requirement of

---

[49] ECF Nos. 169 at 1; 171 at 1.

[50] ECF No. 169-22 at 6.

[51] *Id.* at 4–5.

[52] ECF Nos. 171 at 1–4; 171-1 at 6. Plaintiffs have not fully explained why they have included data from a year before the proposed class period.

[53] ECF No. 187 at 1–3. As alternative grounds for denying certification unrelated to the Rule 23 factors, Defendants also argued that the proposed class cannot be certified as currently defined because numerous putative class members are subject to binding arbitration and class action waiver agreements. Because the court ultimately finds that Plaintiffs have failed to satisfy Rule 23's requirements, there is no need to address whether the arbitration and class action waiver provisions affect the propriety of certification.

[54] *Id.* at 4–11. Courts have recognized that "[t]he ascertainability standard is not applicable to Rule 23(b)(2) classes." *See, e.g., City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 439 n.2 (3d Cir. 2017). Defendants appear to acknowledge this. ECF No. 187 at 6.

Rule 23, Defendants assert that it is an implicit requirement Plaintiffs must satisfy.[55] Second, with respect to the Rule 23(a) requirements, Defendants argue that Plaintiffs have failed to show typicality and adequacy.[56] Third, and finally, Defendants argue that class certification under Rule 23(b)(3) is not appropriate because individual issues regarding reliance, loss causation, certain counterclaims and affirmative defenses, and damages will predominate over common issues.[57] The court will address these arguments in turn.

## I.    Ascertainability

Although it is not one of the class certification requirements enumerated in Rule 23, almost every court of appeals has addressed the concept of class ascertainability and decided whether, or to what extent, it plays a role in the class certification analysis.[58] In doing so, they have created a circuit split.

The First, Third, Fourth, and Sixth Circuits have adopted ascertainability as an implicit threshold requirement for class certification that involves a two-part inquiry. Parties seeking class certification must show that (1) "the class is defined with reference to objective criteria," and (2) "there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."[59] A mechanism is considered

---

[55] ECF No. 187 at 6.

[56] *Id.* at 18–19.

[57] *Id.* at 11–17. Defendants raise no specific objections to class certification under Rule 23(b)(2).

[58] *See In re Nexium Antitrust Litig.*, 777 F.3d 9, 19 (1st Cir. 2015); *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017); *Carrera v. Bayer Corp.*, 727 F.3d 300, 307–08 (3d Cir. 2013); *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014); *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 639 (5th Cir. 2012); *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 464 (6th Cir. 2020); *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 662 (7th Cir. 2015); *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1123 (9th Cir. 2017); *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1304 (11th Cir. 2021).

[59] *See Hargrove v. Sleepy's LLC*, 974 F.3d 467, 469–70 (3d Cir. 2020); *see also In re Nexium*, 777 F.3d at 19; *EQT Prod.*, 764 F.3d at 358; *Hicks*, 965 F.3d at 454.

administratively feasible if it allows class members to be identified "without extensive and individualized fact-finding or 'mini-trials.'"[60]

The Third Circuit—the original and strongest supporter of this "heightened" ascertainability standard—has identified three rationales underlying its adoption.[61] First, ensuring that a class is ascertainable enables the court to provide adequate notice to class members, allowing them to choose whether to remain in the class or opt out.[62] Second, the ascertainability requirement protects defendants' rights during a class action by ensuring "that 'those persons who will be bound by the final judgment are clearly identifiable.'"[63] It also protects defendants' due process rights by allowing them "to test the reliability of the evidence submitted to prove class membership."[64] Third, the ascertainability requirement ensures that identifying class members will not eliminate or conflict with "efficiencies" the class action mechanism is meant to facilitate.[65]

On the other side of the split, the Second, Fifth, Eighth, Ninth, and Eleventh Circuits have rejected the "heightened" standard of ascertainability, at least with respect to an administrative feasibility requirement.[66] Some of these circuits recognize ascertainability as an implicit

---

[60] *See Carrera*, 727 F.3d at 303–04; *EQT Prod.*, 764 F.3d at 358.

[61] *City Select*, 867 F.3d at 439; *see also id.* at 447–48 (Fuentes, J., concurring) (describing the Third Circuit's standard as a "heightened ascertainability requirement"); *Mullins*, 795 F.3d at 657 (same).

[62] *City Select*, 867 F.3d at 439.

[63] *Id.* (quoting *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012)).

[64] *Carrera*, 727 F.3d at 307.

[65] *City Select*, 867 F.3d at 439 (quoting *Carrera*, 727 F.3d at 307).

[66] *See In re Petrobras Sec.*, 862 F.3d at 264 ("We conclude that a freestanding administrative feasibility requirement is neither compelled by precedent nor consistent with Rule 23, joining four of our sister circuits in declining to adopt such a requirement."); *Seeligson v. Devon Energy Prod. Co., L.P.*, 761 F. App'x 329, 334 (5th Cir. 2019) (unpublished) (noting that the Fifth Circuit "has not adopted th[e] heightened standard" that a class be currently and readily ascertainable at the class certification stage); *Sandusky*, 821 F.3d at 996 (explaining, after describing the approaches adopted by the other circuits, that the Eighth Circuit "has not addressed ascertainability as a separate, preliminary requirement" but has required only that the class "be adequately defined and clearly ascertainable"); *Briseno*, 844 F.3d at 1123 ("[T]he language of Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification, and the policy

requirement for certification, but require only that the proposed class be defined by adequate objective criteria.[67] Certification is therefore inappropriate only "if a proposed class definition is indeterminate in some fundamental way," such as when membership criteria are vague or subjective.[68] The other circuits have explicitly rejected ascertainability as a separate requirement for class certification.[69] Instead, they address ascertainability-related issues only to the extent they relate to and arise when analyzing Rule 23's enumerated requirements.[70]

Notably, the Tenth Circuit Court of Appeals has not yet directly addressed whether, or to what extent, ascertainability is a requirement for class certification.[71] Defendants point out that in the absence of controlling authority on the issue, other district courts in this circuit have generally accepted ascertainability as an implicit requirement for class certification and decided

---

concerns that have motivated the Third Circuit to adopt a separately articulated requirement are already addressed by the Rule."); *Cherry*, 986 F.3d at 1302 ("Proof of administrative feasibility cannot be a precondition for certification.").

[67] *See In re Petrobras Sec.*, 862 F.3d at 264 ("The ascertainability doctrine that governs in [the Second] Circuit requires only that a class be defined using objective criteria that establish a membership with definite boundaries."); *Seeligson*, 761 F. App'x at 334 (finding that a class was "adequately defined and clearly ascertainable" when there was "sufficient objective criteria from which to identify class members"); *Mullins*, 795 F.3d at 657 ("We and other courts have long recognized an implicit requirement under Rule 23 that a class must be defined clearly and that membership be defined by objective criteria rather than by, for example, a class member's state of mind."); *Cherry*, 986 F.3d at 1302 (explaining that "[a]scertainability is an implied requirement of Rule 23" and that a class is "adequately defined and clearly ascertainable" as long as it is not "defined through vague or subjective criteria").

[68] *See In re Petrobras Sec.*, 862 F.3d at 257; *see also Mullins*, 795 F.3d at 659–60 (noting that "classes that are defined too vaguely" or "by subjective criteria, such as by a person's state of mind" cannot be certified); *Cherry*, 986 F.3d at 1302 ("A class is inadequately defined if it is defined through vague or subjective criteria.").

[69] *Sandusky*, 821 F.3d at 996 ("[T]his court has not addressed ascertainability as a separate, preliminary requirement. Rather, this court adheres to a rigorous analysis of the Rule 23 requirements, which includes that a class 'must be adequately defined and clearly ascertainable.'"); *Briseno*, 844 F.3d at 1124 n.4 ("[W]e have addressed the types of alleged definitional deficiencies other courts have referred to as 'ascertainability' issues through analysis of Rule 23's enumerated requirements." (citation omitted)).

[70] *Sandusky*, 821 F.3d at 996; *Briseno*, 844 F.3d at 1124 n.4.

[71] *See Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 788 n.9 (10th Cir. 2019) (declining to evaluate the parties' arguments regarding "an 'implied requirement of ascertainability'" because the issue was not raised and ruled on below); *see also Wesley v. Snap Fin. LLC*, 339 F.R.D. 277, 301 (D. Utah 2021) (finding the same); *Rodriguez v. Cascade Collections LLC*, 532 F. Supp. 3d 1099, 1122 (D. Utah 2021) (same); *Banks v. Cent. Refrigerated Servs., Inc.*, No. 2:16-CV-356-DAK, 2017 WL 1683056, at *4 (D. Utah May 2, 2017) (same).

between the standards adopted by other circuits.[72] In asking the court to deny certification on grounds of ascertainability here, Defendants advocate the use of the Third Circuit's "heightened" standard.[73]

Even though the Tenth Circuit Court of Appeals has not yet decided whether, or under which standard, parties seeking class certification must show ascertainability, that does not mean that ascertainability is irrelevant to the court's certification analysis. The Tenth Circuit's concerns about similar issues when reviewing some class certification requirements undercuts any argument to the contrary. For example, the Tenth Circuit has stated that a "lack of *identifiability* [of class members] is a factor that may defeat Rule 23(b)(3) class certification"[74] because it is relevant to whether a court can provide notice to class members as required by Rule 23(c)(2).[75] Class member identifiability concerns have also arisen in the context of numerosity and manageability.[76] The Tenth Circuit has explained that "[p]laintiffs must offer 'some evidence of established, *ascertainable* numbers constituting the class'" to establish numerosity.[77] And it has upheld a class certification denial in part because "the significant amount of work simply to identify the purported class members" showed that the proposed class action "would be

---

[72] ECF No. 187 at 6, 10.

[73] *Id.*

[74] *Shook I*, 386 F.3d at 972 (emphasis added).

[75] *Shook v. Bd. of Cty. Commissioners of Cty. of El Paso*, 543 F.3d 597, 611–12 (10th Cir. 2008) (*Shook II*) ("Rule 23(c)(2) explicitly authorizes courts to consider problems identifying class members in (b)(3) class actions insofar as such difficulties are relevant to providing notice to class members . . . ."). Problems with identifiability are relevant to Rule 23(b)(2) class certification decisions as well, even though courts do not have to provide notice in such class actions. *Id.* Indefinite class boundaries or "problems with identifying *characteristics* of the class" may leave a court unable "to ascertain whether a defendant acted on generally applicable grounds" or "determin[e] whether the injunctive relief sought is appropriate for the class as a whole." *Id.*

[76] As noted above, numerosity is one of the four enumerated prerequisites for class certification. *See* Fed. R. Civ. P. 23(a)(1). Manageability—"the likely difficulties in managing a class action"—is a factor courts must consider in determining whether a proposed class satisfies Rule 23(b)(3)'s predominance and superiority requirements. *See* Fed. R. Civ. P. 23(b)(3)(D).

[77] *See Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1215 (10th Cir. 2014) (emphasis added) (quoting *Rex v. Owens ex rel. State of Okl.*, 585 F.2d 432, 436 (10th Cir. 1978)).

difficult to manage and would not be more efficient than having the claims of individual class members resolved independently."[78] The Tenth Circuit has never discussed whether identifying class members must be administratively feasible. However, it has held that a district court did not abuse its discretion when it denied certification on grounds that identifying class members was "administratively infeasible" because doing so would have required "individualized inquiries to determine whether a potential class member" fell within the proposed class definition.[79]

This case law does not provide any clear indication as to which of the other circuit's ascertainability standards the court should apply here. And, as already noted, other district courts in this circuit have disagreed about whether showing ascertainability is required and which ascertainability standard to apply.[80] For the reasons stated below, the court need not resolve the issue because the substance of those concerns either are not present here or are relevant to and addressed by the predominance and superiority requirements.

Defendants' opposition to certification on grounds of ascertainability begins with their contention that Plaintiffs have failed to provide some of the information needed to determine who meets one of the class criteria, financial loss.[81] Plaintiffs propose determining which distributors suffered a financial loss by using LifeVantage's records to calculate the difference between what they paid to LifeVantage—for the distributorship, training, and products—and

---

[78] *Quinn v. Nationwide Ins. Co.*, 281 F. App'x 771, 777–78 (10th Cir. 2008) (unpublished).

[79] *See Davoll v. Webb*, 194 F.3d 1116, 1146 (10th Cir. 1999). In upholding the district court's finding of administrative infeasibility in *Davoll*, the Tenth Circuit emphasized that district courts "ha[ve] broad discretion to determine whether the class description is sufficiently definite." *Id.* (quoting James W. Moore et al., Moore's Federal Practice § 23.21[5] at 23–61 (3d ed. 1999)).

[80] *Compare Rodriguez*, 532 F. Supp. 3d at 1122 (rejecting the Third Circuit's "restrictive" standard in favor of the standard requiring only that the proposed class be "capable of definition through objective criteria"), *and In re Syngenta AG MIR 162 Corn Litig.*, No. 14-MD-2591-JWL, 2016 WL 5371856, at *3 (D. Kan. Sept. 26, 2016) (same), *with Abraham v. WPX Prod. Prods., LLC*, 317 F.R.D. 169, 254 (D.N.M. 2016) (following the Third Circuit's approach to ascertainability), *and Donaca v. Dish Network, LLC.*, 303 F.R.D. 390, 397 (D. Colo. 2014) (same).

[81] ECF No. 187 at 6–11.

what they received in commissions, bonuses, and refunds. According to Defendants, however, those records are inadequate for that task because they lack data regarding how many of the products each distributor purchased from LifeVantage were personally consumed (personal consumption), how many were resold to others (retail sales), and what other voluntary expenditures distributors made to build their distributorship businesses (business expenses).[82]

Defendants argue that data regarding distributors' personal consumption and retail sales is needed to determine whether they suffered a financial loss because distributors derived value from consuming or reselling the products.[83] Yet Plaintiffs' proposed method for calculating financial loss from LifeVantage's records would count the amount distributors paid for products as losses even if they were personally consumed or resold.[84] If damages were calculated in this way Plaintiffs class would include, and provide an improper windfall for, distributors who did not actually suffer a financial loss.[85]

Defendants argue that data about distributors' business expenses is also needed because such expenses could count toward distributors' losses.[86] Without such data, Defendants suggest, some distributors who suffered a net financial loss may be inadvertently excluded from the class.[87]

Defendants argue that the absence of this data renders Plaintiffs' class unascertainable in two ways. First, Defendants argue that because Plaintiffs have failed to provide some data needed to determine which distributors suffered a financial loss, the proposed class is not defined

---

[82] *Id.* at 7–10.

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] *Id.* at 9.

[87] *Id.*

by "objective criteria."[88] Without objective criteria, Defendants argue, Plaintiffs class fails under

any ascertainability standard.[89] Second, Defendants argue that even if Plaintiffs' class is defined

by objective criteria, Plaintiffs' class is unascertainable under the "heightened" standard because

they failed to provide a "reliable and administratively feasible" method for obtaining all data

needed to determine which distributors suffered a financial loss.[90] Defendants assert that

acquiring the remaining data needed to accurately calculate each distributor's damages would

require the type of individualized fact finding and mini-trials that the administrative feasibility

requirement condemns.[91] They also assert that any data gathered from distributors would be

"extremely unreliable" and would not provide an adequate basis for identifying who suffered a

financial loss.[92]

Assuming that the missing data is necessary to identify which distributors suffered a

financial loss, the court is not convinced that these reasons alone require denying class

certification. Defendants' argument that Plaintiffs have failed to provide "objective" class criteria

is misguided. The objectivity requirement for class criteria speaks to the nature of the criteria,

not the quantity, comprehensiveness, or quality of the evidence provided to show who meets it.[93]

---

[88] *Id.* at 10.

[89] *Id.*

[90] ECF No. 187 at 6–9.

[91] *Id.* at 8–9.

[92] *Id.* at 10–11.

[93] *See In re Petrobras Sec.*, 862 F.3d at 269 & n.20 ("The ascertainability requirement, as defined in this Circuit, asks district courts to consider whether a proposed class is defined using objective criteria that establish a membership with definite boundaries. . . . Ascertainability does not directly concern itself with the plaintiffs' ability to offer *proof of membership* under a given class definition, an issue that is already accounted for in Rule 23 [by the predominance and superiority requirements]."); *see also City Select*, 867 F.3d at 441 ("Rule 23 does not require an objective way of determining class membership at the certification stage, but only that there be 'objective criteria' for class membership and a 'reliable and administratively feasible' means of determining whether these criteria are met." (quoting *Byrd*, 784 F.3d at 163)); *Mullins*, 795 F.3d at 660 (explaining that classes based on conduct or other objective facts are ascertainable while those defined by a state of mind generally are not); *Marcus*, 687 F.3d at 593 (noting that a case in which a class was defined "by reference to those who 'believe' they were discriminated against" was not based on objective criteria (quoting *Chiang v. Veneman*, 385 F.3d 256, 271 (3d Cir. 2004))).

Plaintiffs propose a class that would include individuals who joined LifeVantage's distributorship program during a specific, albeit very lengthy, period of time and suffered a financial loss due to their participation. Whether an individual became a LifeVantage distributor during the class period and whether they suffered a net financial loss are both objective criteria. They are also unambiguous, as there is no "patent uncertainty" as to what they mean,[94] and they present a class with definite "outer boundaries," as there is a finite, though very large, number of individuals who became distributors during the proposed class period.[95]

As for Defendants' argument that the need for individualized fact-finding into distributors' personal consumption, retail sales, and business expenses would render class member identification administratively infeasible, it is important to recognize that Plaintiffs' financial loss criterion to which those factors relate is really no more than a requirement that class members have suffered damages, which would be required even if Plaintiffs had not definitionally limited their class in that way.[96] This is significant for two reasons.

First, it means a method for determining which distributors meet the financial loss class criterion is already baked into the natural course of litigation here. The ascertainability requirement's first concern is that class members can be identified at some point.[97] If Plaintiffs

---

[94] *See DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (finding that a class was not "adequately defined and clearly ascertainable" when it was defined as "residents of this State active in the 'peace movement'").

[95] *See Shook II*, 543 F.3d at 611; *In re Petrobas Sec.*, 862 F.3d at 257 ("[A] class is ascertainable if it is defined using objective criteria that establish a membership with definite boundaries.").

[96] This is because uninjured individuals cannot recover in a class action. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not. The Judiciary's role is limited 'to provid[ing] relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm.' Therefore, if there is no way to ensure that the jury's damages award goes only to injured class members, that award cannot stand. (citations omitted) (alterations in original)); *In re Nexium Antitrust Litig.*, 777 F.3d at 25 ("[W]here an individual claims process is conducted at the liability and damages stage of the litigation, the payout of the amount for which the defendants were held liable must be limited to injured parties.").

[97] *See EQT Prod.*, 764 F.3d at 358 ("[P]laintiffs need not be able to identify every class member at the time of certification.").

succeed on the question of liability, they would have to prove each distributor's damages and, in so doing, would definitively establish who is and is not a member of the class. The fact that the class may be temporarily over- or under-inclusive until that point does not automatically preclude certification.[98]

Second, even though individualized fact finding would be needed to determine distributors' damages, even the Third Circuit has recognized that the need for individualized damages calculations is "not an ascertainability issue."[99] The need for individualized damages calculations generally precludes class certification only if completing them will overwhelm the issues that are common to the class, i.e., destroy the predominance of common issues.[100]

Accordingly, the court finds that whether identifying which distributors meet the class criterion of financial loss at the damages stage is administratively feasible depends on whether it can be done without destroying the predominance of common issues or the superiority of the class action mechanism. If common issues predominate and a class action would be superior despite the need for individualized damages determinations, the court would be reluctant to declare those individualized determinations an administratively infeasible method for ascertaining class membership.[101] On the other hand, if the individualized damages

---

[98] *See City Select*, 867 F.3d at 442 n.4 ("While a high degree of over-inclusiveness could prevent certification, any degree of over-inclusiveness will not do so."). Defendants also argue that the potential over- and under-inclusiveness of Plaintiffs' class means that certification would violate the Rules Enabling Act. ECF No. 187 at 9–10. However, that is not the case. Certifying a class action violates the Rules Enabling Act only if it will "giv[e] plaintiffs and defendants different rights in a class proceeding than they could have asserted in an individual action." *See Tyson Foods*, 577 U.S. at 458. Because Defendants would be able to assert any defense, present evidence, and challenge the reliability of Plaintiffs' evidence at the damages stage, none of their rights would be infringed.

[99] *See Hargrove*, 974 F.3d at 481 (recognizing that determining "the exact damages owed each [class member] is *not* an ascertainability issue" (emphasis added)).

[100] *See Naylor Farms*, 923 F.3d at 798.

[101] Indeed, the fact that the heightened ascertainability standard's administrative feasibility requirement is often rendered superfluous by Rule 23's enumerated requirements is one of the main reasons some circuits have rejected it. *See Briseno*, 844 F.3d at 1126–32 (explaining why the interests the administrative feasibility requirement seeks to protect are already protected by Rule 23's enumerated requirements); *Mullins*, 795 F.3d at 663–72 (same).

determinations needed to identify class members destroy the predominance of common issues and superiority of the class action, identifying class members would be de facto administratively infeasible.

Therefore, whether the proposed class is ascertainable will rise or fall with the court's findings regarding predominance and superiority. For that reason, the court declines to deny certification in this case on grounds of ascertainability alone.

## II.      Rule 23(a) Requirements

With regard to Rule 23(a)'s requirements, Defendants challenge Plaintiffs' class only on grounds of typicality and adequacy.[102] However, because parties seeking class certification bear the burden of showing all the requirements of Rule 23(a) are satisfied, the court will address the other two factors as part of conducting its "rigorous analysis."[103]

### A.  Numerosity

A class may be certified only when "the class is so numerous that joinder of all members is impracticable."[104] Plaintiffs bear the burden of showing that a class has established and ascertainable numbers, but there is no specific formula that determines whether a class is sufficiently numerous.[105] The court must consider "the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of the dispute."[106]

---

[102] *See* ECF No. 187 at 17–19.

[103] *See Wal-Mart*, 564 U.S. at 350–51.

[104] Fed. R. Civ. P. 23(a)(1).

[105] *Colo. Cross*, 765 F.3d at 1215. Unlike some other circuits, the Tenth Circuit has declined to adopt the position that "numerosity may be presumed at a certain number." *Trevizo*, 455 F.3d at 1162.

[106] *Colo. Cross*, 765 F.3d at 1215 (alteration in original) (quoting 7A Charles Alan Wright, Arthur R. Miller & Marry Kay Kane, Federal Practice and Procedure § 1762, at 206–07 (3d ed. 2005)).

Plaintiffs claim that over 157,000 LifeVantage distributors suffered a financial loss—paid more to LifeVantage than they received in return—from January *2014* to February 2020. Although this does not definitively establish how many individuals who became LifeVantage distributors between January *2015* and the present—the proposed class period—suffered losses, there is no reason to believe that the number is so different as to preclude a finding of numerosity. Indeed, Defendants' own expert calculated, using Plaintiffs' dataset and methodology, that approximately 99,100 individuals who became distributors between January 2015 and February 2020 suffered a financial loss.[107] District courts in the Tenth Circuit have routinely found classes of a few hundred individuals sufficiently numerous for certification,[108] and the Tenth Circuit Court of Appeals has recognized that some "[c]lass actions have been deemed viable in instances where as few as 17 to 20 persons are identified as the class."[109] Without a doubt, the huge number of potential class members here—around 100,000 or more— would render joinder impracticable. Defendants have made no argument to the contrary.

### B. Commonality

To satisfy Rule 23's commonality requirement, Plaintiffs must show that class members' claims "depend upon a common contention" and, more importantly, that the common contention is "of such a nature that it is capable of classwide resolution."[110] An issue can be resolved on a class-wide basis when "the same evidence will suffice for each member to make a prima facie

---

[107] ECF No. 187 at 16–17 n.9.

[108] *See Florece v. Jose Pepper's Restaurants, LLC*, No. 20-2339-ADM, 2021 WL 5038773, at *3 (D. Kan. Oct. 29, 2021); *Decoteau v. Raemisch*, 304 F.R.D. 683, 687 (D. Colo. 2014); Dilley v. Acad. Credit, LLC, No. 2:07CV301DAK, 2008 WL 4527053, at *2 (D. Utah Sept. 29, 2008); *Armstrong v. Powell*, 230 F.R.D. 661, 674 (W.D. Okla. 2005); *Schreiber v. National Collegiate Athletic Ass'n*, 167 F.R.D. 169, 174 (D. Kan. 1996).

[109] *See Rex*, 585 F.2d at 436. *But see Monarch Asphalt Sales Co. v. Wilshire Oil Co. of Texas*, 511 F.2d 1073, 1077 (10th Cir. 1975) (expressing doubt that a class of 37 individuals was sufficiently numerous to support class certification).

[110] *Wal-Mart*, 564 U.S. at 350.

showing [or] the issue is susceptible to generalized, class-wide proof."[111] The class need not

share *all* issues or facts in common for a class action to be appropriate, however; a single

common question can be enough.[112]

To determine which issues a class shares in common, the court must begin with the

elements of the claims asserted.[113] Plaintiffs claim that LifeVantage's distributorship program is

a security and that Defendants are and have been operating the distributorship program as a

pyramid scheme, thereby violating two federal securities laws.[114] Plaintiffs bring their first claim

under § 10(b) of the Securities Act of 1934 and its implementing regulation, Rule 10b-5. Section

10(b) makes it unlawful to use or employ a manipulative or deceptive device or contrivance in

connection with the purchase or sale of a security.[115] Rule 10b-5 has the same scope as § 10(b)

but organizes conduct prohibited thereunder into three general categories: devices, schemes, or

artifices to defraud (10b-5(a)); untrue statements and misleading omissions of material facts

(10b-5(b)); and acts, practices, and courses of business which operate or would operate as a fraud

or deceit upon any person (10b-5(c)).[116]

---

[111] *Tyson Foods*, 577 U.S. at 453 (alteration in original) (quoting 2 W. Rubenstein, *Newberg on Class Actions* § 4:50, at 196–97 (5th ed. 2012)).

[112] *Wal-Mart*, 564 U.S. at 359.

[113] *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809–10 (2011) (*Halliburton I*).

[114] Plaintiffs have alleged sufficient facts to make it plausible that the LifeVantage distributorship program is a security. *See* ECF No. 106 at 5–6.

[115] 15 U.S.C. § 78j.

[116] *See* 17 C.F.R. § 240.10b-5; *see also Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173 (1994) ("[A] private plaintiff may not bring a 10b–5 suit against a defendant for acts not prohibited by the text of § 10(b). To the contrary, our cases considering the scope of conduct prohibited by § 10(b) in private suits have emphasized adherence to the statutory language, '[t]he starting point in every case involving construction of a statute.'" (second alteration in original) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197 (1976))). Although § 10(b) and Rule 10b-5 do not create an express private cause of action, courts "have long recognized an implied private cause of action to enforce the[m]." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (*Halliburton II*).

Here, Plaintiffs assert what has come to be known as a "scheme liability" claim under Rule 10b-5(a) and (c).[117] Unlike most securities-fraud claims, which are based on false statements or misleading omissions, scheme liability claims are based on deceptive or manipulative conduct that is distinct from any false statement or omission a defendant has made.[118] To establish scheme liability, then, Plaintiffs must show:

> (1) a manipulative or deceptive act by the defendant in furtherance of a scheme to deceive or defraud;
>
> (2) scienter;
>
> (3) a connection between the manipulative or deceptive act and the purchase or sale of a security;
>
> (4) reliance on the defendant's manipulative or deceptive act;
>
> (5) economic loss; and
>
> (6) loss causation.[119]

Plaintiffs bring their second claim under § 12(a)(2) of the Securities Act of 1933. That section holds any person who "offers or sells a security . . . by means of a prospectus" liable to the person who purchased it if the prospectus "include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in light of the

---

[117] *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 170 (2008); *W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 389 (8th Cir. 2016); *S.E.C. v. Mahabub*, 343 F. Supp. 3d 1022, 1047 (D. Colo. 2018).

[118] *See In re Nektar Therapeutics*, No. 18-CV-06607-HSG, 2020 WL 3962004, at *13 (N.D. Cal. July 13, 2020); *Takata v. Riot Blockchain, Inc.*, No. CV 18-02293 (FLW), 2020 WL 2079375, at *14 (D.N.J. Apr. 30, 2020); *S.E.C. v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 445 (E.D.N.Y. 2016); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1192 (D. Or. 2015); *S.E.C. v. Sullivan*, 68 F. Supp. 3d 1367, 1377 (D. Colo. 2014); *In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 616, 621 (S.D.N.Y. 2005); *see also Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 987 (8th Cir. 2012) ("We join the Second and Ninth Circuits in recognizing a scheme liability claim must be based on conduct beyond misrepresentations or omissions actionable under Rule 10b–5(b).").

[119] *See In re Nektar Therapeutics*, 2020 WL 3962004, at *13; *Takata*, 2020 WL 2079375, at *14; *In re Galena Biopharma*, 117 F. Supp. 3d at 1192. "Manipulation" in the context of securities fraud "is virtually a term of art" that refers to specific practices that are not alleged here. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977). Therefore, the court will only refer to or discuss Defendants' alleged wrongdoing as deceptive acts distinct from any act or practice that is commonly understood to be "manipulation."

circumstances under which they were made, not misleading."[120] Loss causation is also relevant to § 12(a)(2) claims, as it can be asserted as an affirmative defense to limit losses to those directly linked to the false statement or misleading omission in the prospectus.[121]

At the heart of both of Plaintiffs' claims is the allegation that LifeVantage's distributorship program is an illegal pyramid scheme. According to Plaintiffs, Defendants' operation of the alleged pyramid scheme is a scheme to defraud or fraudulent course of business that violates Rule 10b-5(a) and (c). And Defendants' failure to disclose the program's illegal pyramid structure in the program's "prospectus" is what rendered the prospectus misleading in violation of § 12(a)(2). Consequently, Plaintiffs cannot succeed on either of these claims unless they are ultimately able to prove that LifeVantage's distributorships are securities and that the distributorship program is an illegal pyramid scheme.

Although "[n]o clear line separates illegal pyramid schemes from legitimate [MLM] programs" under federal law,[122] courts have often distinguished between them by using the test established by the Federal Trade Commission (FTC) in *In re Koscot*.[123] In that case, the FTC explained that illegal pyramid "schemes are characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product *and* (2) the right to receive in return for recruiting other participants into the program rewards which are

---

[120] 15 U.S.C. § 77*l*(a)(2).

[121] 15 U.S.C. § 77*l*(b).

[122] *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 475 (6th Cir. 1999); *see also Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 639, 643 (5th Cir. 2016) ("Whether a multi-level marketing program is fraudulent or legitimate depends on its internal structure. And such information is not readily apparent or interpreted.").

[123] *See F.T.C. v. BurnLounge, Inc.*, 753 F.3d 878, 883 (9th Cir. 2014); *Gold Unlimited*, 177 F.3d at 480–84; *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 781 (9th Cir. 1996); *see also Whole Living, Inc. v. Tolman*, 344 F. Supp. 2d 739, 742–43 (D. Utah 2004).

unrelated to sale of the product to ultimate users."[124] The last of these characteristics, "recruitment with rewards unrelated to product sales," has been recognized by the FTC and various courts as the most important characteristic distinguishing legitimate enterprises from illegal pyramid schemes.[125]

Because the class members here could use the same generalized, class-wide evidence to show that LifeVantage's distributorship program has these or other characteristics, the issue of whether Defendants have operated a pyramid scheme is one that is common to the class. This is enough to find that Plaintiffs have satisfied Rule 23's commonality requirement. And, once again, Defendants do not argue otherwise.

## C. Typicality and Adequacy

Rule 23's typicality and adequacy requirements "tend to merge" because both concern the relationship between the proposed class representatives and other class members.[126] The typicality inquiry focuses on whether class representatives' interests are sufficiently aligned with those of the other class members because of claims and injuries they share in common.[127] The alignment of interests ensures that class representatives will advance and protect the interests of

---

[124] *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1181 (1975). The issue of whether this test or some other should apply in this case has not yet been adequately briefed and addressed.

[125] *See id.* at 1181–82; *Torres*, 838 F.3d at 639–40; *BurnLounge*, 753 F.3d at 884–86; *Gold Unlimited*, 177 F.3d at 479–81; *see also Webster*, 79 F.3d at 781 ("The satisfaction of the second element of the *Koscot* test is the *sine qua non* of a pyramid scheme.").

[126] *See Falcon*, 457 U.S. at 158 n.13; *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1219 (10th Cir. 2013).

[127] Fed. R. Civ. P. 23(a)(3); *see also Falcon*, 457 U.S. at 26 (1997) ("[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." (quoting *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977))); *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1198 (10th Cir. 2010) ("The interests and claims of Named Plaintiffs and class members need not be identical to satisfy typicality."). The typicality requirement also "limit[s] the class claims to those fairly encompassed by the named plaintiff's claims." *Gen. Tel. Co. of the Nw. v. Equal Emp. Opportunity Comm'n*, 446 U.S. 318, 330 (1980). Typicality's focus on whether claims and injuries are shared in common means that it "tend[s] to merge" with the commonality requirement as well. *See Falcon*, 457 U.S. at 158 n.13.

the entire class simply by virtue of pursuing their own.[128] Class representatives' claims are considered typical of other class members' claims as long as they "are based on the same legal or remedial theory."[129]

The adequacy inquiry focuses on "uncover[ing] conflicts of interest between named parties and the class they seek to represent"[130] that may prevent them from "fairly and adequately protect[ing] the interests of the class."[131] In evaluating adequacy, the Tenth Circuit has instructed courts to ask two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"[132]

Defendants argue that typicality and adequacy are lacking because one named plaintiff, Ilardo, is subject to a counterclaim to which other class members are not.[133] The counterclaim alleges that Ilardo breached his distributorship agreement by recruiting LifeVantage distributors to join other MLMs, mischaracterizing the efficacy of LifeVantage's products to customers, and failing to keep records of his personal retail sales.[134] Defendants argue that because Plaintiffs have alleged that LifeVantage's distributorship program is a pyramid scheme in part because of false and misleading statements made about its products and compensation system, Ilardo's

---

[128] *See Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (explaining that a "representative party's interest in prosecuting his own case must simultaneously tend to advance the interests of the absent class members" to establish typicality).

[129] *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988).

[130] *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

[131] *See* Fed. R. Civ. P. 23(a)(4).

[132] *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

[133] ECF No. 187 at 18. Defendants make no argument as to whether the proposed class counsel is adequate. Having reviewed the class-counsel declarations Plaintiffs have provided, the court finds no grounds for concluding that they are not. *See* ECF Nos. 169-13; 169-16; 169-18; 169-20.

[134] ECF No. 192 at 61.

defense against accusations that he made such statements while recruiting other distributors will place him in conflict with other class members.[135] At the very least, Defendants argue, mounting a defense would distract Ilardo from adequately representing the entire class's interests.[136]

The court disagrees. The fact that Ilardo will have to defend himself against a counterclaim does not, alone, preclude a finding of typicality and adequacy. To begin with, class representatives do not have to be identically situated to absent class members in every respect; their interests need only be "'coextensive' with the interest of the class."[137] The mere existence of a counterclaim against a class representative does not, on its own, put him or her in conflict with the class's interests. "Were it otherwise, every motion for class certification would be defeated simply by the vehicle of filing a counterclaim against the named plaintiffs."[138] Typicality and adequacy are lacking only if a counterclaim creates an actual and substantial conflict between a class representative and absent class members.[139]

Any conflict Defendants' counterclaim creates here, if it does so at all, is not a substantial one. The proposed class's primary contentions are that LifeVantage's distributorship program is a pyramid scheme, and that Defendants concealed that fact from prospective distributors. Whether Ilardo breached his contract, by making misleading statements about LifeVantage's products or otherwise, is unrelated to whether LifeVantage's distributorships are securities and

---

[135] ECF No. 187 at 18–19.

[136] *Id.*

[137] *See Tennille v. W. Union Co.*, 785 F.3d 422, 430 (10th Cir. 2015).

[138] *Heartland Commc'ns, Inc. v. Sprint Corp.*, 161 F.R.D. 111, 116 (D. Kan. 1995).

[139] *See id.*; *see also Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) ("[T]he existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a 'fundamental' one going to the specific issues in controversy.").

whether the distributorship program and compensation plan operate as a pyramid scheme.[140] The same is true as to whether Defendants engaged in deceptive acts to conceal the program's true nature.

Finally, to the extent that Ilardo's defense could be distracting, Defendants have simply provided no evidence that it would be anything more than a minor distraction.[141] Therefore, the court finds that the named representatives are typical of the class and together with the proposed class counsel would adequately protect the interests of the class.

### III.    Rule 23(b) Requirements

Having concluded that Plaintiffs' proposed class satisfies all four requirements of Rule 23(a), the court must now consider whether a class action may be maintained pursuant to Rule 23(b). Plaintiffs assert that a class action is appropriate under both Rule 23(b)(2) and (3). The court will address these grounds for certification separately.

### A.  Plaintiffs Have Failed to Show that a Rule 23(b)(2) Class Action is Appropriate.

In their opposition to Plaintiffs' motion for class certification, Defendants make no argument as to whether certification under Rule 23(b)(2) is appropriate. However, it is the party seeking certification of a class who bears the burden of proving that the proposed class action is warranted under Rule 23(b).[142] Because Plaintiffs have failed to show that their proposed class action satisfies the requirements of Rule 23(b)(2), their motion for certification pursuant to that rule must be denied.

---

[140] *Tennille*, 758 F.3d at 430 ("[O]nly a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." (alteration in original) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1768, 434–35 (3d ed. 2005))).

[141] *See Valley Drug*, 350 F.3d at 1189.

[142] *See Devaughn*, 594 F.3d at 1194.

For Plaintiffs' class to be certified under Rule 23(b)(2), they must satisfy "two independent, but related requirements."[143] First, they must show that Defendants acted or refused to act "on grounds generally applicable to all class members."[144] Second, they must show "the injunctive relief they have requested is 'appropriate for the class as a whole.'"[145] These requirements ensure "that class members' injuries are 'sufficiently similar' that they can be remedied in a single injunction" and that the injunction sought will "satisf[y] Rule 65(d)'s requirement that every injunction 'state its terms specifically; and describe in reasonable detail . . . the act or acts restrained or required.'"[146]

In seeking certification under Rule 23(b)(2), Plaintiffs ask that Defendants be estopped from operating a pyramid scheme. However, as it currently stands, this request is too vague to maintain a class action under Rule 23(b)(2). Plaintiffs have not adequately specified which acts Defendants have engaged in that must be restrained.[147] Nor have they specified how a single injunction provides appropriate relief for every class member.[148] In fact, the primary, if not exclusive, form of relief Plaintiffs seek for class members is monetary damages, and Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages."[149] Therefore, Plaintiffs' motion for class certification under Rule 23(b)(2) must be denied.

---

[143] *Id.* at 1199 (quoting *Shook II*, 543 F.3d at 604).

[144] *Id.*

[145] *Id.* (emphasis omitted).

[146] *Id.* (alterations in original).

[147] *See* Fed. R. Civ. P. 65(d).

[148] *See Wal-Mart*, 564 U.S. at 360 ("Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.").

[149] *See id.* at 360–61; *see also* Fed. R. Civ. P. 23, comm. note to Subdivision (b)(2) ("[Subdivision (b)(2)] does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages.").

**B.  Plaintiffs Have Failed to Show that a Rule 23(b)(3) Class Action is Appropriate.**

Under Rule 23(b)(3), certification is appropriate if the court finds that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members" (predominance), and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" (superiority).[150] When evaluating whether a class satisfies these requirements, particularly superiority, courts must take into account the following factors:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.[151]

### 1.  Predominance

For securities-fraud class actions, "[p]redominance regularly presents the greatest obstacle to class certification."[152] In conducting a predominance analysis, the court must "*characterize* the issues in the case as common or not, and then *weigh* which issues predominate."[153] "An individual [issue] is one where 'members of a proposed class will need to present evidence that varies from member to member.'"[154] And a common issue, as already

---

[150] Fed. R. Civ. P. 23(b)(3).

[151] Fed. R. Civ. P. 23(b)(3)(A)–(D).

[152] *See CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014); *see also Halliburton II*, 573 U.S. at 276 ("In securities class action cases, the crucial requirement for class certification will usually be the predominance requirement of Rule 23(b)(3).").

[153] *CGC Holding*, 773 F.3d at 1087.

[154] *Id.* (alteration in original) (quoting 2 W. Rubenstein, *Newberg on Class Actions* § 4:50, at 196–97 (5th ed. 2012)).

noted, "is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'"[155] While there is no fixed standard for determining which type of issues predominate, the predominance requirement is typically satisfied when "common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues."[156]

Some of the issues here are undisputedly common ones. These include whether a LifeVantage distributorship is a security, whether LifeVantage's distributorship agreement and related documents are a prospectus, whether Defendants engaged in deceptive acts in furtherance of a scheme to deceive or defraud by operating LifeVantage's distributorship program as a pyramid scheme, and whether Defendants knowingly engaged in those acts (scienter). There is also at least one issue that is undisputedly individual in nature, the counterclaims and affirmative defenses Defendants may assert against individual class members. However, there are three issues over which there is a dispute: whether distributors relied on the deceptive acts alleged,[157] whether class members' losses were caused by the alleged fraudulent scheme, and whether distributors were injured as well as the amount of their damages. The court will determine whether these issues are common or individual and then proceed to weighing whether common or individual issues predominate.

### a. Reliance

Reliance "is an essential element of the § 10(b) private cause of action"[158] because it plays a crucial role in establishing a causal link between a defendant's fraudulent conduct and

---

[155] *Id.*

[156] *Tyson Foods*, 577 U.S. at 453 (quoting 2 W. Rubenstein, *Newberg on Class Actions* § 4:49, at 195–96).

[157] Reliance is an element of Plaintiffs' § 10(b) and Rule 10b-5 claims only.

[158] *Stoneridge*, 552 U.S. at 159.

the plaintiff's injury.[159] Ordinarily, to determine whether a plaintiff relied on a defendants'

deceptive or fraudulent acts in deciding to purchase a security, courts must look to the "facts

surrounding the investor's decision to engage in the transaction."[160] If the deceptive or fraudulent

acts were "a substantial factor" in the decision to engage in the transaction[161]—that is, but for

those acts "the plaintiff would not have entered into the detrimental securities transaction"[162]—

reliance is established. Because the nature of this inquiry is usually an individualized one, the

reliance element ordinarily poses a significant obstacle to showing that common issues

predominate in securities-fraud class actions.[163]

Despite that, Plaintiffs argue that reliance is a common issue here because it can be

inferred on a class-wide basis from common evidence, as was the case in *CGC Holding Co. v.

Broad & Cassel*, a Tenth Circuit case, and *Torres v. S.G.E. Management, L.L.C.*, a Fifth Circuit

case.[164] In *CGC Holding*, the Tenth Circuit was presented the question whether causation in a

RICO class was a common or individual issue when the plaintiffs sought to establish causation

by showing that the putative class members had relied on misrepresentations the defendants had

---

[159] *See id.*; *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988).

[160] *Halliburton I*, 563 U.S. at 812.

[161] *See T.J. Raney & Sons, Inc. v. Fort Cobb, Oklahoma Irr. Fuel Auth.*, 717 F.2d 1330, 1332 (10th Cir. 1983)
(quoting *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90, 102 (10th Cir. 1971)).

[162] *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *Emergent Capital Inv. Mgmt., LLC
v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003))).

[163] *See Basic*, 485 U.S. at 242 (noting that "[r]equiring proof of individualized reliance from each member of [a]
proposed plaintiff class effectively would" destroy most class actions, as it would cause individual issues to
"overwhelm[] the common ones"); *see also Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 462–
63 (2013) ("Absent the fraud-on-the-market theory, the requirement that Rule 10b–5 plaintiffs establish reliance
would ordinarily preclude certification of a class action seeking money damages because individual reliance issues
would overwhelm questions common to the class."); *CGC Holding*, 773 F.3d at 1089 ("Since reliance is often a
highly idiosyncratic issue that might require unique evidence from individual plaintiffs, it may present an
impediment to the economies of time and scale that encourage class actions as an alternative to traditional litigation.
In terms of Rule 23 doctrine, individualized issues of reliance often preclude a finding of predominance.").

[164] ECF Nos. 171 at 3–4; 195 at 5–6.

made regarding loan commitments.[165] The defendants were accused of defrauding the class members by entering into loan commitment agreements they never intended to fulfill and then cancelling the agreements in order to keep non-refundable fees the class members had paid.[166] After acknowledging that reliance is often used as a "stand-in for causation" in civil RICO cases, the Tenth Circuit held that it was reasonable to infer that each class member relied on the defendants' misrepresentations regarding the loan agreements because they would not have paid the non-refundable fees had the defendants not misrepresented their intentions regarding the loans.[167] And because whether class members had paid those fees was a "uniform piece of circumstantial evidence" that was "common to the entire class," reliance was a common issue for purposes of the predominance inquiry.[168]

The Fifth Circuit, relying in part on *GCG Holding*'s reasoning, reached the same conclusions in *Torres*.[169] The plaintiffs there brought a RICO class action against an MLM, claiming that its sales program was an illegal pyramid scheme.[170] Like in *CGC Holding*, the plaintiffs in *Torres* argued that causation, as demonstrated by reliance, was a common issue because class members could show "through a common sense inference that they were duped into joining the pyramid scheme based on the representation that [the MLM was] a legitimate enterprise."[171] The Fifth Circuit agreed that inference was reasonable for two main reasons.[172]

---

[165] *CGC Holding*, 773 F.3d at 1086–93.

[166] *Id.* at 1082.

[167] *Id.* at 1088–93.

[168] *Id.* at 1092–93 (explaining that the inference of reliance "exempted [the class members] from demonstrating causation on a class-member-by-class-member basis").

[169] *Torres*, 838 F.3d at 641.

[170] *Id.* at 632–33.

[171] *Id.* at 634, 641.

[172] *Id.* at 643.

First, it was reasonable to infer that no class member knew the MLM was a pyramid scheme because "pyramid schemes are inherently deceptive and operate only by concealing their fraudulent nature."[173] If the scheme's illegality were apparent to the individuals it targeted, it would not work.[174] And second, it was reasonable to infer that no class member would have joined the pyramid scheme even if they knew because "knowingly joining a pyramid scheme [would] require[] the individual to choose to become either a victim or fraudster."[175] Because this inference of reliance provided the putative class members with a "common mechanism by which . . . to prove their affirmative case," there were no predominance concerns.[176]

Defendants argue that the type of class-wide inference of reliance recognized in *CGC Holding* and *Torres* is not appropriate here because those cases involved RICO claims, which do not require a showing of reliance, while this case involves a securities-fraud claim, which does.[177] They assert that unless Plaintiffs can show that the applicability of the class-wide *presumption* of reliance the Supreme Court recognized in *Basic Inc. v. Levinson*[178] or *Affiliated Ute Citizens of Utah v. United States*[179] applies here, reliance is an individual issue that will inevitably predominate over common ones.[180]

---

[173] *Id.*

[174] *Id.*

[175] *Id.*

[176] *Id.* at 645–46.

[177] ECF No. 187 at 12–13.

[178] *Basic*, 485 U.S. at 245–47 (recognizing a presumption based on the fraud-on-the-market theory).

[179] *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) (recognizing a presumption when a defendant has omitted a material fact that it had an affirmative duty to disclose).

[180] ECF No. 187 at 12–13.

The court disagrees. What renders the reliance issue common in certain cases is the fact that a class-wide inference of reliance can be created by generalized, class-wide evidence.[181] And for purposes of the predominance inquiry, that is all that matters: whether an issue will be proved by common or individual evidence.

Reliance was found to be a common issue in *CGC Holding* and *Torres* for this very reason. Both courts concluded that the class representatives could establish each class member's reliance through uniform circumstantial evidence.[182] Although that evidence created only an inference of reliance, which has different evidentiary implications than the presumption of reliance recognized in *Basic* and *Affiliated Ute*,[183] those differences are irrelevant to the question of whether reliance was a common or individual issue. For purposes of the predominance inquiry, the sole question in characterizing issues is whether or not the evidence that will be used to prove an element of a claim is generalized and common;[184] it makes no difference whether that evidence will prove the element directly or by giving rise to an inference or presumption.

Further, while it is true that *CGC Holding* and *Torres* involved RICO claims instead of securities-fraud claims, that alone does not mean that the principles and reasoning they espouse are inapplicable to other types of claims. On the contrary, the Tenth Circuit applied *CGC Holding*'s reasoning outside of the RICO context in *Menocal v. GEO Group, Inc.*, finding that

---

[181] *See Halliburton I*, 563 U.S. at 811 (*Basic*'s fraud-on-the-market presumption is created by evidence that the alleged representations were publicly known and the security at issue was traded in an efficient market); *Affiliated Ute*, 406 U.S. at 153 (presumption of reliance is created when there is evidence the defendant had an affirmative duty to disclose a fact it did not disclose to class members).

[182] *See Torres*, 838 F.3d at 641; *GCG Holding*, 773 F.3d at 1091–92.

[183] As the court of appeals explained in *CGC Holding*, "[a] presumption is a legal conclusion that will alter the plaintiffs' burden of proof on the merits . . . at trial," while "an inference is simply a commonsense deduction based on the facts presented." *CGC Holding*, 773 F.3d at 1094 n.12. The ultimate trier of fact must decide whether to accept such an inference and whether the inference proves the plaintiff's case by a preponderance of the evidence. *See id.* at 1093.

[184] *See Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 918 (10th Cir. 2018); *CGC Holding*, 773 F.3d at 1088.

the causation element of a claim under the Trafficking Victim's Protection Act was a common issue because causation could be inferred class-wide from common circumstantial evidence.[185] Indeed, the court indicated in *Menocal* that *CGC Holding*'s reasoning applies whenever (1) an individual class member could establish an element of his or her claim through circumstantial evidence and (2) all members of that class "share the relevant evidence in common because their claims are based on allegations of a single, common scheme."[186] Understanding this, there is no reason to conclude that individual reliance issues inherently predominate when class members might establish a class-wide inference of reliance through common, generalized circumstantial evidence.

Here, Plaintiffs claim that if they are able to prove that LifeVantage's distributorship program is a pyramid scheme, and that Defendants concealed that fact from the putative class members, the ultimate trier of fact could infer reliance because none of the class members would have paid to become a distributor had they known the program was a pyramid scheme. The court finds that such an inference would be reasonable. LifeVantage's distributorship program is a security if it qualifies as an investment contract and, by definition, those who purchase investment contracts do so with "a reasonable expectation of profits."[187] It is therefore reasonable to infer that those who paid to become distributors for LifeVantage did so with a reasonable expectation that it was at least possible to recoup their investment, if not make a profit, by selling LifeVantage's products. However, if LifeVantage's distributorship program is an illegal pyramid scheme, then the very nature of its structure guaranteed that the overwhelming

---

[185] *See Menocal*, 882 F.3d at 920–22.

[186] *Id.* at 919.

[187] *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975) (noting that the "touchstone" of an investment contract security is "an investment in a common venture premised on *a reasonable expectation of profits* to be derived from the entrepreneurial or managerial efforts of others" (emphasis added)).

majority of its participants were destined "to be disappointed" in their efforts to recoup their investment, let alone make a profit.[188] The *concealment* of such a risk is the exact type of deceptive act that § 10(b) and Rule 10b-5 proscribe.[189] It is also the type of deceptive act that prospective distributors could have relied on in deciding to participate in the program.[190] Thus, if Plaintiffs are able to prove that LifeVantage's distributorship program is a pyramid scheme, and that Defendants engaged in acts to conceal that fact and the risks it entails from prospective distributors, the ultimate trier of fact could reasonably infer that those who paid to join the program relied on Defendants' deceptive acts, i.e., that they would not have joined the program had Defendants not concealed the pyramid scheme and its risks.[191]

 The fact that reliance can be established by inference in this way means that it is a common issue in this case. Any of the putative class members could establish an inference of

---

[188] *See In re Koscot*, 86 F.T.C. at 1181–82; *see also Torres*, 838 F.3d at 639; *Gold Unlimited*, 177 F.3d at 479; *Webster*, 79 F.3d at 781–82.

[189] *See Affiliated Ute*, 406 U.S. at 151 ("[T]he 1934 Act and its companion legislative enactments embrace a 'fundamental purpose . . . to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.'" (footnote omitted) (second alteration in original) (quoting *S.E.C. v. Capital Gains Research Bureau*, 375 U.S. 180, 186 (1963))); *see also Torres*, 838 F.3d at 639 ("[A] pyramid scheme's fraud inheres in its *concealment* of the deceptive nature of the 'robbing Peter to pay Paul' payment structure." (emphasis added)); *Webster*, 79 F.3d at 781–82 (explaining why "the *operation* of a pyramid scheme constitutes fraud for purposes of several antifraud statutes" (emphasis added)); *S.E.C. v. Tropikgadget FZE*, 146 F. Supp. 3d 270, 280 (D. Mass. 2015) (noting that the defendant's fraudulent act was presenting its program "as a legitimate multi-level marketing company offering actual products and services, and . . . conceal[ing] the fact that the company had no legitimate revenue stream and was operating as a classic pyramid scheme"). Put another way, it is in the deceptive scheme, not the pyramid structure, wherein the deceit and fraud of a pyramid scheme lies.

[190] *S.E.C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860 (2d Cir. 1968) (noting that the fraudulent or deceptive device "employed [by a defendant], whatever it might be, [must] be of a sort that would cause reasonable investors to rely thereon" in deciding whether to purchase a security).

[191] *See CGC Holding*, 773 F.3d at 1091 n.9 ("[T]he inference of reliance here is limited to transactional situations—almost always financial transactions—where it is sensible to assume that rational economic actors would not make a payment unless they assumed that they were receiving some form of the promised benefit in return."); *see also St. Gregory Cathedral Sch. v. LG Elecs.*, Inc., No. 6:12-CV-739, 2015 WL 5604763, at *5 (E.D. Tex. Sept. 23, 2015) ("The inference of reliance can be applied in select cases where the facts clearly demonstrate that because of the economics of the transaction, no rational actor would enter into the transaction but for the [defendant's deceit].").

reliance by making the foregoing showing in an individual action.[192] And the evidence needed to do so is generalized and shared in common by all class members, as they claim they were harmed by a "single, common scheme": Defendants' operation and concealment of a pyramid scheme.[193] The class's reliance arguments would "prevail or fail in unison."[194] Therefore, because the proposed class could establish a class-wide inference of reliance through common circumstantial evidence like in *CGC Holding* and *Torres*, the reliance issue does not bar a finding on this record that common issues predominate.

This finding must be qualified, however. The ability to establish an element of a claim by inference through common circumstantial evidence will not necessarily render that element a common issue in every case. Inferences, after all, can be rebutted.[195] And had Defendants presented evidence here that could rebut the inference of reliance for a significant number of class members on an individualized basis, the number of individualized reliance determinations required to resolve the class's claims could have rendered reliance an individual issue for purposes of predominance.[196]

However, Defendants have failed to produce such evidence in any significant amount at this stage of the case. They have presented absolutely no evidence that any of the putative class members knew LifeVantage operated as a pyramid scheme. And there is no reason to infer that they did or had reason to know. Additionally, while it is possible that some distributors joined

---

[192] *See Menocal*, 882 F.3d at 919.

[193] *See id.*

[194] *See Amgen*, 568 U.S. at 460, 469 (noting that this is a sign of class cohesiveness, a major concern of the predominance requirement).

[195] *See Menocal*, 882 F.3d at 921.

[196] *See id.* at 921; *see also CGC Holding*, 773 F.3d at 1091 n.9 (noting that there may be instances when "individual questions, including components of class member reliance, . . . supplant this inference as the predominating concern for purposes of Rule 23").

LifeVantage with absolutely no expectation of being able to recoup their investment or make a profit, Defendants have provided no grounds to believe that there is a significant number of such individuals. Indeed, LifeVantage's own records suggest that it is unlikely they will be able to support this highly counterintuitive point.[197]

In summary, if it is shown that LifeVantage's distributorship program is a pyramid scheme, and that Defendants engaged in acts to conceal the program's illegal pyramid structure and its inherent risks from prospective distributors, the ultimate trier of fact could reasonably infer that those who became distributors relied on those acts in deciding to join LifeVantage's program. Because the evidence that can establish this inference appears to be generalized and common to the entire class, and Defendants have failed to produce evidence to rebut that inference on an individualized basis for any significant number of putative class members, reliance is a common issue for purposes of the predominance inquiry. Accordingly, the reliance issue does not preclude class certification.

### b. *Loss Causation*

To establish loss causation for a scheme liability claim,[198] a plaintiff must show that his or her losses were proximately caused by the defendant's deceptive acts.[199] In most cases, this means showing a direct causal connection between the alleged loss and the materialization of a risk, or the revelation of a state of affairs, those deceptive acts concealed from the investor

---

[197] *See* ECF No. 185-2 at 11–12 ("We believe our independent distributors are typically entrepreneurs who believe in our product and desire to earn income by building a business of their own.").

[198] Although the court will discuss loss causation in the context of § 10(b) claims, the principles discussed also apply to loss causation in the context of § 12(a)(2) claims, where a lack of loss causation can be asserted as an affirmative defense.

[199] *See Dura Pharms.*, 544 U.S. at 342, 346; *see also* 15 U.S.C. § 78u-4(b)(4) ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."); *Halliburton I*, 563 U.S. at 813 (noting that if other "factors were responsible for the loss or part of it, a plaintiff would not be able to prove loss causation to that extent").

during the pertinent security transaction.[200] Most courts also require the plaintiff to show that the risk of loss was foreseeable.[201] This method of proving loss causation, which the Tenth Circuit calls the "theory of materialization of a concealed risk,"[202] is not the only one, but it has been the primary method used in scheme liability cases.[203] And while Plaintiffs do not specifically name this theory as the basis for establishing loss causation, their loss causation allegations are in line with it.[204]

Defendants do not discuss what they believe Plaintiffs must show to establish loss causation, instead summarily arguing that they cannot do so here without individualized inquiry.[205] The court disagrees.

To show that their losses were caused by the materialization of a concealed risk, Plaintiffs would have to show that (1) the transactions in question involved a foreseeable risk of loss that Defendants concealed and (2) distributors suffered a loss because that concealed risk

---

[200] *See Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (explaining that loss causation is shown "by tracing the loss back to 'the very facts about which the defendant lied'" (quoting *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013))); *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1154 (10th Cir. 2015) ("[A] plaintiff alleges loss causation by showing that the defendant's [deceptive act] concealed a risk that caused a loss for the plaintiff when the risk materialized."); *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006) ("[T]he loss causation element requires the plaintiff to prove 'that it was the very facts about which the defendant lied which caused its injuries.'" (quoting *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997))); *Lentell*, 396 F.3d at 172–73 ("[T]o establish loss causation, 'a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered . . . .'" (omission in original) (quoting *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001))).

[201] *See Lentell*, 396 F.3d at 173 (explaining that proximate causation is establish only if the plaintiff can show that "the risk that caused the loss was within the zone of risk *concealed* by" the defendant's deceptive acts).

[202] *See Nakkhumpun*, 782 F.3d at 1154.

[203] *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 439 F. Supp. 2d 692, 723 (S.D. Tex. 2006), *on reconsideration sub nom. In re Enron Corp. Sec., Derivative & ERISA Litig.*, No. CIV.A. H-01-3624, 2006 WL 6892915 (S.D. Tex. Dec. 4, 2006); *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 510 (S.D.N.Y. 2005).

[204] *See* ECF No. 108 at 96–97 ("The loss suffered by the Plaintiffs and the Class was foreseeable and a direct result of the establishment, promotion, and expansion of the schemes by the Defendants because the ultimate collapse of the scheme, and harm to its participants, is a direct and foreseeable consequence of the structure of the scheme.

[205] ECF No. 187 at 14.

materialized.[206] The issues of whether risk of loss was concealed, whether it was foreseeable, and whether distributors incurred losses because the risk materialized are all reasonably susceptible to common, class-wide proof. Therefore, loss causation is a common issue.

### c.  *Injury and Damages*

Plaintiffs appear to suggest that damages present a common issue in this case because each class member's damages can be determined at any point from common evidence, namely, LifeVantage's records.[207] Although Defendants assert that these records are incomplete and inadequate because they lack data about distributors' personal consumption, retail sales, and business expenses,[208] Plaintiffs argue that those factors are irrelevant to the damages calculus or occurred too infrequently to matter.[209] Even if data regarding those factors were needed to calculate damages, Plaintiffs argue, it could be gathered on a class-wide basis by surveying class members.[210]

Contrary to Plaintiffs' assertions, damages are an individual issue here. Regardless of which factors are ultimately considered when calculating damages, the evidence to prove damages varies from class member to class member and must be evaluated on an individualized basis.[211] This remains true even if each class member's damages could be proved solely from the data in LifeVantage's records. The records are merely a common source that contains individualized damages evidence. The existence of such a common source is certainly relevant to

---

[206] *See Nakkhumpun*, 782 F.3d at 1154.

[207] ECF No. 195 at 6–7, 12.

[208] ECF No. 187 at 14–15.

[209] ECF No. 195 at 6–12.

[210] *Id.* at 12.

[211] *See Tyson*, 577 U.S. at 453 ("An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member.'" (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–197 (5th ed. 2012)).

the question of whether evaluating the individualized damages evidence it contains will cause individual issues to predominate, but it does not make that evidence generalized. Therefore, injury and damages are an individual issue for purposes of determining whether Plaintiffs have established predominance.

### d.   Do Common or Individual Issues Predominate?

Based on the foregoing analysis, all issues related to liability in this case appear to be common, including two of the most important issues in this case: whether a LifeVantage distributorship is a security and whether the distributorship program is a pyramid scheme. This suggests that the proposed class is "cohesive."[212] It also suggests that there are efficiencies to be gained by allowing the class's aggregated claims to be resolved through a class action.[213]

However, there are also two individual issues in this case: the counterclaims and affirmative defenses Defendants may assert against some class members, as well as determining which putative class members were injured and the calculation of their damages. Plaintiffs' motion for class certification can be granted only if they have satisfied their burden of showing that the resolution of these individual issues would not overwhelm the resolution of common ones. In other words, they must show that these individual issues can be resolved in the class action without destroying the efficiencies aggregate litigation of the common issues would generate, "sacrificing procedural fairness[,] or bringing about other undesirable results."[214]

---

[212] *Amchem*, 521 U.S. at 623 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.").

[213] *See id.* at 615 (noting that the predominance inquiry was adopted to help courts identify the "cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated'" (quoting Advisory Committee's Notes to Fed. R. Civ. P. 23(b)(3))).

[214] *See id.*

i.    ***Defendants' Counterclaims and Affirmative Defenses Do Not Destroy Predominance.***

Defendants argue that common issues do not predominate because of the individual determinations that would be needed to resolve counterclaims and affirmative defenses. Defendants claim that there are likely to be some class members who, like Ilardo, are subject to breach of contract counterclaims and unclean hands or *in pari delicto* defenses because of false or misleading statements they made about LifeVantage, its products, or its distributorship program while promoting their own distributorships.[215] They also claim that many of the putative class members are actually barred from participating in the class action by the relevant statutes of limitations, and individualized determinations are needed to determine who is barred.[216]

The court is not convinced at this stage that the counterclaims or affirmative defenses would cause individualized issues to predominate. Although Defendants have already brought a breach of contract counterclaim against Ilardo for alleged misrepresentations, they have done no more than speculate that they will be able to do so against a significant number of other class members. Such speculation alone is insufficient to show that counterclaims or defenses would cause individual issues to predominate.[217] Defendants have failed to show they are likely to bring any significant number of breach of contract counterclaims against other class members.[218] And the court has no grounds for finding that Defendants are likely to do so through "the probable

---

[215] ECF No. 187 at 15–17.

[216] *Id.*

[217] *See Bais Yaakov of Spring Valley v. ACT, Inc.*, 12 F.4th 81, 89 (1st Cir. 2021) ("In deciding whether individual issues predominate over common questions, a court must not rely on mere speculation that individual issues may arise."); *see also Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1125 (6th Cir. 2016) ("[A] possible defense, standing alone, does not automatically defeat predominance.").

[218] *See Halliburton II*, 573 U.S. at 276 ("That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate."); *see also Tyson Foods*, 577 U.S. at 453 (stating that class certification is appropriate even when "some affirmative defenses peculiar to some individual class members" exist as long as "one or more of the central issues in the action are common to the class and can be said to predominate" (citation omitted)).

course of the litigation," especially when considering the fact that the only individualized factual inquiries yet needed relate to each class member's damages, not their conduct as distributors.[219]

Defendants' argument regarding unclean hands and *in pari delicto* defenses is unpersuasive for many of the same reasons. Defendants have speculated that they will be able to bring such defenses against a significant number of class members which, on its own, is not enough. But their argument also fails because Defendants have provided no basis for even concluding that such defenses could succeed.[220]

To establish an *in pari delicto* defense in securities actions, defendants must show "(1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public."[221] This means that a plaintiff must have been "an active, voluntary participant in the unlawful activity that is the subject of the suit."[222]

Here, Plaintiffs have alleged that they were harmed because Defendants' deceptive acts concealed the fact that LifeVantage's distributorship program is a pyramid scheme. To establish an *in pari delicto* defense, Defendants would have to show that class members took part in those deceptive acts in a way that would give the class members "substantially equal responsibility"

---

[219] *See Bais Yaakov*, 12 F.4th at 89 (stating that in determining whether individual or common issues predominate, courts "should consider only those issues that would likely arise" during "the probable course of the litigation").

[220] *See Bridging Communities*, 843 F.3d at 1125 (reversing a district court's conclusion that individual defense issues predominated when the defendant "did not offer any information or evidence to support that theory"); *see also Wal-Mart*, 564 U.S. at 351 (noting that the Rule 23 analysis will sometimes require looking to the merits of a given claim).

[221] *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310–11 (1985).

[222] *Pinter v. Dahl*, 486 U.S. 622, 636 (1988).

with Defendants. Defendants have provided no grounds to believe that they could make such a showing with regard to any class member, much less a significant number of class members.

The same is true for Defendants' unclean hands defense. The doctrine of unclean hands is based in the principle that "equity will not aid a party whose conduct has been unlawful, unconscionable, or inequitable."[223] Defendants argue that it is likely some class members acted inequitably by making false or misleading claims when recruiting others into the distributorship program. However, "the doctrine [of unclean hands] 'does not exclude all wrongdoers from a court of equity nor should it be applied in every case where the conduct of a party may be considered unconscionable or inequitable.'"[224] Moreover, it looks only to how a plaintiff's inequitable conduct affects the equitable relations vis-à-vis the defendant, not other plaintiffs.[225]

Again, Plaintiffs' theory of liability here is that distributors were harmed by Defendants' concealment of the fact that LifeVantage's distributorship program is a pyramid scheme. Whether some distributors engaged in inequitable conduct while recruiting other distributors into the program has no bearing on whether the program is an illegal pyramid scheme or whether Defendants engaged in deceptive acts to conceal its true nature.

Finally, the court does not find that individualized statute-of-limitations issues predominate.[226] The relevant statutes of limitations in this case utilize the discovery rule, which means that the limitations period begins to run when a plaintiff "discover[s] or a reasonably

---

[223] *CGC Holding*, 974 F.3d at 1214.

[224] *Id.*

[225] *See Worthington v. Anderson*, 386 F.3d 1314, 1320 (10th Cir. 2004).

[226] Plaintiffs' claims are subject to both a statute of limitations and a statute of repose. The limitations period for claims under § 10(b) is "2 years after the discovery of the facts constituting the violation" with a period of repose after "5 years after such violation." 28 U.S.C. § 1658(b)(1)–(2). Claims under § 12(a)(2) have a limitations period of one year after discovery of the violation with a repose period of three years. 15 U.S.C. § 77m. Because the proposed class period begins on January 24, 2015, three years before this case was filed, neither of the claims could be barred by the statutes of repose.

diligent plaintiff would have 'discover[ed] the facts constituting the violation.'"[227] Defendants argue that the individualized inquiries needed to determine when each class member discovered the facts constituting the violations alleged destroys predominance.[228] However, just because a statute of limitations utilizes the discovery rule does not mean that individualized inquiry is always needed to know when the limitations period began to run. Additionally, even when the discovery rule does require individualized inquiry, that does not necessarily mean that it predominates over common issues. The prevailing view in securities actions "is that '[t]he existence of a statute of limitations issue does not compel a finding that individual issues predominate over common ones. Given a sufficient nucleus of common questions, the presence of the individual issue of compliance with the statute of limitations has not prevented certification of class actions in securities cases.'"[229]

Here, Defendants have provided no evidence that any class member knew the distributorship program is a pyramid scheme or knew all the facts necessary to bring suit under §§ 10(b) or 12(a)(2). Nor have they attempted to explain why a reasonably diligent plaintiff would have discovered the same. In all likelihood, most evidence Defendants would be able to produce to show how some class members had such knowledge, or should have had such knowledge, would be applicable to the class generally. This is especially true considering the fact that the crux of Plaintiffs' claims is that Defendants have been able to successfully conceal the fact that LifeVantage's distributorship program is a pyramid scheme from prospective distributors.[230]

---

[227] *See Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010) (alteration in original) (citation omitted).

[228] *Id.*

[229] *See* 1 McLaughlin on Class Actions § 5:30 (18th ed.) (citations omitted).

[230] *See In re Linerboard Antitrust Litig.*, 305 F.3d 145, 160 (3d Cir. 2002) (noting that the question of whether a statute of limitations did not begin to run due to concealment is generally "a common question, subject to being

While it is possible that some individualized issues related to the discovery rule may arise at some point, Defendants have failed to point out any that destroy predominance or preclude certification at this stage of the case.

### ii. Plaintiffs Have Not Met Their Burden of Showing Why Individualized Damages Determinations Will Not Predominate.

At the outset, it is important to note that "[t]he fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification."[231] Damages are treated like any other issue in a class action; the need for individualized determinations precludes certification only when they will overwhelm the issues common to the class.[232] Defendants argue that the individualized damages determinations needed in this case will do just that because extensive individualized fact-finding is needed to determine how each distributor's personal consumption, retail sales, and business expenses affect his or her damages.[233]

In response, Plaintiffs argue that the individualized damages determinations needed here do not preclude certification for three reasons. First, as previously noted, they argue that personal consumption, retail sales, and business expenses are irrelevant for one reason or another, so each class member's damages can be easily and readily calculated from LifeVantage's records.[234] Second, they argue that even if data regarding those factors is needed to determine damages, it

---

uniformly resolved on behalf of all members of the class" (quoting *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 487 (W.D. Pa. 1999))).

[231] *Naylor Farms*, 923 F.3d at 798 (quoting *Menocal*, 882 F.3d at 922); *see also Gold Strike*, 436 F.3d at 798. The line of cases Defendants rely on in arguing that damages must be susceptible of class-wide measurement involved antitrust claims, and their holdings have generally been limited to that context. *See, e.g., Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374 & n.10 (3d Cir. 2015) (citing other circuits that have held the same).

[232] *Naylor Farms*, 923 F.3d at 798.

[233] ECF No. 187 at 14–15.

[234] ECF Nos. 171 at 9; 195 at 6–12.

can be gathered through "scientific surveys" in a "reasonably reliable fashion."[235] And third, even if individualized damages determinations threaten to overwhelm the common issues, the court could choose to bifurcate the litigation and complete the individualized damages determination in a separate stage if liability is established.[236]

After considering these arguments, Plaintiffs have not met their burden of showing why common issues predominate despite the need for individualized damages determinations. To begin with, although the court agrees that data regarding distributors' voluntarily-incurred "business expenses" is not needed to accurately calculate damages,[237] the same is not true for distributors' personal consumption and retail sales.

Plaintiffs argue that any products distributors consumed were virtually valueless—and, thus, irrelevant to the damages calculus—because distributors were forced to purchase them to maintain their distributorships and protect their investments therein.[238] However, such a position appears reductive and untenable. For example, it ignores those distributors who wanted to purchase and consume products as part of their distributorship, including those who became distributors because they liked (and therefore valued) the product.[239] Can a distributor who would have purchased and consumed the products even if there was no requirement to do so be said to have received no value? What about those who may have purchased and consumed even more product than was required to maintain their distributorship? Even if Plaintiffs could show

---

[235] ECF No. 195 at 12.

[236] *Id.*

[237] It is highly unlikely that Plaintiffs could establish loss causation for such expenses, even if they desired to include them. The business expenses likely were not a foreseeable risk of loss tied to the perpetuation of a pyramid scheme.

[238] ECF No. 195 at 9–10.

[239] *See* Depo. of Jeremy Roth at 19:3–23, 27:21–29:22, ECF No. 185-16 at 10, 16–18; Depo. of James Locke at 15:7–20:23, ECF No. 187-6 at 9–14.

that no distributor would have bought and consumed products absent the requirement to do so, that does not inexorably mean that the products they did consume were inherently worthless. Thus, counting products that were consumed by distributors as an unmitigated loss seems illogical on its face.

Plaintiffs appear to assert that it is safe to assume that no distributor genuinely wanted to consume the products they were required to purchase, or purchased more than required, because Defendants have failed explain why someone who wanted to do so would have become a distributor instead of a preferred customer.[240] However, as the party seeking class certification, it is Plaintiffs who bear the burden of supporting such assumptions; it is not Defendants' burden to disprove them. And Plaintiffs have failed to produce sufficient evidence to support either assumption. Further, it is not just factual support for Plaintiffs' rather extraordinary proposition that is lacking. Plaintiffs have cited no class action case in which a court treated consumable products as having literally zero value. Assuming a zero value for a product which people purchase is, to say the least, not the usual course.

Plaintiffs also contend that distributors' personal consumption should be ignored because "[n]o data exists whether [it] in fact happened to any significant extent, or what hypothetical "value" must be attributed to [it]."[241] However, contrary to Plaintiffs' assertions, the present absence of extensive data on distributors' personal consumption does not mean the effect such data would have on the calculation of damages in this case is purely hypothetical. The current record evidence suggests not only that some distributors "may have personally consumed" the products they purchased, but that they actually did so.[242] Ilardo, one of the two named plaintiffs,

---

[240] *Id.*

[241] ECF No. 195 at 1.

[242] *Id.*

testified that he personally consumed as much as $200 in LifeVantage products each month while he was a distributor and that he kept consuming the products even after he stopped.[243] By contrast Smith, the other named plaintiff, testified that while he tried the product originally, he did not continue to consume it over time.[244] Finally, the other two distributors that have been deposed testified that they personally consumed the products over a period of years.[245] Of course, this is a very small sample size. The parties have deposed only four distributors out of the 157,000 that Plaintiffs suggest would form the class. But the record, such as it is, suggests that plaintiff-by-plaintiff written discovery, depositions, or trial testimony would be needed for the trier of fact to determine how personal consumption affects each distributor's damages. Such a need deals a heavy blow to the argument for certifying this massive nationwide class.

Plaintiffs' attempt to brush aside concerns about distributors' retail sales is also inadequate. The court agrees that the record suggests there was much less incentive for distributors to resell products hand-to-hand than through distributor channels.[246] But the potential rarity with which such retail sales occurred does not warrant dismissing them out of hand when calculating damages. Plaintiffs' characterization of retail sales as a "mere *possibility*"[247] is contradicted by the record. One of the two named Plaintiffs, Ilardo, testified that he did resell some product, though he sold it for a loss and could not say with confidence how much he sold.[248] If distributors received money by reselling some of the products they purchased, then the

---

[243] Depo. of Michael Ilardo at 147:7–21, ECF No. 187-5 at 20.

[244] Depo. of Brian Smith at 118:19–120:24, ECF No. 185-15 at 17–19.

[245] *See* Depo. of Jeremy Roth at 19:3–23, 27:21–29:22, ECF No. 185-16 at 10, 16–18; Depo. of James Locke at 15:7–20:23, ECF No. 187-6 at 9–14.

[246] *See* ECF No. 169-3 at 22.

[247] ECF No. 195 at 7.

[248] Depo. of Michael Ilardo at 120:10–16, 143:25–145:6, ECF No. 187-5 at 9, 16–18.

loss attributed to the resold product should be offset accordingly.[249] Thus, individualized inquiry is also needed to determine which distributors made retail sales and how much money they received from doing so.

Perhaps anticipating that this might be the case, Plaintiffs next assert that any need for further individualized inquiry to calculate damages does not preclude certification because the missing data could be acquired from the whole class through "scientific surveys."[250] While it might be possible to assemble the missing information in this way, and thus render the subsequent individualized damages determinations easier, Plaintiffs have not met their burden of showing how it is possible. They have provided no explanation as to how and at what stage of the litigation 100,000–150,000 putative class members could be surveyed. They have also failed to explain how and when Defendants would be able to test the veracity and reliability of the data acquired in such a way.[251] Plaintiffs have skirted around these issues by suggesting that Defendants could conduct the survey, perhaps because the data to be obtained would be helpful to Defendants by reducing the class size and any damages owed. But Plaintiffs' suggestion again overlooks the fact that it is they who must show that whatever efforts are needed to determine injury and damages on an individual basis would not destroy the efficiencies aggregation of common issues would generate. Plaintiffs have not even tried to make such a showing.

---

[249] Plaintiffs note that there is currently no evidence that any distributor made an "offline sale at a profit." ECF No. 195 at 8. This misses the point. Whether a distributor made "offline" retail sales is an individualized question, as is the value of those sales. That information affects not only the amount of damages for each of the putative class members, but also, for some, may affect whether they were injured at all and hence whether they are a member of the class. Thus, that the sales either were or were not profitable is not only itself an individual issue, but also beside the point for class certification purposes.

[250] ECF Nos. 171 at 9; 195 at 12.

[251] *See* Fed. R. Civ. P. 23, Advisory Committee's Notes to Subdivision (b)(3) (noting that the predominance requirement seeks to ensure that class actions "achieve economies of time, effort, and expense . . . *without sacrificing procedural fairness*" (emphasis added)).

Finally, Plaintiffs contend that any predominance concerns individualized damages determinations raise do not preclude certification because the court can bifurcate the issues of liability and damages pursuant to Federal Rule of Civil Procedure 42.[252] The court is cognizant of the fact that such an outcome is possible. Courts have noted that "there are ways to preserve the class action model in the face of individualized damages," such as dividing a class "into subclasses for adjudication of damages" or certifying a class "for liability purposes only, leaving individual damages calculations to subsequent proceedings.[253]

However, even if the individualized damages determinations were conducted in a separate stage of litigation through bifurcation, it appears that the trier of fact would still have to determine damages for tens of thousands of class members on an individualized basis. As just discussed, individualized fact-finding is needed to determine how much of the product purchased from LifeVantage each distributor consumed, whether they would have purchased and consumed it absent a requirement to purchase it, whether they resold any of it, and, if so, at what price. Though the common liability issues are more important, the sheer number and type of individualized damages determinations needed here raises serious concerns about whether a class action in this case would actually "achieve economies of time, effort, and expense."[254]

Plaintiffs have not even attempted to explain how this type of fact-finding for tens of thousands of class members could be carried out, in a bifurcated damages stage or otherwise, let

---

[252] ECF No. 195 at 12.

[253] *XTO Energy*, 725 F.3d at 1220 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 42 & n* (2013) (Ginsburg, J. dissenting))); *see also Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (identifying five different ways in which the individual damages issues can be handled if they appear to predominate that do not require that class certification be denied); Proposed Amendments to the Rules of Civil Procedure, Advisory Committee's Note to Rule 23(b)(3), 39 F.R.D. 69, 103 (1966) ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.").

[254] *Amchem*, 521 U.S. at 615 (quoting Advisory Committee's Notes to Fed. R. Civ. P. 23(b)(3)).

alone explain why doing so would not destroy any efficiencies litigating the common liability issues in the aggregate would generate. Indeed, their failure to do anything but state that bifurcation is a possible course of action does not overcome these serious concerns—it just proposes kicking the can to another day. In a case where Plaintiffs propose a nationwide class spanning seven years and including, by their calculations, something like 157,000 class members, the court will not defer any part of Plaintiffs' burden to show that all of the class certification standard are "clearly met"[255] or the "rigorous analysis"[256] the court is required to perform. Here, Plaintiffs have utterly failed to address in a meaningful way what appear to be significant individualized issues that easily could devolve into thousands of individualized inquires involving written discovery, depositions, and trial testimony, depriving the proposed class of much of its efficiency and potentially causing individualized determinations to swamp the common ones.

These considerable difficulties are made even more formidable by Plaintiffs' class definition. Because Plaintiffs seek a "net losers" class, the litigation will not even reveal who is actually in the class until after these individualized issues are decided. Standing alone, this need not be fatal to class action treatment. But, as noted previously, any damages amount will be affected by the value of the products consumed by each class member and by the amount of money each class member made in retail sales. Until a factfinder makes these determinations for each class member, it is not just the amount of damages that will be unknown, but whether the class member was injured at all and is even a member of the class.

---

[255] *Trevizo*, 455 F.3d at 1162.

[256] *Wal-Mart*, 564 U.S. at 350–51.

In summary, the class action mechanism is an exception to the general rule of individual litigation and is appropriate only when the parties seeking certification "affirmatively demonstrate [their] compliance with Rule 23."[257] Though Plaintiffs may be able to satisfy this burden by showing why the multiple individualized damages determinations apparently needed in this case would not overwhelm the common issues, they have not done so yet. Plaintiff have described these issues as "a chimera that there may be (not that there are) anecdotal differences between class members."[258] For the reasons stated above, including testimony from one of the two named plaintiffs, these differences are not a matter of anecdote but testimony; they are not hypothetical or chimerical, but very real issues that Plaintiffs are required to address satisfactorily. Because Plaintiffs have failed to do so, their motion for class certification must be denied.

## 2. Superiority

The parties have provided little argument regarding the superiority element generally, let alone address thoroughly the enumerated factors the court must consider. Plaintiffs assert that a class action would be superior to other methods of adjudicating this case because the loss most distributors suffered is too small to warrant an individual action.[259] Defendants, on the other hand, summarily argue that Plaintiffs have failed to show superiority for the same reasons they failed to show ascertainability, because extensive individualized inquiry is needed to determine class membership.[260]

---

[257] *See Comcast*, 569 U.S. at 33.

[258] ECF No. 195 at 3.

[259] ECF No. 171 at 10.

[260] ECF No. 187 at 11.

This case contains many circumstances that typically support a finding of superiority. Class members share some key issues in common, including the most important issues of whether a LifeVantage distributorship is a security and whether the distributorship program is a pyramid scheme. Allowing these issues to be litigated once and for all as part of a class action, instead of being asserted and contested over and over again in individual actions, could save time and resources for the putative class members, the Defendants, and perhaps the judicial system.[261] It is also clear that if each putative class member were required to bring an individual action, thousands likely would not do so because their individual claims are probably too small to justify the effort.[262] Overcoming this problem is "[t]he policy at the very core of the class action mechanism."[263]

Nevertheless, Plaintiffs have failed to establish superiority for the same reason they failed to establish predominance: they did not even attempt to show how individualized damages determinations could be carried out in a way that will not destroy the efficiencies gained by aggregating the class's common issues. Conducting individualized damages determinations (which also will determine whether each class member is injured at all and is a member of the class), whether in a single or bifurcated action, presents the greatest difficulty to managing this case as a class action.[264] Because Plaintiffs have not made any significant effort to explain how

---

[261] *See Jenson v. Fiserv Trust Co.*, 256 F. App'x 924, 926 (9th Cir. 2007) (unpublished) (finding that a Ponzi scheme class certification was appropriate in part because "[t]he Ponzi scheme itself would have to be proved or controverted over and over were the case not to proceed as a class action").

[262] Based on the data compiled by Plaintiffs' expert, distributors allegedly suffered an average loss of $2,466 between January 2014 and February 2020. ECF No. 171-1 at 7. Aggregating these claims through the class action mechanism could help those who "would be without effective strength to bring their opponents into court" to attempt to vindicate their rights. *See Amchem*, 521 U.S. at 617 (citation omitted).

[263] *Amchem*, 521 U.S. at 617 (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (1997))).

[264] *See* Fed. R. Civ. P. 23(b)(3)(D).

the difficulties these individual determinations would pose could be managed, class certification must also be denied on grounds of superiority.[265]

Plaintiffs contend that "[n]o pyramid scheme class like this has ever *not* been certified."[266] Statements like this are emblematic of the approach Plaintiffs have taken to some of the thorny issues presented by their attempt to certify a nationwide, seven-year, 157,000 plaintiff class. That there have been other MLM class action cases is the beginning of the analysis, not the end. In addition to noting that Plaintiffs have not convincingly discussed *any* pyramid scheme case truly like this one, it should go without saying that every case is different. To persuade the court that the unusual mechanism of class certification is warranted here, plaintiffs must show that all of the class action requirements are "clearly met." They have done so on many of the requirements, but fallen far short on others. The court will not accept conceptual punts or rainchecks for another day. Because it is possible that additional class discovery or further concerted and detailed efforts by Plaintiffs eventually might change the result, the motion is denied without prejudice.

## ORDER

For the foregoing reasons, Plaintiffs' Motion [ECF No. 169] for Class Certification is DENIED WITHOUT PREJUDICE.

Signed April 18, 2022.                    BY THE COURT

                                          _____
                                          David Barlow
                                          United States District Judge

---

[265] *See Quinn*, 281 F. App'x at 777–78 (agreeing that denying class certification was appropriate when "the class action proposed by plaintiffs would be difficult to manage and would not be more efficient than having the claims of individual class members resolved independently" because the district court would have "ha[d] to engage in a significant amount of work simply to identify the purported class members").

[266] ECF No. 195 at 1.